# EXHIBIT 1

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

1818 H STREET, NW | WASHINGTON, DC 20433 | USA
TELEPHONE +1 (202) 458 1534 | FACSIMILE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# C E R T I F I C A T E

**EDMOND KHUDYAN**

v.

**REPUBLIC OF ARMENIA**

**(ICSID CASE NO. ARB/17/36)**

Annulment proceeding

    I hereby certify that the attached document is a true copy of the *ad hoc* Committee's Decision on Annulment dated 21 July 2023.

Meg Kinnear
Secretary-General

Washington, D.C., 21 July 2023

# INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

**EDMOND KHUDYAN**

Applicant

and

**REPUBLIC OF ARMENIA**

Respondent on Annulment

**ICSID Case No. ARB/17/36
Annulment Proceeding**

---

## DECISION ON ANNULMENT

---

**Members of the *ad hoc* Committee**
Sir Christopher Greenwood, GBE, CMG, KC, President
Ms Tina Cicchetti, Member
Dr Ucheora Onwuamaegbu, Member

**Secretary of the *ad hoc* Committee**
Dr Laura Bergamini

*Date of dispatch to the Parties:* 21 July 2023

## REPRESENTATION OF THE PARTIES

*Representing Mr Edmond Khudyan*:

Mr James H. Boykin
Mr Alexander S. Bedrosyan (until
1 May 2023)
Mr Alexander Afnan
Hughes Hubbard & Reed LLP
1775 I Street, N.W.
Washington DC 20006
United States of America

   and

Dr Gevorg Tumanov
Redbridge LLC
Abovyan str. 39
21 area
Yerevan 0009
Republic of Armenia

  and

(from 1 May 2023)
Mr Alexander S. Bedrosyan
Lewis Baach Kaufmann Middlemiss PLLC
1101 New York Ave, NW
Suite 1000
Washington DC 20005
United States of America

*Representing Republic of Armenia*:

Mr Yeghishe Kirakosyan
Representative of the Republic of Armenia on
International Legal Matters
Office of the Representative of the
Republic of Armenia on International
Legal Matters
Republic Square, Government House 1
0010 Yerevan
Republic of Armenia

   and

Ms Kristine Khanazadyan
Mr Liparit Drmeyan
Ms Mariam Tarverdyan
Ms Parandzem Mikayelyan
Office of the Representative of the
Republic of Armenia on International
Legal Matters
Republic Square, Government House 1
0010 Yerevan
Republic of Armenia

   and

(until 3 April 2023)
Mr Edward Baldwin
Mr Thomas Innes
Ms Chloe Baldwin
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
United States of America

   and

(from 3 April 2023)
Mr Edward Teddy Baldwin
Alliance Law Partners LLP
1510 Wisconsin Ave NW
Suite #203
Washington, DC 20007

i

United States of America

 and

Prof. Frédéric Gilles Sourgens
Washburn University
United States of America

TABLE OF CONTENTS

I.      INTRODUCTION AND PARTIES ................................................................. 1

II.     PROCEDURAL HISTORY ......................................................................... 2

III.    BACKROUND ON THE ARBITRATION AND THE AWARD ......................... 9

        A.   Factual Background ..................................................................... 9

        B.   The Award .................................................................................. 11

             (1)   Jurisdiction with respect to Mr Khudyan ............................... 11

                   a.   Whether Mr Khudyan lost his USSR/ASSR citizenship after the proclamation
                        of independence by the Supreme Council of the ASSR in 1990 ......................... 12

                   b.   Whether Mr Khudyan lost his Armenian citizenship after the 1995 Citizenship
                        Law entered into force ................................................................ 14

                   c.   Whether Mr Khudyan lost his Armenian citizenship when he acquired US
                        nationality in 1998 ..................................................................... 17

                   d.   Whether the issuance of a passport with special residency status in 2004 affects
                        Mr Khudyan's nationality status in any manner .............................. 17

             (2)   Jurisdiction with respect to Arin US ..................................... 19

             (3)   Costs ....................................................................................... 19

             (4)   Dispositif ................................................................................ 20

IV.     THE GROUND FOR ANNULMENT AND PRAYERS FOR RELIEF ........................ 21

        A.   The Ground for Annulment ........................................................ 21

        B.   Parties' Requests for Relief ....................................................... 22

             (1)   The Applicant's requests ....................................................... 22

             (2)   The Respondent's requests ..................................................... 23

V.      THE POSITIONS OF THE PARTIES ........................................................ 24

        A.   The Standard to be Applied ....................................................... 24

             (1)   The Applicant ......................................................................... 24

             (2)   The Respondent ..................................................................... 28

        B.   Whether the Tribunal Manifestly Exceeded its Powers ................. 32

             (1)   The Applicant ......................................................................... 32

                   a.   The Tribunal's conclusion that Mr Khudyan became a citizen of the Republic
                        of Armenia in 1991 under USSR law lacks any legal basis .............................. 34

                   b.   The Tribunal asked the wrong question: No Armenian law conferred
                        citizenship upon the Applicant ..................................................... 37

       c.   The Respondent has explicitly acknowledged that Mr Khudyan has never been a citizen of the Republic .................................................... 40

    (2)  The Respondent .......................................................................... 46

       a.   The Claimant's conduct in the arbitration compelled the Tribunal's decision on Mr Khudyan's citizenship and precludes him from arguing for annulment .. 47

       b.   Challenges to the Tribunal's conclusion that Mr Khudyan became a citizen of the Republic of Armenia in 1991 under USSR laws are impermissible allegations of errors in judicando ........................................................ 50

       c.   Challenges to the Tribunal's conclusion that Armenian law and administrative practice confirm that Mr Khudyan holds Armenian nationality are impermissible allegations of errors in judicando ........................................... 54

       d.   The Respondent did not, before the beginning of the arbitration or after the issuance of the Award, acknowledge that Mr Khudyan has never been its citizen ....................................................................................... 57

  C.   Whether the Tribunal's decision on Mr Khudyan's citizenship is material to the outcome of the dispute ......................................................................... 60

    (1)  The Respondent .......................................................................... 60

    (2)  The Applicant ............................................................................. 61

VI.   THE COMMITTEE'S ANALYSIS .......................................................... 62

  A.   The Scope of the Proceedings on Annulment ........................................ 62

  B.   The Standard to be Applied ............................................................... 63

  C.   Did the Tribunal Manifestly Exceed its Powers? ................................... 68

    (1)  Did the Tribunal exceed its powers when it held that it lacked jurisdiction *ratione personae* over Mr Khudyan? ...................................................... 68

    (2)  Was the excess of power manifest? ............................................... 79

  D.   Is the Applicant Raising a New Issue Not Raised Before the Tribunal? ..... 80

  E.   The Committee's Discretion .............................................................. 81

    (1)  The Gravity of the Excess of Power ............................................. 81

    (2)  Would Annulment Serve No Purpose ............................................ 84

  F.   Conclusion ................................................................................... 85

VII.  COSTS ........................................................................................... 86

  A.   The Parties' Positions ...................................................................... 86

    (1)  The Applicant's submission ........................................................ 86

    (2)  The Respondent's submission ...................................................... 87

  B.   The Committee's Analysis ................................................................ 88

VIII. DECISION ...................................................................................... 90

**TABLE OF SELECTED ABBREVIATIONS**

| | |
|---|---|
| 1978 USSR Citizenship Law | Union of Soviet Socialist Republics, Citizenship Law of 1978 |
| 1995 Citizenship Law | Law of the Republic of Armenia on citizenship dated 16 November 1995 |
| ALA-[#] | Applicant's Legal Authority |
| Applicant or Claimant | Mr Edmond Khudyan |
| Application | Application for Annulment dated 7 April 2022 |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| Arbitration Hearing Day [#], Transcript, p. [#], line [#] | Transcript of the hearing on jurisdiction and merits held in the arbitration proceeding from 20 to 24 January 2020 |
| Arin Armenia | Arin Capital Investments LLC |
| Arin US | Arin Capital & Investment Corp. |
| Armenia or Republic or Respondent | Republic of Armenia |
| ASSR or Soviet Armenia | Armenian Soviet Socialist Republic |
| Award | Award rendered on 15 December 2021 in the proceeding captioned *Edmond Khudyan and Arin Capital & Investment Corp. v. Republic of Armenia*, ICSID Case No. ARB/17/36 |
| A-[#] | Applicant's Exhibit |
| BIT or Treaty | Treaty between the United States of America and the Republic of Armenia concerning the reciprocal encouragement and protection of investments, signed on 23 September 1992 and entered into force on 29 March 1996 |
| Committee | *Ad hoc* committee constituted on 1 June 2022 |
| Committee Hearing, Transcript, p. [#], line [#] | Transcript of the Hearing on Annulment |

| Counter-Memorial | Respondent's Counter-Memorial dated 19  September 2022 |
|---|---|
| Declaration of Independence or Declaration | Armenia's Declaration of Independence dated 23 August 1990 |
| Hearing on Annulment | Hearing on annulment held on 4 April 2023 |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| Memorial | Applicant's Memorial dated 7 April 2022 |
| RA-[#] | Respondent's Exhibit |
| Rejoinder | Respondent's Rejoinder dated 19 December 2022 |
| Reply | Applicant's Reply dated 3 November 2022 |
| RL-[#] | Respondent's Legal Authority |
| Statelessness Convention | 1961 UN Convention on the Reduction of Statelessness |
| Tribunal | Arbitral tribunal in the original proceeding composed of Ms Melanie Van Leeuwen (President), Ms Ank Santens, and Prof Zachary Douglas KC |
| USSR | Union of Soviet Socialist Republics |
| USSR Secession Law | Law of the USSR on the procedure for resolving the issues connected with a Union Republic's secession from the USSR, 1990 |

## I.     INTRODUCTION AND PARTIES

1.     This annulment proceeding concerns an application submitted by Mr Edmond Khudyan (the "**Applicant**")[1] for annulment of the award rendered on 15 December 2021 in the arbitral proceeding captioned *Edmond Khudyan and Arin Capital & Investment Corp. v. Republic of Armenia* (ICSID Case No. ARB/17/36) (the "**Award**") rendered by an arbitral tribunal composed of Ms Melanie Van Leeuwen (President), Ms Ank Santens, and Prof Zachary Douglas KC (the "**Tribunal**").

2.     The Applicant and the Republic of Armenia ("**Armenia**", or the "**Republic**" or the "**Respondent**") are collectively referred to as the "**Parties**." The Parties' representatives and their addresses are listed above on pages (i) and (ii).

3.     The Award decided a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of the Treaty between the United States of America and the Republic of Armenia Concerning the Reciprocal Encouragement and Protection of Investments, which entered into force on 29 March 1996 (the "**BIT**" or the "**Treaty**") and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 (the "**ICSID Convention**"). The ICSID Convention entered into force for the United States of America on 14 October 1966 and for the Republic of Armenia on 16 October 1992.

4.     As described in the Award, the dispute in the original proceeding related to alleged interests of Mr Khudyan and Arin Capital & Investment Corp. ("**Arin US**") in a luxury apartment real estate development located at 33 Mashtots Avenue in Yerevan, the capital city of Armenia, held via a locally incorporated company Arin Capital Investments LLC ("**Arin**

---

[1] Arin Capital & Investment Corp. is not a party to the annulment proceeding.

**Armenia**"). Mr Khudyan and Arin US claimed before the Tribunal that the Respondent had failed to protect them from "*an elaborate criminal scheme*" resulting in the siphoning off of Arin Armenia's assets.[2]

5.      In the Award, the Tribunal found that it (1) lacked jurisdiction *ratione personae* over Mr Khudyan; (2) possessed jurisdiction *ratione personae* over Arin US; but (3) lacked jurisdiction *ratione materiae* in respect of the claim by Arin US. The Tribunal accordingly dismissed for lack of jurisdiction all the claims by both claimants. The Tribunal also ordered that Mr Khudyan and Arin US pay the Respondent the sum of USD 337,466.34 for the expended portion of the Respondent's advances to ICSID and USD 400,000 towards the Respondent's legal fees and expenses.[3]

6.      Mr Khudyan applied for annulment, on the basis of Article 52(1)(b) of the ICSID Convention (manifest excess of powers),[4] of those parts of the Award which dismissed his claim and the section which awarded costs to Armenia. No application for annulment was made in respect of the parts of the Award relating to the lack of jurisdiction with regard to the claims made by Arin US.

## II.      PROCEDURAL HISTORY

7.      On 8 April 2022, Mr Edmond Khudyan filed with ICSID an application for annulment of the Award, together with an appendix and supporting documentation (the "**Application**") pursuant to Article 52 of the ICSID Convention and Rule 50 of the ICSID Rules of Procedure for Arbitration Proceedings (the "**Arbitration Rules**"). The Application also

---

[2] Award, para. 5.

[3] Award, para. 452. The Award did not distinguish between Mr Khudyan and Arin US, the two Claimants, in making this award of costs.

[4] See Section IV below.

contained a request under Article 52(5) of the ICSID Convention and Arbitration Rule 54(1) for a stay of enforcement of the Award until the Application was decided.

8.    On 13 April 2022, pursuant to Arbitration Rule 50(2), the Secretary-General of ICSID registered the Application. On the same date, the Secretary-General informed the Applicant and the Republic of Armenia that the enforcement of the Award had been provisionally stayed, in accordance with Arbitration Rule 54(2).

9.    On 1 June 2022, the *ad hoc* Committee (the "**Committee**") was constituted in accordance with Article 52(3) of the ICSID Convention. Its members are: Sir Christopher Greenwood GBE, CMG, KC (British), as President, Ms Tina Cicchetti (Canadian and Italian) and Dr Ucheora Onwuamaegbu (British and Nigerian) as Members. Dr Laura Bergamini, ICSID Senior Legal Counsel, was appointed to serve as Secretary of the Committee.

10.   On 28 June 2022, the Committee wrote to the Parties regarding arrangements for the first session. The Applicant was also invited to confirm if he maintained his request for the stay of enforcement of the Award, which he did on 29 June 2022.

11.   On 29 June 2022, the Committee invited the Parties to confer and agree upon a briefing schedule to address the Applicant's request for stay of enforcement of the Award. The Committee also decided to extend the stay of enforcement of the Award until it could hear the Parties and reach a final decision on the continuation of the stay.

12.   On 6 July 2022, the Parties transmitted to the Committee an agreed briefing schedule, which included two rounds of written submissions to address the Applicant's request for stay of enforcement of the Award. On the following day, the Committee confirmed its agreement with the Parties' agreed briefing schedule.

13.     By communications of 18 and 19 July 2022, the Parties filed their comments on draft Procedural Order No. 1, including a proposed procedural timetable for the proceeding jointly agreed by the Parties.

14.     On 20 July 2022, in accordance with Arbitration Rules 53 and 13(1), the Committee held a first session with the Parties by videoconference.

15.     Following the first session, on 27 July 2022, the Committee issued Procedural Order No. 1 recording the Parties' agreements on procedural matters and the Committee's decisions on those where no agreement had been reached. Procedural Order No. 1 provided, *inter alia*, that the applicable Arbitration Rules for this proceeding were those in effect from 10 April 2006, that the procedural language was English, and that the place of proceeding was Washington D.C. In Procedural Order No. 1, the Committee set out a calendar for the proceeding and confirmed that the stay of enforcement would remain in force unless and until the Committee decided otherwise.

16.     On the same date, the Applicant filed his Memorial on Annulment (the "**Memorial**") along with exhibits A-0001 through A-0036 and legal authorities ALA-0001 through ALA-0024. The Applicant also filed his Request to Continue the Stay of Enforcement of the Award (the "**Stay Request**"), along with exhibits A-0037 through A-0052 and legal authorities ALA-0025 through ALA-0049.

17.     On 18 August 2022, the Respondent filed its Opposition to the Request to Continue the Stay of Enforcement of the Award, along with exhibits RA-0001 through RA-0009 and legal authorities RALA-0001 through RALA-0020.

18.     On 26 August 2022, the Applicant filed his Reply on the Continued Stay of Enforcement along with a declaration of Mr Edmond Khudyan, exhibits A-0053 through A-0065 and legal authority ALA-0050.

19.    On 6 September 2022, the Respondent filed its Rejoinder on the Continued Stay of Enforcement along with exhibits RA-0010 through RA-0018 and legal authorities RALA- 0021 through RALA-0027.

20.    On 13 September 2022, the Committee informed the Parties that it did not consider that it would be assisted by a hearing on the issue of the continuation of the stay. The Committee also informed the Parties that it was minded to follow the Respondent's offer to accept a continuation of the stay of enforcement on condition that it received a suitable guarantee of payment in the event that the Award is upheld. The Committee invited the Respondent to clarify by 19 September 2022 whether "*its offer extends to not seeking enforcement against Arin Capital, as well as against Mr Khudyan if it receives from Mr Khudyan a sufficient guarantee.*" The Committee required "*the Parties to enter into discussion as to the form which a suitable guarantee might take, to endeavour in good faith to reach agreement on that question, and to report back to the Committee*" by 26 September 2022.

21.    On 17 September 2022, the Respondent confirmed that "*its offer extends to not seeking enforcement against Arin Capital, as well as against Mr Khudyan if it receives from Mr Khudyan a sufficient guarantee.*"

22.    On 19 September 2022, the Respondent submitted its Counter-Memorial on Annulment (the "**Counter-Memorial**") along with exhibits RA-0019 through RA-0021 and legal authorities RALA-0028 through RALA-0084.

23.    On 26 September 2022, the Parties requested an extension of time to revert on the question of the form of a suitable guarantee, which was granted by the Committee.

24.    On 28 September 2022, each Party submitted its comments on the Committee's request of 13 September 2022.

25.     On 24 October 2022, the Committee decided on the Request for a Continuation of the Stay and wrote to the Parties:

> *The Committee thanks the Parties for their submissions and takes note of (a) the undertaking by the Respondent that, in the event of a stay of enforcement against the Applicant being made subject to a payment into escrow, the Respondent would not seek to enforce the award or any part thereof against either Mr Khudyan or Arin Capital; (b) the agreement of the Applicant to pay the full amount of the award into escrow; (c) the condition on the part of the Applicant that, if the application for annulment is unsuccessful, the amount paid should remain in escrow pending the outcome of any proceedings in national courts; and (d) the refusal of the Respondent to accept that condition.*

> *The Committee has decided that it cannot accept the condition proposed by the Applicant. The Committee's jurisdiction is limited to the present proceedings. It cannot, therefore, make a continuation of the stay of enforcement subject to conditions which concern proceedings elsewhere which would take place, if at all, after the Committee has issued its decision on the application for annulment. Accordingly, the Committee has decided that the stay of enforcement will be continued if, but only if, the Applicant pays the sum awarded by the Tribunal into escrow with a reputable international bank on terms whereby, if the application for annulment is unsuccessful or the proceedings are discontinued, subject to any agreement between the Parties regarding the conditions on which discontinuance takes place, the sum thus paid into escrow, together with any interest thereon, is paid to the Respondent. If the application for annulment is successful, the amount paid into escrow, together with any interest thereon, shall be repaid to the Applicant. The Applicant is to bear the cost of any fees levied by the escrow agent.*

> *The Applicant shall notify the Committee by close of business on 31 October 2022 whether he is prepared to make the payment into escrow on the terms set out in the preceding paragraph. Until then, the interim stay of enforcement which is already in place will remain in force. If the Applicant does not accept the condition by that date, then the interim stay will lapse automatically. If the Applicant*

> *agrees to payment into escrow on the terms set out above, then the*
> *interim stay of enforcement will remain in place until the Parties*
> *notify the Committee that the payment into escrow has been made,*
> *at which point the Committee will issue a Procedural Order staying*
> *enforcement until the conclusion of the annulment proceedings. The*
> *Respondent shall have liberty to apply to the Committee to end the*
> *temporary stay of enforcement in the event of unreasonable delay in*
> *making the payment into escrow.*

26.    On 28 October 2022, the Applicant agreed to make the payment in the terms set out by the Committee.

27.    On 4 November 2022, the Applicant submitted his Reply on annulment (the "**Reply**") along with exhibits A-0066 through A-0072 and legal authorities ALA-0051 through ALA-0061.

