UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---------------------------------------------------------------X
EDMOND KHUDYAN,                                     :
                                                    :
    Petitioner and Counter-Respondent,          :
                                                    :  Civ. Action No.: 1:24-cv-1054
    - against -                                 :
                                                    :
REPUBLIC OF ARMENIA                                 :
                                                    :
    Respondent and Counter-Petitioner.           :
                                                    :
---------------------------------------------------------------X

## OPPOSITION TO KHUDYAN'S PETITION TO ENFORCE ANNULMENT AWARD, COUNTERPETITION TO CONFIRM ARBITRAL AWARD

Counter-petitioner the Republic of Armenia ("Counter-petitioner" or "Armenia"), by and through undersigned counsel, hereby petitions this Court for an Order: (i) confirming, recognizing, and enforcing the final ICSID award (the "Award")[1] rendered by an arbitral tribunal (the "Tribunal") on December 15, 2021 in an arbitration (the "Arbitration") between Counter-petitioner and (a) Mr. Edmond Khudyan ("Petitioner" or "Khudyan") as well as (b) Arin Capital & Investment Corp. ("Arin Capital" or "Award Debtor"), pursuant to the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States, dated 18 March 1965 (the "Washington Convention"), the Arbitration Rules of the International Centre for Settlement of Investment Disputes for Arbitration Proceedings, dated 10 April 2006 ("ICSID Rules), and the Treaty between the United States of America and the Republic of Armenia Concerning the Reciprocal Encouragement and Protection of Investments signed on 23 September

---

[1]     A duly certified copy of the Award is attached as Exhibit 1 to the Declaration of Edward G. Baldwin ("Baldwin Declaration") filed concurrently with and in support of this Petition.

1

1992 (the "BIT"); (ii) finding that Petitioner is the alter ego of the Award Debtor, Arin Capital, under California law; (iii) setting off any amount due by Armenia to Khudyan by the amount due Armenia by the Award Debtor and its alter ego Khudyan; (iv) opposing confirmation of the Annulment Decision for the reasons set out below, (v) entering judgment in Counter-petitioner's favor against Petitioner and Arin Capital in the amount of the Award plus pre- and post-Award interest awarded therein, post judgment-interest pursuant to 28 U.S.C. § 1961, and the costs of this proceeding; and (vi) awarding the Counter-Petitioner such other and further relief as this Court may find just and proper.

In summary, Armenia is owed money by the Petitioner's alter ego, Arin Capital, under the December 15, 2021 Award, which remains unpaid. The amount due by Arin Capital under the Award, for which Arin Capital was jointly and severally liable, exceeds the amount sought by Khudyan in the enforcement of the Annulment Decision (defined below), an annulment action brought solely by Khudyan against the Republic of Armenia. Thus, any amount allegedly due by Armenia under the Annulment Decision would be lower than the amount that Khudyan owes Armenia as the alter ego of Arin Capital.

**Parties, Jurisdiction, and Venue**

1. The Arbitration was seated in Washington, D.C. and the Award was rendered pursuant to the Washington Convention. Counter-Petitioner brings this proceeding pursuant to 22 U.S.C. § 1650a, and the Washington Convention to confirm a final arbitration award in its favor against the Petitioner as alter ego of the Arin Capital in its entirety.

2. Counter-Petitioner Armenia is a foreign state within the meaning of the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), and 1062-11.

3. This Court has subject matter jurisdiction over these proceedings pursuant to 22 U.S.C. § 1650a.

4. Venue is proper in this district pursuant to 28 U.S.C. §§ 1330 et seq.

**A. The Petitioner's and Arin Capital's Consent to Arbitration**

5. As set forth in the Award at §200, the Petitioner consented to arbitrate its dispute with the Counter-Petitioner by filing an arbitration claim pursuant to the BIT. Petitioner has brought his own petition to enforce the Decision on Annulment, dated 21 July 2023 in the Arbitration. This further confirms Petitioner's consent to arbitration.