28.    On 19 December 2022, the Respondent submitted its Rejoinder on annulment (the "**Rejoinder**") along with legal authorities RALA-0085 through RALA-0093.

29.    On 15 February 2023, the Committee held with the Parties a pre-hearing organizational meeting by videoconference. At the meeting the Parties updated the Committee on the progress made in the execution of the escrow agreement. On the same date, the Committee issued Procedural Order No. 2 concerning the organization of the hearing.

30.    On 20 March 2023, the Applicant notified the Committee that it had executed the escrow agreement.

31.    On 23 March 2023, the Applicant informed the Committee that the Respondent's representatives signed the escrow agreement on 21 March 2023 and that the Applicant deposited the USD 737,466.34 into escrow that same day. The Applicant also requested that the Committee issue a Procedural Order staying enforcement until the conclusion of

the annulment proceeding pursuant to the Committee's directions of 24 October 2022. On 24 March 2023, the Respondent confirmed the Applicant's communication.

32.     A hearing on annulment was held in-person in Washington, D.C., on 4 April 2023 (the "**Hearing on Annulment**"). The following persons were present at the Hearing on Annulment:

*Committee*:
Sir Christopher Greenwood GBE CMG KC         President
Ms Tina Cicchetti                            Member of the Committee
Dr Ucheora Onwuamaegbu                       Member of the Committee

*ICSID Secretariat*:
Dr Laura Bergamini                           Secretary of the Committee

*For the Claimant*:
Mr Jim Boykin                                Hughes Hubbard & Reed LLP
Mr Alexander Bedrosyan                       Hughes Hubbard & Reed LLP
Mr Alexander Afnan                           Hughes Hubbard & Reed LLP
Mr Edmond Khudyan                            Applicant

*For the Respondent*:
Mr Edward Baldwin                            Alliance Partners Law
Prof Frédéric Gilles Sourgens                Washburn University

*Court Reporter*:
Ms Dawn K. Larson                            B&B Reporters

33.     At the Hearing on Annulment, the Parties presented oral pleadings on the Application and responded to the Committee's questions. The Hearing was recorded. A verbatim transcript was made and circulated to the Parties. It was agreed that no post-hearing briefs would be needed.

34.     The Committee met to deliberate in Washington, D.C. on 5 April 2023 and continued its deliberations thereafter by various means of communication.

35.     On 8 April 2023, the Committee issued its Decision on the Applicant's Request for a Continuation of the Stay in accordance with the conditions set in its correspondence of 24 October 2022.

36.     The Parties submitted agreed revisions to the transcript on 1 May 2023.

37.     On 3 May 2023 the Applicant requested an extension of time to 8 May 2023 for the filing of submissions on costs. The extension was approved by the President of the Committee on 3 May 2023. The Parties filed their submissions on costs on 8 May 2023.

38.     The proceeding was closed on 14 July 2023.

## III.     BACKROUND ON THE ARBITRATION AND THE AWARD

### A.     FACTUAL BACKGROUND

39.     The following section provides a brief overview of the factual matrix of the dispute as presented to the Tribunal and summarised in the Award.

40.     Mr Edmond Khudyan was born in Tehran in 1965. At the age of six, he emigrated with his family to the Armenian Soviet Socialist Republic (the "**ASSR**") which, at the time, formed part of the Union of Soviet Socialist Republics (the "**USSR**").[5]

41.     On 13 August 1989, Mr Khudyan and his family established their permanent residence in Los Angeles, United States of America (the "**USA**"). The Applicant alleges that he and his family deregistered from their address in Yerevan and left the USSR using a USSR exit passport issued in January 1989.[6] That was confirmed by the Passport and Visa Department

---

[5] Award, para. 76.
[6] The passport, sometimes referred to in the Award as an "*exit visa*", is at exhibit **A-0005** (**C-0165 Arbitration**).

of Armenia in a letter to Concern Dialog Law Firm of 22 November 2018 (the "**November Letter**").[7]

42.    On 21 August 1998, Mr Khudyan was naturalized and became a citizen of the USA.[8]

43.    In March 2002, Mr Khudyan created Arin Capital & Investment Corp. (defined above as Arin US), a company incorporated under the laws of the State of California, which was the second claimant in the arbitration. Mr Khudyan is the sole owner and President of Arin US.[9]

44.    On 18 December 2003, Mr Khudyan applied for special residency status in Armenia, which was granted by Presidential Decree of 22 January 2004. On 30 March 2004, Mr Khudyan obtained an Armenian passport with special residency status.[10]

45.    On 10 November 2005, Mr Khudyan registered Arin Capital Investments LLC (defined above as Arin Armenia), a limited liability company organized under the laws of Armenia.[11] Mr Khudyan, was the sole partner and manager of Arin Armenia.

46.    According to Mr Khudyan, he and Arin US, acting in part through Arin Armenia, invested in a luxury apartment development in Armenia but were the victims of a criminal scheme which forced Arin Armenia into insolvency and resulted in losses in excess of USD 10 million to Mr Khudyan and Arin US. They claimed that Armenia had failed to protect them as required by the BIT.[12]

---

[7] Memorial, para. 2 referring to **A-0004** (**R-0008 Arbitration)**; Award, para. 77 (the Award only mentions that Mr Khudyan moved to the United States of America on 13 August 1989).

[8] Award, para. 78; Certificate of Naturalization **A-0011** (**C-0171 Arbitration**).

[9] Award, para. 79.

[10] Award, para. 81.

[11] Award, para. 99.

[12] Award, paras. 82-150, where the allegations are set out in detail.

**B.    THE AWARD**

47.    The Respondent raised objections to the Tribunal's jurisdiction *ratione personae* and *ratione materiae*.[13] The Tribunal heard the jurisdictional objections together with the merits and delivered its Award on 15 December 2021.

**(1)    Jurisdiction with respect to Mr Khudyan**

48.    The Respondent maintained that the Tribunal lacked jurisdiction *ratione personae* with regard to Mr Khudyan's claims. The objection was based on Article 25(2)(a) of the ICSID Convention, which provides:

> *"National of another Contracting State" means:*
>
> *any natural person who had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration as well as on the date on which the request was registered pursuant to paragraph (3) of Article 28 or paragraph (3) of Article 36, but does not include any person who on either date also had the nationality of the Contracting State party to the dispute* […].

49.    The Tribunal held that Mr Khudyan was a national of the United States of America at the relevant times but decided that the final clause of Article 25(2)(a) meant that the Tribunal lacked jurisdiction if, in addition to his US nationality, Mr Khudyan had held Armenian nationality on the date of the submission of the Request for Arbitration or on the date of its registration.[14]

50.    On that issue, at paragraphs 205 and 206, the Award stated:

---

[13] Award, para. 153.

[14] Award, para. 204.

> *As the starting point for its analysis, the Tribunal takes the common ground between the Parties that prior to Mr. Khudyan's departure from Armenia to the USA in 1989 and at least until the Declaration of Independence by the Supreme Council of the ASSR on August 23, 1990, Mr. Khudyan was a citizen of the USSR as well as of the ASSR. He held a passport of the USSR, which he used when emigrating to the USA.*
>
> *It is also common ground that the question whether Mr. Khudyan is an Armenian citizen must be assessed on the basis of Armenian law.*

51.   The Tribunal then identified four issues that it considered necessary to assess in order to determine Mr Khudyan's nationality:

> *(1) whether Mr. Khudyan lost his USSR/ASSR citizenship after the proclamation of independence by the Supreme Council of the ASSR in 1990; (2) whether Mr. Khudyan lost his Armenian citizenship after the 1995 Citizenship Law entered into force; (3) whether Mr. Khudyan lost his Armenian citizenship when he acquired US nationality in 1998; and (4) whether the issuance of a passport with special residency status in 2004 affects Mr. Khudyan's nationality status in any manner [...].*[15]
>
> ### a.   Whether Mr Khudyan lost his USSR/ASSR citizenship after the proclamation of independence by the Supreme Council of the ASSR in 1990

52.   In paragraphs 208-224 of the Award, the Tribunal concluded that it was not "*convinced*" that Armenia's Declaration of Independence of 23 August 1990 (the "**Declaration of Independence**" or "**Declaration**") had the effect of depriving USSR/ASSR citizens living abroad of their nationality for three reasons.[16]

---

[15] Award, para. 207.
[16] Award, paras. 209-210, 224.

53.   <u>First</u>, the Declaration "*was not a constitutive act, establishing a detailed legal regime, but a declaration of principles*" and "*neither conferred citizenship upon individuals, nor deprived individuals of their citizenship.*"[17]

54.   <u>Secondly</u>, the Tribunal found that Article 4 of the Declaration, although distinguishing between ASSR citizens residing in Armenia and "*Armenians of abroad*" (a category not clearly identified in the Declaration), confirmed that the Republic of Armenia intended to extend citizenship to citizens of the former ASSR living in its territory, as well as to those living abroad.[18]

55.   <u>Thirdly</u>, the Tribunal found that until the adoption of the Armenian Law on Citizenship of 16 November 1995 (the "**1995 Citizenship Law**") Soviet legislative acts, including the USSR citizenship law of 1978 (the "**1978 USSR Citizenship Law**") and the Soviet Law on the procedure of exiting the USSR (the "**USSR Secession Law**") remained in force in Armenia. In particular, the Tribunal found that:

> *Upon the dissolution of the USSR in December 1991, every citizen of the former USSR had the right to choose his or her citizenship pursuant to Article 15 of the Soviet Law on the Procedure of Exiting the USSR. Failing the exercise of that right, it was State practice that a citizen of a seceding republic was automatically considered a citizen of the seceding republic. Therefore, absent any affirmative action taken by a person to become a citizen of another seceding republic, the former citizens of the ASSR were deemed citizens of the Republic of Armenia without any special procedure or decision.*
>
> *In addition, Mr. Arabyan* [the Respondent's expert witness] *credibly attested that in the 1990s, ASSR citizens with a passport of the USSR – even if it had expired (as would have been the case for Mr. Khudyan) – were admitted to the Republic of Armenia on a* laissez

---

[17] Award, paras. 211-213.
[18] Award, paras. 214-216.

*passer basis and were issued a passport of the Republic of Armenia without the need to go through any recognition procedure.*[19]

56.     The Tribunal noted that it had neither been argued, nor proven, that Mr Khudyan had lost his USSR/ASSR citizenship due to one of the reasons set out in the USSR Citizenship Law and concluded that "*the mere fact that Mr. Khudyan resided abroad could not have caused the loss of his USSR/ASSR citizenship while the 1978 USSR Citizenship Law applied in Armenia.*"[20]

> **b.     Whether Mr Khudyan lost his Armenian citizenship after the 1995 Citizenship Law entered into force**

57.     In paragraphs 225-244, the Tribunal examined whether Mr Khudyan lost his nationality upon the entry into force of the 1995 Citizenship Law for failure to register under Article 10(3):

> *The following persons shall be recognized as citizens of the Republic of Armenia:*
>
> *(3) the citizens of the former Armenian SSR, who are Armenians by national origin and reside outside the Republic of Armenia after 21 September 1991 and who have not acquired the citizenship of another State, as well as the citizens of the former Armenian SSR, who are Armenians by national origin and have resided outside Armenia before and have not acquired the citizenship of another State and have placed on consular record-registration before the entry into force of this Law.*[21]

58.     The Tribunal recognized that the wording of Article 10(3) "*lacks clarity*" in that it was unclear whether:

---

[19] Award, paras. 219-220.
[20] Award, paras. 221-223.
[21] Award, para. 226.

> - *in the first category, the use of the wording "*reside outside Armenia after 21 September 1991*" does not exclude persons who started residing outside Armenia prior to that date; and*
>
> - *in the second category, the use of the wording "*have resided outside Armenia before *[September 21, 1991]*" can be read as requiring that a person's residence abroad had ended prior to September 21, 1991.*[22]

59.    The Tribunal however explained that "[i]*rrespective of whether Mr. Khudyan falls in one or both of the categories as defined by Article 10(3)*" Mr Khudyan would have been recognized as an Armenian citizen upon the entry into force of the 1995 Citizenship Law.[23]

   (i)    If he fell into the first category, he would have been recognized as an Armenian citizen because he was a citizen of the former ASSR, an Armenian by national origin, and had not acquired the citizenship of another State;[24]

   (ii)    If he fell into the second category, he would have been recognized as an Armenian citizen despite not having registered with the Armenian consulate.[25] If the registration requirement had operated to deprive Mr Khudyan of his Armenian nationality at the time of the entry into force of the law, the provision would have rendered Mr Khudyan stateless and would have created a situation that "*directly conflict*[ed] *with Armenia's international law obligation arising under the 1961 UN Convention on the Reduction of Statelessness.*"[26]

---

[22] Award, para. 229.
[23] Award, para. 230.
[24] Award, para. 231.
[25] Award, para. 232.
[26] Award, paras. 232-236.

60.   Moreover, the Tribunal held that Mr Khudyan would not have been deprived automatically of his Armenian nationality upon the entry into force of the 1995 Citizenship Law even if the registration requirement in Article 10(3) were to be given effect. The Tribunal noted that:

> […] *Mr. Arabyan's expert evidence on the 1995 Citizenship Law was very clear in this respect: Armenian nationality can only be terminated in accordance with the special procedure set out in Articles 24 to 26 of the Law. Termination must ultimately be memorialized in a Presidential Decree. If the Claimants' interpretation of Article 10(3) were correct, a large number of Armenian nationals would have been rendered stateless when the 1995 Citizenship Law came into effect without any special procedure having been followed or official act of the State of Armenia being issued. It is much more plausible to interpret Article 10 as applying* ex nunc; *in other words, that the persons falling into the enumerated categories would henceforth be considered to be Armenian nationals automatically but without prejudice to the status of Armenian citizenship that had been acquired prior to the 1995 Citizenship Law coming into force. Indeed, the 1995 Citizenship Law does not appear to alter the status of Armenian citizenship acquired prior to that law.*[27]

61.   The Tribunal then examined the amendment of Article 10(3) of the 1995 Citizenship Law approved in 2001 and found that the conclusions it reached on the operation of this provision were confirmed by the 2001 amendment.[28]

62.   The Tribunal also found that Mr Khudyan's conduct in the period between 1991 and the date of his naturalization in the USA confirmed this view.

---

[27] Award, para. 241.
[28] Award, para. 242.

### c.     Whether Mr Khudyan lost his Armenian citizenship when he acquired US nationality in 1998

63.  In paragraphs 245-253, the Tribunal held that Mr Khudyan did not lose his Armenian citizenship when he acquired US nationality in 1998. The Tribunal held that this question was governed by Armenian law. While Article 1(3) of the 1995 Citizenship Law did not permit Armenian citizens to hold dual nationality, the Tribunal held that Mr Khudyan's acquisition of US nationality did not cause him to lose his Armenian citizenship. The Tribunal considered that, under Arts. 23 to 28 of the 1995 Citizenship Law, an Armenian citizen could lose citizenship only by way of renunciation or deprivation, both of which required a specific application procedure and a decree of the President of the Republic of Armenia. There was a record neither of an application procedure, nor a Presidential Decree. The Tribunal further noted that, with the amendment of the 1995 Citizenship Law in 2007, any potential issue arising from Mr Khudyan's dual citizenship was removed through the introduction of Article 1(6), which provides that "[r]*enunciation of the citizenship of the Republic of Armenia or accepting the citizenship of another State shall not per se entail to the loss of citizenship of the Republic of Armenia*."[29]

### d.     Whether the issuance of a passport with special residency status in 2004 affects Mr Khudyan's nationality status in any manner

64.  In paragraphs 254-267, the Tribunal examined whether, under Armenian law, Mr Khudyan's nationality status was affected by the issuance to him in 2004 of an Armenian passport with special residency status and concluded that it did not prove that he was a "*foreigner.*"[30] When Mr Khudyan had sought special residency status in Armenia his USSR passport had expired and he "*may have been unaware that pursuant to Article 10(3) of the 1995 Citizenship Law he was actually recognized as a citizen of the Republic*

---

[29] Award, paras. 245-253.
[30] Award, paras. 254-258.

*of Armenia*."[31] In addition, the name given in his USSR passport had been rendered differently from the name in his application for special residency and there was at the time no functioning population register against which his application could have been checked.[32]

65.   The Tribunal therefore concluded that Mr Khudyan had not lost the citizenship of Armenia which it had decided his nationality of the ASSR had become on the independence of Armenia and upheld the objection to jurisdiction *ratione personae*.

66.   With regard to the Respondent's objection *ratione materiae*, the Tribunal concluded:

> *In the absence of comprehensive and verifiable evidence, the Tribunal is unable to make any conclusive findings in respect of the amounts purportedly reinvested by Mr. Khudyan in Arin Armenia for the construction and development of the Mashtots Properties.*
>
> *With respect to Mr. Khudyan, the Tribunal has assessed the evidence pertaining to Mr. Khudyan's alleged investments in Armenia in considerable detail and has concluded that, on the basis of the series of transactions described above, Mr. Khudyan acquired a 61.1% shareholding in Arin Armenia, which in turn, held the legal title to the Mashtots Properties. The Tribunal has reached different conclusions with respect to other alleged investments. As per the Tribunal's findings at paragraphs 203 to 266 above, however, it does not have jurisdiction ratione personae over Mr. Khudyan. Thus, even if the Claimants had been able to convince the Tribunal that Mr. Khudyan made other investments in **Armenia**, this ultimately would not have assisted the Claimants in view of the Tribunal's conclusion that it has no jurisdiction over Mr. Khudyan.*[33]

---

[31] Award, para. 259.

[32] Award, paras. 261-263.

[33] Award, paras. 415-416 (emphasis in the original).

**(2)     Jurisdiction with respect to Arin US**

67.    The Tribunal rejected the objection *ratione personae* in relation to Arin US holding that:

    (i)    Arin US was a "*a national of another Contracting State*" in the sense of Article 25(1)(b) of the ICSID Convention because it was a company legally constituted in accordance with the laws of California (USA);[34] and

    (ii)    Arin US had not abused its rights by failing to claim for a distinct harm.[35]

68.    The Tribunal held, however, that the company's "*claims are dismissed for lack of jurisdiction* ratione materiae *because it has failed to establish that it had any direct or indirect ownership of, or control over, any of the assets that are alleged to comprise its investment.*"[36]

**(3)     Costs**

69.    In Section VI of the Award, the Tribunal decided on the allocation of costs for the proceeding. The Tribunal held that:

> *Having failed to establish jurisdiction, the Claimants have lost this arbitration. Accordingly, the Tribunal finds that the Claimants must bear the arbitration costs in full, and make a contribution towards the legal fees and other expenses that the Respondent has incurred to defend itself against their claims in this arbitration. Considering the amount of legal fees and other expenses incurred by the Respondent and the fact that the Claimants, who lost the arbitration, spent almost double on legal fees and other expenses compared to the Respondent, the Tribunal accepts that the Respondent's legal fees and other expenses have been reasonably incurred. The Tribunal considers it appropriate to award only a portion of the Respondent's legal fees and other expenses because its decision to*

---

[34] Award, paras. 268-285.