**B. Counter-Petitioner's Consent to Arbitration**

6. The Counter-Petitioner has consented to arbitration pursuant to the BIT.

**C. Summary of the Underlying Dispute**

7. Petitioner purports to be a real estate developer resident in California. The Petitioner is the sole shareholder of Arin Capital and he controls the corporation in its entirety. Baldwin Decl., Ex. 1, ¶ 79.[2]

8. Petitioner and his alter ego Arin Capital commenced a specious claim against Arin Capital pursuant to the BIT with regard to Petitioner's alleged ownership interest in properties located in Yerevan, Armenia (the "Properties"). Baldwin Decl., Ex. 1, Award, ¶ 6.

9. According to his own statements, Petitioner acquired the Properties in question at the urging of a then-sitting Armenian government official whose brother was at the time the Minister of Defense and became the President of Armenia during the time of the events in question.

---

[2] The facts stated below are mostly taken from Section III of the Tribunal's Award. As the Tribunal noted at the beginning of Section III, these facts are the allegations of Claimants (meaning Khudyan and Arin Capital) and not the findings of the Tribunal. Baldwin Decl., Ex. 1, Award, ¶ 75. In other words, these are the allegations and statements of Khudyan and Arin Capital themselves and not allegations of the Republic of Armenia.

Baldwin Decl., Ex. 1, Award, ¶¶ 80-87. The then sitting-government official requested that Khudyan give a loan to an associate of the officials at an undisclosed interest rate and with undisclosed terms of repayment. Baldwin Decl., Ex. 1, Award, ¶ 82. Khudyan testified that the then-sitting government official promised to guarantee repayment of the loan. *Id*. Following an issue that rose with Khudyan in Armenia, the then-sitting Armenian government official interceded on Petitioner's behalf. Baldwin Decl., Ex. 1, Award, ¶ 89. In exchange for the then-sitting Armenian government official's intercession and a discount of $125,000 for the purchase price of the property, Khudyan forgave a $100,000 debt of an associate of the Armenian government official as expressly requested by that official. *Id*. Thus, Khudyan forgave a $100,000 loan to an associate of a government official in exchange for that government official causing the seller to discount the purchase price of a property. The support for this assertion comes directly from Khudyan himself. Baldwin Decl., Ex. 1, Award, ¶ 75.

10. According to Khudyan, he used money from Arin Capital to purchase the Properties. Baldwin Decl., Ex. 1, Award, ¶ 84. Rather than putting the Properties in the name of Arin Capital, Khudyan put the properties into the name of his "friend." *Id*. Khudyan later put the Properties in his own name, even though the money came from Arin Capital. Baldwin Decl., Ex. 1, Award, ¶ 85. Upon information and belief, the Properties were not put in the name of Arin Capital. Further, upon information and belief, Khudyan did not enter into an agreement with Arin Capital with respect to the money it allegedly paid to acquire the Properties.

11. Based on his own testimony and documents, Khudyan sold the property referenced above for a payment to him (not Arin Capital) and for a payment to the associate of the then-sitting government official of $300,000. Baldwin Decl., Ex. 1, Award, ¶ 87. According to Khudyan, the

4

then-sitting government official caused the buyer of Khudyan's property to pay the government official's business associate as part of the sale transaction. *Id*.

  12. Khudyan alleges that he took the money from the first sale of property to acquire a second property. Baldwin Decl., Ex. 1, Award, ¶ 88. Again, it appears that he put the property in his name instead of the name of Arin Capital, even though he himself states that the funds came from Arin Capital. Upon purchasing this second property, Khudyan hired the then-government official's associate for the construction work. Baldwin Decl., Ex. 1, Award, ¶ 89. This associate of the then-government official was the same person who received money from the sale of the previous property. Baldwin Decl., Ex. 1, Award, ¶ 87. Khudyan had complained to the then-sitting government official that his associate had not begun construction on the first property, which is allegedly why Khudyan sold it, yet Khudyan hired the associate of the then-sitting government official for construction work on the second property. Baldwin Decl., Ex. 1, Award, ¶ 89. Thus, Khudyan alleges that he sold the first property (which funds came from Arin Capital) because the associate of the then-sitting government official had not begun construction, used the money to purchase another property, and then hired the same-business associate to do construction work on the second property. Again, this is not allegations from Armenia, but statements made under oath by Khudyan himself.