[35] Award, paras. 286-294.

[36] Award, paras. 417-434.

> *change counsel just before the Rejoinder was due inevitably led to a degree of duplication of costs and resulted in a different emphasis in the Respondent's pleaded case. In the circumstances of this case, the Tribunal finds it reasonable that the Claimants contribute USD 400,000 towards the Respondent's legal fees and expenses. The Respondent's claim for interest on legal fees and expenses is unsubstantiated in that it failed to indicate the legal basis for its claim, the applicable interest rate and the period over which interest is claimed. Therefore, the Tribunal does not award the Respondent's claim for interest.*[37]

70.     Accordingly, the Tribunal ordered the Claimants to pay to the Respondent USD 337,466.34 for the expended portion of the Respondent's advances to ICSID and USD 400,000 to cover a reasonable proportion of the Respondent's legal fees and expenses.[38] In making this order for costs, the Tribunal did not distinguish between Mr Khudyan and Arin US.

**(4)     Dispositif**

71.     In the *dispositif* section of the Award, at paragraph 452, the Tribunal ordered as follows:

> *For the reasons set forth above, the Tribunal:*
>
> *(1) FINDS that it lacks jurisdiction ratione personae over the first Claimant, Mr. Edmond Khudyan;*
>
> *(2) FINDS that it has jurisdiction ratione personae over the second Claimant, Arin Capital & Investment Corp;*
>
> *(3) FINDS that it lacks jurisdiction ratione materiae over the alleged investments of the second Claimant, Arin Capital & Investment Corp;*

---

[37] Award, para. 448.

[38] Award, para. 451.

> *(4) D*ISMISSES *the Claimants' claims for lack of jurisdiction; and*
>
> *(5) O*RDERS *the Claimants to pay the Respondent the sum of USD 337,466.34 for the expended portion of the Respondent's advances to ICSID and USD 400,000 towards the Respondent's legal fees and expenses.*
>
> *(6) D*ENIES *all other requests for relief.*

## IV.    THE GROUND FOR ANNULMENT AND PRAYERS FOR RELIEF

### A.    THE GROUND FOR ANNULMENT

72.    The Applicant seeks the partial annulment of the Award under Article 52(1)(b) of the ICSID Convention. According to the Applicant, the Tribunal manifestly exceeded its powers by failing to exercise jurisdiction over Mr Khudyan after concluding, "*without any legal or factual basis and against evidence and legal authorities in the record*" that he was a citizen of the Republic of Armenia.[39]

73.    The Applicant refers to Articles 52(1)(d) and (e) of the ICSID Convention and argues that the Tribunal (i) failed to apply principles of international law that the Parties agreed to apply; (ii) disregarded the proper procedure by relying on a new legal authority without offering the Parties an opportunity to comment on it; and (iii) provided a reasoning on the 1995 Citizenship Law contradictory to the point of not being a reasoning at all. The Applicant has explained that he "*does not advance these errors as self-standing grounds for annulment*", but as elements that contributed to the manifest excess of power that the Tribunal made by mistakenly declining jurisdiction over Mr Khudyan.[40]

---

[39] Memorial, para. 1; see below Section V.B.1.
[40] Memorial, paras. 12, 22-26, fn. 53.

74.     In his Reply, the Applicant clarifies that he does not advance "*failure to apply the proper law*" as a separate ground for partial annulment of the Award.[41]

**B.      PARTIES' REQUESTS FOR RELIEF**

**(1)     The Applicant's requests**

75.     In the Memorial, the Applicant sets out his prayer for relief as follows:

>       *66.1. Pursuant to Article 52(5) of the ICSID Convention, enforcement of the Award rendered on 15 December 2021 in ICSID Case No. ARB/17/36 be stayed until a ruling on the present Application;*
>
>       *66.2. Pursuant to Article 52(1)(b) of the ICSID Convention, paragraphs 203-267, and 452(1), (4), (5) of the Award rendered on 15 December 2021 in ICSID Case No. ARB/17/36 be annulled;*
>
>       *66.3. The Republic of Armenia be ordered to pay all costs and expenses borne by Mr. Khudyan in connection with this Application.[42]*

76.     In the Reply, the Applicant modifies his prayer for relief to the following:

>       *210.1. Pursuant to Article 52(1)(b) of the ICSID Convention, paragraphs 154-175, 181-188, 193-195, 201-267, and 452(1), (4), (5) of the Award rendered on 15 December 2021 in ICSID Case No. ARB/17/36 be annulled;*
>
>       *210.2. The Republic of Armenia be ordered to pay all costs and expenses borne by Mr. Khudyan in these proceedings.[43]*

---

[41] Reply, para. 7.

[42] Memorial, para. 66.

[43] Reply, para. 210 (emphasis added).

**(2)**     **The Respondent's requests**

77.     In the Counter-Memorial, the Respondent requests that the Committee render a decision:

> *178. Rejecting in its entirety Mr. Khudyan's Application for Partial Annulment of the Award rendered on 15 December 2021.*
>
> *179. Ordering Mr. Khudyan to pay the Republic's costs in these annulment proceedings in an amount to be specified, including all attorneys' fees and expenses in connection with these proceedings, and all fees and expenses of the ad hoc Committee and the ICSID Secretariat, together with interest thereon;*
>
> *180. Ordering any other relief that the ad hoc Committee deems appropriate.*[44]

78.     While not seeking costs in the section titled "*prayer for relief*", at paragraph 176 of the Counter-Memorial the Respondent states that "*Mr. Khudyan must pay for the costs of legal representation incurred by the Republic to defend such a frivolous application.*"[45]

79.     In the Rejoinder, the Respondent objects to the amendment in the Reply of the scope of the annulment requested by the Applicant. The Respondent maintains that the Reply seeks the annulment of paragraphs of the Award that were not challenged in the Application, without seeking leave from the Committee. The Respondent further notes that in the Counter-Memorial it relied on the passages subsequently challenged by the Applicant as being *res judicata* to present arguments on annulment to the Committee, and principles of collateral estoppel and basic fairness in the orderly progression of an annulment proceeding require that Mr Khudyan not be allowed to change course at this stage. The Respondent adds that

---

[44] Counter-Memorial, paras. 178-180.

[45] Counter-Memorial, para. 176.

"*the Reply*" constitutes an impermissible collateral annulment application and "*it therefore must be struck.*"[46]

80.    In the Rejoinder's prayer for relief, the Respondent reiterates the requests set in the Counter-Memorial and asks the Committee to order "*the Escrow Agent to release the funds in escrow representing the Award in the Republic's favor to the Republic.*"[47]

81.    As to costs, the Respondent clarifies that it "*incorporates its request for costs by reference*" and that "*costs and fees should be awarded for* [the Applicant's] *inappropriate use of the annulment mechanism.*"[48]

## V.    THE POSITIONS OF THE PARTIES

### A.    THE STANDARD TO BE APPLIED

### (1)    The Applicant

82.    Relying on the decisions in *Vivendi v. Argentina*,[49] *MHS v. Malaysia*,[50] and *Helnan v. Egypt*,[51] the Applicant submits that a failure to exercise jurisdiction in a case where the requirements of Article 25 of the ICSID Convention are met qualifies *per se* as an "*excess of power*" under Article 52(1)(b) of the ICSID Convention.[52]

---

[46] Rejoinder, paras. 25-31.

[47] Rejoinder, para. 116.

[48] Rejoinder, para. 115.

[49] *Compañía de Aguas del Aconquija S.A. and Vivendi Universal v. Argentine Republic*, ICSID Case No. ARB/97/3, Decision on Annulment, 3 July 2002, paras. 93 et seq ("**Vivendi v. Argentina**", **AL-0006**).

[50] *Malaysian Historical Salvors SDN BHD v. Government of Malaysia*, ICSID Case No. ARB/05/10, Decision on the Application for Annulment, 16 April 2009, para. 61 (**ALA-0007**).

[51] *Helnan International Hotels A/S v. Arab Republic of Egypt*, ICSID Case No. ARB/05/19, Decision of the *ad hoc* Committee, 14 June 2010, paras. 47, 73(1) ("**Helnan v. Egypt**", **ALA-0008**).

[52] Memorial, para. 17.

83.     The Applicant maintains that tribunals' decisions on jurisdiction *ratione materiae*, *ratione personae* and *ratione voluntatis* concern the legitimacy of the arbitral decision-making process and that *ad hoc* committees may, must and routinely do, review the substance of tribunals' findings, namely the factual and legal basis of these decisions and their correctness. According to the Applicant,[53] this principle is confirmed by numerous ICSID decisions (including *Soufraki v. UAE*,[54] *MTD v. Chile*,[55] and *Klöckner v. Cameroon*[56]). This principle is, according to the Applicant, also consistent with the origin of Article 52(1)(b) of the ICSID Convention which was modelled on the International Law Commission's Model Rules on Arbitral Procedure (as conceded by the Respondent). The drafters of those rules understood that, unlike merits decisions, jurisdictional decisions implicated the arbitral procedure and fell within the scope of the annulment review. The Applicant adds that, in the ICSID system, *ad hoc* committees have the role of guardians of "*the fundamental integrity of the ICSID arbitral process in all its facets*" and they would not be able to perform their role if they could not annul incorrect jurisdictional decisions.[57]

84.     The Applicant denies that the issue of Mr Khudyan's citizenship is a question of fact beyond annulment review and argues that the Committee has the authority to review the Tribunal's decision on this issue even if it accepts the Respondent's theory that a committee can only review a fault in the Tribunal's decision-making process. According to the

---

[53] Reply, paras. 13, 16-25, 38-52.

[54] *Hussein Nuaman Soufraki v. The United Arab Emirates*, ICSID Case No. ARB/02/7, Decision on the Application for Annulment, 5 June 2007, para. 23 ("**Soufraki v. UAE**, **ALA-0013**).

[55] *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Decision on Annulment, 21 March 2007, para. 54 ("**MTD v. Chile**", **ALA-0020**).

[56] *Klöckner Industrie-Anlagen GmbH and others v. United Republic of Cameroon and Société Camerounaise des Engrais*, ICSID Case No. ARB/81/2, *Ad hoc* Committee Decision on Annulment, 3 May 1985, paras. 15-56 ("**Klöckner I**, **RALA-0051**).

[57] Reply, paras. 13, 20, 23-25, 32.

Applicant, the Tribunal's manifestly incorrect decision is the result of a manifestly flawed decision-making process, including:

(i)      The Tribunal's choice to base its decision on a law in contravention to its text and without citing or referring to the statute or offering any explanation to justify ignoring the statute's plain text.

(ii)     The Tribunal's choice to give Article 15 of the USSR Secession Law extraterritorial application without considering in full the only testimony concerning that law, that confirmed that this provision did not apply to persons living outside Armenia.

(iii)    The Tribunal's reliance on large portions of the expert's testimony on Article 15 of the USSR Secession Law without quoting the testimony or engaging with its content.

(iv)     The Tribunal's approach to invert the relevant inquiry for its decision (namely, whether Mr Khudyan "lost" Armenian citizenship instead of whether he "obtained" it).

(v)      The Tribunal's failure to examine questions that were begged by its reasoning on Article 15 of the USSR Secession Law (namely, the apparent redundancy of decades of amendments to the Armenian 1995 Citizenship Law).[58]

85.    The Applicant denies that there is a distinction between questions of jurisdiction *ratione voluntatis* and other jurisdictional questions for the purposes of the powers of a committee. Article 25 of the ICSID Convention sets "*co-equal*" requirements for jurisdiction (*ratione voluntatis*, *ratione materiae* and *ratione personae*) and offers no basis to privilege *ratione*

---

[58] Reply, paras. 63-72.

*voluntatis* jurisdiction over any of the other jurisdictional requirements either for purposes of establishing the tribunal's jurisdiction or of a committee's review of a decision.[59]

86.    Turning to the meaning of "*manifest*", the Applicant argues that ICSID committees have considered that the requirement is met when the tribunal's decision is "*untenable*", that is a decision which cannot be "*supported by reasonable arguments*", "*is inconsistent with the plain words of the relevant instrument*", is "*arbitrary or unreasonable*" or "*manifestly contrary to the principles of the relevant nationality laws.*"[60]

87.    The Applicant notes that other committees have deemed that an excess of power is "*manifest*" if it can be perceived easily, is "*textually obvious*", "*apparent simply by reading the award*" or "*on the first reading of the award.*"[61] Relying on the decisions in *EDF v. Argentina*, *Occidental v. Ecuador*, and *Venoklim v. Venezuela*, the Applicant argues that an error can be easily perceived even if "*an extensive argumentation and analysis may be required to prove that the misuse of powers has in fact occurred.*"[62]

---

[59] Reply, paras. 15, 33-37.

[60] Memorial, para. 18 citing respectively *Duke Energy International Peru Investments No. 1 Ltd. v. Republic of Peru*, ICSID Case No. ARB/03/28, Decision on Annulment of the Award, 1 March 2011, para. 99 ("**Duke v. Peru**," **ALA-0009**); *Helnan v. Egypt*, paras. 47, 73(1); *M.C.I. Power Group & New Turbine Inc. v. The Republic of Ecuador*, ICSID Case No. ARB/03/6, Decision on Annulment, 19 October 2009, para. 49 (**ALA-0011**); *Victor Pey Casado and President Allende Foundation v. Republic of Chile,* ICSID Case No. ARB/98/2, Decision on the Application for Annulment, 18 December 2012, para. 102 (**ALA-0002**).

[61] Memorial, para. 19, citing respectively *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. The Republic of Ecuador*, ICSID Case No. ARB/06/11, Decision on Annulment of the Award, 2 November 2015, para. 57 ("**Occidental v. Ecuador**", **ALA-0012**); *Soufraki v. UAE* , para. 40; *Repsol YPF Ecuador S.A. v. Empresa Estatal Petróleos del Ecuador (Petroecuador)*, ICSID Case No. ARB/01/10, Decision on the Application for Annulment, 8 January 2007, para. 36 (**ALA-0014**); *Patrick Mitchell v. Democratic Republic of the Congo*, ICSID Case No. ARB/99/7, Decision on the Application for Annulment of the Award, 1 November 2006, para. 47 (**ALA-0015**).

[62] Memorial, para. 20, referring to *Occidental v. Ecuador*, paras. 59, 267; *Caratube International Oil Company LLP v. The Republic of Kazakhstan*, ICSID Case No. ARB/08/12, Decision on the Annulment Application, 21 February 2014, para. 84 (**ALA-0010**); *Venoklim Holding B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/12/22, Decision on Annulment, 2 February 2018, paras. 196, 197 (**ALA-0017**), *EDF International S.A., SAUR International S.A. and León Participaciones Argentinas S.A. v. Argentine Republic*, ICSID Case No. ARB/03/23, Decision on Annulment, 5 February 2016, para. 193 ("**EDF v. Argentina**", **ALA-0016**).

88.    The Applicant concludes that the Tribunal's error is "*manifest*" under any possible standard of review as the *"Tribunal conferred Armenian citizenship on Mr. Khudyan through reasoning that was contradicted by the plain text of the Soviet statute and by the plain terms of all legislation and other normative acts of the Republic of Armenia concerning citizenship."*[63]

**(2)    The Respondent**

89.    The Respondent draws a distinction between annulment and appeal. It maintains that "*annulment is not an appeal*", the difference being that "*appeals carry out a substantive review of a judgment or decision*",[64] while annulment proceedings do not. It relies on the decision of the committees in *Soufraki v. UAE* and *CEAC v. Montenegro* to affirm that the "*annulment system is designed to safeguard the integrity, not the outcome, of ICSID arbitration proceedings.*"[65]

90.    In the context of jurisdictional excess of power, the Respondent posits that contrary to the Applicant's allegation, an error by the Tribunal cannot lead to annulment. While appeals examine whether a judgment committed reversible legal errors, annulments "*focus on the exercise of power by tribunals.*" The consequence of such reasoning for the Respondent is that an "[e]*rror does not come into that analysis, at all*" and "[l]*egal errors themselves are not an excess of power.*"[66]

91.    What matters in annulment proceedings, the Respondent adduces, is the inquiry made by a tribunal and the result it achieved. The Respondent maintains that in all three cases cited by the Applicant (see above para. 82), the committees only reviewed the process of

---

[63] Memorial, para. 21.

[64] Counter-Memorial, para. 16.

[65] *Soufraki v. UAE*, para. 20; *Central European Aluminium Company (CEAC) v. Montenegro*, ICSID Case No. ARB/14/8, Decision on Annulment, 1 May 2018, para. 80 ("**CEAC v. Montenegro**", **RALA-40**).

[66] Counter-Memorial, para. 25.

decision-making. "*Jurisdictional errors* [...] *can in fact be non-annullable*", the Respondent asserts.[67]

92.     The Respondent points to the *Azurix v. Argentina* decision, where the committee decided that under Article 41(1) of the ICSID Convention, the tribunal is the judge of its own competence and jurisdiction, and that in case of doubt over whether a tribunal has jurisdiction, the question needs to be settled by the tribunal in exercise of its *compétence-compétence*. The Respondent recalls the *Azurix v. Argentina* finding that "*Article 52(1)(b) does not provide a mechanism for* de novo *consideration of, or an appeal against, a decision of a tribunal under Article 41(1) after the tribunal has given its final award.*"[68]

93.     In regard to the Applicant's allegation that the Tribunal failed to apply the law agreed by the Parties, the Respondent submits that the "*key*" is to determine "*whether a tribunal correctly identified the applicable law.*"[69] In the Respondent's view, an annulment committee cannot determine whether the tribunal identified or applied the relevant provisions of the applicable law correctly.[70]

94.     The Respondent further submits that under Article 52(1)(b) of the ICSID Convention the Committee is not empowered to review the evaluation of evidence by the Tribunal. Relying on the decision in *Wena Hotels v. Egypt*, it maintains that the "*assignment of probative value to evidence therefore is very much within the powers of the tribunal and could not*

---

[67] Counter-Memorial, paras. 26-30.

[68] Counter-Memorial, paras. 34-35; *Azurix Corp. v. The Argentine Republic*, ICSID Case No. ARB/01/12, Decision on the Application for Annulment of the Argentine Republic, 1 September 2009, para. 68 (**RALA-46**).

[69] Counter-Memorial, para. 38.

[70] Counter-Memorial, para. 38 citing *Continental Casualty Company v. The Argentine Republic*, ICSID Case No ARB/03/9, Decision on the Application for Partial Annulment of Continental Casualty Company and the Application for Partial Annulment of the Argentine Republic, 16 September 2011, para. 91 (**RALA-48**).