  13. Remarkably, Khudyan later repurchased the first property in order to construct a joint property. Baldwin Decl., Ex. 1, Award, ¶ 90. Recall that this was the property that Khudyan had sold (and for which the funds were provided by Arin Capital) and for which the associate of the then-sitting government official had received $300,0000. Baldwin Decl., Ex. 1, Award, ¶ 87. Before repurchasing the property, Khudyan entered into two agreements with the associate of the then-sitting government official. Baldwin Decl., Ex. 1, Award, ¶ 91. Again, also remarkably,

Khudyan engaged that same associate to construct the joint property. *Id*. Khudyan also gave the right to this alleged construction contractor the right to conclude sale agreements on apartments that were to be constructed on the property. *Id*. In other words, Khudyan according to his own testimony and documents, gave the power to the associate of a then-sitting government official the power to sell apartments (that were not constructed yet) and collect funds for a plot of land. *Id*.

14. Rather than put out his own money, or continue to use the funds of Arin Capital even if nominally, Khudyan took money from U.S. persons to provide profit to the associate of the then-sitting government official of Armenia. Baldwin Decl., Ex. 1, Award, ¶ 93. The Tribunal in the Award notes the discrepancies in the testimony of Khudyan as to when the funds from the U.S. persons was received and when the money was paid. Baldwin Decl., Ex. 1, Award, ¶ 95.

15. Not surprisingly, at this point, people in Armenia were buying apartments from Khudyan's project and were not receiving apartments. Baldwin Decl., Ex. 1, Award, ¶ 115. Khudyan had signed other agreements with the associate of the then-sitting government official relating to loans and other transactions. *Id*. Upon information and belief, persons in Armenia and the U.S. purchased apartments from Khudyan and his business partners and never received apartments from these purchasers. Upon information and belief, these persons who gave money to Khudyan and his business associates have never been compensated or made whole for the money they provided for apartments that have never been delivered.

16. By any measure, it appears that Khudyan's actions raise significant questions under the Foreign Corrupt Practices Act or other laws. Khudyan is a U.S. national. His alter ego corporation is a U.S. national. He was paying money (or forgiving a loan) to an associate of a then-sitting government official who was the brother of the then-President of Armenia. Khudyan forgave a loan to that former official's associate in order to receive an allegedly reduced price on

6

a property. Khudyan continued to hire and pay that associate of the former official even after he had information that the associate was not doing the work for which he was paid.

17. The Republic of Armenia asks that the Court review the factual section of the Award, which constitutes Section III of the Award, and which is based on the facts asserted by Khudyan and Arin Capital, to see the substance of the transactions for which he now seeks compensation.

### The Arbitration

18. Petitioner and Arin Capital commenced the Arbitration by submitting a Request for Arbitration to ICSID, which ICSID received on September 18, 2017. Baldwin Decl., Ex. 1, Award ¶ 6. The Request for Arbitration was registered by the Secretary-General of ICSID, pursuant to the Washington Convention, on September 27, 2017. Baldwin Decl., Ex. 1, Award, ¶ 7.

19. A three-member Tribunal was constituted on March 15, 2018. *Id*., at ¶ 14. With the parties' agreement, Ms. Melanie van Leeuwen, a national of the Netherlands, was appointed as the President of the Tribunal. Ank Santens, a national of Belgium, was appointed as the Petitioner's arbitrator. Dr. Zachary Douglas KC, a national of Australia, was appointed as the Counter-Petitioner's arbitrator.

20. Petitioner and Arin Capital were represented by counsel throughout the Arbitration, namely attorneys at Hughes Hubbard & Reed, Washington DC.