*exceed it*." Consequently, according to the Respondent, factual conclusions with which a party disagrees are beyond review in annulment.[71]

95.    Finally, the Respondent provides its interpretation of the requirement that an error must be "*manifest.*" The Respondent first submits, relying mainly on *Wena Hotels v. Egypt* that "[j]*urisprudence that the word 'manifestly' means obvious is well-entrenched.*"[72]

96.    The Respondent admits however that in a few decisions committees developed an alternative approach to manifestness, *i.e.,* tenability. But, for the Respondent, later committees used "*obviousness and tenability as synonyms.*"[73] Indeed, the Respondent points out that the reading of "*manifestly*" as "*obvious*" was developed by committees as a reaction to the *Klöckner I* committee which used the term "*tenability*" for the first time. The Respondent insists that the *Klöckner I* decision[74] "*was generally seen as a dangerous decision that failed to apply the annulment standards in the ICSID Convention in an appropriate manner at that time.*"[75] The Respondent adds, after having examined the drafting history of the ICSID Convention, that the "*tenability standard therefore is on somewhat shaky ground, given its origins in the general international law standard rather than in the Convention.*"[76]

97.    The Respondent further posits, relying on *Fraport v. Philippines*,[77] that a distinction must be made between tenability and review for an *error in judicando*. It concludes that

---

[71] Counter-Memorial, paras. 19-21.

[72] Counter-Memorial, para. 42.

[73] Counter-Memorial, paras. 43, 45-46.

[74] *Klöckner I*, see note 56, above.

[75] Counter-Memorial, para. 46.

[76] Counter-Memorial, para. 51.

[77] *Fraport AG Frankfurt Airport Services Worldwide v. The Republic of the Philippines*, ICSID Case No. ARB/03/25, Decision on the Application for Annulment of Fraport AG Frankfurt Airport Services Worldwide, 23 December 2010, paras. 33-118 ("**Fraport v. Philippines**", **ALA-0018**).

"[t]*enability concerns not the result reached by a Tribunal but the approach used to reach it.*"[78]

98. The Respondent maintains that nationality is a question of legal interpretation and factual evaluation that stands beyond scrutiny under Article 52(1)(b), and that errors (even if there were one in the Award) are not a ground for annulment under Article 52(1)(b).[79]

99. The Respondent argues that the Applicant merely advances errors *in judicando*.[80] In particular, according to the Respondent, at the heart of Mr Khudyan's annulment case is, the contention that Armenian citizenship could only have been conferred on Mr Khudyan by a positive legal act after Armenia's independence. The Respondent maintains that the Tribunal rejected this view based on the evidence on record:

> *The truth is the Tribunal held that Mr. Khudyan received Armenian citizenship when he received ASSR citizenship and that he never lost it. It thus rejected Mr. Khudyan's premise and accepted the Republic's expert-supported premise. Given that it is the theory adopted by the Tribunal after the Tribunal expressly found the Republic's expert propounding it credible, this is fatal to Mr. Khudyan's annulment case* [under Article 52(1)(b) of the ICSID Convention].[81]

100. According to the Respondent, the Claimant's Application is "*an impermissible collateral attack on a well-reasoned Award*" which "*rests on a record Mr. Khudyan had every opportunity to shape and engage.*" The Respondent maintains that Mr Khudyan is simply seeking to re-argue points already discussed (and decided) in the arbitration or add a new line of arguments not raised during the arbitration (based on an alleged untenable

---

[78] Counter-Memorial, para. 54.
[79] Counter-Memorial, paras. 35, 106.
[80] Counter-Memorial, para. 118, Section IV.C.3.
[81] Rejoinder, para. 50.

Tribunal's finding on the meaning of Soviet law by the Tribunal).[82] Relying on *EDF v. Argentina*, the Respondent maintains that:

> The Tribunal did what it was empowered to do – in order to follow the mandate in Article 41 of the ICSID Convention that a "Tribunal shall be the judge of its own competence," the Khudyan Tribunal made credibility findings as well as findings of fact in accordance with ICSID Arbitration 34(1), determined which legal framework was applicable and determined its content in accordance with Article 42 of the ICSID Convention and applied law to the facts it found. There is nothing untenable about how the Tribunal conducted itself. The Tribunal's conclusions are correct (and as such cannot be said that they are not also 'debatable'). And they are the correct as a matter of the arbitral engagement of record engagement on the face of an Award that shows exemplary clarity and reasoning.[83]

## B.   WHETHER THE TRIBUNAL MANIFESTLY EXCEEDED ITS POWERS

### (1)   The Applicant

101.  According to the Applicant, the Tribunal's "*sole support for its refusal to exercise jurisdiction over Mr. Khudyan's claims was the faulty assumption that Mr. Khudyan had automatically become a citizen of the Republic of Armenia.*" That assumption was based on "*an obviously inaccurate paraphrasing of a single statutory provision of a dissolved state that Mr. Khudyan had left in 1989.*" The Applicant maintains that:

> The absence of affirmative evidence that Mr. Khudyan had ever obtained citizenship in the Republic of Armenia would alone have been sufficient to conclude that the Tribunal's failure to exercise jurisdiction was an error. The presence in the record of legal evidence that the statute relied upon by the Tribunal did not apply

---

[82] Counter-Memorial, paras. 77, 101.

[83] Counter-Memorial, para. 101.

> *to Mr. Khudyan makes that error a manifest excess of powers within the meaning of Article 52(1)(b) of the Convention.*[84]

102.   The Applicant does not challenge the Tribunal's choice of law and its decision to apply Article 15 of the USSR Secession Law, but rather maintains that the Tribunal applied that law in a way that contradicted its text, contradicted the evidence in the record, and contradicted the Republic's own laws and actual practice to such an extent that it was manifestly incorrect.[85]

103.   As noted above in paragraph 73, the Applicant further claims that the Tribunal made other serious errors, which together with the Tribunal's "*unsupported and erroneous premise*" that Mr Khudyan became a citizen of Armenia, contributed to the Tribunal's manifest excess of power in declining jurisdiction. These errors consist of: (i) disregarding evidence and authorities that demonstrated "*beyond any doubt*" that persons who were not living in Soviet Armenia at the time of Armenian independence did not become citizens of the new Republic of Armenia; (ii) failing to apply principles of international law that the Parties agreed were applicable; (iii) disregarding proper procedure by introducing and relying in the Award on a legal authority, which post-dated the hearing, without giving the Parties an opportunity to comment on it; and (iv) providing a reasoning concerning the effect of the 1995 Citizenship Law contradictory to the point of not constituting reasoning at all.[86]

104.   According to the Applicant, the Tribunal's finding on Mr Khudyan's Armenian citizenship is clearly flawed, "*manifestly wrong*", "*untenable*" (because its reasoning is based on a paraphrase of the USSR Secession Law that contradicted the text of the law itself), "*unreasonable*" (because its reasoning does not stand up to the slightest scrutiny and it

---

[84] Memorial, paras. 5, 11; see in general paras. 1-15.
[85] Reply, para. 87.
[86] Memorial, para. 12.

disregards all evidence and legal authorities submitted on record), and "*impossible to follow*" on the effects of the 1995 Citizenship Law.[87]

> ### a.     The Tribunal's conclusion that Mr Khudyan became a citizen of the Republic of Armenia in 1991 under USSR law lacks any legal basis

105.   The Applicant argues that the conclusion that Mr Khudyan acquired Armenian citizenship in 1991 lacks any legal basis because its sole support is an incorrect and "*inaccurate paraphrasing*" of Article 15 of the USSR Secession Law, which radically expands the scope of application of that provision.[88] According to the Claimant, the Tribunal applied the law in a way that contradicts: (i) its text, (ii) the evidence on record, and (iii) Armenia's laws and actual practice to an extent that it is manifestly incorrect.[89]

106.   First, the Applicant notes that, in paraphrasing Article 15 of the USSR Secession Law at paragraph 219 of the Award, the Tribunal cites the examination of the Respondent's expert, Mr Arabyan, but fails to cite the actual text of Article 15 (while this text was on record and proved to be dispositive of the issue).[90]

107.   The Award refers to Article 15 in the following passage:

> *Upon the dissolution of the USSR in December 1991, **every citizen of the former USSR** had the right to choose his or her citizenship pursuant to Article 15 of the Soviet Law on the Procedure of Exiting the USSR. Failing the exercise of that right, it was State practice that a citizen of a seceding republic was automatically considered a citizen of the seceding republic. Therefore, absent any affirmative action taken by a person to become a citizen of another seceding republic, **the former citizens of the ASSR** were deemed citizens of*

---

[87] Memorial, paras. 28-31; see also Reply, para. 73.

[88] Memorial, paras. 6, 32-35; Reply, paras. 73, 78.

[89] Reply, paras. 87, 89; see also paras. 85, 86.

[90] Memorial, para. 33; Reply, paras. 75-76, 78, 88. The text and an English translation of Article 15 was in the record as exhibit **R-0044** and was resubmitted in the annulment proceeding as **A-0019**.

*the Republic of Armenia without any special procedure or decision.*[91]

108.   The Applicant, however, quotes the translation of Article 15 which was in the record as stating:

> *USSR citizens **living on the seceding republic's territory** are given the right to choose their citizenship and their place of residence and work. The seceding republic pays compensation for all costs incurred in connection with citizens' resettlement outside the republic.*[92]

109.   The Applicant maintains that it was therefore clear that Article 15 applied only to USSR citizens "*living on the seceding Republic's territory*" and that, contrary to the approach taken by the Tribunal, the provision did "*not address the citizenship of citizens of the USSR, like Mr. Khudyan, who had left the country and were living in another country at the time of the dissolution of the USSR.*"[93]

110.   Secondly, the Applicant argues that the Tribunal disregarded portions of Mr Arabyan's oral and written testimony confirming that, under Article 15, a person residing on the territory of Armenia automatically became a citizen of the Republic of Armenia, while a person living outside Armenia needed to take some affirmative action to this effect.

111.   Thirdly, the Applicant argues, the Tribunal's reliance on the USSR Secession law to confer on Mr Khudyan Armenian citizenship contradicted the Tribunal's own reasoning and a legal authority (post-dating the hearing) on which the Tribunal relied in its Award. The Tribunal applied the USSR law on citizenship to determine Mr Khudyan's nationality but

---

[91] Award, para. 219; Memorial, para. 34 (emphasis in the original).

[92] Memorial, para. 34 (emphasis in the original).

[93] Memorial, paras. 6, 32-35; Reply, paras. 78-79.

acknowledged that the USSR dissolved in 1991[94] and relied on an authority confirming that "*in case of dissolution, the nationality of the predecessor State disappears together with it.*"[95] The Tribunal failed to explain how it concluded that a law "*governing a citizenship that no longer existed (that of the Soviet Union) could confer a different citizenship of an entirely new state.*"[96]

112.     The Applicant notes the Tribunal's comment that "*Mr. Arabyan credibly attested that in the 1990s, ASSR citizens with a passport of the USSR – even if it had expired (as would have been the case for Mr. Khudyan) – were admitted to the Republic of Armenia on a* laissez passer *basis and were issued a passport of the Republic of Armenia without the need to go through any recognition procedure.*"[97] The Applicant responds that an "*administrative practice*" cannot operate as a substitute for a legal act conferring nationality and a purported "*practice*" cannot override the law that the Tribunal purported to apply.[98] Moreover, the Applicant contests that Mr Arabyan's evidence supports a conclusion that there was a practice of treating persons such as Mr Khudyan as Armenian citizens. According to the Applicant, Mr Arabyan's testimony showed that Mr Khudyan would have needed to undergo a recognition procedure to be recognized as a citizen of Armenia, because he held a passport of a country that no longer existed, and he was unlike any of the people who resided in the Republic of Armenia and retained their internal Soviet passports and connection to Soviet Armenia. In any case, the Claimant argues that Mr Arabyan did not testify to any practice with respect to people who never sought to enter

---

[94] Award, para. 219.

[95] Memorial, para. 39 quoting Václav Mikulka, *Articles on Nationality of Natural Persons in Relation to the Succession of States*, January 2020 (**ALA-0022**).

[96] Memorial, para. 40.

[97] Award, para. 220.

[98] Reply, paras. 95-96.

the Republic of Armenia using their Soviet passports (which was the case with Mr Khudyan).[99]

113. In addition, the Applicant maintains that the Award fails to refer to evidence concerning Armenia's actual practice (including a commentary on Armenian citizenship sponsored by the Council of Europe which confirmed that, prior to the enactment of the Citizenship Law in 1995, Armenian authorities determined citizenship in accordance with the Declaration of Independence by reference to a person's residence in the territory of the Republic).[100]

114. In any case, the Applicant notes that the finding of the Tribunal in paragraph 219 of the Award effectively confers citizenship on a million persons (at least) who had emigrated from Soviet Armenia as of 1991 (approximately 25% of all citizens of the new country) with no evidence on record that upon independence the Republic of Armenia intended to confer citizenship on millions of people outside its borders without their knowledge or will. He argues:

> *If the Award's assumption in paragraph 219 were correct, then the entirety of the Soviet Armenian diaspora living in California would be citizens of the Republic. But they are not its citizens. Armenia does not and cannot assert that they are.*[101]

### b. *The Tribunal asked the wrong question: No Armenian law conferred citizenship upon the Applicant*

115. The Applicant argues that, because of the false and unsupported findings on Article 15 of the USSR Secession Law, the Award develops its subsequent analysis by examining the "*wrong question*" (whether the Applicant ever lost his Armenian citizenship) and fails to

---

[99] Reply, paras. 113-118.
[100] Reply, paras. 119-124.
[101] Reply, para. 143.

consider the "*proper question*" of "*whether* [Mr Khudyan] *ever acquired it in* [the] *first place.*"[102]

116.   The Applicant contends that no Armenian law has ever conferred Armenian citizenship on Mr Khudyan. Between 1991 and 1995, Article 4 of the Declaration of Independence conferred citizenship on persons residing in the territory of Armenia at the time of the independence but granted members of the Armenian diaspora (like Mr Khudyan) only the right to apply for citizenship.[103] The Award failed to appreciate the importance of that distinction, because it found that that the Declaration was "*not a constitutive act* […] *but a declaration of principles.*"[104] This finding disregards (a) that Article 4 of the Declaration was consistent with the territorial principle in Article 15 of the USSR Secession Law; (b) that evidence on record confirmed that, between 1991 and 1995, Armenian laws routinely recognised the legal supremacy of the Declaration; and (c) that Armenian officials routinely applied the territorial limitation set in Article 4 of the Declaration.[105]

117.   The 1995 Citizenship Law also did not confer citizenship on members of the Armenian diaspora but required them to take "*some affirmative action* […] *to obtain citizenship*" except in the case of those who, after the amendment of the law in 2001, would otherwise have been stateless, which Mr Khudyan was not.[106]

---

[102] Reply, paras. 125-126.
[103] Memorial, paras. 42-43.
[104] Award, para. 212.
[105] Memorial, paras. 44-47; Reply, paras. 127-134.
[106] Memorial, para. 41.

118.  The Applicant maintains that the Tribunal's reasoning on Article 10(3) of the 1995 Citizenship Law, is "*incorrect*", "*inherently contradictory*" and contains such "*significant lacuna to the point that it does not constitute 'reasoning' at all.*"[107]

119.  According to the Applicant, the Tribunal's finding that the "*1995 Citizenship Law does not appear to alter the status of Armenian citizenship acquired prior to that law*" was flawed because the 1995 Citizenship Law did not state that someone was "*already*" an Armenian citizen. On the contrary, the law established a self-contained regime to determine, for the first time, who was a citizen of the Republic (including through automatic recognition).[108]

120.  In addition, the Applicant maintains that the conclusion reached by the Tribunal in paragraph 219 of the Award that in 1991 all "*the former citizens of the ASSR were deemed citizens of the Republic of Armenia*" treated the provisions of Article 10(1) and (3) of the 1995 Citizenship Law as a nullity without any practical effect:[109]

> [I]*f the Tribunal were correct that Article 10 of the Citizenship Law applied "*ex nunc*" and "without prejudice to the status of Armenian citizenship that had been acquired prior to the 1995 Citizenship Law coming into force," then the universe of people to whom Article 10(1) and (3) of the Citizenship Law applies would be* **zero**. *This is because, under the Tribunal's reasoning, any former citizen of Soviet Armenia (like Mr. Khudyan) had automatically become a citizen of the independent Republic of Armenia in 1991, regardless of where they were living at the moment of independence, on the basis of Article 15 of the Soviet Law on the Procedure of Exiting the USSR.*[110]

---

[107] Memorial, paras. 57-58.

[108] Memorial, paras. 57-59; Reply, paras. 135-138.

[109] Memorial, paras. 54-59; Reply para. 141.

[110] Memorial, para. 59 (emphasis in the original).

121.   The Applicant further argues that the Award's flawed assumption that Mr Khudyan automatically and unknowingly became an Armenian citizen led it mistakenly to conclude that the registration requirement in Article 10(3) set by the text of the 1995 Citizenship Law was to be ignored, because it would have rendered Mr Khudyan stateless. According to the Applicant, the 1995 Citizenship Law did not deprive Mr Khudyan of a citizenship, and the Statelessness Convention did not require Armenia automatically to confer citizenship on persons who were not living in its territory. Even for persons born on a State's territory, the Statelessness Convention permits States to require an affirmative act or continuous residence in the State in order to acquire citizenship.[111]

122.   Furthermore, the Applicant rebuts the Respondent's argument that the Award asserts that Mr Khudyan could have been recognized as a citizen under the alternative reading of Article 10(3) of the 1995 Citizenship Law proposed by the Tribunal in an *obiter dictum* at paragraphs 228-231. According to the Applicant such an interpretation would eliminate the consular registration requirement, in contradiction of the plain text and the history of amendments to the law.[112]

### c.   *The Respondent has explicitly acknowledged that Mr Khudyan has never been a citizen of the Republic*

123.   According to the Applicant, it is undisputed between the Parties that in 2004, Mr Khudyan successfully applied for a special residency permit to Armenian authorities, and that, under Armenian law, special residency status is not available to Armenian citizens. In the arbitration, the Claimant argued that, by issuing the special residency permit, Armenia acknowledged that Mr Khudyan was not an Armenian national. According to the Applicant, the Tribunal's decision that Armenia granted Mr Khudyan a special residency status by "*mistake*" is untenable, based on unsupported speculations by an expert witness

---

[111] Reply, para. 138.
[112] Reply, para. 139.

and against the conclusion the Tribunal had reached *prima facie* in the decision on bifurcation.[113]

124.   According to the Applicant, the question of whether circumstances exist to justify disregarding an official document evidencing nationality, or the lack of nationality, is a question of fact, which requires proof. He challenges the Tribunal's finding in paragraph 263 of the Award on the following grounds.

(i)   The Tribunal accepted the (factual) argument that the Respondent's officials made a mistake by issuing the special residency permit with no oral or written evidence to that effect. The Tribunal relied in its finding on Mr Arabyan's expert testimony, but Mr Arabyan confirmed that he had no first-hand knowledge as to how Mr Khudyan's application for special residency status was processed and could only speculate about how the permit could have been issued by mistake.

(ii)   The Tribunal ignored the arguments and the factual evidence submitted by the Applicant to show why the Respondent's speculation that its officials granted Mr Khudyan the special residency status by mistake was not credible and preferred embracing the speculation offered by an expert witness with no first-hand factual knowledge.

(iii)   The Tribunal relied on documents that did not support its conclusion that Armenian officials could not verify Mr Khudyan's identity and citizenship when issuing the permit on the ground that Mr Khudyan's name was spelled differently on his Soviet passport and application for special residency. The Applicant notes that (a) the relevant documents contained the place and date of birth of Mr Khudyan, which would have been "*sufficient to identify his citizenship*"; (b) the exhibit containing

---

[113] Reply, para. 144 and title of Section E.