21. The arbitration was conducted pursuant to the Washington Convention.

22. The Tribunal held its first session April 7, 2018. Baldwin Decl., Ex. 1, Award ¶ 15.

23. The Tribunal held a hearing on jurisdiction and merits on January 20-24, 2020, in Washington, DC.

24. The proceedings were declared closed on December 3, 2021. Baldwin Decl., Ex. 1, Award ¶ 74.

25. The Tribunal issued the Award on December 15, 2021. The Award was unanimous.

**The Arbitral Award**

26. The resulting Award is 130 pages long. It consists of 452 consecutively numbered paragraphs. Of these 452 paragraphs, 64 paragraphs (¶¶ 203-267) concern Petitioner's claims, *i.e.*, Mr. Khudyan personally. 82 paragraphs (¶¶ 351-433) concern Arin Capital's claims.

27. The dispositive section of the Award finds, first, that the Tribunal "lacks jurisdiction *ratione personae* over the first Claimant, Mr. Edmond Khudyan" [the Petitioner]. Baldwin Decl., Ex. 1, Award ¶ 452(1). The Award lays out in paragraphs 193 to 266 that on Mr. Khudyan is an Armenian national and therefore cannot commence a proceeding against Armenia pursuant to Article 25 of the Washington Convention.

28. The dispositive section of the Award finds, second, that the Tribunal "has jurisdiction *ratione personae* over the second Claimant, Arin Capital & Investment Corp." [Arin Capital]. Award ¶ 452(2). It goes on that "it lacks jurisdiction *ratione materiae* over the alleged investments of the second Claimant, Arin Capital & Investment Corp." Baldwin Decl., Ex. 1, Award ¶ 452(3).

29. Consequently, as the dispositive section of the Award lays out, the Tribunal "dismisse[d] the Claimants' claims for lack of jurisdiction." Baldwin Decl., Ex. 1, Award ¶ 452(4).

30. The dispositive section of the Award, third, "ORDERS the Claimants [the Petitioner and Arin Capital] to pay the Respondent [the Counter-Petitioner] the sum of USD 337,466.34 for the expended portion of the Respondent's advances to ICSID and USD 400,000 toward the

Respondent's [Counter-Petitioner's] legal fees and expenses." Baldwin Decl., Ex. 1, Award ¶ 452(5) (the "Cost Decision").

31.   The dispositive section of the Award finally "DENIES all other request for relief." Baldwin Decl., Ex. 1, Award ¶ 452(6).

32.   Because the Tribunal dismissed the claims on jurisdictional grounds, the Tribunal never decided the other issues--such as the corrupt and dubious actions of Khudyan. Even so, the Tribunal's factual recitations (taken from Khudyan's own documents and testimony) and analysis make clear that they understood the questionable nature of his actions. For example, the Tribunal noted that "there are discrepancies between the Claimants' pleaded case and the limited contemporaneous documentation on the record in respect of each of these essential elements." Baldwin Decl., Ex. 1, Award, ¶ 357. The Tribunal further noted in its analysis that the money for the second property was not actually paid to the seller but instead to the associate of the then-government official. As the Tribunal found: "in spite of the fact that the property acquired in December 2003 was bought from Spitak Tnak LLC, the purchase price was not paid to Spitak Tnak but rather to Mr. Mangasaryan, as discussed in more detail below. There is no document or testimony in the record as to why the purchase price was paid to Mr. Mangasaryan instead of to Spitak Tnak LLC or to Mr. Telpyan so that he could pay it to Spitak Tnak LLC on behalf of Mr. Khudyan." Baldwin Decl., Ex. 1, Award, ¶ 361. In other words, the Tribunal questioned any alleged investment by Khudyan or Arin Capital as the money not paid to the seller but to the associate of the then-government official for the property.