41

the special status application included a letter from the Passport and Visa Department confirming that Mr Khudyan's names, while spelled differently, referred to "*the same person*", which denies the Tribunal's statement that Armenia could not identify Mr Khudyan due the discrepancy in the names used.[114]

125.   In addition, the Applicant submits that, after the Award was issued, the Passport and Visa Department of the Republic of Armenia explicitly recognized that Mr Khudyan is not, and has never been, an Armenian citizen.[115] On 7 July 2022, counsel for Mr Khudyan addressed the following question to the Head of the Passport and Visa Department:

> *Whether or not Edmond Arshak Khudyan (Edmond Arshaluys Khudaverdyan, a former ASSR citizen, identified with 9-UL series passport No. 508185, born in Iran on 06.01.1965) obtained citizenship of the Republic of Armenia under the former USSR legislation, the 23.08.1990 Armenian Declaration of Independence and the 06.11.1995 law (HO-16) "On Citizenship of the Republic of Armenia.*[116]

126.   In its response of 23 February 2022 (the "**February Letter**"), the Head of the Passport and Visa Department stated:

> *Before the adoption of law HO-16 'On Citizenship of the Republic of Armenia' issues related to obtaining citizenship of the Republic of Armenia were regulated by the Armenian Declaration of Independence, under Clause 4 whereof, "All citizens living on the territory of Armenia are granted citizenship of the Republic of Armenia. Armenians of the Diaspora have the right or citizenship or Armenia. The citizens of the Republic of Armenia are protected and aided by the Republic."*

---

[114] Reply, paras. 144-151.

[115] Memorial, paras. 62-65, and Appendix.

[116] Letter from Passport and Visa Department of the Republic of Armenia to Counsel for Mr Khudyan of 23 February 2022 (**A-0036**).

*Under Section 3. Article 10 of law HO-16 "On Citizenship of the Republic of Armenia" (1995 edition). "The former ASSR citizens who, after September 21, 1991, resided outside the Republic of Armenia and did not acquire another country's citizenship, as well as those former ASSR citizens of Armenian descent who resided outside Armenia before that and did not acquire another country's citizenship and have registered with the consulate" are recognized as citizens of the Republic of Armenia.*

*Analyzing the records about E. Khudyan, available in the Passport and Visa Department of the RA Police, it is worthwhile to mention that the latter isn't and hasn't been a citizen of the Republic of Armenia, in particular, he wasn't a permanent resident of the ASSR at the moment of the adoption of the Armenian Independence Declaration and law HO-16 "on Citizenship of the Republic of Armenia" and did not automatically acquire citizenship of the Republic of Armenia by virtue of recognition (as did the permanent residents of ASSR).*

*Clause 3 of Section I, Article 10 of law HO-16 on "Citizenship of the Republic of Armenia" was replaced on 12.04.2001 by law HO-157, which removed the requirement for consular registration. In the context of the said amendment, Edmond Khudyan, Arshak could not have acquired citizenship of the Republic of Armenia as subject to naturalization certificate No. 24219904 he had already acquired US citizenship in 1998.*

*Clause 3 of Section I, Article 10 of law HO-16 on "Citizenship of the Republic of Armenia" was amended on 06.12.17 by law HO-251-N, according to which:*

*"The former citizens of the Armenian SSR, who live outside the Republic of Armenia and have not acquired the citizenship of another state are recognized as citizens of the Republic of Armenia. Subject to the present clause, an individual shall acquire citizenship of the Republic of Armenia if he or she applied and obtained, in a manner prescribed by the law, a document attesting to the citizenship of the Republic of Armenia. In that case. the individual shall be recognized as a citizen of the Republic of Armenia from the*

*moment of entry into effect of the 28 November 1995 law HO-16 of the Republic of Armenia" (information on any action whereon is not available).*

*According to the Passport and Visa Department's population register, Edmond Khudyan, Arshak (Edmond Khudaverdyan, Arshaluys) has not been issued a document of a citizen of the Republic of Armenia; hence the latter has not, by virtue of recognition, acquired citizenship of the Republic of Armenia.*

*Thus, <u>Edmond Khudyan, Arshak (Edmond Khudaverdyan, Arshaluys) (former ASSR citizen, passport series: 9-UL, passport no: 508185, born in Iran on 06.01.1965) has not acquired citizenship of the Republic of Armenia under the former USSR legislation, the 23.08.1990 Armenian Independence Declaration and the 06.11.1995 law HO- 16 "On Citizenship of the Republic of Armenia."</u>*

*<u>He is a foreign citizen for the Republic of Armenia</u>; he acquired a special residence status in a manner prescribed by the RA legislation and was issued the AG series special residence passport No. 0210194 on 30.03.2004.* (emphasis added)[117]

127. The Applicant refutes the Respondent's argument that the February Letter is not properly on record since its filing was not authorised under paragraph 15.4 of Procedural Order No. 1. The Applicant maintains that: (i) the February Letter was validly submitted as an "Annex" to the Application for Annulment and redesignated as "Exhibit A-0036" in July 2022, pursuant to the indications in Procedural Order No. 1; and (ii) the Respondent never objected to the redesignation of the document as an exhibit, nor expressed its intention to raise objections to the inclusion of the document in the record of the annulment proceeding. There was no prejudice to the Respondent from the change in the designation

---

[117] Letter from Passport and Visa Department of the Republic of Armenia to Counsel for Mr Khudyan of 23 February 2022 (**A-0036**).

of the letter as the Respondent had been aware that the Applicant intended to rely on this document since April 2022.[118]

128.   The Applicant further argues that the submission of new evidence is not forbidden under paragraph 15.3 of Procedural Order No. 1, as this provision simply provides that "**[i]***n principle*, *no new evidence shall be admitted in this proceeding*" (emphasis in the original). The Applicant argues that the February Letter is evidence that this Committee should consider in this proceeding because it is both evidence and legal authority concerning Armenia's actual practice of applying its citizenship laws (specifically to Mr Khudyan).[119]

129.   According to the Applicant, the February Letter shows that the Respondent has "*only ever*" considered Mr Khudyan an Armenian citizen in order to defeat the Tribunal's jurisdiction. This document is then relevant for the Committee's decision to perform its role of custodian of the "*integrity of the ICSID process in all its facets*" and annul the Award. Quoting from Schreuer's *Commentary*, the Applicant notes that:

> *There is one situation in which the host State's nationality may be disregarded. An involuntary acquisition of nationality after consent to jurisdiction has been given should not deprive the investor of access to the Centre if the compulsory grant of nationality is intended to defeat jurisdiction or is otherwise contrary to international law. The host State may not impose its nationality on a foreign investor for the purpose of withdrawing its consent.*[120]

---

[118] Reply, paras. 187-191.
[119] Reply, paras. 192-193.
[120] Reply, para. 204 and fn. 151.

130.    Finally, the Applicant maintains that, throughout the criminal proceedings which took place in Armenia, he was consistently treated as a foreign national and not as a citizen of Armenia.[121]

**(2)    The Respondent**

131.    The Respondent makes the following arguments:

(i)     The Applicant's conduct in the arbitration, rather than the Tribunal's alleged disengagement with the evidentiary record, compelled the Tribunal's decision on Mr Khudyan's citizenship and precludes the Applicant from seeking annulment.

(ii)    The Applicant's challenges to the Tribunal's conclusion that Mr Khudyan became a citizen of the Republic of Armenia in 1991 under USSR laws point at alleged errors *in judicando*; in any case, the Tribunal's conclusions are correct and based on the Tribunal's fair assessment of the evidence on record.

(iii)   The Applicant's challenges to the Tribunal's conclusion that Armenian law and administrative practice confirm that Mr Khudyan holds Armenian nationality amount to an allegation of errors *in judicando*; in any case, the Tribunal's conclusions are correct and based on the Tribunal's fair assessment of the evidence on record.

(iv)    The Respondent did not, before the beginning of the arbitration or after the issuance of the Award, acknowledge that Mr Khudyan has never been its citizen.

(v)     The Tribunal's conclusion on Mr Khudyan's citizenship is immaterial to the outcome of the arbitration.

---

[121] Reply, para. 152.

> **a.    The Claimant's conduct in the arbitration compelled the Tribunal's decision on Mr Khudyan's citizenship and precludes him from arguing for annulment**

132.    The Respondent maintains that at the heart of the Applicant's case is the fact that the Tribunal found the Respondent's evidence credible and relied on the Respondent's expert testimony for its findings.[122]

133.    According to the Respondent, the Award is "*well-reasoned*" and rests on a record that Mr Khudyan "*had every opportunity to shape and engage*" but failed to do. While the Respondent submitted two expert reports and made detailed submissions on Armenian law and practice, the Applicant chose not to instruct an expert on Armenian law and regulatory and immigration practice to rebut the Respondent expert's evidence; he chose not to produce any evidence on administrative practice by Armenian authorities; and he chose not to make submissions through Armenian counsel on questions of Armenian law. The Respondent argues that this failure to rebut the Respondent's arguments in the arbitration is not a ground for annulment.[123]

134.    After recounting Mr Arabyan's testimony as summarised in the Award (paragraphs 159, 161, 163, 165) and his expert report, the Respondent argues that the Tribunal's conclusions are "*plausible on the face of the record*", and the Award makes perfect sense considering that the Tribunal endorsed Respondent's submissions that were uncontested, uncontroverted and unrebutted.[124]

135.    In particular, the Respondent notes that Mr Arabyan testified that:

---

[122] Counter-Memorial, para. 80.

[123] Counter-Memorial, paras. 77-80.

[124] Counter-Memorial, paras. 80-101.

(i)     Mr Khudyan did not lose his ASSR nationality in 1991 because "*the Declaration of Independence was not meant to be a comprehensive legal regulation, it did not have the legal effect of rendering all former ASSR citizens stateless*."[125]

(ii)    There was "*no record of Mr. Khudyan ever seeking to renounce or terminate his citizenship of the ASSR or Armenia*."[126]

(iii)   Based on Article 15 of the USSR Secession Law, Mr Khudyan continued to hold his ASSR nationality "*on the ground of being a citizen of the ArmSSR and not enjoying the opportunity to choose citizenship (optation), and after the independence referendum, citizen of already independent Republic of Armenia*."[127]

The Respondent argues that Mr Arabyan's evidence stood "*unrebutted*" before the Tribunal (paragraph 217 of the Award) because Mr Khudyan (i) decided not to instruct an expert on these questions; (ii) did not "*join issue with the bulk of the Republic's submission or the submissions of the Republic's expert*" on the question of his citizenship prior to 1995 (but rather focused on the 1995 Citizenship Law); and (iii) "*did not engage how his Armenian citizenship acquired before 1995 would have been terminated*."[128]

136.    The Respondent further notes that the submissions presented in paragraphs 42 to 51 of the Memorial, "*are the first time that Mr Khudyan so briefed the issue of citizenship between 1991 and 1995 or otherwise engaged the law in question at all in the chief written phase of the proceedings*." Relying on *Fraport v. Philippines*, the Respondent argues that this conduct goes against the task entrusted to ICSID annulment committees, that "*must*

---

[125] Counter-Memorial, para. 81.

[126] Counter-Memorial, para. 81.

[127] Counter-Memorial, para. 84.

[128] Counter-Memorial, paras. 81-89.

*determine the reasonableness of the Tribunal's approach in light of the evidence and submissions which were before the Tribunal, and not on the basis of new evidence.*"[129]

137.   The Respondent adds that Mr Khudyan's submissions, in the written phase of the arbitration, on Armenian law in the period 1991-1995 "*revealed important self-contradictions*" (including on the date of Mr Khudyan's naturalization in the USA and the nationality that he attributed to himself at that time), and that the Respondent rebutted Mr Khudyan's statements.[130]

138.   The Respondent also argues that Mr Arabyan's testimony "*refuted seriatim*" the "*limited assertions about Armenian law made by Mr Khudyan's lawyers through submissions by U.S. counsel*" (including regarding the compatibility between the consular registration requirement in the 1995 Citizenship Law and the provision of the Statelessness Convention). During his cross-examination at the arbitration hearing, Mr Arabyan provided three "*critical piece of evidence*" (on USSR visa exit practice, on the (non)existence of a consular recognition procedure, and on the non-existence of an Armenian consulate in the USA until 1995), and Mr Khudyan submitted no evidence to contradict Mr Arabyan's testimony.[131]

139.   Mr Arabyan's examination provided Mr Khudyan with an opportunity to test his submissions and to demonstrate that the Respondent's submissions were "*untenable*", as well as the chance to test his credibility and the cogency of his expert testimony. However, the Respondent contends, at no point did Mr Khudyan show that "*the submissions of Mr Arabyan were incompetent.*" On the contrary, the Tribunal found in the Award that Mr Arabyan testified "*credibly.*" This finding of credibility is, according to the

---

[129] Counter-Memorial, para. 89.
[130] Counter-Memorial, paras. 90-92.
[131] Counter-Memorial, paras. 91-95.

Respondent, "*plausible upon review of the transcript*" and in any case it cannot be reviewed by the Committee as it falls squarely within the powers of the Tribunal. [132]

140.   In a nutshell, the Respondent argues that Mr Khudyan's own conduct in the arbitration left the Tribunal no meaningful choice to rule other than it did on his citizenship.[133]

141.   In the Rejoinder, the Respondent notes that the Applicant did not seriously respond in the Reply to its argument that Mr Khudyan's own evidentiary choices resulted in the Award.[134] In the Respondent's own words:

> […] *Mr. Khudyan does not have an answer for a simple proposition. Strategic choices can backfire. None can backfire more than a choice to minimize an area of one's opponent's expert-supported case in the hope that the Tribunal will pay it no mind. When such strategic choices backfire, the only expert a tribunal can in fact find credible is the opponent's expert. Once made, such credibility findings appropriately sink cases* […] *It is also a predictable risk Mr. Khudyan incurred with his own strategic choices.*[135]

> **b.      Challenges to the Tribunal's conclusion that Mr Khudyan became a citizen of the Republic of Armenia in 1991 under USSR laws are impermissible allegations of errors in judicando**

142.   The Respondent challenges the Applicant's statement that Article 15 of the USSR Secession Law is the only affirmative legal basis on which the Tribunal concluded that Mr Khudyan became an Armenian citizen. The Respondent argues that the Award, at paragraphs 205-223, considered that Mr Khudyan was a citizen of the ASSR before the Declaration of Independence and that he maintained his Armenian citizenship after the Declaration by virtue of the 1978 USSR Citizenship Law and the USSR Secession Law

---

[132] Counter-Memorial, paras. 96-97.
[133] Counter-Memorial, title Section IV.A.
[134] Rejoinder, paras. 45-50.
[135] Rejoinder, paras. 48, 50.

(which applied provisionally in Armenia). The Tribunal, the Respondent asserts, came to this conclusion based on unrebutted evidence by the Respondent's expert.[136]

143.    According to the Respondent, the Applicant's challenge based on the fact that the Award does not refer, quote or cite the text of Article 15 of the USSR Secession Law "*takes formalism to the point of absurdity*" and does not amount to a manifest excess of powers.[137] The Respondent argues that "*the most that Mr Khudyan can allege*" regarding the Tribunal's finding on his citizenship is that the Tribunal's conclusion is based on "*inaccurate paraphrasing*" of Article 15. However, inaccuracy "*is simply not a ground for annulment*" under Article 52(1)(b) of the ICSID Convention.[138]

144.    In the Rejoinder, the Respondent challenges the Applicant's view that the Tribunal applied Article 15 of the USSR Secession Law in a way that contradicted its text, the evidence in the record, Armenian laws and actual practice to the extent of being manifestly incorrect.[139]

145.    According to the Respondent, the Applicant's contention lacks any merit (under all standards for annulment) because it misses the substance of the applicable Armenian and Soviet law as that law was (correctly) laid out in the Award. The Respondent argues that at paragraphs 218-223, the Award finds that the applicable law between 1990 and 1995 was the 1978 USSR Citizenship Law, that this law identified a limited number of bases for the loss of citizenship which did not include leaving the territory of the USSR/ASSR, and that Article 15 of the USSR Secession Law made clear that secession of a constituent republic of the USSR was not a ground upon which a person would lose his or her of citizenship, unless the person exercised the option to lose it. The Respondent argues that

---

[136] Rejoinder, paras. 3, 51-66, 71-72, 74-81.

[137] Rejoinder, paras. 64-66, explaining that the argument would fail also under the (not raised) ground of failure to state reasons.

[138] Counter-Memorial, paras. 136, 141.

[139] Rejoinder, para. 51; and in general, paras. 51-66, and Appendix B.

the Award's findings do not contradict the text of Article 15, because this provision does not bestow Armenian citizenship by virtue of residence on the territory of Armenia. The Respondent also notes that Article 15 does not contain any default language on what would happen in the absence of a choice, a question governed by the 1978 USSR Citizenship Law, as the Award correctly determined.[140]

146.    The Respondent further rejects the argument that Mr Khudyan lost his ASSR citizenship upon leaving Armenia in 1988, arguing that the Applicant improperly raises this argument for the first time in the annulment proceeding, and that, in any case, this position is incorrect under the applicable law, is unsupported, and is contradicted by Mr Khudyan's sworn statements to the USA immigration officials in his application for naturalization.[141]

147.    The Respondent further rejects the Applicant's arguments that the Award took into consideration only certain portions of Mr Arabyan's testimony and "*somehow focused on the wrong part*." The Respondent notes that arguing with the Tribunal's conclusions about the probative value and content of expert testimony amounts to raising an *error in judicando*, which is not subject to annulment review. In any case, the Respondent argues that the Tribunal did not cherry pick portions of the testimony of Mr Arabyan as the Tribunal's findings on Mr Khudyan's nationality are fully consistent with the full expert testimony. In particular, the Respondent notes that Mr Arabyan testified that "*Article 1 of the Declaration of Independence said ASSR was renamed to RA. So ASSR citizens would automatically become citizens of the RA according to this legal rule that you cited, article*

---

[140] Rejoinder, paras. 51-66.
[141] Rejoinder, para. 5.

*15 of the Law, unless they applied under that article to become citizens of the Soviet Union, the USSR.*"[142]

148.   The Respondent rejects the argument that administrative practice cannot operate as a substitute for a legal act conferring nationality, and that a purported "*practice*" cannot override the law that the Tribunal purported to apply which granted nationality only to ASSR citizens residing in Armenia at the time of independence. The Respondent argues that the Applicant ignores the fact that, under the applicable law, an ASSR citizen became an Armenian citizen after independence by virtue of the conferral of ASSR citizenship during Soviet times. Accordingly, the Respondent affirms, Armenian administrative practice, referred to by the Tribunal in paragraphs 208 et seq. of the Award, confirmed the lack of loss of Armenian citizenship, not its bestowal. Furthermore, according to the Respondent, the Award did not rely on practice relating to Article 15 of the USSR Secession Law alone but rather "*saw it in the context of the broader statutory picture.*" On this ground, the Respondent argues that it is inapposite to argue that Mr Arabyan's testimony relating to Soviet exit visas was not a part of his discussion of Article 15 of the USSR Secession Law.[143] The Respondent challenges the argument that Armenian administrative practice applied to Mr Khudyan, including the issuance of a special residency permit, confirm that persons in Mr Khudyan's position did not acquire Armenian citizenship.[144]

---

[142] Counter-Memorial, paras. 139-140; Rejoinder, paras. 67-73, also explaining that the Claimant's argument would have also failed if it had pleaded *"something like a failure to state reasons or a serious departure from a fundamental rule of procedure*" which he has not (paras. 68-70).