## The Annulment Proceedings

33.   On April 8, 2022, the Petitioner filed an application for the annulment of the Award as it pertains to him. Petitioner asserted that the Tribunal's conclusions with regard to his Armenian

9

nationality ran afoul of several grounds on which annulment is permissible under the Washington Convention. The Petitioner further sought annulment of the Tribunal's order that he pay Armenia $737,466.34 plus interest in costs. The Petitioner's application led to annulment proceedings pursuant to Article 52 of the Washington Convention (the "Annulment Proceedings"). The Annulment Proceedings resulted in a Decision on Annulment rendered on July 21, 2023 (the "Annulment Decision"). The Secretary General of ICSID registered the annulment request on April 13, 2022. Bedrosyan Decl., Ex. 1, Annulment Decision ¶ 8.

34. Arin Capital & Investment Corp., did not seek annulment of the Award. Arin Capital was not a party to the Annulment Proceedings. Consequently, the Award with regard to Arin Capital was not challenged within the period in which annulment of that portion is permissible by the terms of the Washington Convention, namely 120 days. Washington Convention article 52(2).

35. The ICSID Secretary General appointed an *ad hoc* Committee to conduct the Annulment Proceedings to resolve the Petitioner's annulment request on June 1, 2022. Bedrosyan Decl., Ex. 1, Annulment Decision ¶ 9. The *ad hoc* Committee consisted of Mr. Christopher Greenwood, a British subject (President), Ms. Tina Cicchetti, a dual national of Canada and Italy, and Dr. Ucheora Onwuamaegbu, a British subject and Nigerian national. *Id*.

36. The ad hoc Committee held its first session by videoconference on July 20, 2022. *Id*., ¶ 14.

37. The Committee held a hearing on annulment on April 4, 2023. *Id*., ¶ 32.

38. As noted, the Committee rendered its Annulment Decision on July 21, 2023. The Annulment Decision granted Petitioner's annulment request.

**The Annulment Decision**

39. The Annulment Decision granted Petitioner's request for annulment. (It could not grant Arin Capital any annulment as Arin Capital was not a party to the Annulment. The Annulment Committee annulled "Paragraphs 203-267 and 452(1), (4) insofar as it concerns the Applicant, and (5) of the Award." Annulment Decision ¶ 259(1). This decision on its face is a partial annulment only. It does not annul any portion of the Award as concerns Arin Capital. It does not annul the jurisdictional dismissal of Arin Capital's claims.

40. With regard to the Cost Decision, the *ad hoc* Committee concluded that Khudyan and Arin Capital were jointly and severally liable:

> "The Tribunal did not distinguish between the two Claimants, that is Mr Khudyan and Arin US, in making this order. Only Mr Khudyan has sought annulment and the parts of the Award in which the Tribunal held that it lacked jurisdiction ratione materiae in respect of the claims by Arin US remain valid and effective. Nevertheless, the Committee is not in a position to determine for itself what portion of the costs awarded by the Tribunal relate to Mr Khudyan and what part to Arin US, each of which was jointly and severally liable for the full amount awarded, as was clear from the Parties' submissions on the stay of execution. It has therefore concluded that it must annul paragraph 452(5) in its entirety." Annulment Decision ¶ 245.

41. As Khudyan is jointly and severally liable for the Cost Decision, the Annulment Decision annuls the cost award in its entirety as against him with regard to the claims he advanced in a personal capacity. This is why Armenia seeks to hod him liable for the Cost Decision against Arin Capital as the alter ego.

42. The Annulment Decision further orders that Armenia "shall pay to the Applicant [Mr. Khudyan] the following sums: (a) USD 288,465.57 in respect of fees and costs of the Committee and ICSID; and USD 149,928.27 in respect of counsel's fees and other costs." Annulment Decision ¶ 259(3).

**The Armenian Enforcement Proceedings**

43. On or about July 23, 2024, Petitioner commenced enforcement proceedings of the Annulment Decision against Armenia before the Armenian Court of Cassation (the "Armenian Proceedings"). In the Armenian Proceedings, Petitioner sought a writ of execution with regard to the Annulment Decision's order the Armenia "shall pay" Petitioner USD 438,393.84.