[143] Rejoinder, paras. 74-79.

[144] Rejoinder, para. 80.

> ### c.     Challenges to the Tribunal's conclusion that Armenian law and administrative practice confirm that Mr Khudyan holds Armenian nationality are impermissible allegations of errors in judicando

149.    The Respondent denies all arguments that Armenian law has not conferred Armenian citizenship on Mr Khudyan (i) between 1991 and 1995, and (ii) after 1995.

150.    With regard to the position between 1991 and 1995, the Respondent argues that the Applicant cannot allege the "*non-application of Armenia law*" in force between 1991-1995 because it concedes that Armenia "*did not immediately enact a law on citizenship* [until] *1995*" and therefore no Armenian law existed in that period. Furthermore, according to the Respondent, since the law at the time was fluid, Mr Khudyan should have submitted expert evidence to assist the Tribunal on this issue and cannot now complain if the Tribunal followed the only evidence on record (Mr Arabyan's testimony) which it found credible and unrebutted.[145]

151.    The Respondent argues that the Claimant's challenges to the Tribunal's finding on the scope and legal value of the Declaration may "*at most*" qualify as error *in judicando* because the Tribunal did address and decide these issues in the Award.[146] In any case, the Respondent argues that the Tribunal's interpretation of the scope and meaning of the Declaration and the applicable laws is correct and therefore its decision is "*tenable.*" The Respondent notes that, if the Declaration were deemed to grant citizenship only to ASSR nationals residing in Armenia, ASSR citizens who were residing abroad and did not have the nationality of a third State at the time of independence would be rendered stateless contrary to Armenia's obligations under international law.[147]

---

[145] Counter-Memorial, paras. 146-147.
[146] Counter-Memorial, paras. 148-150.
[147] Rejoinder, paras. 86-87; in general, paras. 82-89.

152.    The Respondent denies that the Tribunal ignored that Article 15 of the USSR Secession Law contains the same territorial limitation as Article 4 of the Declaration, pointing at the Tribunal's analysis in paragraphs 215 and 219 of the Award.[148]

153.    The Respondent takes issue with the contention that Armenian laws confirm the supremacy of the Declaration because they required existing laws not to contradict the Declaration. The Respondent notes that the Applicant did not raise this argument in its written submissions, and that the exhibits referred to were not "*even included in his Memorial or Reply pleadings*." The Respondent also argues that, while the Applicant's argument aims at creating an apparent contradiction between the Award and Armenian laws, this contradiction does not exist because the Tribunal reasoned that Soviet citizenship law was provisionally applicable, and that that law did not contradict the Declaration. According to the Respondent, the Applicant's position merely points to disagreement with the Tribunal's findings and to an error *in judicando* beyond the scope of annulment review.[149] In the Rejoinder, the Respondent further rejects the Applicant's contention that the Award does not cite or address the laws deferring to the legal supremacy of the principles set in the Declaration, by noting that in paragraph 217 the Award refers to that law (namely, the Constitutional Law 'on the legislative acts adopted in accordance with Armenia's Declaration of Independence').[150]

154.    The Respondent challenges the Applicant's argument that, at the arbitration hearing, it submitted "*a commentary on the Armenian Citizenship Law of 1995 that purportedly supported his reading of the Law.*" The Respondent argues that the "*submission of a **commentary** on a law that disagrees with the conclusion of some decisionmaker is the very*

---

[148] Rejoinder, para. 89.
[149] Counter-Memorial, para. 151.
[150] Rejoinder, para. 89.

55

*essence of alleging an error* in judicando"[151] and notes that this commentary confirms the Tribunal's conclusion that Armenian citizenship remained governed by Soviet law.[152]

155.    Finally, on Armenian laws between 1991-1995, the Respondent argues that the Applicant submits a new view on how the Soviet law of nationality would function and apply to Mr Khudyan, and that view contradicts the evidence, endorsed in the Award, of Armenian practice in the relevant time period to allow persons in Mr Khudyan's position to enter into Armenia on a *laissez passer* basis. The Respondent denies this argument as a challenge on the weight of practice as opposed to the text of legislation which at best reflects an error *in judicando* and does not contest the factual submission on which the Award rests.[153]

156.    With regard to the position following the enactment of the 1995 Citizenship Law, the Respondent contends that Mr Khudyan is seeking to re-argue issues already presented to the Tribunal.[154]

157.    In particular, the Respondent maintains that the Tribunal analysed at length the Applicant's arguments regarding the 1995 Citizenship Law and its amendment in 2001 and resolved these issues at paragraphs 228-239, 242 of the Award. The Respondent concedes that the Award does not expressly address the arguments on the 2017 amendment to the 1995 Citizenship Law but contends that the Tribunal's "*reasoning concerning the earlier amendment is similarly apt*" and that the "*Tribunal's treatment of this argument can perhaps be explained by the fact that the argument now re-raised by Mr. Khudyan was originally consigned to a footnote in the Reply pleading (footnote 21).*" The Respondent

---

[151] Counter-Memorial, para. 152 (emphasis in the original).
[152] Rejoinder, para. 89.
[153] Counter-Memorial, para. 157.
[154] Counter-Memorial, paras. 158-161.

also argues that the Tribunal provided an alternative reading of the 1995 Citizenship Law that would entirely obviate the need for consular registration for Mr Khudyan.[155]

158. Finally, the Respondent challenges the argument that the Award is contradictory because, if any former citizen of Soviet Armenia had automatically become a citizen of the independent Republic in 1991 on the basis of Article 15 of the USSR Secession Law, the 1995 Citizenship Law would never apply:

> [T]he Award concerned holders of an ASSR passport and were in fact citizens of the ASSR at the relevant time (as Mr. Khudyan was). There could well be people who would fall into another category: a person of Armenian national origin who at one point held a passport of the ASSR (and thus at one point a 'citizen of the former Armenian SSR') but, at the relevant time, held a passport of the Kazakh SSR because his last place of residence in the USSR was Astana who then resided as a permanent resident in London at the time of independence. Again, the various permutations possible or not possible are simply attempts at re-argument and pointing out of errors in judicando. They cannot sound in manifest excess of power.[156]

### d.    The Respondent did not, before the beginning of the arbitration or after the issuance of the Award, acknowledge that Mr Khudyan has never been its citizen

159. The Respondent argues that that the Tribunal's finding comes at the end of a proceeding in which Mr Khudyan had made repeated false statements about his US nationality and his naturalization proceeding. According to the Respondent, this background explains why the Tribunal made in the Award, at the end of the proceeding, a different assessment on

---

[155] Counter-Memorial, paras. 162-166.
[156] Counter-Memorial, para. 167.

nationality from that which it had made, *prima facie*, in the earlier decision on bifurcation.[157]

160.   According to the Respondent:

(i)     The Tribunal did not accept the Respondent's argument on the mistaken issuance of the special residency permit without any evidence. The Respondent maintains that the Tribunal did not need to be presented with a fact witness to understand that the mistake had occurred in 2004 because the error was clear from the discrepancy in Mr Khudyan's patronymics used in the documents. The Respondent adds that the Tribunal did not rely on Mr Arabyan's testimony as fact evidence on the issuance of Mr Khudyan's permit but only as testimony about the nature of the search process at the relevant time to identify a person as an Armenian citizen.

(ii)    It is not correct that the Tribunal ignored arguments and evidence presented by the Applicant, given that it engaged with them in paragraphs 261-263 of the Award. In any case, the Respondent notes, it is settled law that a tribunal does not commit annullable error if it does not respond to each allegation made by a party.

(iii)   Contrary to what the Applicant alleges, the Tribunal did not conclude that it would have been impossible for the Armenian authorities to verify Mr Khudyan's identity and citizenship status. According to the Respondent, the Award simply establishes that name searches were the means to check for citizenship.

161.   In the Counter-Memorial, the Respondent argues that the February Letter and exhibit A-0064 are new evidence which was not submitted in accordance with the Committee's directions in paragraph 15.4 of Procedural Order No. 1 (according to which a Party wishing

---

[157] Rejoinder, paras. 92-94.

to introduce new documents or other evidence shall "*file a request to the Committee*"). The Respondent maintains that it "*cannot respond to arguments*" raised on evidence that has not been properly admitted into this proceeding. According to the Respondent, the procedure set out in paragraph 15 of Procedural Order No. 1 aims at preserving the scope of the proceeding, and that annulment cannot be "*used by one party to complete or develop an argument which it could and should have made during the arbitral proceeding or help that party retrospectively fill gaps in its argument*" as found in *Postova Banka v. Greece*.[158]

162.  The Respondent notes that (i) paragraph 15.4 of Procedural Order No. 1 is clear on the need for leave from the Committee and the Memorial was submitted after Procedural Order No. 1 was issued; (ii) the Claimant did not advance the February Letter as a basis for an annulment argument but in the context of the stay of enforcement, and the Claimant failed to seek leave even after the Respondent communicated its view on this matter in the Counter-Memorial; and (iii) the February Letter is a factual exhibit, which requires leave under paragraph 15.4 of Procedural Order No. 1, even if the Claimant attempts to qualify it as a legal authority.[159]

163.  The Respondent challenges the suggestion that it fabricated evidence in the arbitration when submitting exhibit R-0008 and asks that this accusation be withdrawn. The Respondent argues that there is no indication that it falsified, withheld, manipulated, or otherwise fabricated evidence and explains that the February Letter does not prove the Applicant's allegations but rather confirms the accuracy of the November Letter. The Respondent also challenges the allegation that it lacked candour and argued that the contents of the two documents are essentially the same. It further maintains that the fact that "*two different officers do not share the same opinion with regard to questions that pre-*

---

[158] Counter-Memorial, paras. 169-173; Rejoinder, paras. 32, 37.
[159] Rejoinder, paras. 33-36.

*date their respective tenures in the respective office by approximately two decades does not prove lack of candor on the part of anyone.*"[160]

164. While maintaining its admissibility objection, in the Rejoinder, the Respondent also contends that the February Letter is "*wrong in its legal analysis*" because it ignores the core aspects of the applicable law, namely that the 1978 USSR Citizenship Law remained in force in Armenia after the promulgation of the Declaration of Independence.[161]

165. In any case, even if the February Letter had been in the arbitration record, it would not be appropriate for the Committee to second guess the Tribunal's credibility findings on evidence. According to the Respondent, a committee can overturn a credibility finding by a Tribunal under Article 52(1)(b) of the ICSID Convention only if it finds that the Tribunal has manifestly failed to apply Arbitration Rule 34, which the Applicant has not alleged.[162]

## C. WHETHER THE TRIBUNAL'S DECISION ON MR KHUDYAN'S CITIZENSHIP IS MATERIAL TO THE OUTCOME OF THE DISPUTE

### (1) The Respondent

166. The Respondent notes that, in its Application/Memorial, the Applicant does not seek to annul Section V.B of the Award.[163] On this basis, it argues that findings reached in that Section are *res judicata*. Those findings include the Tribunal's conclusions that Mr Khudyan holds no investment in Armenia (but for his shareholding in Arin Armenia) and that there is no evidence of a "*contribution by Mr. Khudyan in Armenia.*" The Respondent concludes that the partial annulment of the Award sought by the Applicant

---

[160] Rejoinder, paras. 39-42.

[161] Rejoinder, paras. 43-44.

[162] Counter-Memorial, para. 174.

[163] As seen above in paragraph 76, in the Reply the Applicant has amended the scope of the relief requested. The Respondent has objected to the admissibility of the amendment.

would be "*wasteful*", because even if it were granted, Mr Khudyan would have no prospect that on resubmission a tribunal would uphold jurisdiction *ratione materiae*.[164]

167.    In the Rejoinder, the Respondent identifies the findings reached in Section V.B that are *res judicata* quoting from paragraphs 371, 374-375, 382, 388, 396, 410, 415, 416, of the Award, and notes that any resubmission tribunal would be compelled to conclude that Mr Khudyan did not make an investment under the ICSID Convention. The Respondent denies that, in paragraph 416 of the Award, the Tribunal found that Mr Khudyan made an investment in Armenia and acquired an indirect real estate ownership through his shareholding in Arin Armenia. The Respondent argues that the Award merely finds that Mr Khudyan holds shares in a company that "*in turn held the legal title to the Mashtots Properties*." According to the Respondent, no resubmission tribunal could conclude that naked share ownership can qualify as an investment in a case where it must be taken as a given that the shares were not acquired for value by the putative investor and where no other incidence of ownership could be proved.[165]

**(2)    The Applicant**

168.    The Applicant rejects the Respondent's argument that the Tribunal's determination on Mr Khudyan's citizenship is not material to the outcome of the arbitration because the Tribunal "*implicitly*" found that Mr Khudyan did not have an investment in Armenia and the section in which this finding is made is *res judicata*. First, the Applicant notes that, if the Tribunal had found that the Applicant did not have an investment, it would have said so explicitly in Section V.B of the Award, and it would have dismissed Mr Khudyan's case on this ground. Secondly, the Applicant argues that a fair reading of paragraphs 416 and

---

[164] Counter-Memorial, para. 175; Rejoinder, para. 101.
[165] Rejoinder, paras. 101-108.

432 of the Award strongly implies that the Tribunal found that Mr Khudyan had indeed made an investment in Armenia.[166]

## VI.   THE COMMITTEE'S ANALYSIS

### A.   THE SCOPE OF THE PROCEEDINGS ON ANNULMENT

169.   Mr Khudyan seeks annulment only of those portions of the Award which address his claims. Arin US is not a party to the proceeding on annulment and the parts of the Award which dismissed the objection to jurisdiction *ratione personae* but upheld the objection *ratione materiae* in respect of Arin US are not challenged.

170.   In the Application for Annulment, Mr Khudyan requested annulment only of paragraphs 203-267 and 452(1), (4) and (5) of the Award. In the Reply, he also sought annulment of paragraphs 154-175, 181-188, 193-195 and 201-202.[167] The Respondent challenges what it characterises as an attempt to enlarge the scope of the challenge by widening it to include passages which the Respondent had treated in its Counter-Memorial as *res judicata*.[168]

171.   The Committee agrees with the Respondent that an applicant for annulment who seeks annulment of only part of an award must specify in the application precisely which parts of the award it seeks to challenge and is not free to amend that specification at will. A general "reservation of rights" statement does not affect that principle. The Committee therefore rejects the Applicant's attempt to broaden the scope of the annulment sought and proceeds on the basis that it is only the paragraphs mentioned in the Application which are under consideration. Nevertheless, paragraphs 154-175 and 181-188 are merely summaries by the Tribunal of the arguments of the Parties and contain no decision by the Tribunal. In

---

[166] Reply, paras. 180-185.
[167] See paras. 75-76, above.
[168] See para. 79, above.

practice, therefore, it makes no difference whether or not they are included in the scope of annulment sought. Paragraphs 193-195 and 201-202 are different in that they set out the decision of the Tribunal regarding the requirements which must be met in relation to jurisdiction *ratione personae* in a case brought by a natural person under the ICSID Convention. Nevertheless, neither before the Tribunal nor in the present proceeding has either Party sought to challenge the general statements set out in those paragraphs which amount, in effect, merely to a setting of the scene for the findings in paragraphs 203-266.

## B.    THE STANDARD TO BE APPLIED

172.    The basic principles governing annulment proceedings are now well established. As the *ad hoc* Committee in *MTD v. Chile* put it:

> Under Article 52 of the ICSID Convention, an annulment
> proceeding is not an appeal, still less a retrial; it is a form of review
> on specified and limited grounds which take as their premise the
> record before the Tribunal.[169]

173.    This point was developed by the *ad hoc* Committee in *Soufraki v. UAE*, which observed that:

> […] annulment review, although obviously important, is a limited
> exercise and does not provide for an appeal of the initial award. In
> other words […]"an ad hoc committee does not have the jurisdiction
> to review the merits of the original award in any way. The annulment
> system is designed to safeguard the integrity, not the outcome, of
> ICSID arbitration proceedings."[170]

---

[169]  *MTD v. Chile*, note 55, above, para. 31.

[170] *Soufraki v. UAE*, note 54, above, para. 20. See also, *CEAC v. Montenegro*, note 65, above, paras. 79-85.

174.    The function of an *ad hoc* committee is limited to deciding whether or not one of the five grounds in Article 52(1) of the ICSID Convention has been made out. It is not entitled to range beyond those grounds.

175.    In the present case, the Applicant seeks annulment under only one of those five grounds, namely Article 52(1)(b), "*that the Tribunal has manifestly exceeded its powers.*" Although the Applicant has, in the course of the pleadings, accused the Tribunal of procedural errors and of reasoning which he describes as so defective as not to amount to reasoning at all, he does not seek annulment under either Article 52(1)(d) ("*serious departure from a fundamental rule of procedure*") or (e) ("*failure to state the reasons on which* [the Award] *is based*").[171] Accordingly, the Committee's task is confined to determining whether or not the Tribunal manifestly exceeded its powers when it held that it lacked jurisdiction *ratione personae* over Mr Khudyan's claim.

176.    A proceeding for annulment under Article 52(1)(b) of the ICSID Convention can normally be based only on the record before the tribunal. Such a proceeding is not an appeal, still less a rehearing. An *ad hoc* committee cannot, by relying upon evidence that was not before the tribunal, find that that tribunal has manifestly exceeded its powers. It follows that evidence which was not before the tribunal will almost always be irrelevant to an annulment proceeding under Article 52(1)(b).[172]

177.    In the present case, the Applicant has sought to introduce into the record before the Committee a new document, the February Letter (see paragraph 126, above). The February Letter post-dates the Award and thus was obviously not part of the record before the

---

[171] See para. 73, above.

[172] It is possible that there may be exceptional cases, for example where the tribunal has relied upon its own translation of a text not in the language of the arbitration, in which it may be appropriate for the annulment committee to admit evidence which shows that this translation was wrong or incomplete. That is not this case and the Committee expresses no opinion on the matter.

Tribunal. Procedural Order No. 1, paragraph 15.4, makes clear that "[i]*n principle no new evidence shall be admitted in this proceeding*" and requires that a party wishing to introduce new evidence must make an application to that effect. The Applicant has made no such application. The Committee therefore decides that the February Letter shall not be admitted into the record before the Committee. The Committee would, in any event, have attached no weight to the February Letter. While the Committee considers it disturbing that the organ of the respondent State most closely concerned with matters of citizenship appears to take a different view from that advanced by the respondent State in the proceeding before the Tribunal, the letter cannot establish that the Tribunal exceeded its powers, still less that it manifestly did so.