44. It is our understanding that this proceeding is still ongoing in some capacity and that the Khudyan is still seeking payment in Armenia that mirrors his request for payment before this Court.

**Arin Capital and Its Alter Ego Remain Liable for the Cost Decision in the Award**

45. The state of affairs today after the Award and the Annulment Decision, and the action by Petitioner to enforce the Annulment Decision in Armenia is as follows: Arin Capital and its alter ego Khudyan continue to have joint and several liability for the satisfaction of the Cost Decision in the Award. Arin Capital did not seek to annul the Award. It is now out of time to do so pursuant to the clear terms of the Washington Convention as more than 120 days have elapsed since the issuance of the Award. Washington Convention article 52(2).

46. As far as Arin Capital is concerned, the mandate of Article 53 of the Washington Convention applies with full force: "The award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention." Washington Convention Article 53. That is, the Cost Decision is binding on Arin Capital and its alter ego.

47. The Annulment Decision confirms as much. the Committee recognized that Khudyan and Arin Capital jointly and severally owed the Award debt to Armenia, as opposed to each owing a pre-determined portion of that $737,466.34. According to the Committee, it "is not

in a position to determine for itself what portion of the costs awarded by the Tribunal relate to Mr Khudyan and what part to Arin US." *Id.*, Annulment Decision ¶ 245. The Committee therefore could not reduce the total cost award by reducing it in proportion to the portion owed solely by Mr. Khudyan in his personal capacity. Logically, no such portion can exist. Each Mr. Khudyan and Arin Capital & Investment Corp. owe Armenia the full amount in question. Once Armenia has received satisfaction of the full debt from either or both parties, Arin Capital & Investment Corp. and Mr. Khudyan will have to resolve between themselves their relative contributions between themselves. As the Committee decided not to specify the amount of money it annuls for Mr. Khudyan's obligation in paragraph 259(1), it recognized the joint and several nature of the underlying debt.

48.     Having recognized that the Award debt was joint and several, the only way that the Committee could have annulled the cost award in full would have been to annul the debt of Arin Capital & Investment Corp. The Committee never stated that it annulled a debt owed by Arin Capital in the annulment decision. It recognized that Arin Capital was jointly and severally liable for the full award debt. Should it have wished to extinguish the debt of Arin Capital, it would need to state so specifically as it is a debt distinct from the debt incurred by Mr. Khudyan in his personal capacity. The Committee did not take any steps to extinguish this debt. The reason that it did not do so is clear: the Committee did not have the authority to make any decision regarding Arin Capital simply because the latter was not an applicant in the Annulment proceedings.

49.     The Secretary General of ICSID confirmed the same conclusion in a letter addressed to Armenia, Petitioner and Arin Capital. Petitioner asked the Secretary General of ICSID to send correspondence to Armenia reminding it of its obligation to meet all obligations under the Annulment Decision. Armenia replied to the Secretary-General, noting the outstanding payment

13

obligation by Arin Capital and noting further that all obligations that might have been owed to Petitioner were offset by the remaining award debt of Arin Capital under the original Award. The Secretary General in response to this exchange reminded all parties of their respective obligations to comply with the Award and Annulment Decision. This response makes sense only to the extent that Arin Capital (and its alter ego) continue to owe an Award debt.

### Arin Capital is an Alter Ego of the Khudyan

50. Arin Capital is a California company. Consequently, the question of alter ego liability is governed by California law. Alter ego liability means that the owners of a company are liable for the debts of a company. *See Automotriz del Golfo de Cal. S. A. de C. V. v. Resnick*, 47 Cal.2d 792, 796 (1957) and *Hasso v. Hapke*, 227 Cal.App.4th 107, 155 (2014), as modified on denial of reh'g (July 15, 2014), review denied (Oct. 22, 2014). The relevant test is whether "the corporation and its shareholders have a unity of interest in that they have no real separate existence; and the corporation's acts should be treated as the shareholders' acts to avoid an inequitable result." *Id*.