178.    Article 52(1)(b) of the ICSID Convention lays down two requirements which an applicant for annulment must satisfy. First, they must establish that the tribunal exceeded its powers and, secondly, that that excess was "*manifest.*" It is now well established that a tribunal may exceed its powers not only by asserting jurisdiction where none exists but also by declining to exercise a jurisdiction which it does possess.[173]

179.    In either case, however, an excess of power exists only where the decision of the tribunal is not tenable under the relevant law and jurisdictional instruments. It is not a ground for annulment that a tribunal followed one tenable view of the law or interpretation of the

---

[173] See, e.g., *Vivendi v. Argentina*, note 49, above, para. 86, "[i]*t is settled [and neither party disputes] that an ICSID tribunal commits an excess of powers not only if it exercises a jurisdiction which it does not have under the relevant agreement or treaty and the ICSID Convention, read together, but also if it fails to exercise a jurisdiction which it possesses under those instruments.*" Similarly, *Empresas Lucchetti, S.A. and Lucchetti Peru, S.A. v. The Republic of Peru,* ICSID Case No. ARB/03/4, Decision on Annulment*,* 5 September 2007 (**ALA-0005** and **RALA-0083**), para. 99, reads as follows: "[w]*here a tribunal assumes jurisdiction in a matter for which it lacks competence under the relevant BIT, it exceeds its powers. The same is true in the inverse case where a tribunal refuses or fails to exercise jurisdiction in a matter for which it is competent under the BIT. The* Ad hoc [sic] *Committee considers that these situations are analogous and should be assessed according to the same legal standards.*"

relevant instruments rather than another. As the *ad hoc* committee in *TECO v. Guatemala* put it:

> […] *in determining whether a tribunal has committed a manifest excess of powers, an annulment committee is not empowered to verify whether a tribunal's jurisdictional analysis or a tribunal's application of the law was correct, but only whether it was tenable as a matter of law. Even if a committee might have a different view on a debatable issue, it is simply not within its powers to correct a tribunal's interpretation of the law or assessment of the facts.*[174]

180.    The same passage highlights another limitation, namely that a committee is not empowered to substitute its own findings of fact for those of the tribunal unless the tribunal's conclusions on a factual issue were simply not tenable on the evidence before it.

181.    As for the requirement that the excess must be manifest, that term is generally held to refer not to the gravity of the excess but to how readily apparent it is. In the words of a leading commentary to which both Parties have referred:

> *In accordance with its dictionary meaning, "manifest" may mean "plain", "clear", "obvious", "evident" and easily understood or recognized by the mind. Therefore, the manifest nature of an excess of powers is not necessarily an indication of its gravity. Rather it relates to the ease with which it is perceived.* […] *An excess of powers is manifest if it can be discerned with little effort and without deeper analysis.*[175]

---

[174] *TECO Guatemala Holdings, LLC v. Republic of Guatemala*, ICSID Case No. ARB/10/23, Decision on Annulment, 5 April 2016, para. 78 ("**TECO v. Guatemala**", **RALA-0069**).

[175] Schreuer et al, *The ICSID Convention: A Commentary* (2nd edition, 2009), Article 52, para. 135 (**ALA-0001**). The third edition of this Commentary (published in 2022 and not cited by the Parties) is more nuanced on this point.

182.    That proposition needs to be treated with a degree of caution. First, while the jurisprudence is consistent in requiring that the excess of power be sufficiently clear as not to require "*elaborate interpretation*",[176] in the words of the *EDF v. Argentina* Committee:

> While […] *an excess of powers will be manifest only if it can readily be discerned,* […] *this does not mean that the excess must, as it were, leap out of the page on a first reading of the Award. The reasoning in a case may be so complex that a degree of inquiry and analysis is required before it is clear precisely what the tribunal has decided. In such a case, the need for such inquiry and analysis will not prevent an excess of powers from being "manifest."*[177]

183.    Secondly, while it is true that the term "*manifest*" refers to whether the excess is clear rather than whether it is serious, a trivial excess will frequently not lead to annulment. The language of Article 52(3) of the ICSID Convention, which states that a committee "*has the authority to annul the award or any part thereof*" makes clear that annulment is not automatic if one of the grounds in Article 52(1) is made out. Rather, an annulment committee has a discretion whether or not to annul. If the defect which has been discovered is of insufficient gravity that it could have made a difference to the outcome of the case, the committee may choose not to order annulment.

184.    The Committee considers, therefore, that its task is to determine, on the basis of the record before the Tribunal:

    (a)    whether the Tribunal exceeded its powers by taking a position which was not tenable when it held that it lacked jurisdiction *ratione personae*; and

---

[176] *Wena Hotels Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Decision on the Application by the Arab Republic of Egypt for Annulment of the Arbitral Award dated 8 December 2000, 5 February 2002, para. 25 (**RALA-0042**). See also *CDC Group plc v. Republic of Seychelles*, ICSID Case No. ARB/02/14, Decision on Annulment, 29 June 2005, para. 41 (**RALA-0052**).

[177] *EDF v. Argentina*, note 62, above, para. 193.

(b)    if so, whether that excess was one which could readily be discerned after the requisite degree of inquiry and analysis required by the nature of the case.

If both these requirements are met, the Committee will then, in the exercise of its discretion, consider whether the excess was one which is of sufficient gravity that it could have made a difference to the outcome of the proceeding before the Tribunal.

## C.    DID THE TRIBUNAL MANIFESTLY EXCEED ITS POWERS?

### (1)    Did the Tribunal exceed its powers when it held that it lacked jurisdiction *ratione personae* over Mr Khudyan?

185.    There can be no doubt that the Tribunal was correct in deciding that it possessed jurisdiction over Mr Khudyan's claims only if Mr Khudyan was not a national of Armenia at the relevant time. Article 25(2)(a) of the ICSID Convention (which is quoted at paragraph 48, above) makes clear that an ICSID tribunal possesses jurisdiction *ratione personae* in respect of a natural person only if that person does not possess the nationality of the respondent State at the relevant time. It thus excludes jurisdiction over the claims of a natural person who possesses dual nationality if one of the citizenships in question is that of the respondent State.

186.    According to Article 25(2)(a) of the ICSID Convention, the relevant times for these purposes are the date on which the parties agreed to arbitration (in this case the date on which the Request for Arbitration was submitted) and the date on which the arbitration was registered by the Centre. Before the Tribunal, Armenia argued that the Applicant's nationality at the date when the alleged investment was said to have been made was also relevant. The Tribunal did not, however, consider it necessary to determine whether that was indeed a relevant date as it concluded that Mr Khudyan was a national of Armenia

throughout the period from 1991 to the submission of the Request for Arbitration and the registration of the case.

187.   The challenge to that finding is at the heart of the Applicant's case on annulment. According to the Applicant the Tribunal manifestly exceeded its powers when it found that Mr Khudyan was a national of the Republic of Armenia at the relevant date. In that context he challenges the Tribunal's starting point, the assumption that Mr Khudyan became a citizen of the Republic of Armenia on that country's independence because it considered that he had been a citizen of the ASSR and that this citizenship had converted into citizenship of the Republic of Armenia. According to the Applicant, that led the Tribunal to ask the wrong question in relation to all subsequent events, namely whether Mr Khudyan had lost Armenian citizenship, rather than inquiring properly into whether he had ever acquired that citizenship in the first place.

188.   It is therefore necessary to analyse the Tribunal's starting point in some detail.

189.   The Tribunal's reasoning has been summarised in paragraphs 48-66, above. It is necessary, nevertheless, to repeat the terms of paragraph 205 of the Award which sets out the first, critical, step in the Tribunal's line of reasoning:

> *As the starting point for its analysis, the Tribunal takes the common ground between the Parties that prior to Mr. Khudyan's departure from Armenia to the USA in 1989 and at least until the Declaration of Independence by the Supreme Council of the ASSR on August 23, 1990, Mr. Khudyan was a citizen of the USSR as well as of the ASSR. He held a passport of the USSR, which he used when emigrating to the USA.*

190.   The Committee considers it important to unpack the different elements of this paragraph. There are three separate elements. First, the Tribunal considered that it was common ground between the Parties that Mr Khudyan was a national of both the ASSR and the

USSR prior to his emigration to the USA in August 1989. Secondly, the Tribunal considered that it was common ground between the Parties that this continued to be the case "*at least until the Declaration of Independence by the Supreme Council of the ASSR on August 23, 1990.*" Thirdly, the Tribunal makes a statement of fact that Mr Khudyan held a USSR passport which he used when emigrating to the United States in 1989.

191.    The record gives no basis to question the first of the three elements of the Tribunal's analysis. Before the Tribunal – and, indeed, before the Committee – both Parties were clear that, prior to his emigration to the USA in August 1989, Mr Khudyan was a citizen of the USSR and the ASSR. Until he deregistered from the address in Yerevan and surrendered the document described as his "*internal passport*", Mr Khudyan possessed identity documents which showed him to be a citizen of the ASSR. Under the 1978 USSR Citizenship Law, that made him, in addition, a citizen of the USSR.

192.    Nor does either Party question the third element in paragraph 205. The passport which was granted to Mr Khudyan and allowed him to emigrate was in evidence before the Tribunal and has been produced to the Committee.[178] It bears on its face the description "*Union of Soviet Socialist Republics Passport*", describes the bearer as "*a citizen of the Union of Soviet Socialist Republics*" and states that he "*is departing for abroad*" for a stay which is described as "*indefinite.*" The passport is stated to be valid until 11 January 1994.

193.    It is the second element of paragraph 205, however, which demands closer attention. Here the Tribunal treated as common ground that Mr Khudyan continued to be a national of both the USSR and the ASSR after emigrating to the USA and being granted permanent residence there. Three features of the treatment of this second element by the Tribunal are significant.

---

[178] **A-0005**; **C-0165 Arbitration**.

194.    First, it represents a critical step in the Tribunal's analysis of whether Mr Khudyan was a national of Armenia at the time, nearly twenty years after he emigrated to the USA, when he filed his Request for Arbitration and that Request was registered. Because the Tribunal accepted that Mr Khudyan remained a citizen of the ASSR after he emigrated, it concluded that this citizenship mutated into citizenship of the independent Republic of Armenia with Armenia's independence. The rest of its analysis is an inquiry into whether he lost that Armenian citizenship, not whether he acquired it.

195.    Secondly, this critical step in the Tribunal's reasoning is not based on findings regarding the evidence or analysis of the law regarding citizenship of the USSR and the ASSR but on a statement that the matter was "*common ground*" between the Parties.

196.    Thirdly, the Tribunal does not address the question whether Mr Khudyan might have continued to be a national of the USSR after he emigrated but not a national of the ASSR.

197.    If it was indeed common ground between the Parties that Mr Khudyan remained a citizen of both the USSR and the ASSR between his emigration in August 1989 and the Declaration of Independence by Armenia, then the rest of the reasoning of the Tribunal follows naturally. But was it common ground?

198.    It was certainly common ground that Mr Khudyan continued to be a citizen of the USSR during this period. Between August 1989 and August 1990 (and indeed later), Mr Khudyan possessed his USSR passport and used it for identification purposes.[179] It was also accepted by both Parties that, under the law of the USSR (contained in the 1978 USSR Citizenship Law), a citizen of the USSR did not lose their USSR nationality by taking up permanent residence in another State.

---

[179] Arbitration Hearing Day 2, Transcript, p. 545, lines 7-24 (**A-0012**).

199.   There is, however, no statement in the record before the Tribunal in which Mr Khudyan, either in his own evidence or through his counsel, accepted that he remained a citizen of the ASSR after he had emigrated. That question is not addressed in the Memorial or in Mr Khudyan's two witness statements. The Memorial states only that Mr Khudyan was at no time a citizen of the Republic of Armenia.[180]

200.   The Reply addresses the issue of citizenship at greater length, presumably because Armenia had by then set out, in the Counter-Memorial, its objection that there was no jurisdiction *ratione personae* with regard to Mr Khudyan on the basis that he had been a citizen of the ASSR and had become a citizen of Armenia.[181] However, the focus is on the effects of the 1995 Citizenship Law rather than Mr Khudyan's status in the years immediately following his emigration to the USA. Thus, paragraph 35 of the Reply states:

>   *The uncontested evidence shows that Mr. Khudyan, **a former citizen** of the ASSR of Armenian descent, had "left for the USA in 1988* [sic] *for permanent residence."* (emphasis added)

201.   This statement was picked up by the Respondent in its Rejoinder at paragraph 479:

>   *The Reply offers key points as to which the Republic and Khudyan are in agreement on the question of his Armenian nationality. The first fact as to which the parties are in agreement is that Khudyan was a citizen of the Armenian Socialist Republic.*[182]

202.   The footnote at the end of that statement cited to paragraph 35 of the Reply. However, neither paragraph 35 of the Reply, nor paragraph 479 of the Rejoinder says anything about whether Mr Khudyan continued to be a citizen of the ASSR after he emigrated.

---

[180] Arbitration Memorial, para. 160 (**RA-0003**).

[181] Arbitration Counter-Memorial, paras. 224-231 (**A-0017**).

[182] Arbitration Rejoinder, para. 479 (**RA-0020**).

203.    Later, the Rejoinder reviews the provisions of Article 10(3) of the 1995 Citizenship Law, which provides that the following persons shall be recognized as citizens of the Republic of Armenia:

> The citizens of the former Armenian SSR, who reside outside the Republic of Armenia after 21 September 1991 and who have not acquired the citizenship of another State, as well as the citizens of the former Armenian SSR, who have been residing outside Armenia prior to that, who are Armenians by national origin, have not acquired the citizenship of another State and have registered with the consulate before the entry into force of this Law.

204.    At paragraph 482 of the Rejoinder, the Respondent states that "*according to paragraph 35 of the Reply, it is uncontested that Khudyan is 'one of the citizens of the former Armenian SSR' to whom Article 10(3) could apply.*" However, paragraph 35 of the Reply did not say whether Mr Khudyan had remained a citizen of the ASSR after emigrating to the USA.

205.    Turning to statements made at the hearing before the Tribunal, counsel for Armenia stated that:

> Here's the admission; the Reply at 35, that Mr Khudyan was a former citizen of the ASSR not the USSR. That's the Reply at 35. Here's the language from the Armenian declaration of independence which states that […] the Armenian SSR is renamed the Republic of Armenia.[183]

However, paragraph 35 of the Reply does not state that Mr Khudyan was not a citizen of the USSR and it says nothing about whether his citizenship of the ASSR continued after he left for the USA. Moreover, Mr Khudyan had not stated that during the period after he had emigrated he was not a citizen of the USSR, quite the contrary.

---

[183] Arbitration Hearing Day 1, Transcript, p. 171, lines 7-13 (**A-0027**).

206.    Mr Khudyan testified on the second day of the hearing before the Tribunal. There were the following exchanges between the President of the Tribunal and Mr Khudyan:

President: […] *my question is about the period between 1971 and 1989 when you were in Yerevan.*

Mr Khudyan: *Yes*

President: *At that moment or in that period of time are we correct to understand that you were a citizen of the USSR ?*

Mr Khudyan: *I was - yes I was citizen of Armenia SSR, not USSR.*

President: *So what did your passport say? You held a passport of the Armenian SSR?*

Mr Khudyan: *I want to remember. Something tells me that I had a passport of USSR, not even Armenian. I believe it was USSR. Passport of USSR. I'm not sure. But I actually provide a document that is in the record, I believe, of my last passport that I travelled from Armenia to USA.*[184]

The USSR passport was then produced and the exchange continued:

President: *So you held a passport of the USSR which had an exit visa to go –*

Mr Khudyan: *- to Los Angeles.*

President: *To Los Angeles.*

Mr Khudyan: *But you would only get this passport if you were an immigrant* [emigrant?]*, from what I know. From what I know you would surrender your passport, you obtain another passport and*

---

[184] Arbitration Hearing Day 2, Transcript, p. 541, lines 5-22 (**A-0012**).

> *this was the only passport and they were red passports. That's what I know. You would only get this passport when you were emigrating, and to my knowledge we surrender everything in Armenia, whether it was passport, real estate, obligation. If you were a member of party – like at that time I was in university and I had to surrender by whatever party, the communist – not the communist but something similar for young people. So I had to surrender all that.*[185]

207.   Later in this exchange, Mr Khudyan stated that he continued to use his USSR passport for identification purposes until it expired in 1994.[186]

208.   On Day 4 of the hearing before the Tribunal, Mr Minas Arabyan, the Respondent's expert, testified about the issues of nationality. In his first expert report,[187] Mr Arabyan cited Article 33 of the 1977 Constitution of the USSR:

> *Common union citizenship is established in the USSR. Every citizen of the Union Republics is a citizen of the USSR. The procedure and conditions for obtaining and the loss of citizenship of the Union are defined by the Law "On Citizenship."*[188]

He also referred to Article 31 of the 1978 Constitution of the ASSR:

> *Every citizen of the Armenian SSR is a citizen of the USSR, in accordance with the common union citizenship established in the USSR.*[189]

209.   Mr Arabyan then stated that:

---

[185] Arbitration Hearing Day 2, Transcript, p. 543, lines 4-21 (**A-0012**). See also the exchange between Professor Douglas and counsel for Mr Khudyan at Arbitration Hearing Day 1, Transcript, p. 148, line 13 to p. 150, line 21 (**A- 0027**).

[186] Arbitration Hearing Day 2, Transcript, p. 545, lines 7-24 (**A-0012**).

[187] First Legal Opinion of Minas Arabyan (**A-0009**).

[188] First Legal Opinion of Minas Arabyan, para. 15 (**A-0009**).

[189] First Legal Opinion of Minas Arabyan, para. 17 (**A-0009**).

> *It follows from the above-mentioned legal norms that the USSR Constitution 1977 and the Arm SSR Constitution 1978, at the same time declaring union citizenship as supreme over the republican citizenship, also stipulated the institution of republican citizenship, as well as the dialectical link between the republican and the union citizenship. Hence, E. Khudyan, being citizen of the USSR, was also citizen of the ArmSSR, as well as after his departure from the USSR he retained citizenship of the USSR and respectively of the ArmSSR.*[190]

210.    Mr Arabyan repeated this view in his oral testimony on Day 4:

> *For Mr Khudyan we have no facts to show that while he was a citizen of the USSR his USSR citizenship was taken away. So the conclusion is after travelling to the United States under the USSR legislation, the legislation of the country of his primary citizenship, Mr Khudyan was considered a citizen of the USSR. Therefore also a citizen of the Armenian Soviet Socialist Republic.*[191]

211.    Mr Arabyan was not challenged on this statement during his cross-examination by counsel for Mr Khudyan. Counsel for Armenia, in closing submissions, highlighted that Mr Arabyan's evidence had not been contradicted and that no expert evidence had been submitted by Mr Khudyan.[192] That point was repeated in the Respondent's post-hearing brief.[193] The Claimant did not address this issue in closing submissions or in his post-hearing brief.

212.    The Committee cannot discern in this record that it was common ground that Mr Khudyan remained a citizen of the ASSR after emigrating to the USA and "*at least until the Declaration of Independence by the Supreme Council of the ASSR on August 23, 1990.*" At

---

[190] First Legal Opinion of Minas Arabyan, para. 18 (**A-0009**).
[191] Arbitration Hearing Day 4, Transcript, p. 962, lines 16-24 (**A-0023**).
[192] Arbitration Hearing Day 5, Transcript, p. 1101, line 20 to p. 1102, line 7 (**A-0023**).
[193] Respondent's Arbitration Post-Hearing Brief, para. 2 (**RA-0008**).

no point in the record did Mr Khudyan, either directly or through counsel, accept that proposition. As counsel for Mr Khudyan told the Committee, in answer to a question by the President, "[t]*hat precise question was never put to us. It was disputed as a factual matter.*"[194] It is true that Mr Arabyan made the statement quoted in paragraph 208, above, which was not directly challenged by Mr Khudyan's counsel. The failure to challenge that statement does not, however, amount to its acceptance. The Tribunal's Procedural Order No. 1, paragraph 18.3 provides that:

> *A party that does not call for cross-examination of a particular witness or expert whose evidence has been submitted by the opposing party shall not be deemed thereby to accept the evidence given in the relevant statement or report.*[195]

Had Mr Arabyan not been cross-examined, it follows that the failure to challenge his testimony on this point would not have amounted to acceptance. The Committee considers that the fact that he was not challenged on it in cross-examination also cannot amount to an acceptance.