51. Petitioner is the owner and sole shareholder of Arin Capital. Baldwin Decl., Ex. 1, Award ¶ 423. If the alter ego test is satisfied, Petitioner therefore is personally liable for the debts of Arin Capital.

52. As noted above, this is precisely what happened, as Petitioner has admitted in the underlying arbitration – and the Tribunal has ruled on the basis of these admissions – that Petitioner used the funds of Arin Capital to make a purchase for his own account. As stated in the Baldwin Decl., Ex. 1, Award at footnote 426, Petitioner testified that "in December 2003, I purchased in my friend's name the 956.6 square meter empty plot located at 33/1 Mesrop Mashtots Avenue, using funds from Arin Capital & Investment Corp. My friend later transferred the plot to my name in

April 2004". There is no evidence of the purchase agreement, of a deed, or another other documentation typically associated with such a transaction. There is thus no evidence whatsoever that the funds of Arin Capital were used to benefit Arin Capital. Nor is there any evidence that there were sufficient corporate records to authorize the transactions in the first place. This lack of evidence is what led the Tribunal to conclude that Arin Capital had not made an investment in Armenia. Baldwin Decl., Ex. 1, Award ¶¶ 351-433. These determinations were not challenged in annulment nor were these findings annulled. They are thus *res judicata* and cannot be further contested by Petitioner.

53. Petitioner and Arin Capital further alleged in the arbitration that "Mr. Khudyan [Petitioner] would be the agent of [Arin Capital] as a matter of Californian law and that his control over alleged investments in Armenia could be imputed to his principal, Arin US [Arin Capital]." Baldwin Decl., Ex. 1, Award, ¶ 190. Here, Petitioner attempts to invert the relationship and make himself the agent of Arin Capital despite the fact that any ownership held in Armenia by either of them was only ever held by Petitioner and not Arin Capital while Petitioner alleges that the funds used for to pay the purchase price was Arin Capital's. There is no agency agreement. There are no accounts, no debt instruments or any other documents that could shed further light on the question. There is no authorization. The wire transfers purposefully hide the source of funds. Without such documentation, these statements admit that both Petitioner and Arin Capital were interchangeable and operated as one entity, not two. That is precisely the situation in which alter ego liability is engaged.

54. These statements captured in the Award are just the tip of the iceberg. Petitioner made repeated admissions in written witness statements as well as on cross-examination that show that Petitioner and Arin Capital were alter egos. These statements confirm that Petitioner abused

Arin Capital's corporate form for his own personal gain. These statements further belie any respect for Arin Capital's corporate form whatsoever. Petitioner treated all assets of Arin Capital's as his personal assets.

### The Petitioner Is Liable As Arin Capital's Alter Ego for the Cost Decision

55. Having established that Petitioner and Arin Capital are alter egos, the question is what the consequence of this relationship is. As noted above, Arin Capital continues to owe money to Armenia under the Cost Decision. The Petitioner as Arin Capital's alter ego is liable for this debt. It is therefore enforceable against Petitioner as well as against Arin Capital.

56. This debt of Petitioner has not been annulled by the annulment decision. The annulment decision only concerned Petitioner's personal liability under the Cost Decision. For the reasons outlined above, it could not reach the alter ego liability for Arin Capital's debt, even if the Committee wanted to. The debt itself was beyond the jurisdiction of the *ad hoc* Committee to annul.

### The Petitioner's Potential FCPA Violations And Actions Regarding Foreign Officials Raises Questions About The Enforcement Of The Annulment Decision

57. The alleged investment that Khudyan claimed in the Arbitration by his own admissions involve payments to an associate of a then-government official. In addition, he provided at the request of this former official benefits and payments to the former official's associate in order to achieve benefits such as a reduced purchase price. Khudyan also continued to pay and enter into arrangements with the associate of the former government official despite allegedly having concerns as to whether the associate was doing the construction for which he had allegedly been engaged. Khudyan and/or the associate of the former government official sold apartments that were not delivered, leaving victims in Armenia in their wake.