213. The Committee considers that to describe a proposition as "*common ground*" requires more than showing that the proposition, when advanced, was not directly challenged; it requires a positive acceptance. That is particularly true when the proposition is then treated as a central building block of the reasoning in an award. As counsel for the Respondent said in the hearing before the Committee (albeit in relation to another matter), there is a difference between saying that something is common ground and saying that it is undisputed.[196]

---

[194] Committee Hearing, Transcript, p. 178, lines 7-8.

[195] Arbitration Procedural Order No. 1 (**A-0069**).

[196] Committee Hearing, Transcript, p. 101, lines 13-22.

214.    Moreover, the Committee takes into account the evidence of Mr Khudyan (quoted at paragraph 206, above) that in emigrating he considered that he was giving up everything in Armenia including his passport.

215.    The Tribunal's assumption that it was common ground that Mr Khudyan retained his ASSR citizenship after emigrating meant that the Tribunal did not inquire into whether he might have been a national of the USSR but not of the ASSR during the period between August 1989, when he left for the USA, and the dissolution of the USSR in December 1991. In the proceedings before the Committee, the Respondent argues that the Tribunal decided that Mr Khudyan did not lose his citizenship of the USSR or the ASSR when he emigrated.[197] However, the passages from the Award on which the Respondent relies address the possibility that Mr Khudyan lost his citizenship of the USSR; there is no separate analysis of whether he lost citizenship of the ASSR.

216.    As shown above, Mr Arabyan testified that citizenship of the USSR automatically entailed citizenship of the ASSR (see paragraphs 209-210, above). He reached that conclusion, however, on the basis of provisions of the 1977 USSR Constitution and the 1978 ASSR Constitution which provided that a citizen of the ASSR was also a citizen of the USSR. They say nothing about the converse situation. In this context, it is important to recall that it was citizenship of the USSR which had consequences in international law and which alone is mentioned in the passport with which Mr Khudyan emigrated to the USA.

217.    It is impossible for the Committee to tell whether, had it analysed this question, the Tribunal would have concluded that Mr Khudyan could have been a national of the USSR but not of the ASSR or whether, if it had found that this was possible, that that was in fact

---

[197] Rejoinder, paras. 55 and 184, citing paras. 221-223 of the Award.

his situation. The point is that the issue was an important one and the Tribunal did not inquire into it.

218.   Questions of jurisdiction are important. Under Article 41(1) of the ICSID Convention, a tribunal is the judge of its own competence. But to make a judgement on whether it has competence in a case, a tribunal must analyse and decide all of the questions which go to that issue of competence. To avoid analysing a critical question and deciding it on the assumption that it was "*common ground*" when that was not in fact the case is, in the opinion of the Committee, an excess of power.

**(2)    Was the excess of power manifest?**

219.   The Committee turns to the question whether the excess of power which it has identified was manifest. As stated above, the Committee accepts that an excess of power which can be identified only after prolonged and detailed inquiry will not meet this requirement. However, it also accepts the cautionary note sounded by the *EDF v. Argentina* Committee (and quoted at paragraph 182 above) that the reasoning in a case may be such that some degree of inquiry and analysis is required.

220.   Where a tribunal bases a critical step in its reasoning on a statement that a particular proposition is "*common ground*", it is clearly necessary for an annulment committee to inquire into the record to ascertain whether that was actually the case.

221.   In the present case, the Committee has engaged in precisely that task. A review of the record clearly shows that there was in fact no "*common ground*" on the critical point. The Committee concludes that the requirement of a "*manifest*" excess is thus satisfied in the present case.

**D.      IS THE APPLICANT RAISING A NEW ISSUE NOT RAISED BEFORE THE TRIBUNAL?**

222.    Before the Committee, the Respondent has argued that, in challenging the finding that Mr Khudyan was a national of the ASSR from the time of his emigration to the USA until at least the Declaration of Independence of the Republic of Armenia, the Applicant is seeking to open an issue on which it could have made submissions to the Tribunal but chose not to do so.

223.    The Committee does not agree. It is true that Mr Khudyan did not directly discuss this issue in the hearing before the Tribunal but, as the Committee has already discussed (see paragraph 212, above), the point was never put to him in those terms. Moreover, his own evidence before the Tribunal (quoted at paragraph 206, above) suggests that on emigration he regarded himself as having lost any connection, whether of nationality or otherwise with the ASSR.

224.    It has to be recalled that the excess of power identified by the Committee was that the Tribunal held that it was "*common ground*" that Mr Khudyan retained the citizenship of the ASSR even after emigrating, whereas the record provided no basis for such a finding. It is not a ground for rejecting an annulment application that a point was not argued in detail before the Tribunal when the basis for annulment is that the Tribunal held that something was "*common ground*" even though it had not been the subject of submissions by one party.

E.    THE COMMITTEE'S DISCRETION

225.    The Committee has thus found that the ground for annulment under Article 52(1)(b) of the ICSID Convention has been made out. It will now consider whether or not to exercise its discretion to annul those parts of the Award challenged by Mr Khudyan.

(1)    The Gravity of the Excess of Power

226.    As explained in paragraph 183, above, this first requires the Committee to consider whether the excess of power was sufficiently grave that it could have made a difference to the outcome of the case.

227.    As explained in paragraphs 189 to 196 above, the assumption which the Tribunal made that Mr Khudyan was still a national of the ASSR at the time of the Declaration of Independence on 23 August 1990 was central to the entire inquiry which followed. On the basis of that assumption, the Tribunal asked whether any of the acts which it examined – particularly the Declaration of Independence and the 1995 Citizenship Law – had deprived him of that nationality.

228.    If Mr Khudyan had not been a citizen of the ASSR after he emigrated, the inquiry would necessarily have been different. The Tribunal held that the Declaration of Independence neither conferred nationality upon anyone nor deprived anyone of it.[198] It would therefore have been irrelevant.

229.    As for the 1995 Citizenship Law, the assumption that Mr Khudyan was a citizen of the former ASSR was central to the finding that the Citizenship Law recognized him as a citizen of the Republic of Armenia.[199] Moreover, the Tribunal's interpretation of the Citizenship Law was heavily influenced by the consideration that it should not be read in

---

[198] Award, para. 213.
[199] See, in particular, Award, paras. 231-232.

such a way as to render existing ASSR citizens stateless.[200] Yet if Mr Khudyan had already ceased to be a citizen of the ASSR before Armenia became independent, then the alternative reading of the Citizenship Law would not have "*rendered*" him stateless. Instead, the question would have been whether the Citizenship Law conferred citizenship upon someone who was of Armenian origin but was not a citizen, had not been born in Armenia and had lived outside Armenia for some years.

230.   Moreover, the entire question of statelessness would have had to be examined differently if the Tribunal had considered whether Mr Khudyan was a citizen of the USSR but not of the ASSR following his emigration (see paragraphs 227 to 229, above). Had the Tribunal concluded that that was the case, then Mr Khudyan would not have been stateless when the Declaration of Independence was adopted or when Armenia became independent in September 1991. The USSR was still in existence at those times and was not dissolved until three months after the Armenian referendum took effect.

231.   The Committee accepts that the Tribunal attached weight to Mr Arabyan's evidence that the practice of the Armenian authorities was to admit on a "*laissez passer*" basis holders of USSR passports who sought entry into Armenia using such passports, and then to give them Armenian nationality documents. However, because the Tribunal had already started from the assumption that Mr Khudyan still held ASSR nationality and had thus become a national of Armenia, it did not inquire into whether this practice would have applied to someone who was not an ASSR citizen at the time of leaving the USSR. Nor did it inquire into the precise nature of the practice, namely whether it was a recognition of what was considered to be an existing nationality or a grant of citizenship.

232.   The Committee cannot speculate on how the Tribunal would or should have answered those questions had it asked them. It cannot, however, be said that it was axiomatic that the

---

[200] Award, paras. 233-239.

Tribunal would have answered them in the Respondent's favour. It follows that, if the Tribunal had not exceeded its powers in the manner set out above, it might have reached a different conclusion on whether Mr Khudyan was a national of the Republic of Armenia.

233. That leaves the possibility that it would still have decided against Mr Khudyan on another basis: either the circumstances of his acquisition of US nationality in 1998 or his acquisition of special residency status in Armenia. The Award does not support either possibility.

234. It is true that paragraph 243 of the Award contains the following statement:

> *Finally, it is important to note that, in that relevant period (November 28, 1995 until August 21, 1998) Mr. Khudyan comported himself in a manner that suggests that he considered himself to be a citizen of the Republic of Armenia. Mr. Khudyan attested at the Hearing that until its expiry in 1994, he continued using his USSR passport. Also after the entry into force of the 1995 Citizenship Law, Mr. Khudyan continued identifying as an Armenian citizen, as is borne out by the fact that in April 1997, when he applied for naturalization in the USA, Mr. Khudyan – assisted by an immigration lawyer – declared on the application form his "Citizenship" to be "Armenia/Russia". In addition, it is undisputed that stateless persons cannot obtain US nationality through naturalization.*

235. However, this passage is not a freestanding ground for the decision but merely a factor which the Tribunal noted. The Committee also notes that Mr Khudyan's use of his USSR passport until 1994 (which was outside the period referred to by the Tribunal in paragraph 243) shows only the acknowledgment of a connection to the USSR, not the ASSR or the Republic of Armenia. Moreover, Mr Khudyan's evidence was that he used it only as a means of identification.[201] As for the statement on his application for naturalization, the

---

[201] Arbitration Hearing Day 2, Transcript, p. 544, line 25 to p. 545, line 24 (**A-0012**).

fact that it cites Russia as well as Armenia reduces the weight which can be placed upon it as it suggests a degree of confusion. There also appears to be no basis in the record for the statement that "*it is undisputed that stateless persons cannot obtain US nationality through naturalization.*"[202]

236.   As for the acquisition of special residency status, although Armenia initially argued that this was a form of nationality, that argument was not pursued and the Tribunal expressly accepted that "*only foreigners are eligible for special residency status.*"[203] The Tribunal's analysis was concerned with the different question whether by granting Mr Khudyan that status the Republic of Armenia had bound itself to treat him as a foreign national.

237.   Accordingly, the Committee concludes that the manifest excess of power which it has identified could have significantly affected the outcome of the case.

**(2)      Would Annulment Serve No Purpose**

238.   The Respondent also argues that annulment of the passages challenged by the Applicant would serve no purpose, because the unchallenged portions of the Award amount to a decision, with the status of *res judicata*, that the Tribunal lacked jurisdiction *ratione materiae* with regard to Mr Khudyan's claims.

239.   The Committee does not agree. While the Tribunal, in the unchallenged paragraphs 355-415 of the Award, made a number of factual findings regarding Mr Khudyan's alleged investments, it did not rule on the objection *ratione materiae* in respect of Mr Khudyan (and, given its finding that it lacked jurisdiction *ratione personae*, had no need to do so), nor did it find that he had made no investment in Armenia.

---

[202] Award, para. 243.
[203] Award, para. 258.

240.   That is clear from paragraph 416, which reads:

> *With respect to Mr. Khudyan, the Tribunal has assessed the*
> *evidence pertaining to Mr. Khudyan's alleged investments in*
> *Armenia in considerable detail and has concluded that, on the basis*
> *of the series of transactions described above, Mr. Khudyan acquired*
> *a 61.1% shareholding in Arin Armenia, which in turn, held the legal*
> *title to the Mashtots properties. The Tribunal has reached different*
> *conclusions with respect to other alleged investments. As per the*
> *Tribunal's findings at paragraphs 203 to 266 above, however, it*
> *does not have jurisdiction* ratione personae *over Mr. Khudyan. Thus,*
> *even if the Claimants had been able to convince the Tribunal that*
> *Mr. Khudyan made other investments in* **Armenia***, this ultimately*
> *would not have assisted the Claimants in view of the Tribunal's*
> *conclusion that it has no jurisdiction over Mr. Khudyan.* (emphasis
> in the original)

241.   The Committee therefore rejects the Respondent's objection that to grant the relief sought
by the Applicant would be "*wasteful.*" If Mr Khudyan chooses to submit a fresh request
for arbitration, the findings of fact in paragraphs 355-415 of the Award would be *res
judicata* and, as such, binding on both Parties. Those findings might limit the scope of a
future tribunal's jurisdiction. Whether that is so would be a matter for decision by that
tribunal. The Committee cannot read this portion of the Award as rendering that decision
a foregone conclusion.

## F.   CONCLUSION

242.   For the reasons stated above, the Committee concludes that the Tribunal manifestly
exceeded its powers and upholds Mr Khudyan's application for annulment of parts of the
Award under Article 52(1)(b) of the ICSID Convention.

243.   The Committee therefore annuls paragraphs 203-267 and 452(1) and, so far as it relates to
Mr Khudyan but not in respect of Arin US, paragraph 452(4) of the Award.

244. That leaves the question of what to do about paragraph 452(5), in which the Tribunal ordered "*the Claimants to pay the Respondent the sum of USD 337,466.34 for the expended portion of the Respondent's advances to ICSID and USD 400,000 towards the Respondent's legal fees and expenses.*"

245. The Tribunal did not distinguish between the two Claimants, that is Mr Khudyan and Arin US, in making this order. Only Mr Khudyan has sought annulment and the parts of the Award in which the Tribunal held that it lacked jurisdiction *ratione materiae* in respect of the claims by Arin US remain valid and effective. Nevertheless, the Committee is not in a position to determine for itself what portion of the costs awarded by the Tribunal relate to Mr Khudyan and what part to Arin US, each of which was jointly and severally liable for the full amount awarded, as was clear from the Parties' submissions on the stay of execution. It has therefore concluded that it must annul paragraph 452(5) in its entirety.

## VII.   COSTS

## A.   THE PARTIES' POSITIONS

## (1)   The Applicant's submission

246. The Applicant has requested (see paragraphs 75 and 76, above) that if he is successful, "*the Republic of Armenia be ordered to pay all costs and expenses borne by Mr Khudyan in connection with this Application.*"

247. In the submission on costs, filed on 8 May 2023, Mr Khudyan's counsel listed the costs incurred in connection with the annulment proceeding as follows:

- Lodging fee: USD 25,000
- Advance payments: USD 325,000

Of the advance payments USD 68,211.76 (estimated) remains and will be returned to Mr Khudyan.

248.   Mr Khudyan's counsel also listed USD 2,435 in costs for document production and preparation of hearing materials.

249.   With regard to attorney's fees, the Applicant submitted a table of "*the total value of time spent by Hughes Hubbard*", which came to a total of USD 573,712. However, the submission stated:

> *Mr Khudyan agreed to pay Hughes Hubbard $147,493.27 (20% of the fee and cost award of $737,466.34) of attorneys' fees if the application is successful. If successful, Mr Khudyan respectfully requests that the Committee order the Respondent to pay the full amount of the value of his attorneys' time spent in connection with these proceedings ($573,712), and in any event, no less than the $147,493.27 of attorneys' fees that he agreed to pay should his Application be successful.*

**(2)   The Respondent's submission**

250.   In its Counter-Memorial, the Respondent requested the Committee to order the Applicant to pay the Respondent's costs, including all attorneys' fees and expenses and all fees and expenses of the *ad hoc* Committee and the ICSID Secretariat, together with interest thereon (see paragraph 77, above).

251.   In its submission on costs, filed on 8 May 2023, the Respondent requested payment of:

-   Professional fees of outside counsel: USD 280,000.00

-   Travel and lodging costs for Professor Sourgens: USD 1,958.00

-   Copying and administrative costs: USD 128.00

Armenia did not claim in respect of the costs of internal government counsel.

**B.    THE COMMITTEE'S ANALYSIS**

252.    Article 61(2) of the ICSID Convention provides:

> *In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.*

253.    This provision, together with Arbitration Rule 47(1)(j) (applied by virtue of Arbitration Rule 53) gives the Committee discretion to allocate all costs of the proceeding, including attorney's fees and other costs, between the Parties as it deems appropriate.

254.    Article 61(2) of the ICSID Convention gives the Committee a discretion as to which Party should bear the costs and in what proportion. Mr Khudyan has been successful in his application for partial annulment of the Award. The Committee considers, therefore, that the Republic of Armenia should bear the costs of the Committee and of ICSID in their entirety.

255.    The costs of the proceeding, including the fees and expenses of the Committee, ICSID's administrative fees and direct expenses, amount to (in USD):

| | |
|---|---|
| Committee Members' fees and expenses | 164,048.98 |
| President, Sir Christopher Greenwood GBE CMG, KC | 72,087.38 |
| Member, Ms Tina Cicchetti | 49,911.60 |
| Member, Dr Ucheora Onwuamaegbu | 42,050.00 |
| ICSID's administrative fees | 84,000 |
| Direct expenses (estimated) | 15,416.59 |
| **Total** | **263,465.57** |

256.    The above costs have been paid out of the advances made by the Claimant pursuant to Administrative and Financial Regulation 15(5).[204]

257.    Accordingly, the Committee orders the Respondent to pay the Applicant Party USD 263,465.57 for the expended portion of the Applicant's advances to ICSID, together with USD 25,000 as the Lodging Fee, to give a total of USD 288,465.57.

258.    Article 61(2) also gives the Committee discretion to determine whether one Party should reimburse the other for all or part of the fees and expenses which that latter Party has incurred. In the exercise of that discretion, the Committee decides that, since the Applicant has been successful, the Republic of Armenia should bear the cost of counsel's fees and other costs incurred by the Applicant to the extent that these are reasonable. The Committee notes that the Applicant was represented on a contingency fee basis with a fixed amount to be paid only if the application was successful. Since the Applicant was successful, this fee thus becomes payable. The Applicant's counsel have pointed out that, nevertheless, this fee was substantially less than the value of the time spent by the Applicant's counsel. The Committee considers that Article 61(2) permits it only to award a Party the expenses which that Party has actually incurred. It appears from his costs submission that Mr Khudyan's liability was limited to USD 147,493.27 and that he has no liability to reimburse his counsel for the value of time spent over and above that sum. Accordingly, the Committee determines that the Republic of Armenia shall pay to Mr Khudyan the sum of USD 147,493.27 in respect of attorneys' fees and USD 2,435 in respect of other costs. The Republic of Armenia shall bear its own costs of representation.

---

[204] The remaining balance will be reimbursed to the Applicant.

## VIII.  DECISION

259.    For the reasons set forth above, the *ad hoc* Committee unanimously DECIDES as follows:

    (1)    Paragraphs 203-267 and 452(1), (4) insofar as it concerns the Applicant, and (5) of the Award are hereby annulled;

    (2)    The funds held in escrow in accordance with the Committee's decision on the Applicant's Stay Request, together with all interest incurred thereon, are to be paid to Mr Khudyan; and

    (3)    The Respondent shall pay to the Applicant the following sums:

        (a)    USD 288,465.57 in respect of the fees and costs of the Committee and ICSID; and

        (b)    USD 149,928.27 in respect of counsel's fees and other costs.

Ms Tina Cicchetti
Member of the *ad hoc* Committee

Date:    **JUL 2 0 2023**

Dr Ucheora Onwuamaegbu
Member of the *ad hoc* Committee

Date:    **JUL 2 1 2023**

Sir Christopher Greenwood, GBE, CMG, KC
President of the *ad hoc* Committee

Date:    **JUL 2 0 2023**

91