58.     The Arbitration Tribunal decided the case on jurisdictional grounds and therefore did not provide findings on these payments and arrangements that would appear to violate the FCPA and potentially other U.S. and state laws. The Tribunal noted that it was not reaching these other issues. The Annulment Committee was tasked with only determining the nationality issue of Khudyan and thus was not seized with the issues of these payments and arrangements. Khudyan now seeks to benefit from this by seeking payment from Armenia for costs in the Annulment Proceeding while having his alter ego Arin Capital refuse payment on the cost decision in the Award. Although ICSID awards are treated differently than N.Y. Convention Awards, the ICSID award system should not be used to reward a claimant who appears to have abused U.S. laws in connection with his actions in a foreign country. Armenia therefore opposes enforcement of the Annulment Decision to the extent that it results from Khudyan's and Arin Capital's actions with these Properties.

## THE AWARD MUST BE CONFIRMED IN FAVOR OF ARMENIA

59.     Counter-Petitioner repeats and re-alleges the allegations in paragraphs 1 through 58 as if set forth fully herein.

60.     22 U.S.C. § 1650a provides that "[t]he pecuniary obligations imposed by such an [ICSID] award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States." The Award against Arin Capital has not been annulled, modified, or corrected. None of the grounds for annulment of the Award enumerated in Article 52 of the ICSID Convention apply in this case.

61.     U.S. "[f]ederal courts must give ICSID awards 'the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States." *Valores Munidiales S.L. v. Venez.*, CITE. As further noted in *Valores Mundiales* "The full faith and

17

credit provision's language mirrors that used in 28 U.S.C. § 1738, which requires federal courts to give full faith and credit to state court judgments. See 28 U.S.C. § 1738. It is also noteworthy that Section 1650a excludes ICSID awards from the purview of the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. See 22 U.S.C. § 1650a(a)." *Id*. at *8. A copy of the Award, as authenticated and transmitted, is attached as Exhibit 1 to this Counter Petition.

62. The parties' agreement to ICSID arbitration in found in Article VI of the BIT and in Petitioner's submission of an arbitration to ICSID.

63. Consequently, Counter-Petitioner is entitled to an order confirming, recognizing, and enforcing the Award pursuant to 22 U.S.C. § 1650a as well as Articles 53 and 54 of the Washington Convention.

**WHEREFORE,** Counter-Petitioner prays that the Court enter an Order pursuant to 22 U.S.C. § 1650a as well as Article 54 of the Washington Convention:

(a) Confirming, recognizing, and enforcing the Award against Mr. Edmond Khudyan as the alter ego of Arin Capital & Investment Corp.

(b) Entering judgment against Mr. Edmond Khudyan as the alter ego of Arin Capital & Investment Corp in an amount equal to the full amount of the Award, $737,466.34, plus (i) post-Award interest, accruing through the date of this Court's confirmation Order; (ii) post-judgment interest, pursuant to 28 U.S.C. § 1961, accruing hereafter through the payment date; as well as (iii) the costs of this proceeding.

(c) Declining confirmation of the Annulment Decision as the basis of this action and Arbitration arising from Khudyan's violations of U.S. and California law.

(d) Granting such other and further relief as may be just and proper.

Dated:    February 25, 2025
              Washington, DC

Respectfully submitted,

<u>/s/ Edward Baldwin</u>
Edward G. Baldwin (D.C. Bar No. 973850)
ALLIANCE LAW PARTNERS LLP
Email:  tbaldwin@alliancepartnerslaw.com

Derrick F. Moore (D.C. Bar No. 1645015)
MOORE LAW PLLC
1140 3rd St NE, Suite 200
Washington, DC 20002
Tel.: (202) 289-7963
Email:  derrick@mooreatty.com

*Attorneys for the Republic of Armenia*