# EXHIBIT 1



**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**
1818 H STREET, NW | WASHINGTON, DC 20433 | USA
TELEPHONE +1 (202) 458 1534 | FACSIMILE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

## CERTIFICATE

**EDMOND KHUDYAN AND ARIN CAPITAL & INVESTMENT CORP.**

V.

**REPUBLIC OF ARMENIA**

**(ICSID CASE NO. ARB/17/36)**

I hereby certify that the attached document is a true copy of the Tribunal's Award dated December 15, 2021.

Meg Kinnear
Secretary-General

Washington, D.C., December 15, 2021



**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**MR. EDMOND KHUDYAN AND ARIN CAPITAL & INVESTMENT CORP.**

Claimants

and

**REPUBLIC OF ARMENIA**

Respondent

**ICSID Case No. ARB/17/36**

---

# AWARD

---

*Members of the Tribunal*
Ms. Melanie Van Leeuwen, President
Ms. Ank Santens
Prof. Zachary Douglas QC

*Secretary of the Tribunal*
Ms. Laura Bergamini

*Date of dispatch to the Parties*: December 15, 2021

## REPRESENTATION OF THE PARTIES

*Representing Mr. Edmond Khudyan and Arin Capital & Investment Corp.*:

Mr. James H. Boykin, Esq.
Mr. Alexander Bedrosyan
Hughes Hubbard & Reed LLP
1775 I Street, N.W.
Washington, D.C. 20006
U.S.A.

and

Dr. Gevorg Tumanov
Redbridge LLC
Yerevan, V. Antarain 124
Republic of Armenia

*Representing Republic of Armenia*:

From November 12, 2019 to present:

Mr. Yeghishe Kirakosyan
Ms. Kristine Khanazadyan
Office of the Representative of the Republic of
Armenia to the European Court of Human
Rights
Government building 1
Republic Square
0010 Yerevan
Republic of Armenia

and

Mr. Edward Baldwin
Ms. Chloe Baldwin
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
U.S.A.

and

Thomas Innes
Steptoe & Johnson LLP
5 Aldermanbury Square
London EC2V 7HR
United Kingdom
and

From November 16, 2017 to present:

Mr. Aram Orbelyan
Ms. Lilit Karapetyan
Concern Dialog Law Firm
Charents str.1, 2nd floor, office 207
Yerevan 0025
Republic of Armenia

i

<u>From November 16, 2017 to November 12, 2019</u>:

Prof. Dr. Klaus Sachs

Ms. Susanne Schwalb
CMS Hasche Sigle
Nymphenburger Straße 12
80335 Munich
Germany

and

Dr. Nicolas Wiegand

Dr. Mariel Dimsey

Ms. Sanjna Pramod
CMS Hasche Sigle, Hong Kong LLP
27/F, 8 Queen's Road Central
Hong Kong

<sub>T</sub>ABLE OF <sub>C</sub>ONTENTS

I.    Introduction and Parties .................................................................................... 1

II.   Procedural History ............................................................................................. 1

III.  Factual Background .......................................................................................... 11

    A.    The Claimants.......................................................................................... 12

    B.    The Initial Acquisition of Real Estate at 33/1 Mashtots Avenue and the Subsequent
          Sale of that Real Estate........................................................................... 13

    C.    The Acquisition of Real Estate at 33A Mashtots Avenue........................... 15

    D.    The Reacquisition of Real Estate at 33/1 Mashtots Avenue ...................... 15

    E.    The Construction and Development of the Mashtots Building.................... 19

    F.    The Shareholders Agreement and Transfer to Arin Armenia ..................... 20

    G.    The Irregularities and Tax Evasion of Arin Armenia................................. 22

    H.    The Legal Proceedings in Armenia ........................................................... 24

    I.    The Liquidation of Arin Armenia's Assets and the Criminal Investigation ............... 27

IV.   The Parties' Claims and Requests for Relief .................................................... 32

    A.    The Claimants' Request for Relief............................................................ 32

    B.    The Respondent's Request for Relief........................................................ 32

V.    Jurisdiction ...................................................................................................... 33

    A.    Jurisdiction *Ratione Personae* ................................................................. 33

        (1)   The Parties' Positions .................................................................... 33

            a.    The Respondent's Position.................................................. 33

            b.    The Claimants' Position ..................................................... 43

        (2)   The Tribunal's Analysis.................................................................. 48

            a.    Jurisdiction *ratione personae* under the BIT................................ 49

            b.    Jurisdiction *ratione personae* under the ICSID Convention ...................... 50

    B.    Jurisdiction *Ratione Materiae* ................................................................. 75

        (1)   Do the Claimants have an "Investment" within the Meaning of the BIT and the
              ICSID Convention?........................................................................ 75

        (2)   The Parties' Positions .................................................................... 77

            a.    The Respondent's Position.................................................. 77

            b.    The Claimants' Position ..................................................... 91

(3) The Tribunal's Analysis...................................................................... 99

    a.   Analysis of the alleged investments of Mr. Khudyan and Arin US ............ 101

    b.   Analysis of jurisdiction *ratione materiae* ..................................................... 119

VI.   Costs.............................................................................................................. 124

   A.   The Claimants' Cost Submissions............................................................. 124

   B.   The Respondent's Cost Submissions ......................................................... 126

   C.   The Tribunal's Decision on Costs .............................................................. 127

VII.  Decision ......................................................................................................... 129

**TABLE OF SELECTED ABBREVIATIONS/DEFINED TERMS**

| | |
|---|---|
| Arabyan's First Expert Opinion | Expert Opinion of Mr. Minas Arabyan dated February 26, 2019 |
| Arabyan's Second Expert Opinion | Second Expert Opinion of Mr. Minas Arabyan dated November 15, 2019 |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings dated April 10, 2006 |
| BIT or Treaty | The Treaty between the United States of America and the Republic of Armenia Concerning the Reciprocal Encouragement and Protection of Investments which was signed on September 23, 1992 and entered into force on March 29, 1996 |
| C-[#] | Claimants' Exhibit |
| Claimants' Memorial | Claimants' Memorial on Jurisdiction and Merits dated July 20, 2018 |
| Claimants' PHB | Claimants' Post Hearing Brief dated March 2, 2020 |
| Claimants' Reply | Claimants' Reply dated July 1, 2019 |
| CL-[#] | Claimants' Legal Authority |
| Hearing | Hearing on Jurisdiction and the Merits held from January 20 to 24, 2020 in Washington, D.C. |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated March 18, 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| Khudyan's First Witness Statement | Witness Statement of Mr. Edmond Khudyan dated July 20, 2018 |
| Khudyan's Second Witness Statement | Second Witness Statement of Mr. Edmond Khudyan dated June 25, 2019 |
| R-[#] | Respondent's Exhibit |

| Respondent's Counter-Memorial | Respondent's Counter-Memorial on Jurisdiction and Merits dated February 28, 2019 |
|---|---|
| Respondent's PHB | Respondent's Post Hearing Brief dated March 2, 2020 |
| Respondent's Rejoinder | Respondent's Rejoinder dated November 15, 2019 |
| RL-[#] | Respondent's Legal Authority |
| Transcript, Day [#], [page:line] | Transcript of the Hearing |
| Tribunal | Arbitral tribunal constituted on March 15, 2018 |

## I.    INTRODUCTION AND PARTIES

1.    This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of the Treaty between the United States of America and the Republic of Armenia Concerning the Reciprocal Encouragement and Protection of Investment, which entered into force on March 29, 1996 (the "**BIT**" or "**Treaty**"), and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on October 14, 1966 (the "**ICSID Convention**").

2.    The claimants are Mr. Edmond Khudyan ("**Mr. Khudyan**" or "**Claimant 1**"), a natural person having the nationality of United States of America, and Arin Capital & Investment Corp. ("**Arin US**" or "**Claimant 2**"), a company incorporated under the laws of California, United States of America (together, the "**Claimants**").

3.    The respondent is the Republic of Armenia ("**Armenia**" or the "**Respondent**").

4.    The Claimants and the Respondent are collectively referred to as the "**Parties**." The Parties' representatives and their addresses are listed above on page (i).

5.    This dispute relates to Mr. Khudyan and Arin US's alleged interests in a luxury apartment real estate development located at 33 Mashtots Avenue in Yerevan, held via a locally incorporated company Arin Capital Investments LLC ("**Arin Armenia**"), and the Respondent's alleged failure to protect the Claimants from "*an elaborate criminal scheme*"[1] resulting in the siphoning off of Arin Armenia's assets.

## II.    PROCEDURAL HISTORY

6.    On September 18, 2017, ICSID received a request for arbitration dated September 18, 2017 from Mr. Khudyan and Arin US against Armenia (the "**Request**").

---

[1] Claimants' Memorial, ¶4.

7.    On September 27, 2017, the Secretary-General of ICSID registered the Request in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of ICSID Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

8.    On November 29, 2017, following several exchanges, the Parties agreed upon a method for constituting the Tribunal, providing that the Tribunal shall consist of three arbitrators, one arbitrator appointed by each Party and the third, who shall be the President of the Tribunal, appointed by agreement of the Parties.

9.    On December 6, 2017, the Claimants appointed Ms. Marney Cheek, a national of the United States of America, as an arbitrator. On December 19, 2017, the Claimants informed the Secretariat that the appointment of Ms. Cheek was withdrawn and that the Parties had agreed to extend the deadlines to appoint the Members of the Tribunal. The Respondent confirmed the Parties' agreement on the same date.

10.   On December 21, 2017, the Claimants appointed Ms. Ank Santens, a national of Belgium, as an arbitrator in this case. Ms. Santens accepted her appointment on December 26, 2017.

11.   On January 16, 2018, the Respondent appointed Prof. Zachary Douglas QC, a national of Australia, as an arbitrator in this case. Prof. Douglas accepted his appointment on January 18, 2018.

12.   On February 22, 2018, Ms. Santens informed the Centre that the Parties and the co-arbitrators had agreed upon a method for the appointment of the President of the Tribunal, which superseded any prior agreement between the Parties.

13.   On March 14, 2018, Ms. Santens and Prof. Douglas informed the Centre that the Parties had agreed to appoint Ms. Melanie van Leeuwen, a national of The Netherlands, as President of the Tribunal.

14.     On March 15, 2018, the ICSID Secretary-General, in accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings (the "**Arbitration Rules**"), notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. Mr. Jean-Paul Le Cannu, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal. The Parties were later informed that Ms. Laura Bergamini, ICSID Legal Counsel, would replace Mr. Le Cannu as Secretary of the Tribunal. Ms. Aurélia Antonietti, ICSID Senior Legal Counsel, served as Secretary of the Tribunal during Ms. Bergamini's maternity leave.

15.     On April 7, 2018, following several exchanges with the Parties, the Secretary of the Tribunal confirmed that the first session would be held on April 24, 2018 and transmitted to the Parties a draft Procedural Order No. 1 and a draft agenda in advance of the first session.

16.     On April 19, 2018, the Parties jointly submitted their comments on the draft Procedural Order No. 1. In the revised draft, the Claimants identified their representatives as follows: Mr. James H. Boykin and Mr. Alexander Bedrosyan.

17.     On April 22, 2018, the Parties jointly submitted a proposed timetable for the proceedings.

18.     On April 24, 2018, the Tribunal held a first session with the Parties by teleconference, in accordance with Arbitration Rule 13(1).

19.     On May 30, 2018, the Claimants updated the list of their representatives pursuant to Arbitration Rule 18 and requested that Dr. Gevorg Tumanov of ELL Partnership be added as counsel of record.

20.     On May 31, 2018, the Secretary of the Tribunal transmitted to the Parties a revised draft Procedural Order No. 1 including an updated list of the Parties' representatives, along with draft timetables for the proceedings.

21.     On June 6, 2018, the Parties confirmed their agreement with the timetables annexed to the revised draft Procedural Order No. 1.

22.    On June 7, 2018, the Tribunal issued Procedural Order No. 1 recording the agreement of the Parties on procedural matters. Procedural Order No. 1 provides, *inter alia*, that the applicable Arbitration Rules would be those in effect from April 10, 2006, that the procedural language would be English, and that the place of proceeding would be Washington, D.C., United States of America. Annex B to Procedural Order No. 1 also sets out the agreed schedules applicable to the proceedings (which were later amended, as discussed below).

23.    On June 27, 2018, the Respondent objected to the addition of Dr. Tumanov as counsel of record for the Claimants, alleging that he had worked on the case while in the employment of the Ministry of Justice of the Republic of Armenia.

24.    On July 3, 2018, the Claimants responded to the Respondent's letter of June 27, 2018, denying the existence of a conflict of interest.

25.    On July 12, 2018, the Respondent formally requested that the Tribunal proceed with the removal of Dr. Tumanov as counsel of record ("**Application for the Removal of Dr. Tumanov**") and submitted Exhibit R-0001 and Legal Authorities RL-0001 and RL--0002.

26.    On July 20, 2018, in accordance with the agreed timetable, the Claimants submitted their Memorial on Jurisdiction and the Merits ("**Memorial**"), together with: the Witness Statement of Mr. Edmond Khudyan dated July 20, 2018 ("**Khudyan's First Witness Statement**"); the Witness Statement of Mr. Lernik Hovhannisyan dated July 20, 2018; the Witness Statement of Mr. Nikolay Baghdasaryan dated June 15, 2018; Exhibits C-0001 through C--0131; and Legal Authorities CL-0001 through CL-0081.

27.    On July 27, 2018, the Claimants submitted their response to the Application for the Removal of Dr. Tumanov, along with a letter dated July 25, 2018 from Dr. Tumanov to the Tribunal and Legal Authority CL-0082. The Claimants requested that the Tribunal deny the Respondent's application.

28.    On August 10, 2018, the Respondent responded to the Claimants' July 27 letter and submitted Legal Authorities RL-0003 through RL-0008.

29.     On August 17, 2018, the Claimants replied to the Respondent's letter of August 10, 2018 and submitted a letter dated August 15, 2018 from Dr. Tumanov to the Tribunal.

30.     On August 31, 2018, in accordance with the agreed timetable, the Respondent submitted an application for bifurcation, together with Legal Authorities RL-0009 through RL-0022 (the "**Application for Bifurcation**"). The Respondent set out three jurisdictional objections that, it indicated, would be detailed further in the jurisdictional phase. The Respondent also requested that the proceedings be bifurcated into a preliminary phase dealing with its jurisdictional objections and that the proceedings on the merits be suspended pending a decision on the Respondent's jurisdictional objections.

31.     On September 14, 2018, the Respondent submitted its requests for production of documents related to jurisdiction.

32.     On September 17, 2018, the Claimants filed their response to the Application for Bifurcation along with Legal Authorities CL-0083 through CL-0100, requesting that the Tribunal deny the Application for Bifurcation.

33.     On October 1, 2018, the Parties were informed that the Tribunal had decided to join the Respondent's jurisdictional objections to the merits and that the reasons for its decision would follow in due course.

34.     On December 5, 2018, the Tribunal issued Procedural Order No. 2 rejecting the Application for the Removal of Dr. Tumanov.

35.     On the same date, the Tribunal issued Procedural Order No. 3, wherein it set out the reasons for its decision on the Respondent's Application for Bifurcation.

36.     On January 15, 2019, the Respondent informed the Tribunal that the Parties (i) had agreed on an extension of the deadline to submit the Respondent's Counter-Memorial on Jurisdiction and the Merits until February 28, 2019; and (ii) would discuss and attempt to agree on respective extensions to the subsequent deadlines in Annex B-2 to Procedural Order No. 1. The Claimants confirmed their agreement on January 16, 2019.

37.    On January 17, 2019, the Tribunal approved the modification to the procedural timetable agreed to by the Parties.

38.    On February 18, 2019, the Parties circulated a revised procedural calendar for these proceedings, which was approved by the Tribunal on February 18, 2019.

39.    On February 28, 2019, the Respondent filed its Counter-Memorial on Jurisdiction and the Merits ("**Counter-Memorial**"), together with the Expert Opinion of Mr. Tigran Markosyan dated February 21, 2019; the Expert Opinion of Mr. Minas Arabyan dated February 26, 2019 ("**Arabyan's First Expert Opinion**"); the Expert Opinion of Mr. Ruben Melikyan dated February 22, 2019; the Expert Opinion of Mr. Vahagn Grigoryan dated February 22, 2019; Exhibits R-0002 through R-0105; and Legal Authorities RL-0023 through RL-0141.

40.    On March 21, 2019, the Parties exchanged their requests for production of documents.

41.    On April 4, 2019, the Parties exchanged their respective objections to the other Party's requests for production of documents.

42.    On April 17 and 18, 2019, the Parties filed their replies to the other Party's objections to the requests for production of documents and asked the Tribunal to rule on certain of their requests.

43.    On May 13, 2019, the Tribunal issued Procedural Order No. 4 ruling on the Parties' document production requests. In its Order, the Tribunal, *inter alia*, requested that the Parties provide clarification on the Respondent's Document Request No. 8.

44.    On May 19 and 20, 2019, the Claimants and the Respondent responded to the Tribunal's request for clarification concerning the Respondent's Document Request No. 8.

45.    On June 7, 2019, the Tribunal wrote to the Parties indicating that (i) on the basis of the clarifications provided by Mr. Khudyan on May 19, 2019, it concluded that "*no Documents exist that are responsive to the Respondent's Request No. 8 in respect of Claimant No. 1 ('Documents showing that Claimant 1 ... duly paid the taxes on income arising out of the sales of the apartments on the Mashtots Plots')*"; and that (ii)

> *Insofar as the Respondent's Request No. 8 concerns "Documents showing that ... Arin Capital LLC duly paid the taxes on income arising out of the sales of the apartments on the Mashtots Plots," the Tribunal concludes on the basis of the Parties' observations set forth in the Redfern Schedule, as well as the additional clarifications in the Respondent's letter of May 20, 2019, that the Parties in fact agree that Arin Capital LLC never paid any taxes on the pertinent transactions. On that basis, the Tribunal concludes that there also exist no Documents that are responsive to the Respondent's Request No. 8 in respect of Arin Capital LLC.*

46.    On June 13, 2019, the Tribunal invited the Parties "*to confer in order to attempt to agree on the most suitable place for the hearing and revert to the Tribunal with their common position or their respective position*s."

47.    On June 20, 2019, the Parties informed the Tribunal that they were unable to reach an agreement on a venue for the hearing and provided their respective positions on the matter.

48.    On June 24, 2019, the Tribunal informed the Parties that, absent a different agreement between the Parties, the hearing would be held in Washington, D.C., in accordance with Article 62 of the Convention and Arbitration Rule 13(3).

49.    On July 1, 2019, the Claimants filed their Reply, along with the Second Witness Statement of Mr. Edmond Khudyan dated June 25, 2019 ("**Khudyan's Second Witness Statement**"), the Expert Report of Mr. Artur Ghambaryan dated June 4, 2019, Exhibits C-0132 through C-0341 and Legal Authorities CL-0101 through CL-0167.

50.    On July 11, 2019, the Claimants requested leave to submit a corrected version of their Reply and to produce copies of certain exhibits and a legal authority cited therein (Exhibits C-0342-ARM and C-0343-ARM and Legal Authority CL-0168). The Tribunal granted the Claimants' application on July 31, 2019.

51.    On September 20, 2019, Mr. Teddy Baldwin informed the Tribunal that Armenia had instructed Steptoe & Johnson to replace CMS Hasche Sigle, and requested a one-month extension to file the Respondent's Rejoinder.

52.    On September 23, 2019, the Centre acknowledged receipt of Mr. Baldwin's communication and invited the Respondent to provide an updated power of attorney.

53.     On September 27, 2019, the Tribunal informed the Parties that it would confirm the amended deadline for the submission of the Respondent's Rejoinder following receipt of the updated power of attorney from the Republic of Armenia.

54.     On November 12, 2019, the Respondent submitted an updated power of attorney identifying Mr. Teddy Baldwin and Mr. Yeghishe Kirakosyan as counsel of record.

55.     On November 15, 2019, the Respondent filed its Rejoinder, along with the Witness Statement of Mr. Arsen Chitchyan dated November 14, 2019, the Second Expert Opinion of Mr. Minas Arabyan dated November 15, 2019 ("**Arabyan's Second Expert Opinion**"), the Second Expert Opinion of Mr. Vahagn Grigoryan dated November 14, 2019, Exhibits R-0106 through R-0190, and Legal Authorities RL-0142 through RL-0198.

56.     On November 25, 2019, the Tribunal invited the Parties to (i) designate the witnesses and experts they would like to cross-examine during the upcoming hearing; (ii) confirm their availability for a pre-hearing organizational meeting on December 11, 2019; and (iii) present a chronology and a list and a brief description of the individuals and entities who/which are part of the relevant factual background by December 9, 2019. The Tribunal also invited the Parties to work on a list of substantive issues and update the Tribunal on their progress at the pre-hearing conference.

57.     On November 26, 2019, following exchanges with the Parties, the Centre confirmed that the pre-hearing organizational meeting would take place on December 11, 2019.

58.     On December 2, 2019, the Parties submitted their respective lists of witnesses and experts that they wished to cross-examine at the hearing.

59.     On December 5, 2019, the Secretary of the Tribunal circulated a draft agenda for the pre-hearing organizational meeting.

60.     On December 9, 2019, the Parties responded to the Tribunal's letter of November 25, 2019.

61.    On December 10, 2019, the Claimants submitted a draft pre-hearing conference agenda recording the Parties' agreements regarding the schedule and the organization of the hearing and their disagreement as to whether Mr. Khudyan's family should be permitted to attend part of the hearing.

62.    On December 11, 2019, the Tribunal held a pre-hearing organizational meeting with the Parties by telephone conference.

63.    On December 12, 2019, the Tribunal, informed the Parties that "[w]*hile* [it] *is not convinced that the presence of the children would be appropriate, it is sympathetic to the request for permission to allow Mrs. Khudyan to accompany her husband during the first two days of the hearing, subject to her signing a confidentiality undertaking. The Tribunal, however, is constrained by ICSID Arbitration Rule 32(2), which was not discussed during the Pre-Hearing Organizational Meeting*." The Tribunal invited the Parties to consider Arbitration Rule 32(2) and revert on this issue by December 20, 2019.

64.    On December 13, 2019, the Claimants submitted new Exhibits C-0344 through C-0346 for use by the Claimants at the hearing and reserved their right to file an additional exhibit (Exhibit C-0347) by December 20, 2019.

65.    On December 19, 2019, the Claimants submitted the Judgement of the Court of General Jurisdiction of the Kentron and Nork-Marash Administrative Districts of the City of Yerevan dated July 29, 2019, along with a partial translation of that judgement, as Exhibit C-0347-ARM.

66.    On December 20, 2019, the Respondent objected to the attendance of Mr. Khudyan's family at the hearing and the Claimants indicated that Mr. Khudyan "[would] *not press the matter*."

67.    On the same date, the Claimants submitted a copy of their chronology of relevant facts. The Respondent never submitted the requested chronology.

68.     A hearing on jurisdiction and the merits was held in Washington, D.C. from January 20
        to January 24, 2020 (the "**Hearing**"). Together with the Members of the Tribunal and
        the Secretary of the Tribunal the following persons attended the Hearing:

*For the Claimants*:
| | |
|---|---|
| Mr. James Boykin | Hughes Hubbard & Reed, LLP |
| Mr. Alexander Bedrosyan | Hughes Hubbard & Reed, LLP |
| Ms. Lauryn Hardy | Hughes Hubbard & Reed, LLP |
| Ms. Svitlana Stegniy | Hughes Hubbard & Reed, LLP |
| Dr. Gevorg Tumanov | ELL Partnership Law Firm |
| Dr. Norayr Balayan | ELL Partnership Law Firm |
| Mr. Edmond Khudyan | Claimant 1 and factual witness |
| Mr. Lernik Hovhannisyan | Claimants' factual witness |
| Mr. Nikolay Baghdasaryan | Claimants' factual witness |
| Mr. Artur Ghambaryan | Claimants' expert on issues of Armenian bankruptcy law |
| Mr. Arsen Barseghyan | Claimants' real estate evaluation expert |

*For the Respondent*:
| | |
|---|---|
| Mr. Teddy Baldwin | Steptoe & Johnson |
| Ms. Chloe Baldwin | Steptoe & Johnson |
| Mr. Thomas Innes | Steptoe & Johnson |
| Prof. Freddy Sourgens | Steptoe & Johnson Consultant |
| Ms. Elitza Popova-Talty | Steptoe & Johnson Consultant |
| Mr. Yeghishe Kirakosyan | Government of the Republic of Armenia |
| Ms. Kristine Khanazadyan | Government of the Republic of Armenia |
| Mr. Arsen Chitchyan | Respondent's factual witness |
| Mr. Minas Arabyan | Respondent's expert on issues of Armenian law on nationality |
| Mr. Tigran Markosyan | Respondent's expert on issues of Armenian bankruptcy law |
| Mr. Vahagn Grigoryan | Respondent's expert on issues of Armenian bankruptcy law |

*Court Reporter*:
| | |
|---|---|
| Ms. Laurie Carlisle | Carlisle Reporting |

*Interpreters*:
Mr. Khachatur Adumyan
Mr. Artashes Emin
Mr. Vahagn Petrosyan

69.     During the Hearing, the following persons were examined:

*On behalf of the Claimants*:
| | |
|---|---|
| Mr. Edmond Khudyan | Claimant 1 and factual witness |

| Mr. Lernik Hovhannisyan | Claimants' factual witness |
| Mr. Nikolay Baghdasaryan | Claimants' factual witness |
| Mr. Artur Ghambaryan | Claimants' expert on issues of Armenian bankruptcy law |
| Mr. Arsen Barseghyan | Claimants' real estate evaluation expert |

*On behalf of the Respondent*:

| Mr. Arsen Chitchyan | Respondent's factual witness |
| Mr. Minas Arabyan | Respondent's expert on issues of Armenian law on nationality |
| Mr. Tigran Markosyan | Respondent's expert on issues of Armenian bankruptcy law |
| Mr. Vahagn Grigoryan | Respondent's expert on issues of Armenian bankruptcy law |

70.     The Parties filed simultaneous Post-Hearing Briefs on March 2, 2020 ("**Claimants' PHB**" and "**Respondent's PHB**").

71.     On March 19, 2020, the Respondent filed an amended Post-Hearing Brief.

72.     On April 1, 2020, the Claimants filed an amended Post-Hearing Brief.

73.     The Parties filed their respective Submissions on Costs on July 6, 2021.

74.     On December 3, 2021, the Tribunal closed the proceedings pursuant to Arbitration Rule 38(1).

## III.     FACTUAL BACKGROUND

75.     The factual matrix of this dispute is broad and disputed to a large extent. This **Section III** is intended to provide a succinct overview of the Claimants' main factual allegations from which the dispute between the Parties arises. The Tribunal makes no ruling on these allegations in this section. The Tribunal will address in **Sections V.A** and **V.B** below the disputed elements of the Claimants' factual allegations relating to jurisdiction in the context of its analysis of the question whether the Tribunal has jurisdiction *ratione personae* over the Claimants and jurisdiction *ratione materiae* over their alleged investments. Because, as explained below, the Tribunal considers that it

lacks jurisdiction over the dispute, it does not need to address the remaining disputed factual allegations.

## A.    THE CLAIMANTS

76.    The first Claimant, Mr. Edmond Khudyan, was born in Tehran in 1965. When Mr. Khudyan was six years old, he emigrated with his family to the Soviet Union, where they settled in Yerevan, the capital of the then Armenian Soviet Socialist Republic ("**ASSR**").[2]

77.    On August 13, 1989, Mr. Khudyan moved to the United States of America ("**USA**") where he established his permanent residence in Los Angeles.[3]

78.    On August 21, 1998, Mr. Khudyan was naturalized and became a citizen of the USA.[4]

79.    In March 2002, Mr. Khudyan created Arin Capital & Investment Corp., a company incorporated under the laws of the State of California, which is the second Claimant, also referred to as Arin US.[5] Mr. Khudyan is the sole owner and President of Arin US.[6]

80.    Mr. Khudyan began to seek opportunities to invest in Armenia.[7] He was one of the sponsors of the Pan-Armenian Games, which took place in August 2003 in Yerevan. The Pan-Armenian Games is an Olympic-style sports competition between teams representing different communities of ethnic Armenians, including those living abroad. At that occasion, Mr. Khudyan was introduced by a childhood friend, Mr. Eduard Yesayan, to Mr. Levon Sargsyan, who was then the Armenian Ambassador to Syria. The brother of Mr. Levon Sargsyan, Mr. Serzh Sargsyan, was the Minister of Defense

---

[2]    Khudyan's First Witness Statement, ¶2.

[3]    Khudyan's First Witness Statement, ¶3; Exit Visa of Mr. Edmond Khudyan (Exhibit C-0165).

[4]    Mr. Khudyan first claimed that he became a United States citizen in 1994: Khudyan's First Witness Statement, ¶3. He later corrected this date, Khudyan's Second Witness Statement, ¶3; Certificate of Naturalization of Mr. Edmond Khudyan, August 21, 1998 (Exhibit C-0171).

[5]    Khudyan's First Witness Statement, ¶5; Articles of Incorporation of Arin Capital & Investment Corp, March 29, 2002 (Exhibit C-0014).

[6]    Khudyan's First Witness Statement, ¶1.

[7]    Khudyan's First Witness Statement, ¶6.

at the time, and later became the President of the Republic of Armenia (Mr. Levon Sargsyan is also referred to as "**Ambassador Sargsyan**").[8]

81.    On December 18, 2003, Mr. Khudyan applied for special residency status in the Republic of Armenia,[9] which was granted to him by Presidential Decree of January 22, 2004.[10] On March 30, 2004, Mr. Khudyan obtained an Armenian passport with special residency status.[11]

**B.    THE INITIAL ACQUISITION OF REAL ESTATE AT 33/1 MASHTOTS AVENUE AND THE SUBSEQUENT SALE OF THAT REAL ESTATE**

82.    Shortly after their introduction in August 2003, Ambassador Sargsyan invited Mr. Khudyan to invest in the Armenian real estate sector, initially by way of a USD 100,000 loan to one of his business partners, named Mr. Vladimir Mangasaryan. Mr. Khudyan decided to provide the loan because he was interested "*in investing in and contributing to the development of the Armenian economy.*"[12] Mr. Khudyan testified that Ambassador Sargsyan promised to personally guarantee Mr. Mangasaryan's repayment of the loan with interest, but did not specify the amount of interest promised.[13]

83.    In November 2003, Ambassador Sargsyan proposed that Mr. Khudyan participate in a real estate project in the middle of downtown Yerevan. The project involved the acquisition and development of two land plots, located behind 33 Mashtots Avenue at 33/1 Mashtots Avenue (the "**33/1 Mashtots Property**") and 33A Mashtots Avenue (the "**33A Mashtots Property**"). Ambassador Sargsyan proposed that Mr. Khudyan acquire the land plots and retain Mr. Mangasaryan to develop them by constructing a building and by selling residential units in that building.[14] Mr. Khudyan testified that

---

[8]    Claimants' Memorial, ¶¶16-17; Khudyan's First Witness Statement, ¶7.
[9]    Application of Mr. Edmond Khudyan for Special Residency Status, December 18, 2003 (Exhibit R-0007).
[10]    Republic of Armenia, Presidential Decree No. N NK-18-A, January 22, 2004 (Exhibit C-0180).
[11]    Republic of Armenia, Passport of Mr. Edmond Khudyan (Exhibit C-0017).
[12]    Claimants' Memorial, ¶18; Khudyan's First Witness Statement, ¶7.
[13]    Khudyan's First Witness Statement, ¶7.
[14]    Khudyan's First Witness Statement, ¶9.

Ambassador Sargsyan had arranged for him to receive a USD 125,000 discount off the asking price, as repayment for the USD 100,000 he had loaned to Mr. Mangasaryan.[15]

84.   In December 2003, Mr. Khudyan purchased the 33/1 Mashtots Property, which Mr. Khudyan testified consisted of an empty plot measuring 956.6 square meters, in the name of a friend, Mr. Armen Telpyan, using funds from Arin US for an amount initially quantified at USD 400,000,[16] which later increased to USD 520,000.[17] Mr. Khudyan purchased the plot in name of Mr. Telpyan because under Armenian law he could not use land in his own name until he obtained special residency status.[18]

85.   On April 6, 2004, shortly after Mr. Khudyan obtained an Armenian passport with special residency status, Mr. Telpyan transferred the 33/1 Mashtots Property to Mr. Khudyan and it was registered in Mr. Khudyan's name.[19]

86.   Mr. Khudyan testified that, as of October 2004, Mr. Mangasaryan had not begun construction of the planned building and that, after expressing his frustration to Ambassador Sargsyan, the latter proposed that Mr. Khudyan sell the 33/1 Mashtots Property and purchase instead the adjacent 33A Mashtots Property, which was 1,500 square meters and on which stood a four-storey unfinished building.[20]

87.   On October 6, 2004, Mr. Khudyan sold the 33/1 Mashtots Property to Mr. Vikin Barsikhyan, who acquired the property for Mr. Paren Parsegian (also spelled

---

[15]   Khudyan's First Witness Statement, ¶9.

[16]   Khudyan's First Witness Statement, ¶9; Claimants' Reply, ¶81.1; Incident Report in Criminal Case No. 83159711, November 3, 2016 ("**Indictment Report**") (Exhibit C-0121); Wire Transfer Receipt, December 19, 2003 (Exhibits C-0179 / R-0183); Tr., Day 2, 343:1-2.

[17]   Claimants' PHB, ¶3, fn 14, citing Arin Capital & Investment, Income Tax Return, 2003 (Exhibit C-0137) and Republic of Armenia, Certificate of Registration of Arin Capital, November 11, 2005 (Exhibit R-0011), p. 8. Exhibit C-0137 is Arin US's tax return for 2003, which shows "*Properti*[e]*s in Armenia*" for USD 595,000. The Claimants say that this shows that Arin US had investments of USD 595,000 worth of real property in Armenia, which included the 33/1 Mashtots Property at USD 520,000 and another apartment in Yerevan that Mr. Khudyan purchased for USD 75,000. Exhibit R-0011 mentions the other apartment, but does not list a USD amount. The Claimants claim that the USD 100,000 loan that Mr. Khudyan had extended to Mr. Mangasaryan in 2003 was factored in the purchase price of the 33/1 Mashtots Property, Khudyan's First Witness Statement, ¶9.

[18]   Claimants' Memorial, ¶22; Claimants' PHB, ¶3.

[19]   Khudyan's First Witness Statement, ¶9; Claimants' PHB, ¶3; Republic of Armenia, National Bureau of Expertises, Expert Opinion No. 14-2938, October 9, 2015 ("**Expertise Report**") (Exhibit C-0295), p. 121.

[20]   Khudyan's First Witness Statement, ¶10.

Barsikhyan) (a Syrian citizen of Armenian origin and an acquaintance of Ambassador Sargsyan[21]) against payment of USD 700,000 to Mr. Khudyan for the plot and a further USD 300,000 to Mr. Mangasaryan for the construction.[22] Mr. Khudyan testified that Ambassador Sargsyan convinced the Barsikhyans to hire Mr. Mangasaryan to build a real estate development on the plot.[23]

## C.    THE ACQUISITION OF REAL ESTATE AT 33A MASHTOTS AVENUE

88.    On November 16, 2004, with the sales proceeds of the 33/1 Mashtots Property, Mr. Khudyan bought from Spitak Tnak LLC the public building and land plot located at 33A Mashtots Avenue for a purchase price initially stated to be USD 600,000,[24] and later amended to USD 630,000.[25] The Claimants claim that the USD 630,000 was paid on October 7, 2004.[26]

89.    Mr. Khudyan testified that he wished to renovate the building on the plot and sell it within twelve months.[27] For purposes of the renovation, he entered into a construction agreement with construction company VERM LLC, owned by Mr. Mangasaryan.[28]

## D.    THE REACQUISITION OF REAL ESTATE AT 33/1 MASHTOTS AVENUE

90.    In August 2005, Mr. Mangasaryan allegedly demolished the existing four-storey building on Mr. Khudyan's 33A Mashtots Property and constructed the foundation for

---

[21]    Khudyan's First Witness Statement, ¶10; Khudyan's Second Witness Statement, ¶9; Land Plot Purchase and Sale Agreement between Mr. Edmond Khudyan and Mr. Vikin Barsikhyan, October 6, 2004 ("**October 2004 Sale and Purchase Agreement**") (Exhibit R-0013).

[22]    Khudyan's First Witness Statement, ¶10; Khudyan's Second Witness Statement, ¶9; Claimants' PHB, ¶3.

[23]    Khudyan's Second Witness Statement, ¶9.

[24]    City of Yerevan, Witness Interrogation Protocol of Mr. Edmond Khudyan, November 16, 2015 ("**2015 Khudyan Interrogation Report**") (Exhibit C-0302), p. 58; Khudyan's Second Witness Statement, ¶10.

[25]    Claimants' PHB, ¶3, citing, *inter alia*, Real Property Purchase and Sale Agreement between Spitak Tnak LLC and Mr. Edmond Khudyan, November 16, 2004 ("**November 2004 Sale and Purchase Agreement**") (Exhibit R-0012) ("*the public building located at 33a … Mashtots Ave.*" "*with an area of 1552.8 … square meters and a land plot with an area of 0.09566 ha*" for "*108.906.000 … Armenian drams*").

[26]    Claimants' PHB, ¶3, citing Documents Produced in Response to Armenia's Document Request Nos. 4 and 5 (Exhibit R-0126), p. EK-00026 (page in Armenian showing "07/10/04" and an amount of "630,000.00").

[27]    Khudyan's First Witness Statement, ¶10; Khudyan's Second Witness Statement, ¶10.

[28]    Khudyan's Second Witness Statement, ¶10.

a building (the "**Mashtots Building**"), which occupied all of Mr. Parsegian's 33/1 Mashtots Property and some of Mr. Khudyan's 33A Mashtots Property, thereby effectively joining the two plots, making it impossible to sell them individually.[29] Mr. Khudyan then decided to buy back the neighbouring 33/1 plot from Mr. Parsegian.[30]

91.    Before the reacquisition of the property located at 33/1 Mashtots Avenue, in September 2005, Mr. Khudyan entered into two contracts with Mr. Mangasaryan:

-    On September 9, 2005, Mr. Mangasaryan, as contractor, undertook to construct for Mr. Khudyan, as client, an eleven-storey building and parking lot on what is described in the contract as a plot *situated in 33ᵃ Mashtots Avenue …, plot occupied by the museum 956.6 m²;*"[31] and

-    On September 16, 2005, Mr. Khudyan granted Mr. Mangasaryan the right to conclude preliminary sales agreements with third parties for apartment units on the sixth and higher floors of the building to be constructed at 33A Mashtots Avenue (referred to as "33 Mashtots Avenue" in this contract) pursuant to the construction contract concluded on September 9, 2005, together with parking spaces. Mr. Mangasaryan, for his part, undertook to apply half of the sales proceeds he would receive under the preliminary sales agreements towards the construction of the building and the other half was to be "*paid or transferred*" to Mr. Khudyan "*by any means specified by him.*"[32]

92.    In a letter on Arin US letterhead dated November 29, 2005, Mr. Khudyan and Mr. Mangasaryan recorded the terms agreed "*thus far*" and those concerning "*an addition for a new transaction*":

---

[29]    Khudyan's First Witness Statement, ¶11; Khudyan's Second Witness Statement, ¶¶11-14.

[30]    Khudyan's First Witness Statement, ¶11; Khudyan's Second Witness Statement, ¶16.

[31]    Khudyan's First Witness Statement, ¶12; Construction Contract between Mr. Vladislav Mangasaryan and Mr. Edmond Khudyan, September 9, 2005 (Exhibit C-0018) (Article 3.1(12) indicates that the building was to consist of 11 floors).

[32]    Khudyan's First Witness Statement, ¶12; Contract between Mr. Vladislav Mangasaryan and Mr. Edmond Khudyan, September 16, 2005 (Exhibit C-0019).

16

> *In November 2004, I bought the building that was four stories tall at that time. This building was supposed to be remodeled only, and each of us would earn a benefit/profit of $500,000 by May 31, 2005 (see the letter/agreement dated November 17, 2004[33]). Subsequently, I was asked to expand my space into Parin's space and, if agreed, my amount [profit] would increase by another $400,000, but by May 31, 2006.*
>
> *Consequently, my balance stands at $1,284,522 as of November 31 [SIC]. Please see the attached Table A-1.*
>
> *The purchase by Sevak Adamyan and Armen Bandaryan of the space currently owned by Parin will generate profits/benefits of $250,000 for them by May 31, 2006. That space will be bought for $1,000,000. Consequently, I request that [you] start repayment of these amounts on February 15, 2006 by selling appropriate spaces. Specifically, every $250,000 repaid (starting on February 15) will stop accruing interest/profit and, if these repayments continue, according to the attached chart, the overall loan will be reduced by $111,278 (see Chart A-2). The amounts to be paid and the payment dates must not change; otherwise changes would occur and the referenced chart will not apply. There has been a mutual agreement that appropriate documents will be provided to obtain [ownership] certificates as soon as each floor is built. Consequently, for each payment of $550,000 one floor will be returned to you.[34]*

93.    With a view to the purchase by Mr. Sevak Adamyan and Mr. Armen Bandaryan (Mr. Khudyan's brothers-in-law) of "*the space currently owned by Parin*" (i.e., Mr. Paren Parsegian), on December 2, 2005, Mr. Khudyan signed an agreement with Messrs. Adamyan and Bandaryan as "*investors*,"[35] pursuant to which they invested EUR 1 million (EUR 850,00 and EUR 150,000 respectively), with which Mr. Khudyan would acquire in his own name vacant land at 33A Mashtots Avenue in Yerevan.[36] The text of this agreement is reproduced below:

> *Edmond Khudyan is offering a short term business opportunity (until May 31, 2006) in Yerevan Armenia. Armen Bandarian and Sevak Adamyan are investors (hereby "Investors") from Burbank CA (USA), who periodically invest with Arin Capital & Investment Corp in Los Angeles, California. "Investors" will invest $1,000,000 with Edmond Khudyan, and with that*

---

[33]    This letter is not in the record.

[34]    Letter signed by Mr. Edmond Khudyan and Mr. Vladislav Mangasaryan, November 29, 2005 (Exhibit C-0182).

[35]    Tr., Day 2, 525:5–527:2.

[36]    Agreement between Mr. Edmond Khudyan, Mr. Armen Bandaryan and Mr. Sevak Adamyan, December 2, 2005 (Exhibit C-0183).

17

*investment, Edmond Khudyan will be acquiring a vacant land on Mashtoc 33a, Yerevan Armenia under his personal name.*

*Upon execution of this agreement, "Investor"* [sic] *agree to invest (Armen Bandarian-$150,000 and Sevak Adamyan-$850,000) under the terms below:*

1.   *Profit will be paid according to the agreement between Edmond Khudyan (USA) and Vladislav Mangasaryan (Armenia) dated November 29, 2005. In the event Edmond Khudyan does not purchase the land in the next 30 days, the investment will not be made, or it be returned and no profit will be paid to the "investors".*

2.   *The expected profit to both "Investors" is $250,000. ($37,500 to Armen Bandarian and $212,500 to Sevak Adamyan). In the event the $1,250,000 (total amount to be returned, including profit) is not returned back to the "Investors" by May 31, 2006, the* [sic] *Edmond Khudyan will be personally responsible for the investment amount + profits in the USA.*

3.   *Edmond Khudyan understands that "Investors" are not investing in Armenia, they are investing with Edmond Khudyan personally. Therefore, in the event said investment, or any portion of it, plus potential profit shall not be paid back in time for ANY reason, then Edmond Khudyan personally, AND Arin Capital & Investment Corp. will be liable for the $1,000,000, plus profit and legal fees. In the event the investment is not returned on or before May 31, 2006, Arin Capital will immediately start liquidating their assets to raise capital to pay off the balance. Edmond Khudyan and "Investors" confirm that Arin Capital & Investment Corp together own $4,000,000 worth of net real estate assets in LA County, CA and they will be sold no later than Aug 31, 2006 to pay off "Investors.*[*"*]

4.   *In the event Edmond Khudyan requests that $1,000,000 investment shall be wired to Arin Capital & Investment Corp. account in USA, or to Edmond Khudyan account in Armenia, or to the seller of the property which he is acquiring, then the investment will be considered made and Edmond Khudyan will be liable for it.*

94.   This agreement describes the land in question as "*vacant land on Mashtoc 33a.*" The Claimants contend in their Post-Hearing Brief that "*the plot was still denominated as 33A Mashtots at the time, and would not be registered as 33/1 Mashtots until 21 July 2009.*"[37]

---

[37]   Claimants' PHB, ¶3, fn 20, citing Tr., Day 3, 691:8-18.

95.    The Claimants first stated that Mr. Khudyan repurchased the 33/1 Mashtots Property from Mr. Parsegian with the USD 1,000,000 invested by his brothers-in-law on December 13, 2005.[38] They later stated that Mr. Khudyan's brothers-in-law provided the USD 1 million to Mr. Khudyan on December 13, 2005, that the purchase took place on December 17, 2005, and that Mr. Khudyan paid the purchase price on December 21, 2005.[39]

**E.    THE CONSTRUCTION AND DEVELOPMENT OF THE MASHTOTS BUILDING**

96.    Following the reacquisition of the Mashtots 33/1 Property, Mr. Khudyan invested a further USD 4,205,392 in various expenses related to the construction of the Mashtots Building.[40]

97.    On July 27, 2006, Mr. Khudyan entered into a mortgage (pledge) contract with AviaTrans CJSC, pursuant to which Mr. Khudyan mortgaged "*the first, second and third floors of the unfinished multi-functional building in Mashtots 33a Avenue*" as collateral to secure the repayment of the loan provided by AviaTrans to VERM LLC (a construction company owned by Mr. Mangasaryan) in an amount of AMD 417 million.[41] The collateral was valued at AMD 450 million.[42]

---

[38]    Khudyan's First Witness Statement, ¶13; Khudyan's Second Witness Statement, ¶16; Tr., Day 2, 384:10-17; Tr., Day 2, 386:6–390:16.

[39]    Claimants' PHB, ¶3, citing, *inter alia*, Arin US Bank Statement, December 22, 2005 (Exhibit C-0184) (showing an inflow of USD 1 million on December 13, 2005); Land Plot Purchase and Sale Agreement between Mr. Edmond Khudyan and Mr. Vikin Barsikhyan, December 17, 2005 ("**December 2005 Purchase and Sale Agreement**") (Exhibit R-0014); Documents Produced in Response to Armenia's Document Request Nos. 4 and 5 (Exhibit R-0126), p. EK-00045, (page in Armenian showing "21/12/05" and an amount of "1,000,000.00").

[40]    Claimants' Reply, ¶81; Claimants' PHB, ¶¶3, 50; Motion to Admit Evidence from Mr. Edmond Khudyan, May 8, 2016 (Exhibit C-0119); City of Yerevan, Decision on Not Conducting a Criminal Prosecution, December 21, 2015 (Exhibit C-0164); Summary of Cash Assets of Mr. Edmond Khudyan, December 11, 2015 (Exhibit C-0303).

[41]    Mortgage (Pledge) Contract between AviaTrans and Mr. Edmond Khudyan, July 27, 2006 ("**2006 Mortgage**") (Exhibit C-0021), Articles 1.1-1.2.

[42]    2006 Mortgage (Exhibit C-0021), Article 1.4.

98.    In the course of 2006 and the first three quarters of 2007, Mr. Khudyan concluded several preliminary sales agreements concerning units in the Mashtots Building then under construction at 33 Mashtots Avenue.[43]

## F.    THE SHAREHOLDERS AGREEMENT AND TRANSFER TO ARIN ARMENIA

99.    After the acquisition of the 33A Mashtots Property but before the reacquisition of the 33/1 Mashtots Property, on November 10, 2005, Mr. Khudyan registered Arin Capital Investments LLC (herein referred to as "**Arin Armenia**"), a limited liability company organized under the laws of Armenia.[44]

100.    On August 15, 2007, Mr. Khudyan, being the sole partner and manager of Arin Armenia, decided to resign as its manager and appointed his childhood friend, Mr. Eduard Yesayan, in his stead.[45]

101.    On October 1, 2007, Mr. Khudyan entered into an agreement with Mr. Mangasaryan and Mr. Ghevond Ghalumyan (the "**Shareholders Agreement**"),[46] pursuant to which:

-    Mr. Khudyan agreed to contribute his 33A and 33/1 Mashtots Properties to the statutory capital of Arin Armenia;

-    Mr. Khudyan agreed to sell "*without compensation*"[47] 21.3% of his shares in Arin Armenia to Mr. Mangasaryan in consideration of the USD 1,217,000 he had contributed to the execution of the construction. The 21.3% stake of

---

[43]    Khudyan's First Witness Statement, ¶14; Khudyan's Second Witness Statement, ¶24; Results of Audit Conducted by AN Consult (Exhibit C-0053); Preliminary Agreement on the Purchase and Sale of Real Property between Mr. Edmond Khudyan and Mr. Ruben Mangasaryan, November 15, 2007 (Exhibit R-0018); Preliminary Agreement on the Purchase and Sale of Real Property between Mr. Edmond Khudyan and Mr. Hmayak Mandalyan, November 15, 2007 (Exhibit R-0019); Preliminary Agreement on the Purchase and Sale of Real Property between Mr. Edmond Khudyan and Mr. Hmayak Mandalyan, November 15, 2007 (Exhibit R-0100); Preliminary Agreement on the Purchase and Sale of Real Property between Mr. Edmond Khudyan and Mr. Ruben Mangasaryan, November 15, 2007 (Exhibit R-0104).

[44]    Certificate of Incorporation of Arin Capital Investments LLC, November 10, 2005 (Exhibit C-0020).

[45]    Khudyan's First Witness Statement, ¶17 (Mr. Khudyan states this occurred on September 7, 2007, but the document shows otherwise; *see* Decision No. 1/2007 of the Sole Partner of Arin Capital Investment [sic] LLC, August 15, 2007 (Exhibit C-0190)).

[46]    Preliminary Agreement on Purchase and Sale of the Shares of Arin Capital LLC between Mr. Edmond Khudyan, Mr. Vladislav Mangasaryan and Mr. Ghevond Ghalumyan, October 1, 2007 ("**Shareholders Agreement**") (Exhibit C-0025); Khudyan's First Witness Statement, ¶17.

[47]    Shareholders Agreement (Exhibit C-0025), Articles 2.2.1, 2.4.1, 2.5.1, 2.6.1.

Mr. Mangasaryan was transferred to and held by Mr. Mangasaryan's son-in-law, Mr. Haykaz Avetik Sargsyan;

- Mr. Khudyan agreed to sell "*without compensation*"[48] a 17.6% stake in Arin Armenia to Mr. Ghalumyan in consideration of the USD 1,000,000 he had contributed to the financing of the construction. Mr. Ghalumyan, who was a former senior police officer, was brought in "*to hold* [Mr.] *Mangasaryan accountable to his obligations*" and "*to manage the accounting, the city-related documentation, and taxation;*"[49] and

- Mr. Khudyan retained a 61.1% shareholding in Arin Armenia, which was estimated to be worth USD 3,481,000, the equivalent of the amounts Mr. Khudyan considered he had invested at that point.[50]

102.  The Shareholders Agreement provides in Article 2 that Mr. Khudyan is entitled to: "*the value estimated at the time of the share investment from the company and the other Parties - $ 3,481,000,*" which would be paid as follows:

- An amount of USD 1,500,000 to be paid by Arin Armenia out of a USD 2,000,000 loan it obtained from HSBC Armenia Bank (see below); and

- From the funds generated by the sales, 50% would be used to secure repayment of the remaining USD 1,981,000.[51]

103.  Also on October 1, 2007, Arin Armenia took out the referenced USD 2,000,000 loan from HSBC Bank Armenia for a three-year period against an annual interest rate of 14%.[52] The purpose of the loan is described in the Facility (Loan) Agreement as follows: "[f]*rom the granted Loan USD 1,300,000 (US one million three hundred thousand Dollars) is provided for repayment of dept* [sic] *to 'Arin Capital and*

---

[48]   Shareholders Agreement (Exhibit C-0025), Articles 2.2.1, 2.4.1, 2.5.1, 2.6.1.

[49]   Khudyan's Second Witness Statement, ¶19.

[50]   Shareholders Agreement (Exhibit C-0025); Mr. Edmond Khudyan's Power of Attorney Authorizing Mr. Eduard Yesayan, October 3, 2007 (Exhibit C-0026); Khudyan's First Witness Statement, ¶¶16-17.

[51]   Shareholders Agreement (Exhibit C-0025), Article 2.

[52]   Facility (Loan) Agreement between HSBC Bank Armenia and Arin Capital Investments LLC, October 1, 2007 ("**HSBC Loan Agreement**") (Exhibit C-0024).

*Investments' USA and 700,000 (US seven hundred thousand Dollars) for accomplishment of residential building construction works.*"[53]

104. On October 3, 2007, Mr. Khudyan gave a power of attorney to Mr. Eduard Yesayan, authorizing him to execute all legal acts provided for in the Shareholders Agreement, to represent Mr. Khudyan within Arin Armenia and to cast his votes.[54]

105. On October 5, 2007, Arin Armenia paid "*$1.5 million with proceeds from the mortgage from HSBC Bank*" to Mr. Khudyan.[55] Of that amount, USD 1.3 million was subsequently paid as a repayment of a debt to Arin US, which in turn paid back to Mr. Khudyan's brothers-in-law the USD 1 million they had invested with interest.[56]

106. On November 16, 2007, Mr. Khudyan transferred 9,167.7 m$^2$ of surface in the multifunctional building situated at 33A Mashtots Avenue, as well as the land plot of 0.19236 hectares to the charter capital of Arin Armenia.[57]

107. On December 6, 2007, Mr. Khudyan transferred 21.3% of the shares of Arin Armenia to Mr. Mangasaryan and 17.6% to Mr. Ghalumyan.[58]

108. The Claimants noted at the Hearing and in their post-hearing brief that on July 21, 2009, the 13-storey Mashtots Building received the address 33/1 Mashtots Avenue.[59]

## G.    THE IRREGULARITIES AND TAX EVASION OF ARIN ARMENIA

109. Following a warning of Mr. Yesayan in early 2009 that Arin Armenia was behind on its mortgage payments to HSBC and that there was a risk that the bank would foreclose on the building, Mr. Khudyan first tried to find out from the company's accountant

---

[53]    HSBC Loan Agreement (Exhibit C-0024).

[54]    Mr. Edmond Khudyan's Power of Attorney Authorizing Mr. Eduard Yesayan, October 3, 2007 (Exhibit C-0026); Tr., Day 2, 459:4-12.

[55]    Khudyan's First Witness Statement, ¶18.

[56]    Claimants' PHB, ¶3, fn 21, citing HSBC Loan Agreement (Exhibit C-0024).

[57]    Agreement on the Investment (Transfer) of Real Property between Mr. Edmond Khudyan and Arin Capital Investment [sic] LLC, November 16, 2007 ("**November 2007 Transfer Agreement**") (Exhibit C-0027); Khudyan's First Witness Statement, ¶18.

[58]    Khudyan's First Witness Statement, ¶17.

[59]    Claimants' PHB, ¶3, fn 20; Tr., Day 3, 693:1-7.

what the company's financial situation was and subsequently engaged accounting firm Ameria CJSC in May 2009 to conduct an external audit of Arin Armenia.[60] Ameria issued a due diligence report in late 2009.[61]

110.  Ameria informed Mr. Khudyan that it was highly likely that Mr. Mangasaryan was engaging in full-scale embezzlement of money from Arin Armenia by selling apartment units in the unfinished Mashtots Building and pocketing all the proceeds of those sales.[62]

111.  When Mr. Khudyan asked Ameria to take legal action against Mr. Mangasaryan, it reportedly declined, stating that although "*they thought the evidence of embezzlement was strong, they were aware of Mangasaryan's close business ties with Levon* [Ambassador Sargsyan]" and that "[t]*hey were not willing to do anything that could risk putting themselves into conflict with Levon, whose brother had by then become President of Armenia.*" Ameria allegedly added that Mr. Khudyan "*could expect a similar attitude from any judge in Armenia.*"[63]

112.  In order to prevent HSBC from foreclosing on the building, Mr. Khudyan claims having sold USD 700,000 worth of apartments to a friend in California, with whom he travelled to Armenia in order to make sure that those sales proceeds would be applied towards the repayment of the HSBC loan and to avoid the misappropriation of those funds by Mr. Mangasaryan.[64]

113.  Upon his return to the USA, Mr. Khudyan allegedly received calls from angry buyers who had signed preliminary sale purchase agreements and made down payments but had not received a certificate of ownership. In some cases, the buyers had found out that the apartment they had bought had been sold to others.[65] When Mr. Yesayan failed to provide an explanation, Mr. Khudyan decided to engage "*a dependable Armenian*

---

[60]    Khudyan's First Witness Statement, ¶¶20-22; Letter from Ameria to Mr. Edmond Khudyan, May 12, 2009 (Exhibit C-0029).

[61]    Ameria, Due Diligence Report on Arin Capital Investments LLC (Exhibit C-0001).

[62]    Claimants' Memorial, ¶29; Khudyan's First Witness Statement, ¶23.

[63]    Khudyan's First Witness Statement, ¶23.

[64]    Khudyan's First Witness Statement, ¶24.

[65]    Khudyan's First Witness Statement, ¶25.

*lawyer who would not fear retribution from Levon (unlike the auditing firm) and who would not defect to Mangasaryan's side (unlike Yesayan).*"[66] In May 2010, Mr. Khudyan engaged civil lawyer, Mr. Lernik Hovhannisyan.[67]

114.    On June 3, 2010, on the advice of counsel, Mr. Khudyan revoked the power of attorney he had granted to Mr. Eduard Yesayan to act on his behalf as majority shareholder in Arin Armenia.[68]

115.    It turned out that prior to the revocation of the power of attorney, Arin Armenia had signed loan agreements with a company of Mr. Mangasaryan, V.M.G. Group, allegedly without receiving any funds, as well as construction agreements. In addition, Arin Armenia had pledged apartments in the building as security for the purported loans.[69] Again, on the advice of his lawyer, Mr. Khudyan allegedly decided to turn "*to Armenian authorities to help us save Arin Capital LLC from Mangasaryan's scheme*."[70]

## H.    THE LEGAL PROCEEDINGS IN ARMENIA

116.    On June 22, 2010, the Legal and Enforced Collections Division of the Spandaryan Tax Inspectorate of the State Revenue Committee of the Republic of Armenia (the "**SRC**"), upon instruction of its Chairperson, placed a lien on Arin Armenia's property for unpaid taxes, which was confirmed by the administrative court on September 6, 2010.[71]

117.    On July 2, 2010, one of the buyers of the apartments initiated legal proceedings against Mr. Khudyan and Arin Armenia, claiming that he had not received the apartment he had bought and seeking the invalidation of the preliminary sale purchase agreement, as well as a refund of the purchase price he had paid.[72]

---

[66]     Khudyan's First Witness Statement, ¶26.

[67]     Khudyan's First Witness Statement, ¶27.

[68]     Notification of Revocation on Power of Attorney, June 3, 2010 (Exhibit C-0033).

[69]     Khudyan's First Witness Statement, ¶29.

[70]     Khudyan's First Witness Statement, ¶30.

[71]     Web Portal Page for Civil Case No. VD/2059/05/10 (Exhibit C-0040); Report of Legal and Enforced Collections Division, September 3, 2010 (Exhibit C-0041).

[72]     City of Yerevan, Court of General Jurisdiction of Kentron and Nork-Marash Administrative Regions, Case No. YKD1345/02/10, Decision, August 6, 2010 (Exhibit C-0036).

118.    On July 23, 2010, the Head of the Spandaryan Tax Inspectorate of the SRC informed
the Head of the Investigation Department of the SRC that during the second quarter of
2010, Arin Armenia failed to pay USD 365,308 in value added tax on the sale of assets
amounting to USD 1,826,540.[73]

119.    On August 6, 2010, the lien that the SRC had placed on the property of Arin Armenia
on June 22, 2010 was removed.

120.    On August 31, 2010, the SRC started administrative proceedings against Arin Armenia
and Mr. Khudyan to recover the unpaid taxes on the sales of units in the Mashtots
Building.[74]

121.    Around the same time, Mr. Khudyan initiated two sets of legal proceedings against Arin
Armenia to invalidate the two pledge agreements in favour of V.M.G. Group, signed
by Mr. Yesayan on behalf of Arin Armenia.[75]

122.    On September 10, 2010, Mr. Khudyan sent an open letter to the President of Armenia,
the Minister of the Diaspora, the Prosecutor General, and the Head of the Police of the
Republic of Armenia, claiming that Mr. Mangasaryan had been defrauding
Mr. Khudyan, as well as innocent buyers of apartments in the Mashtots Building, and
that he had caused Arin Armenia to take on fraudulent debts towards
Mr. Mangasaryan's V.M.G. Group with the intent of forcing Arin Armenia into a
deliberate bankruptcy.[76]

123.    According to the Claimants, on September 27, 2010, Mr. Khudyan and his lawyer met
Mr. Yesayan, Mr. Mangasaryan, Mr. Ghalumyan and Ambassador Sargsyan in

---

[73]    Letter from Spandaryan Tax Inspectorate to Investigation Department, July 23, 2010 (Exhibit C-0035).

[74]    Web Portal Page for Civil Case No. VD/2059/05/10 (Exhibit C-0040).

[75]    City of Yerevan, Court of General Jurisdiction of Kentron and Nork-Marash Administrative Regions,
Case No. EKD1725/02/10, Decision, October 29, 2010 (Exhibit C-0047); City of Yerevan, Court of
General Jurisdiction of Kentron and Nork-Marash Administrative Regions, Case No. EKD1726/02/10,
Decision, October 15, 2010 (Exhibit C-0045); City of Yerevan, Court of General Jurisdiction of Kentron
and Nork-Marash Administrative Regions, Case No. EKD1718/02/10, Decision, December 13, 2010
(Exhibit C-0054); City of Yerevan, Court of General Jurisdiction of Kentron and Nork-Marash
Administrative Regions, Case No. EKD1651/02/10, Decision, December 3, 2010 (Exhibit C-0052).

[76]    Letter from Mr. Edmond Khudyan to the President of Armenia and others, September 10, 2010 (Exhibit
C-0042).

Ambassador Sargsyan's office at the Ministry of Foreign Affairs, who allegedly convinced him to withdraw the lawsuits he had initiated against Arin Armenia, in exchange for the undertaking that an audit of Arin Armenia would be conducted to resolve the feud between the shareholders. At that occasion, Ambassador Sargsyan allegedly promised to "*punish whoever was found to be stealing from the company.*"[77]

124.   Following that meeting, Mr. Khudyan withdrew both claims, as a result of which the legal proceedings he had started to invalidate the two pledge agreements with V.M.G. Group were terminated on October 15 and 29, 2010 respectively.[78]

125.   In the meantime, on October 1, 2010, Mr. Gagik Vahanyan (a purchaser of an apartment in the Mashtots Building) had filed an application to declare Arin Armenia bankrupt (the "**Insolvency Proceedings**").[79] On October 20, 2010, the Court of General Jurisdiction (also referred to as the "**Insolvency Court**") declared Arin Armenia to be insolvent and appointed Mr. Hrant Ghambaryan as temporary bankruptcy manager.[80]

126.   On November 21, 2010, Mr. Khudyan initiated civil proceedings against Mr. Yesayan and V.M.G. Group, seeking the invalidation of the loan and construction agreements that Mr. Yesayan had concluded on behalf of Arin Armenia with V.M.G. Group (the "**Invalidation Proceedings**").[81]

---

[77]   Claimants' Memorial, ¶52; Khudyan's First Witness Statement, ¶¶34-35.

[78]   City of Yerevan, Court of General Jurisdiction of Kentron and Nork-Marash Administrative Regions, Case No. EKD1725/02/10, Decision, October 29, 2010 (Exhibit C-0047); City of Yerevan, Court of General Jurisdiction of Kentron and Nork-Marash Administrative Regions, Case No. EKD1726/02/10, Decision, October 15, 2010 (Exhibit C-0045).

[79]   Application of Mr. Gagik Vahanyan to City of Yerevan, Court of General Jurisdiction of Kentron and Nork-Marash Administrative Regions (Exhibit C-0043); City of Yerevan, Court of General Jurisdiction of Kentron and Nork-Marash Administrative Regions, Case No. YKD0061/04/10, Decision, October 1, 2010 (Exhibit C-0044).

[80]   City of Yerevan, Court of General Jurisdiction of Kentron and Nork-Marash Administrative Regions, Case No. YKD0061/04/10, Decision, October 20, 2010 (Exhibit C-0046).

[81]   Application of Mr. Edmond Khudyan to City of Yerevan, Court of General Jurisdiction of Kentron and Nork-Marash Administrative Regions (Exhibit C-0049); Statement of Claim of Mr. Edmond Khudyan, City of Yerevan, Court of General Jurisdiction of Kentron and Nork-Marash Administrative Regions (Exhibit C-0050).

127.    On November 28, 2010, Mr. Khudyan, represented by criminal lawyer Mr. Ani Torosyan, requested that the SRC conduct a criminal investigation into the embezzlement of Arin Armenia's assets.[82]

128.    On December 11, 2010, the audit of Arin Armenia (which had been agreed to be conducted at the meeting of September 27, 2010) was completed by AN Consult.[83] According to Mr. Khudyan, the AN Consult audit report established that many individuals who concluded preliminary sale-purchase agreements for apartments in the Mashtots Building did not receive title over the apartments, and that Mr. Mangasaryan misappropriated substantial amounts by not depositing the sales proceeds from preliminary sales transactions.[84] When Mr. Khudyan informed Ambassador Sargsyan about the outcome of the AN Consult audit he stated that "*this issue was no longer his problem.*"[85]

## I.    THE LIQUIDATION OF ARIN ARMENIA'S ASSETS AND THE CRIMINAL INVESTIGATION

129.    On October 20, 2010, Arin Armenia was declared bankrupt by the Court of General Jurisdiction of the Administrative Districts of Kentron and Nork-Marash of the City of Yerevan.[86]

130.    On January 18, 2011, in the framework of the Insolvency Proceedings, the first meeting of creditors of Arin Armenia took place.[87]

131.    On March 22, 2011, Mr. Khudyan requested to be placed on the list of creditors.[88]

---

[82]    Application of Mr. Edmond Khudyan to Chairman of SRC, November 28, 2010 (Exhibit C-0051).

[83]    Results of Audit Conducted by AN Consult (Exhibit C-0053).

[84]    Claimants' Memorial, ¶87; Results of Audit Conducted by AN Consult (Exhibit C-0053); Khudyan's First Witness Statement, ¶42.

[85]    Claimants' Memorial, ¶¶88-89; Khudyan's First Witness Statement, ¶¶43-45.

[86]    City of Yerevan, Court of General Jurisdiction of Kentron and Nork-Marash Administrative Regions, Case No. YKD0061/04/10, Decision, October 20, 2010 (Exhibit C-0046).

[87]    Newspaper article (undated) (Exhibit R-0034).

[88]    City of Yerevan, Court of General Jurisdiction of Kentron and Nork-Marash Administrative Regions, Case No. YKD0061/04/10, Decision, June 2, 2011 (Exhibit R-0035), p. 7.

132. On May 2, 2011, the Insolvency Court ordered the liquidation of Arin Armenia because no financial recovery plan had been submitted within the statutory deadline of Article 60 of the Law on Bankruptcy.[89]

133. On May 3, 2011, the Investigation Department of the SRC opened a criminal investigation into the deliberate insolvency of Arin Armenia (the "**Criminal Investigation**").[90] On May 30, 2011, the SRC ordered the bankruptcy administrator to hand over all documents concerning the bankruptcy of Arin Armenia.[91]

134. On May 10, 2011, Mr. Khudyan sent another open letter, this time to the Minister of Justice of the Republic of Armenia, denouncing Mr. Mangasaryan's embezzlement scheme that drove Arin Armenia into bankruptcy and requesting that the liquidation of its assets be suspended.[92]

135. On May 17, 2011, the Insolvency Court ordered the first transfer of assets of Arin Armenia to V.M.G. Group.[93]

136. On May 23, 2011, Mr. Khudyan's lawyer (Mr. Hovhannisyan) sent a letter to the President of Armenia, requesting his "*personal interference*" because, despite the ongoing criminal investigation, no indictments had been issued, and the appeal of the bankruptcy judgment was purportedly being held up by the first instance court that was not sending the file to the court of appeal.[94]

137. Between May and September 2011, additional letters were sent by Mr. Khudyan's lawyers and himself to the Investigation Department of the SRC, Armenia's Prosecutor

---

[89] City of Yerevan, Court of General Jurisdiction of Kentron and Nork-Marash Administrative Regions, Case No. YKD0061/04/10, Decision, May 2, 2011 (Exhibit C-0064).

[90] State Revenue Committee, Case No. 83159711, Decision, May 3, 2011 (Exhibit C-0065).

[91] State Revenue Committee, Case No. 83159711, Decision, May 30, 2011 (Exhibit C-0074).

[92] Letter from Mr. Edmond Khudyan to Minister of Justice, May 10, 2011 (Exhibit C-0066).

[93] City of Yerevan, Court of General Jurisdiction of Kentron and Nork-Marash Administrative Regions, Case No. YKD0061/04/10, Decision, May 17, 2011 (Exhibit C-0067).

[94] Letter from Mr. Lernik Hovhannisyan to the President of Armenia, May 23, 2011 (Exhibit C-0068).

General, the President of the Republic of Armenia, the Minister of Justice, the Chief of the Police of the Republic of Armenia and the Chairman of the SRC.[95]

138. On June 2, 2011, Mr. Khudyan was placed on the list of creditors of Arin Armenia by the Insolvency Court.[96]

139. While Mr. Khudyan did not appeal the liquidation order, Mr. Abrahamyan and Ms. Filikyan (also represented by Mr. Hovhannisyan) did. Their appeal was rejected by the appellate court on July 1, 2011.[97]

140. On September 20, 2011, the Insolvency Court ordered the second transfer of Arin Armenia's assets to parties designated by the V.M.G. Group.[98]

141. On March 20, 2012, the Senior Prosecutor of the Department of Crimes against Property and Business Activity of the General Prosecutor's Office sent a letter to the Senior Investigator of the SRC, stating that the Criminal Investigation into the deliberate bankruptcy of Arin Armenia was taking unreasonably long and instructed the SRC to "*question in detail*" Mr. Yesayan and Mr. Khudyan.[99]

142. On May 2, 2012, Mr. Khudyan was examined in the context of the Criminal Investigation.[100]

143. On June 14, 2012, Mr. Khudyan's action in the Invalidation Proceedings was rejected on the ground that the loan agreements concluded by Arin Armenia with the V.M.G. Group were valid. The court held that at the time the loan agreements were made (i.e.,

---

[95]    Letter from Mr. Lernik Hovhannisyan to the Investigation Department, State Revenue Committee, May 25, 2011 (Exhibit C-0071); Letter from Mr. Lernik Hovhannisyan to the General Prosecutor (undated) (Exhibit C-0080); Letter from Mr. Edmond Khudyan to the President of Armenia and others, August 11, 2011 (Exhibit C-0086); Letter from Deputy General Prosecutor to Mr. Edmond Khudyan, September 2, 2011 (Exhibit C-0088).

[96]    City of Yerevan, Court of General Jurisdiction of Kentron and Nork-Marash Administrative Regions, Case No. YKD0061/04/10, Decision, June 2, 2011 (Exhibit R-0035), p. 9.

[97]    Republic of Armenia, Appellate Civil Court, Case No. YKD0061/04/10, July 1, 2011 (Exhibit C-0081).

[98]    City of Yerevan, Court of General Jurisdiction of Kentron and Nork-Marash Administrative Regions, Case No. YKD0061/04/10, Decision, September 20, 2011 (Exhibit C-0089).

[99]    Letter from Senior Prosecutor to State Revenue Committee, March 20, 2021 (Exhibit C-0099).

[100]   City of Yerevan, Witness Interrogation Protocol of Mr. Edmond Khudyan, May 2, 2012 ("**2012 Khudyan Interrogation Report**") (Exhibits C-0101 / R-0002).

prior to Mr. Khudyan's revocation of Mr. Yesayan's power of attorney) Mr. Khudyan had been validly represented by Mr. Yesayan.[101] On July 14, 2012, Mr. Khudyan filed an appeal against this decision before the Armenian Civil Court of Appeal.[102]

144.    Fifteen months after the liquidation order and a year after the rejection of the appeal against the liquidation order that had been filed by Mr. Abrahamyan and Ms. Filikyan, on July 9, 2012, the Insolvency Court ordered a third and final transfer of the remainder of Arin Armenia's assets to V.M.G. Group.[103]

145.    On October 26, 2012, the Senior Prosecutor of the Department of Crimes against Property and Business Activity of the General Prosecutor's Office provided further instructions to the Senior Investigator of the SRC about the taking of witness and expert evidence in the context of the Criminal Investigation.[104]

146.    On March 16, 2013, the SRC indicted Mr. Mangasaryan for his responsibility in forcing Arin Armenia into deliberate bankruptcy.[105]

147.    On August 28, 2014, Mr. Khudyan and Arin US (at the time represented by Dentons) gave the Republic of Armenia notice of dispute for breach of its obligations under Article II of the Bilateral Investment Treaty between the USA and the Republic of Armenia.[106]

148.    On November 3, 2016, the General Prosecutor of the Republic of Armenia released an indictment report, which describes the evidence taken during the Criminal Investigation.[107]

---

[101]    City of Yerevan, Court of General Jurisdiction of Kentron and Nork-Marash Administrative Regions, Case No. YKD1724/02/10, Decision, June 14, 2012 (Exhibit C-0103).

[102]    Republic of Armenia, Civil Court of Appeal, Case No. YKD1724/02/10, Application of Mr. Edmond Khudyan, July 14, 2012 (Exhibit C-0106).

[103]    City of Yerevan, Court of General Jurisdiction of Kentron and Nork-Marash Administrative Regions, Case No. YKD0061/04/10, Decision, July 9, 2012 (Exhibit C-0105).

[104]    Letter from Senior Prosecutor to State Revenue Committee, October 26, 2012 (Exhibit C-0260); Letter from Senior Prosecutor to Mr. Edmond Khudyan, October 26, 2012 (Exhibit R-0069).

[105]    Inspector, State Revenue Committee, Criminal Case No. 83159711 Decision, March 16, 2013 (Exhibit C-0113).

[106]    Letter from Dentons to the Prime Minister of Armenia, August 28, 2014 (Exhibit C-0117).

[107]    Indictment Report (Exhibit C-0121).

149.   On September 18, 2017, the Claimants initiated these arbitral proceedings by filing their Request for Arbitration, which was registered by ICSID on September 27, 2017.

150.   On July 29, 2019, the Court of General Jurisdiction of the Kentron and Nork-Marash Administrative Districts of the City of Yerevan issued its judgment in the criminal case against Mr. Mangasaryan, in which the Court (1) found Mr. Mangasaryan guilty and convicted him to a prison sentence under Article 783(3) part 1 of the Criminal Code; (2) recognized Mr. Khudyan as a victim of the crime committed by Mr. Mangasaryan; and (3) awarded damages to Mr. Khudyan in the amount of approximately USD 2,305,520:

> *Victim Edmond Khudyan's representative Nikolay Baghdasaryan filed a claim against Vladislav Mangasaryan for compensation of the damage caused by the crime. At the judicial session of 25 July 2019 the victim's representative Nikolay Baghdasaryan advanced his filed claim and requested its satisfaction. According to the filed claim, the victim's representative requested in favor of the founder and shareholder of "'Arin Capital' Investments' LL Company Edmond Khudyan the seizure of office spaces 1, 3, 9, apartments 11, 15, 25, 40, 55, 56, 64-69, parking spaces 3 and 10, office spaces 6-8, 13, 18, apartments 1, 3, 5-6, 21, 24, 26-27, 46-47, 51 and 59, parking spaces 1, 2, 5-6, 9, 13-14, 16-17 and the 12th floor 52 square meter apartment 59 of the 33/1 Mashtots building. [Also] compensation of the damages caused to the victim as a result of the crime, which amount to AMD 1,113,238,667.94, which under the calculation rules of Article 411 of the Civil Procedure Code of the Republic of Armenia are subject to interest; AMD 294,440,790.2 that the victim has lost as a result of devaluation of the Armenian dram; AMD 469,385,000 of the victim's lost profits; AMD 85,782,165 that the victim has lost as a result of depreciation of the real estate; as well as amounts paid for translation which is the AMD equivalent of USD 66,937.*
>
> *Having studied the filed claim and having taken account of the fact that judicial examination has substantiated the damage caused to "Arin Capital' Investment" LL Company as a result of the crime, the court finds that the filed claim is satisfied.[108]*

---

[108]   City of Yerevan, Court of General Jurisdiction of Kentron and Nork-Marash Administrative Regions, Case No. EKD0295/01/16, Decision, July 29, 2019 (excerpts) (Exhibit C-0347), p. 148.

## IV.    THE PARTIES' CLAIMS AND REQUESTS FOR RELIEF

### A.    THE CLAIMANTS' REQUEST FOR RELIEF

151.    The Claimants are seeking the following relief from the Tribunal, as most recently articulated in their Reply:

> *613.1. Declaring that it has jurisdiction over Claimants' claims and that Claimants' claims are admissible;*
>
> *613.2. Declaring that Respondent has breached its obligations under the Treaty towards Claimants;*
>
> *613.3. Ordering Respondent to pay compensation for the damages caused by the breach of its obligations under the Treaty, which Claimants calculate at USD 10,661,818;*
>
> *613.4. Ordering Respondent to pay interest on USD 10,318,433 of this amount at the interest rate for three-month deposits in U.S. dollars on the London Interbank market (LIBOR) plus 3%, compounded annually from 23 July 2010, and on USD 343,385 of this amount at the same rate compounded annually from 27 September 2017, until full payment has been made;*
>
> *613.5. Ordering Respondent to pay Claimants' costs in these arbitration proceedings in an amount to be specified later together with interest thereon, including all attorneys' fees and expenses in connection with this proceeding, and as between the parties, alone to bear responsibility for compensating the Arbitral Tribunal and ICSID Secretariat;*
>
> *613.6. Ordering any other relief that the Tribunal may deem appropriate.*[109]

### B.    THE RESPONDENT'S REQUEST FOR RELIEF

152.    The Respondent is seeking the following relief from the Tribunal, as most recently articulated in its post-hearing brief dated March 2, 2020:

> *a.    Find that it has no jurisdiction to hear Claimants' claims; or*
>
> *b.    Reject Claimants' claims on the merits;*
>
> *c.    Reject Claimants' claims for compensation;*
>
> *d.    Order the Republic of Armenia's costs and fees to be paid by the Claimants; and*

---

[109]    Claimants' Reply, ¶613.

      *e.*      *To provide any other relief for the Republic of Armenia as is just and proper in this case.*[110]

## V.    JURISDICTION

153.    The Respondent has raised objections to the Tribunal's jurisdiction *ratione personae* and *ratione materiae*. In this **Section V** the Tribunal addresses these jurisdictional objections in turn.

### A.    JURISDICTION *RATIONE PERSONAE*

### (1)    The Parties' Positions

#### a.    The Respondent's Position

##### (i)  Claimant 1 – Mr. Edmond Khudyan

154.    It is Armenia's case that the Tribunal has no jurisdiction over the first Claimant, Mr. Khudyan, because he does not qualify as a foreign investor under the ICSID Convention and the BIT. Armenia argues that the object and purpose of foreign investment protection prevents the Tribunal from exercising jurisdiction over Mr. Khudyan under the BIT and the ICSID Convention because Mr. Khudyan is an Armenian national and his claims amount to an abuse of rights and process.[111]

155.    Armenia submits that the ICSID Convention prohibits individuals from bringing investment claims within the ICSID framework against the State of which they are a national, and accordingly an ICSID tribunal cannot exercise jurisdiction over a claimant bringing a claim against a State of which it holds nationality.[112] Armenia reads a similar intention in the distinction the BIT makes between "*a Party*" and "*the other Party*," which according to Armenia makes clear that it was not intended that "*a Party*" would be subject to claims of nationals of "*the same Party*."[113]

---

[110]    Respondent's PHB, ¶122.

[111]    Respondent's Counter-Memorial, Section VI.

[112]    Respondent's Rejoinder, ¶¶476-477.

[113]    Respondent's Rejoinder, ¶¶473-475.

156. Based on investment case law and the definition of the term "*national*" in the BIT as "*a natural person who is a national of the Party under its applicable law*" Armenia states that for the purposes of international investment protection, Mr. Khudyan's nationality must be determined on the basis of the national law of Armenia.[114]

157. It is the Respondent's case that as a matter of Armenian law, Mr. Khudyan is an Armenian national.

158. The key question is whether Mr. Khudyan lost his Armenian nationality at any point in view of the facts that:

   a. In 1981, when Mr. Khudyan obtained a passport of the Union of Soviet Socialist Republics ("**USSR**"), and in 1989 when he obtained an exit visa, he was a national of the USSR, as well as a national of one of the USSR constituent republics, the Armenian Soviet Socialist Republic ("**ASSR**");[115]

   b. In 1991, the former ASSR became independent of the USSR and became the Republic of Armenia;[116] and

   c. In 1998, Mr. Khudyan was naturalized and received U.S. citizenship.[117]

159. By reference to the expert evidence of Mr. Minas Arabyan, the Respondent alleges that Mr. Khudyan did not lose his nationality of the ASSR after Armenia declared its independence from the USSR in 1991. Armenia's Declaration of Independence of 1991 proclaimed principles, which subsequently had to be implemented and elaborated in new legislation. As the Declaration of Independence was not meant to be a comprehensive legal regulation, it did not have the legal effect of rendering all former ASSR citizens stateless.[118]

---

[114]  Respondent's Counter-Memorial, ¶¶206-213.

[115]  Exit Visa of Mr. Edmond Khudyan (Exhibit C-0165); Respondent's Counter-Memorial, ¶¶218-219; Arabyan's First Expert Opinion, ¶¶15-18.

[116]  Armenia, Declaration of Independence, August 23, 1990 ("**Declaration of Independence**") (Exhibits C-0346 / R-0043).

[117]  Respondent's Rejoinder, ¶¶6, 46-47, 479, 501; Respondent's PHB, ¶12.

[118]  Respondent's PHB, ¶6; Arabyan's First Expert Opinion, Section B(i); Tr., Day 4, 978:25–979:-17.

160.    The Respondent argues that the USSR Constitution and the USSR legal framework remained in force in Armenia after the dissolution of the USSR and continued to govern the nationality of the citizens of the former ASSR until the entry into force of the new Armenian Constitution and the new Armenian Law on Citizenship in 1995 ("**1995 Citizenship Law**"). In the meantime, the Respondent argues, Mr. Khudyan's USSR passport remained valid.[119]

161.    The Respondent submits that in the context of the dissolution of the USSR and the State succession of the Republic of Armenia to the ASSR, Mr. Khudyan automatically became a national of the Republic of Armenia.[120]

162.    In response to the Claimants' argument that Mr. Khudyan lost his Armenian nationality because he did not register with an Armenian consulate in accordance with Article 10(3) of the 1995 Citizenship Law prior to the entry into force of that law, the Respondent insists that the consular registration requirement was contrary to the provisions of the 1961 UN Convention on the Reduction of Statelessness and therefore did not generate legal effect. Article 10(3) of the 1995 Citizenship Law had the potential of rendering citizens stateless for failing to register, which is expressly prohibited by Articles 7(3) and 8 of the 1961 UN Convention.[121] Because the Armenian Constitution expressly provides for the primacy of international law over national legislation, the provisions of the 1995 Citizenship Law should be applied in a manner that avoids any conflict with Armenia's international treaty obligations.[122] The Respondent emphasizes that Armenia removed the consular registration requirement from the 1995 Citizenship Law in 2001 because of its inconsistency with the 1961 UN Convention.[123]

---

[119]    Respondent's Counter-Memorial, ¶220.

[120]    Respondent's Counter-Memorial, ¶¶220-223; Arabyan's First Expert Opinion, ¶¶31-34; Respondent's PHB, ¶9.

[121]    Respondent's Rejoinder, ¶¶487-488; Respondent's PHB, ¶¶6, 16-17; Arabyan's Second Expert Opinion, ¶11; United Nations, Convention on the Reduction of Statelessness, 1961 (Legal Authority RL-0157), Articles 1(3)-(4), 7, 8.

[122]    Arabyan's Second Expert Opinion, ¶¶7-12; Respondent's Rejoinder, ¶¶487-488; Respondent's PHB, ¶18.

[123]    Tr., Day 4, 1014:2-6; Respondent's PHB, ¶19.

163. In addition, the Respondent insists that there is no record of Mr. Khudyan ever seeking to renounce or terminate his citizenship of the ASSR or Armenia. In any event, had Mr. Khudyan taken any initiative to that end, it would not have led to the termination of his Armenian citizenship as a matter of Armenian law[124] since Article 1 of the 1995 Citizenship Law provides that "[r]*enouncing one's citizenship of the Republic of Armenia itself does not cause losing the citizenship of the Republic of Armenia*."[125]

164. According to the Respondent, Mr. Khudyan also did not lose his Armenian nationality when he obtained his US citizenship in 1998 because obtaining another nationality does not automatically result in the loss of the Armenian nationality.[126] Pursuant to Article 25 of the 1995 Citizenship Law, an Armenian citizen "*may*" be deprived of his Armenian citizenship if he acquired the citizenship of another country,[127] but such deprivation requires affirmative action of the Republic of Armenia through a specific procedure.[128] The Respondent alleges that the Armenian authorities never undertook any action aimed at depriving Mr. Khudyan of his Armenian nationality. By reference to Mr. Arabyan's expert evidence concerning the State practice following the Declaration of Independence, the Respondent submits that persons with a USSR passport issued in the ASSR were admitted into the Republic of Armenia without any conditions, including after the expiry of their USSR passports, and were entitled to a passport of the Republic of Armenia.[129]

165. In respect of the special residency passport that Mr. Khudyan received from the Republic of Armenia in 2004, the Respondent contends that it is not, *per se*, evidence of Mr. Khudyan's status as a foreigner. The Respondent alleges, supported by the expert evidence of Mr. Arabyan, that no weight should be given to the special residency passport of Mr. Khudyan for two reasons:

---

[124]    Respondent's Counter-Memorial, ¶¶230-231; Arabyan's First Expert Opinion, ¶¶44-45.

[125]    Respondent's Rejoinder, ¶¶490-491; Law of the Republic of Armenia on Citizenship, October 23, 1995 ("**1995 Citizenship Law**") (Exhibits C-0167, C-0168 / R-0046), Article 1.

[126]    Respondent's Rejoinder, ¶¶492-494.

[127]    Respondent's Rejoinder, ¶493; 1995 Citizenship Law (Exhibits C-0167, C-0168 / R-0046), Article 25.

[128]    Respondent's Rejoinder, ¶¶493-494; Respondent's PHB, ¶6; Arabyan's First Expert Opinion, ¶¶43-46; Tr., Day 1, 168:8-20; Tr., Day 4, 1010:4-17.

[129]    Respondent's PHB, ¶¶9-11; Tr., Day 4, 998:4–999-6.

a.    First, when Mr. Khudyan applied for special residency status in Armenia, there was no centralized repository of information about people with Armenian citizenship. As a result, it was impossible for the competent authorities to verify whether Mr. Khudyan already had Armenian nationality, which would have been a ground for refusal of the special residency status that he was applying for.[130]

b.    Second, there is an important discrepancy in the personal information provided by Mr. Khudyan when he applied for special residency status and the personal information held by the Armenian authorities in the official records from the period when Mr. Khudyan resided in the ASSR. While Mr. Khudyan's patronymic on his USSR passport issued in the ASSR and his exit visa is "*Arshaluys*" and his family name "*Khudaverdyan*," he applied for special residency status in 2004, using "*Ashrak*" as his patronymic and "*Khudyan*" as his family name. Even if there had been a central repository in place when Mr. Khudyan applied for special residency status, it would have been impossible to identify Mr. Khudyan in it because he used a different name than the one registered in the records of the Armenian authorities retained from the USSR era.[131]

166.    Furthermore, the Respondent claims that even if Mr. Khudyan had lost his Armenian nationality upon the dissolution of the USSR, as the Claimants contend, he re-acquired it when he obtained special residency status in 2004. It is the Respondent's submission that special residency status is equivalent to the broader notion of "*nationality*" of the BIT. In that respect, the Respondent refers to criteria established in the *Nottebohm* case, according to which the concept of nationality is defined by (1) the bonds of kinship between the national and the nation, and (2) the reciprocal rights and duties between

---

[130]    Respondent's Counter-Memorial, ¶¶232-235; Respondent's Rejoinder, ¶¶497-499; Arabyan's First Expert Opinion, ¶¶56-59.

[131]    Respondent's Counter-Memorial, ¶235; Respondent's Rejoinder, ¶498; Arabyan's First Expert Opinion, ¶¶7, 9, 11, 59.

national and the nation.[132] The Respondent argues that a third criterion must be added, namely that the national enjoy a right to remain undisturbedly on the territory of the nation.[133]

167.  According to the Respondent, Mr. Khudyan's special residency status meets all of these criteria. First, the special residency status is premised upon Armenian national origin, which forms the bond of kinship that is at the root of the concept of nationality.[134] Second, Mr. Khudyan's special residency status creates reciprocal rights in the sense of the *Nottebohm* test, notably by conferring upon him all rights and obligations of Armenian citizens, except for political rights.[135] Third, the special residency status granted to Mr. Khudyan allows him free access to and undisturbed presence on the territory of the Republic of Armenia.[136]

168.  On that basis, the Respondent concludes that Mr. Khudyan had Armenian nationality on the day of the filing of the Request for Arbitration on September 18, 2017 and on the day of its registration on September 27, 2017.[137] As Article 25(2)(a) of the ICSID Convention excludes dual nationals from ICSID jurisdiction, which is not only confirmed by the text of Article 25(2)(a) itself, but also by the Report of the Executive Directors on the Convention, and case law,[138] the Respondent submits that the Tribunal has no jurisdiction over Claimant 1, Mr. Khudyan.

169.  Moreover, the Respondent posits that Mr. Khudyan's dual nationality at the time the purported investments were made also constitutes a bar to ICSID jurisdiction. After Mr. Khudyan obtained an Armenian passport and special residency status, in 2004, he

---

[132]  Respondent's Rejoinder, ¶¶503-504, citing *Nottebohm Case (Lichtenstein v. Guatemala)*, International Court of Justice, Second Phase: Judgment, April 6, 1955 ("***Nottebohm***") (Legal Authority RL-0159), p. 23.

[133]  Respondent's Rejoinder, ¶504.

[134]  Respondent's Rejoinder, ¶505.

[135]  Respondent's Rejoinder, ¶506.

[136]  Respondent's Rejoinder, ¶507.

[137]  Respondent's Counter-Memorial, ¶¶241-244.

[138]  Respondent's Counter-Memorial, ¶¶245-255, citing, *inter alia*, International Bank for Reconstruction and Development, Report of the Executive Directors on the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, March 18, 1965 (Legal Authority RL-0026), ¶¶9, 28; *Tokios Tokelés v. Ukraine*, ICSID Case No. ARB/02/18, Dissenting Opinion of Prof. Prosper Weil, April 29, 2004 ("**Weil Opinion**") (Legal Authority RL-0060), ¶5.

was not treated as a foreigner. Instead, Mr. Khudyan enjoyed the same rights and had the same obligations as Armenian citizens, with the exception of political rights.[139] Unlike foreigners, Mr. Khudyan as a holder of an Armenian passport with special residency status was allowed to acquire real estate in Armenia and to travel freely and stay in Armenia. It is the Respondent's position that at the time the alleged investments were made, Mr. Khudyan used only his Armenian passport (and not his American passport) to travel in and out of the country and that he leveraged his Armenian nationality, as a consequence of which his effective nationality was Armenian when making his purported investments.[140]

170. In this framework, the Respondent relies on the decision of the tribunal in *Champion Trading v. Egypt*, declining jurisdiction over two claimants who in addition to their US nationality also held Egyptian nationality, and who had relied on their Egyptian nationality when making their investment.[141] The Respondent further points to the dissenting opinion of Prof. Francisco Orrego Vicuña in *Siag v. Egypt*, where the tribunal exercised jurisdiction over Mr. Waguih Siag. Mr. Siag was an Egyptian national by birth, who did not express, as was required by Egyptian law, his intention to preserve his Egyptian nationality when he became Lebanese and, later, when he became an Italian national. The majority of the tribunal held that the "negative" nationality test was satisfied and that Mr. Siag was not an Egyptian national when he initiated ICSID arbitration against Egypt.[142] However, Prof. Orrego Vicuña dissented on this point, emphasizing the overarching concern of States that ratified the ICSID Convention not to be taken to international arbitration by their own nationals.[143] According to Prof. Orrego Vicuña, it was wrong to exercise ICSID jurisdiction over Mr. Siag,

---

[139]    Respondent's Counter-Memorial, ¶¶258-261.

[140]    Respondent's Counter-Memorial, ¶¶262-263.

[141]    Respondent's Counter-Memorial, ¶¶270-273, citing *Champion Trading Company and others v. Arab Republic of Egypt*, ICSID Case No. ARB/02/9, Decision on Jurisdiction, October 21, 2003 ("***Champion Trading v. Egypt***") (Legal Authority RL-0072).

[142]    Respondent's Counter-Memorial, ¶¶275-277, citing *Waguih Elie George Siag and Clorinda Vecchi v. Arab Republic of Egypt*, ICSID Case No. ARB/05/15, Decision on Jurisdiction and Partial Dissenting Opinion of Prof. Francisco Orrego Vicuña, April 11, 2007 ("***Siag v. Egypt***") (Legal Authorities CL-0142 / RL-0066).

[143]    Respondent's Counter-Memorial, ¶278, citing *Siag v. Egypt* (Legal Authorities CL-0142 / RL-0066), pp. 63-65.

because he was Egyptian at the time when the investment was made and he benefited from rights that as a matter of Egyptian law are exclusively available to Egyptian citizens. Given that Mr. Siag was treated at all times as an Egyptian national, it appeared to Prof. Orrego Vicuña to be inconsistent with the exercise of ICSID jurisdiction over him as a foreign investor within the meaning of the ICSID Convention.[144] According to Prof. Orrego Vicuña, one has to consider an investor's nationality not only on the date of initiation of ICSID arbitration, as required by the ICSID Convention, but also on the date when the purported investment was made.[145]

171.   Accordingly, the Respondent argues that the ICSID Convention does not extend protection to purported investors like Mr. Khudyan, who, in order to make the alleged investments, exercised rights that are under Armenian law exclusively available to Armenian nationals. Mr. Khudyan's invocation of the investment protection that the ICSID Convention reserves for foreign investors, is, according to the Respondent, contrary to the Convention's object and purpose.[146]

172.   Alternatively, the Respondent argues that even if the Tribunal were to find that Mr. Khudyan does not hold Armenian nationality in the strict meaning of the term, policy considerations militate against the treatment of Mr. Khudyan as a foreign investor under international law because Mr. Khudyan's behaviour demonstrates that while making the alleged investments, he considered himself an Armenian national and relied only on his Armenian nationality.[147] In particular, the right to acquire and own real estate in Armenia is limited to Armenian nationals and those treated on an equal footing, such as foreigners with special residency status and, therefore, Mr. Khudyan could not have made his purported investment as a US national.[148]

---

[144]   Respondent's Counter-Memorial, ¶¶279-283, citing *Siag v. Egypt* (Legal Authorities CL-0142 / RL-0066), pp. 63-65.

[145]   Respondent's Counter-Memorial, ¶284, citing *Siag v. Egypt* (Legal Authorities CL-0142 / RL-0066), pp. 63-65.

[146]   Respondent's Counter-Memorial, ¶¶285-291.

[147]   Respondent's Counter-Memorial, ¶¶294-295.

[148]   Respondent's Counter-Memorial, ¶296.

173.    The Respondent insists that Mr. Khudyan was perfectly aware of that limitation, which is the very reason why he initially chose to acquire the 33/1 Mashtots Property in the name of his friend, Mr. Aram Telpyan.[149] Moreover, the Respondent argues that Mr. Khudyan solely used his Armenian passport to enter and exit Armenia in the relevant period,[150] a large number of documents related to his purported investments only include Mr. Khudyan's Armenian passport information, as well as his address in Armenia (including the documents related to the creation and incorporation of Arin Armenia (fully named Arin Capital Investments LLC), the sale and purchase agreements of land plots, as well as many of the preliminary sale-purchase agreements for apartments concluded by Mr. Khudyan with the buyers).[151]

174.    In addition, the Respondent contends that Mr. Khudyan's alleged investments lack international character and that, for all intents and purposes, Mr. Khudyan was an Armenian national when he made his purported investments,[152] relying on the right under domestic laws to purchase real estate, reserved for Armenian nationals.[153] Where according to domestic law investments can only be made by the host State's own nationals, such investments lack international character and thus cannot benefit from investment protection under international law.[154]

175.    Lastly, the Respondent submits that exercising jurisdiction in the particular circumstances of this case would set a dangerous precedent, loosening the nationality requirements of the ICSID Convention.[155] The Respondent submits that Mr. Khudyan engaged in an abuse of rights and process by using a status akin to Armenian nationality in making his purported investment.[156] According to the Respondent, even if Mr. Khudyan were technically to be considered a foreigner, he was "*masquerading as*

---

[149]    Respondent's Counter-Memorial, ¶297.
[150]    Respondent's Counter-Memorial, ¶¶262, 300.
[151]    Respondent's Counter-Memorial, ¶¶301-310.
[152]    Respondent's Counter-Memorial, ¶¶311-317.
[153]    Respondent's Counter-Memorial, ¶318.
[154]    Respondent's Counter-Memorial, ¶319.
[155]    Respondent's Counter-Memorial, ¶¶327-328.
[156]    Respondent's Counter-Memorial, ¶¶320-323, citing *Siag v. Egypt* (Legal Authorities CL-0142 / RL-0066), p. 63.

*a local Armenian to gain access to rights and opportunities otherwise reserved for Armenian nationals*."[157] The Respondent argues that Mr. Khudyan *de facto* engaged in nationality shopping, using a status akin to Armenian nationality to invest as an Armenian national only subsequently to invoke his US nationality to claim investment protection in respect of the same alleged investments under the Armenia–US BIT.[158] Consequently, if the Tribunal were to find that Mr. Khudyan's status under Armenian law does not amount to nationality, the Respondent submits that the reasoning of the *Champion Trading v. Egypt* tribunal and of Prof. Orrego Vicuña in his dissenting opinion in the *Siag v. Egypt* case should also find application in the present case.[159]

### (ii) Claimant 2 – Arin Capital & Investment Corp.

176. In relation to Claimant 2, Arin US, the Respondent advances two jurisdictional objections.

177. First, because Mr. Khudyan is an Armenian national and owns 100% of the share capital of the second Claimant, Arin US, the Respondent submits that the second Claimant is a shell company that is controlled entirely by an Armenian national. Therefore, according to the Respondent, the second Claimant does not qualify either as a foreign entity under Article 25(2)(b) of the ICSID Convention and thus does not satisfy the Convention's *ratione personae* requirements.[160]

178. Second, the Respondent submits that the Tribunal also lacks jurisdiction over Arin US because it would have committed an abuse of right by failing to claim for a distinct harm.

179. Relying on the *Orascom v. Algeria* award, the Respondent submits that it "*has not consented to being sued by other entities that are controlled by Claimant 1, in relation to the same alleged investment, the same alleged measures and the same alleged harm*"

---

[157]    Respondent's Counter-Memorial, ¶324.
[158]    Respondent's Counter-Memorial, ¶326.
[159]    Respondent's Counter-Memorial, ¶¶329-331.
[160]    Respondent's Counter-Memorial, ¶¶191-196.

and asserts that Arin US, which is controlled by Mr. Khudyan, "*cannot seek protection for the same harm inflicted on Claimant 1's alleged investment.*"[161]

180. It is the Respondent's case that Arin US's conduct constitutes an abuse of the system of investment protection, which would constitute a further ground for the inadmissibility of Arin US's claims and would preclude the Tribunal from exercising jurisdiction over this dispute.[162]

### b. The Claimants' Position

#### (i) Claimant 1 – Mr. Edmond Khudyan

181. The Claimants characterize the Respondent's jurisdictional objection *ratione personae* with respect to Mr. Khudyan as "*frivolous*"[163] on grounds that he is not a citizen of the Republic of Armenia under the applicable law.

182. It is the Claimants' case that the Respondent's interpretation of the 1995 Citizenship Law is untenable because that Law provides that the former citizens of the ASSR did not automatically become Armenian citizens when the Republic of Armenia succeeded the ASSR as a State. The Claimants argue that pursuant to Articles 9 and 10(3) of the 1995 Citizenship Law, citizens of the former ASSR who were living abroad when that Law entered into force (i.e., on November 28, 1995) had to satisfy two conditions to be recognized as Armenian citizens: (1) they could not have acquired citizenship of another State; and (2) they had to have filed for consular registration before the entry into force of the Law.[164]

183. As it is common ground that Mr. Khudyan left Armenia and moved his permanent residence to the USA in 1988, the two requirements of Article 10(3) would have to be

---

[161]    Respondent's Counter-Memorial, ¶¶198-201, citing *Orascom TMT Investments S.à r.l. v. People's Democratic Republic of Algeria*, ICSID Case No. ARB/12/35, Final Award, May 31, 2017 ("**Orascom v. Algeria**") (Legal Authority RL-0061), ¶¶542-543.

[162]    Respondent's Counter-Memorial, ¶202.

[163]    Claimants' Reply, Section I(A).

[164]    Claimants' Reply, ¶¶33-34.

43

met in order for him to be recognized as an Armenian citizen under the 1995 Citizenship Law:[165]

    a.    As to the first requirement, the Claimants recognize that when the 1995 Citizenship Law entered into force, Mr. Khudyan was yet to acquire his US citizenship, as a result of which he does satisfy the first requirement of Article 10(3) of the 1995 Citizenship Law;[166] and

    b.    As to the second requirement, the Claimants assert that it is not satisfied because Mr. Khudyan never registered with an Armenian consulate,[167] and because Armenia did not open its first consulate in the USA until 1995, the year when the 1995 Citizenship Law was adopted in Armenia.[168]

184.    The Claimants dismiss the Respondent's reliance on the 1961 UN Convention on the Reduction of Statelessness as an attempt to circumvent its own statutory requirements for granting nationality.[169] They argue under general principles of law that Mr. Khudyan cannot be deprived of the protection of the ICSID Convention and the BIT on grounds of the alleged incompatibility of Armenia's own laws with the 1961 UN Convention.[170] Moreover, the Claimants submit that issues of nationality following State succession are not governed by the 1961 UN Convention but by the 1999 ILC Draft Articles on the Nationality of Natural Persons in relation to the Succession of States ("**1999 ILC Draft Articles**").[171] Even if the 1961 UN Convention on the Reduction of Statelessness were to apply, the Claimants insist that it does not lead to the affirmative and automatic grant of Armenian nationality to Mr. Khudyan.[172]

---

[165]    Claimants' Reply, ¶35.

[166]    Claimants' Reply, ¶36.

[167]    Claimants' Reply, ¶¶37-38; Khudyan's First Witness Statement, ¶1.

[168]    Web Page Portal, Embassy of Armenia to the United States of America, "Bilateral Relations" (Exhibit C-0140).

[169]    Tr., Day 1, 144:19-24.

[170]    Tr., Day 1, 144:25–145:6.

[171]    Tr., Day 1, 145:7–145:19, referring to International Law Commission, Draft Articles on Nationality of Natural Persons in Relation to the Succession of States, 1999 ("**1999 ILC Draft Articles**") (Legal Authority CL-0107).

[172]    Tr., Day 1, 145:20–147:10.

185. While the Claimants recognize that the consular registration requirement was removed from the 1995 Citizenship Law in 2001, the parliamentary debate surrounding this amendment confirms that the effect desired by the legislator when introducing the registration requirement had been to leave a large number of the former ASSR citizens stateless.[173] This is exactly the case of Mr. Khudyan who, from the point of view of Armenian law, was thus stateless up until the moment he obtained US citizenship in 1998.[174]

186. In addition, the Claimants reject the Respondent's submission to the effect that Mr. Khudyan would have preserved his Armenian citizenship because there is no record of Mr. Khudyan terminating his Armenian citizenship. It is the Claimants' case that Mr. Khudyan could not have terminated a citizenship that he never obtained in the first place.[175]

187. Furthermore, the Claimants submit that in 2004 the Respondent itself recognized that Mr. Khudyan was not a citizen of the Republic of Armenia by granting him special residency status.[176] They claim that it is not credible that the Armenian authorities would not have had sufficient records in 2004 to verify whether or not Mr. Khudyan was an Armenian citizen.[177]

188. Finally, the Claimants submit that no policy considerations can override the clear wording of Article 25(2)(a) of the ICSID Convention and object against the recognition of Mr. Khudyan's alleged Armenian nationality on policy grounds for five reasons.

    a.   First, the Claimants deny that Mr. Khudyan would have held himself out as an Armenian national when he applied for special residency status and argue that Mr. Khudyan only referred to his Armenian "nationality" in the sense of national or ethnic origins, rather than in terms of legal citizenship status, which

---

[173]   Claimants' Reply, ¶39, citing Republic of Armenia, National Assembly, Minutes of Fifth Session of Second Convocation, March 19, 2001 (Exhibit C-0172).

[174]   Claimants' Reply, ¶40.

[175]   Claimants' Reply, ¶43.

[176]   Claimants' Reply, ¶45.

[177]   Claimants' Reply, ¶¶46-47.

is only logical as according to Armenian law, the special residency status can only be granted to people of Armenian origin, holding citizenship of a different State.[178]

b.    Second, the Respondent's assertion that special residency status would be equivalent or akin to Armenian nationality is wrong, as it does not confer upon an individual the same rights and obligations that a national has (notably, the right to vote, run for office and enrol in political organizations), and, unlike nationality, expires after a ten-year period.[179]

c.    Third, the Claimants argue that the investor's nationality should not be assessed on the date of the first investment – as the Respondent submits – because this contradicts both the text of the ICSID Convention and its drafting history, where such requirement was neither specifically discussed nor agreed.[180] Therefore, the Claimants argue that the Tribunal should not rely on the partial dissenting opinion in *Siag v. Egypt* but on the actual decision of the majority of the *Siag* tribunal, which applied the plain text of Article 25(2)(a) of the ICSID Convention to determine the investor's nationality and exercised jurisdiction.[181]

d.    Fourth, the Claimants allege that the fact that Mr. Khudyan would have used his Armenian address and special residency status in several transactions related to his investment is irrelevant, as it does not mean that Mr. Khudyan considered

---

[178]    Claimants' Reply, ¶¶49-50, citing Republic of Armenia, Law on the Status of Foreign Citizens, December 25, 2006 ("**Law on Foreign Citizens**") (Exhibit C-0023), Articles 2, 18; 1995 Citizenship Law (Exhibits C-0167, C-0168 / R-0046), Articles 1, 3.

[179]    Claimants' Reply, ¶¶52-53.

[180]    Claimants' Reply, ¶54.

[181]    Claimants' Reply, ¶55, citing, *inter alia*, *Siag v. Egypt* (Legal Authorities CL-0142 / RL-0066), ¶¶198-201 and Z. Douglas, *The International Law of Investment Claims* (Cambridge University Press, 2009) (Exhibit CL-0074), p. 293, ¶547.

himself to be an Armenian national.[182] Moreover, just as many documents identify Mr. Khudyan as a US citizen.[183]

e.    Lastly, the Claimants object to the Respondent's qualification of Mr. Khudyan's claims in these proceedings as an abuse of process on grounds that the acquisition of real estate is a type of investment that could not be made by foreigners but only by Armenian nationals or those with a special residency status. The Claimants argue that by acquiring special residency status, Mr. Khudyan merely tried to ensure that his investment was made in full compliance with the requirements of Armenian law for ownership of real estate, which cannot be used against him in order to deny him investment protection on jurisdictional grounds.[184]

*(ii) Claimant 2 – Arin Capital & Investment Corp.*

189.    While, in their Reply, the Claimants purport to address the Respondent's jurisdictional objections in relation to Arin US, their arguments are largely unresponsive to the particular objections raised by the Respondent in this respect.

190.    The Claimants' principal defence against the Respondent's first jurisdictional objection based on the object and purpose of the ICSID Convention is the general proposition that Mr. Khudyan would be the agent of Arin US as a matter of Californian law and that his control over the alleged investments in Armenia can be imputed to his principal, Arin US.[185]

---

[182]    Claimants' Reply, ¶56, citing Data from the Ministry of Justice of the Republic of Armenia, Head of State Register Agency of Legal Entities, August 2010(Exhibit R-0010); Statement of Information issued by the Kentron Territorial Division of State Register Agency of Legal Entities of the Republic of Armenia under the Staff of the Ministry of Justice of the Republic of Armenia, August 4, 2009 (Exhibit R-0015); Statement of Information issued by the Kentron Territorial Division of State Register Agency of Legal Entities of the Republic of Armenia under the Staff of the Ministry of Justice of the Republic of Armenia, August 11, 2010 (Exhibit R-0016).

[183]    *See, e.g.*, November 2004 Sale and Purchase Agreement (Exhibit R-0012); October 2004 Sale and Purchase Agreement (Exhibit R-0013); December 2005 Purchase and Sale Agreement (Exhibit R-0014); Preliminary Agreement on the Purchase and Sale of Real Property between Mr. Edmond Khudyan and Mr. Ruben Mangasaryan, November 15, 2007 (Exhibit R-0018); 2006 Mortgage (Exhibit C-0021); Shareholders Agreement (Exhibit C-0025); November 2007 Transfer Agreement (Exhibit C-0027).

[184]    Claimants' Reply, ¶¶57-58.

[185]    Claimants' Reply, ¶¶61-65.

191.    Accordingly, the Claimants appear to allege that not Mr. Khudyan, but Arin US *through* Mr. Khudyan, in his capacity as its CEO, controls the investments that were owned initially by Mr. Khudyan and later by Arin Armenia. It is the Claimants' submission that for this reason, the Tribunal should reject the Respondent's objection *ratione personae* over Arin US.[186]

192.    Furthermore, as regards the Respondent's second jurisdictional objection based on abuse of right, the Claimants argue that the objection lacks merit as they did not start "*separate arbitration proceedings in connection with the same investment that could create a risk of duplicative liability for Respondent*." In addition, the Claimants point out that "*full reparation to either Claimant would compensate both Claimants*."[187]

### (2)    The Tribunal's Analysis

193.    It is undisputed that for the purpose of establishing jurisdiction over each Claimant, the Claimants must prove jurisdiction *ratione personae* under the terms of both the BIT and the ICSID Convention for each Claimant.

194.    Article 25 of the ICSID arbitration also requires in respect of a claimant who is a natural person that he/she is not also a national of the other contracting State.[188]

195.    It is also generally accepted in international law that nationality is within the domestic jurisdiction of the home State of the investor, which settles, by its own legislation, the rules relating to the acquisition (and loss) of its nationality, within the bounds set by international law. If the nationality of a person is challenged in international arbitration proceedings, the tribunal is competent to pass upon that challenge. In so doing, the tribunal must accord great weight to the nationality law of the State in question and to the interpretation and application of that law by its authorities. On the basis of the facts

---

[186]    Claimants' Reply, ¶65.

[187]    Claimants' Reply, fn 92.

[188]    *See* C. Schreuer, *The ICSID Convention: A Commentary* (Cambridge University Press, 2009) (excerpts) ("**Schreuer Commentary**") (Legal Authorities CL-0080 / RL-0030), ¶¶642, 649; Z. Douglas, *The International Law of Investment Claims* (Cambridge University Press, 2009) (Legal Authority CL-0074), ¶¶133, 535-541; *Hussein Nuaman Soufraki v. United Arab Emirates*, ICSID Case No. ARB/02/7, Award, July 7, 2004 ("*Soufraki v. UAE*") (Legal Authority RL-0068), ¶¶55, 63; *Siag v. Egypt* (Legal Authorities CL-0142 / RL-0066', ¶143.

and applicable law before it, the tribunal must establish whether the claimant whose nationality is at issue was a national of the relevant State at the relevant time(s). In addition, for the purposes of the ICSID Convention, the tribunal must also establish whether a natural person was also a national of the respondent State at those time(s), and determine what legal consequences follow from that finding. Where, as in the instant case, the jurisdiction of an international tribunal turns on an issue of nationality, the international tribunal is empowered, indeed bound, to decide that issue.[189]

### a. *Jurisdiction* ratione personae *under the BIT*

196.    Articles I and VI of the BIT define an "*investment dispute*" as "*a dispute between a Party and a national or company of the other Party.*" They further define a "*national*" of a Party as "*a natural person who is a national of a Party under its applicable law*" without further limitation and a "*company*" of a Party as "*any kind of corporation, company, association, partnership, or other organization, legally constituted under the laws and regulations of a Party*" without further limitation.[190]

197.    The Respondent asserts that the BIT contrasts "*a Party*" with "*the other Party*" to make clear "*that it is not intended that 'a Party' would not be subject to claims by nationals of 'the same Party'*" and argues on this basis that dual nationals, holding the nationality of both the host State and home State may not claim under the BIT in their personal capacity.[191]

198.    The Tribunal observes that the Respondent has not supported its submission in this respect with any legal authority. The Tribunal also observes that the BIT does not explicitly exclude individuals who hold the nationality of both contracting State Parties to the BIT from bringing claims against a host State under the BIT.

199.    Absent such express language in the BIT, the Tribunal finds that it cannot alter the treaty carefully negotiated between the USA and Armenia by reading into it the

---

[189]    *Ibid*.

[190]    Treaty between the United States of America and the Republic of Armenia Concerning the Reciprocal Encouragement and Protection of Investment, signed September 23, 1992 and entered into force March 29, 1996 ("**BIT**") (Legal Authorities CL-0081 / RL-0037), Articles I, VI.

[191]    Respondent's Rejoinder, ¶474.

additional requirement that a US national seeking to invoke the protection of the BIT may not also hold the nationality of Armenia, and *vice versa*. Instead, it is sufficient for the purposes of the present BIT that the Claimants demonstrate that they have the nationality of their home or "other" State Party to the BIT, i.e., the USA.

200.   It is undisputed that at the time this arbitration was initiated, Mr. Khudyan was a citizen of the USA and Arin US was a company incorporated under the laws of the State of California (USA).[192] The Tribunal is further satisfied that the Claimants were US nationals at the time of the alleged breaches of the BIT. The Tribunal is thus satisfied that both Claimants are US nationals for the purposes of the BIT.

### b.  *Jurisdiction* ratione personae *under the ICSID Convention*

201.   In order to invoke the jurisdiction of an ICSID tribunal, an investor also has to fall within the scope of the definition of a "*national*" set forth in Article 25(2)(a) and (b) of the ICSID Convention, which provides as follows:

> (a)   *any natural person who had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration as well as on the date on which the request was registered …, but does not include any person who on either date also had the nationality of the Contracting State party to the dispute; and*

> (b)   *any juridical person which had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration and any juridical person which had the nationality of the Contracting State party to the dispute on that date and which, because of foreign control, the parties have agreed should be treated as a national of another Contracting State for the purposes of this Convention.*

202.   The Tribunal will proceed to determine whether each of the Claimants in the present arbitration satisfy the requirements of Article 25(2) of the ICSID Convention.

---

[192]   Passport of Mr. Edmond Khudyan (Exhibit C-0128); Articles of Incorporation of Arin Capital & Investment Corp, March 29, 2002 (Exhibit C-0014); State of California Web Portal, Business Entities, "Arin Capital & Investment Corp." (Exhibit C-0130).

*(i)  Claimant 1 – Mr. Edmond Khudyan*

203.    The ICSID Convention expressly excludes jurisdiction over natural persons having the nationality of the respondent State, thereby barring dual nationals from access to ICSID arbitration.

204.    In view of the objection against the Tribunal's jurisdiction raised by the Respondent, the Tribunal must determine whether Mr. Khudyan also held Armenian nationality on the date of the submission of the Request for Arbitration to the ICSID Secretariat and on the date of its registration by the ICSID Secretariat.

205.    As the starting point for its analysis, the Tribunal takes the common ground between the Parties that prior to Mr. Khudyan's departure from Armenia to the USA in 1989 and at least until the Declaration of Independence by the Supreme Council of the ASSR on August 23, 1990, Mr. Khudyan was a citizen of the USSR as well as of the ASSR. He held a passport of the USSR, which he used when emigrating to the USA.[193]

206.    It is also common ground that the question whether Mr. Khudyan is an Armenian citizen must be assessed on the basis of Armenian law.[194]

207.    There are four issues to be decided by the Tribunal in this respect: (1) whether Mr. Khudyan lost his USSR/ASSR citizenship after the proclamation of independence by the Supreme Council of the ASSR in 1990; (2) whether Mr. Khudyan lost his Armenian citizenship after the 1995 Citizenship Law entered into force; (3) whether Mr. Khudyan lost his Armenian citizenship when he acquired US nationality in 1998; and (4) whether the issuance of a passport with special residency status in 2004 affects Mr. Khudyan's nationality status in any manner. These issues are discussed below.

---

[193]    Exit Visa of Mr. Edmond Khudyan (Exhibit C-0165).

[194]    Claimants' Reply, ¶¶32-42; Respondent's Counter-Memorial, ¶¶205-244; Respondent's Rejoinder, ¶¶478-495.

1) Did Mr. Khudyan lose his USSR/ASSR citizenship upon the Declaration of Independence by the Supreme Council of the ASSR?

208. The Tribunal will first address the question whether Mr. Khudyan lost his USSR/ASSR citizenship when the ASSR proclaimed its independence in 1990.

209. The Tribunal is not convinced that Mr. Khudyan lost his USSR/ASSR citizenship when the ASSR declared its independence from the USSR and changed its name to the Republic of Armenia. In the absence of any evidence that the Respondent intended to deprive its citizens living abroad of their nationality, it is inconceivable that by proclaiming its independence from the USSR on August 23, 1990, the ASSR sought to render stateless the numerous USSR/ASSR citizens living abroad (like Mr. Khudyan).

210. The Tribunal does not accept that the Declaration of Independence had the effect of depriving USSR/ASSR citizens living abroad of their nationality for the following three reasons.

211. First, the Declaration of Independence of August 23, 1990 served to record the will of the Armenian people, expressed by the Supreme Council of the ASSR, to exercise its right of self-determination and marked "[t]*he beginning of the process of establishing of independent statehood positioning the question of the creation of a democratic society based on the rule of law*."[195] The Declaration of Independence was followed by a referendum on September 21, 1991, during which 99.5% of the voters voted for Armenia to secede from the USSR.

212. The Declaration of Independence was not a constitutive act, establishing a detailed legal regime, but a declaration of principles.[196] Indeed, the Declaration of Independence had to be later ratified by the Armenian people in the above-referenced referendum. One of the principles articulated in the Declaration of Independence concerns the basis upon which the Republic of Armenia would administer citizenship: the citizens living in the territory of Armenia were to be granted citizenship of the Republic of Armenia, while

---

[195]    Declaration of Independence (Exhibits C-0346 / R-0043).
[196]    Declaration of Independence (Exhibits C-0346 / R-0043); Tr., Day 4, 986:3–987:5.

the Armenians living abroad were to be granted the right to citizenship of the Republic of Armenia, as discussed further below.

213.   As the Declaration of Independence was not designed to provide a comprehensive set of rules regulating citizenship,[197] it is clear to the Tribunal that it neither conferred citizenship upon individuals, nor deprived individuals of their citizenship.

214.   Second, the Tribunal recognizes that Article 4 of the Declaration of Independence appears to distinguish between:

-      Armenians residing within the Armenian territory, who are automatically recognized as citizens of the Republic of Armenia; and

-      the so-called "*Armenians of abroad*"[198] (or in another translation the "*Armenians of the Diaspora*"[199]), who "*have the right of citizenship of Armenia.*"[200]

215.   However, the Tribunal also notes that the text of Article 4 of the Declaration of Independence[201] does not clearly provide whether the category of "*Armenians from abroad*" comprises only citizens of the former ASSR residing abroad, or whether it encompasses a broader group of people of Armenian origin who may have acquired the citizenship of another State (as attested by the Respondent's expert Mr. Arabyan[202]).

216.   In any event, the Tribunal notes that the Declaration of Independence does not contain any indication that the newly named Republic of Armenia intended to deprive citizens of the ASSR of their citizenship. On the contrary, the Declaration of Independence

---

[197]    Tr., Day 4, 986:3-10.

[198]    Tr., Day 4, pp. 985:10–986:4; Declaration of Independence (Exhibits C-0346 / R-0043), Article 4.

[199]    Tr., Day 4, 980–985; Declaration of Independence (Exhibits C-0346 / R-0043), Article 4.

[200]    Declaration of Independence (Exhibits C-0346 / R-0043), Article 4.

[201]    Declaration of Independence (Exhibits C-0346 / R-0043), Article 4 reads "*All citizens living on the territory of Armenia are granted citizenship of the Republic of Armenia. Armenians of the Diaspora have the right of citizenship of Armenia. The citizens of the Republic of Armenia are protected and aided by the Republic. The Republic of Armenia guarantees the free and equal development of its citizens regardless of national origin, race, or creed.*"

[202]    Tr., Day 4, 981:12–989:23. *See also* Tr., Day 4, 993:3–994:12; Tr., Day 4, 1005:12–1008:4.

confirms that the Republic of Armenia intended to extend citizenship to citizens of the former ASSR living in its territory, as well as to those living abroad.

217.    Third, as credibly attested by the former Head of Foreign Citizen Registration and Visas Department, Mr. Arabyan – whose evidence stands unrebutted – the Soviet legislative acts (including the laws on nationality) remained in force in Armenia from the date of the promulgation of the Declaration of Independence until the adoption of replacement legislation (with respect to citizenship, a law on citizenship) by the Republic of Armenia by virtue of the Constitutional Law "*On the legislative acts adopted in accordance with Armenia's 'Declaration of Independence'*."[203]

218.    Accordingly, following the Declaration of Independence on August 23, 1990, until the adoption of the 1995 Citizenship Law, Mr. Khudyan's Armenian nationality was governed by the 1978 USSR Citizenship Law.[204]

219.    Upon the dissolution of the USSR in December 1991, every citizen of the former USSR had the right to choose his or her citizenship pursuant to Article 15 of the Soviet Law on the Procedure of Exiting the USSR.[205] Failing the exercise of that right, it was State practice that a citizen of a seceding republic was automatically considered a citizen of the seceding republic.[206] Therefore, absent any affirmative action taken by a person to become a citizen of another seceding republic, the former citizens of the ASSR were deemed citizens of the Republic of Armenia without any special procedure or decision.[207]

220.    In addition, Mr. Arabyan credibly attested that in the 1990s, ASSR citizens with a passport of the USSR – even if it had expired (as would have been the case for Mr. Khudyan) – were admitted to the Republic of Armenia on a *laissez passer* basis

---

[203]    Arabyan's First Expert Opinion, ¶¶35-40.

[204]    Union of Soviet Socialist Republics, Citizenship Law, 1978 ("**USSR Citizenship Law**") (Exhibit R-0005).

[205]    Tr., Day 4, 964:2-15.

[206]    Tr., Day 4, 987:11–988:18.

[207]    Tr., Day 4, 989:8-13.

and were issued a passport of the Republic of Armenia without the need to go through any recognition procedure.[208]

221.  While the 1978 USSR Citizenship Law still applied in Armenia, there was no rule in force pursuant to which a person residing outside the USSR or Armenia would be deprived of citizenship, nor were there any procedures in place for the termination of citizenship.[209] In this framework, it is important to note that the 1978 USSR Citizenship Law did not provide for the possibility of citizens of the USSR (and by extension, the ASSR) losing their citizenship without any affirmative action on the part of the citizen and the State. Pursuant to Article 16 of the law, citizenship could only be lost in case of:

(1)    renunciation;

(2)    deprivation;

(3)    grounds provided for by the international treaties to which the USSR was a party; and

(4)    other grounds provided for by the 1978 USSR Citizenship Law.

222.  It has neither been argued, nor proven, that Mr. Khudyan lost his USSR/ASSR citizenship due to the reasons listed above at (1), (3) and (4). There also is no indication that Mr. Khudyan would have lost his USSR/ASSR citizenship through deprivation of citizenship in the sense of the 1978 USSR Citizenship Law.[210]

223.  Accordingly, the Tribunal finds that the mere fact that Mr. Khudyan resided abroad could not have caused the loss of his USSR/ASSR citizenship while the 1978 USSR Citizenship Law applied in Armenia.[211]

---

[208]    Tr., Day 4, 998:4–1001:16.
[209]    USSR Citizenship Law (Exhibit R-0005), Article 5; Tr., Day 4, 964:16–965:17.
[210]    Claimants' Reply, ¶¶32-42.
[211]    Arabyan's First Expert Opinion, ¶¶16-21.

224. On the basis of the foregoing, the Tribunal concludes that Mr. Khudyan did not lose his USSR/ASSR citizenship when, on August 23, 1990, the ASSR proclaimed its independence from the USSR and changed its name to the Republic of Armenia.

> 2) Did Mr. Khudyan lose his nationality upon the entry into force of the 1995 Citizenship Law for failure to register under Article 10(3)?

225. The second question concerning Mr. Khudyan's nationality status is whether he lost his Armenian citizenship as a consequence of his failure to register with an Armenian consulate prior to the entry into force of the 1995 Citizenship Law.

226. Article 10(3) of the 1995 Citizenship Law provides as follows:

> *The following persons shall be recognized as citizens of the Republic of Armenia:*
>
> *(3) the citizens of the former Armenian SSR, who are Armenians by national origin and reside outside the Republic of Armenia after 21 September 1991 and who have not acquired the citizenship of another State, as well as the citizens of the former Armenian SSR, who are Armenians by national origin and have resided outside Armenia before and have not acquired the citizenship of another State and have placed on consular record-registration before the entry into force of this Law.*[212]
> [emphasis added]

227. The Tribunal notes that Article 10(3) of the 1995 Citizenship Law has two prongs, each identifying one category of citizens of the former ASSR:

- those residing outside the Republic of Armenia after September 21, 1991; and

- those residing outside the Republic of Armenia before September 21, 1991.

228. While the Claimants submit that Mr. Khudyan falls in the second category only,[213] the Respondent argues that Mr. Khudyan falls in both categories and is thus recognized in

---

[212]    1995 Citizenship Law (Exhibits C-0167, C-0168 / R-0046), Article 10(3).
[213]    Claimants' Reply, ¶¶33-36.

any event as an Armenian citizen as part of the first category, for which no registration was ever required.[214]

229. The Tribunal recognizes that the wording of Article 10(3) lacks clarity in two important respects:

- in the first category, the use of the wording "*reside outside Armenia after 21 September 1991*" does not exclude persons who started residing outside Armenia prior to that date; and

- in the second category, the use of the wording "*have resided outside Armenia before* [September 21, 1991]" can be read as requiring that a person's residence abroad had ended prior to September 21, 1991.

230. Irrespective of whether Mr. Khudyan falls in one or both of the categories as defined by Article 10(3), the Tribunal considers that the outcome is ultimately the same.

231. Should Mr. Khudyan fall into the first category, he would be recognized as an Armenian citizen upon the entry into force of the 1995 Citizenship Law on November 28, 1995 because Mr. Khudyan:

- was a citizen of the former ASSR;[215]

- was an Armenian by national origin;[216]

- had not acquired the citizenship of another State;[217] and

---

[214] Respondent's Rejoinder, ¶¶480-482.
[215] Exit Visa of Mr. Edmond Khudyan (Exhibit C-0165); Application for Naturalization of Mr. Edmond Khudyan (Exhibit R-0191).
[216] Application for Naturalization of Mr. Edmond Khudyan (Exhibit R-0191); Application of Mr. Edmond Khudyan for Special Residency Status, December 18, 2003 (Exhibit R-0007).
[217] Certificate of Naturalization of Mr. Edmond Khudyan, August 21, 1998 (Exhibit C-0171).

-       resided outside Armenia after September 21, 1991 (having established his principal residence in the USA on August 13, 1989 and having maintained that residence ever since).[218]

232.    Should Mr. Khudyan fall into the second category, one would arrive at the same conclusion despite the additional consular registration that the second prong of Article 10(3) initially required. While it is common ground that Mr. Khudyan never registered with an Armenian consulate, the Tribunal is not persuaded that Article 10(3) would operate to deprive him of his Armenian nationality for two independent reasons.

233.    First, the 1961 UN Convention on the Reduction of Statelessness was ratified by Armenia in 1994, prior to the adoption of the 1995 Citizenship Law. Article 7(3) of the 1961 UN Convention provides in relevant part that "*a national of a Contracting State shall not lose his nationality, so as to become stateless, on the ground of departure, residence abroad, failure to register or on any similar ground*" (emphasis added); Article 8(1) of that Convention provides that "[a] *Contracting State shall not deprive a person of its nationality if such deprivation would render him stateless.*"[219]

234.    If the registration requirement in the initial version of Article 10(3) had operated to deprive Mr. Khudyan of his Armenian nationality at the time of the entry into force of the 1995 Citizenship Law then this would have rendered him stateless.[220] As such, the registration requirement would have created a legal situation that directly conflicts with Armenia's international law obligation arising under the 1961 UN Convention on the Reduction of Statelessness not to render its citizens stateless.

235.    As to the Claimants' argument that in the context of State succession, the relevant instrument is not the UN Convention on the Reduction of Statelessness but the 1999 ILC Draft Articles,[221] the Tribunal notes that due to the absence of State consensus the

---

[218]    Khudyan's First Witness Statement, ¶3; Exit Visa of Mr. Edmond Khudyan (Exhibit C-0165).

[219]    United Nations, Convention on the Reduction of Statelessness, 1961 (Legal Authority RL-0157), Articles 7(3), 8(1).

[220]    Claimants' Reply, ¶¶37-40; Respondent's Rejoinder, ¶¶43, 484.

[221]    Tr., Day 1, 145:7-19; Claimants' Reply, fn 12, citing 1999 ILC Draft Articles (Legal Authority CL-0107), Article 8; Claimants' PHB ¶5, fn 23, citing 1999 ILC Draft Articles (Legal Authority CL-0107), pp. 7-8.

1999 ILC Draft Articles were never transformed into a treaty, convention or any other type of legal instrument open to adoption or ratification by individual States. Nor can they be regarded as reflecting customary international law. As Mr. Václav Mikulka's[222] 2020 Introductory Note to the 1999 ILC Draft Articles reflects, States have proven to be "*hesitant to enter into clear legal obligations*"[223] in relation to the administration of nationality of natural persons and, to date, the UN General Assembly has merely invited States to take into account, as appropriate, the principles of the 1999 ILC Draft Articles when dealing with issues of nationality of natural persons in the framework of State succession. Therefore, as a matter of international law, the 1999 ILC Draft Articles do not bind the Respondent.

236.  In any event, Article 8 of the 1999 ILC Draft Articles (entitled "*Persons concerned having their habitual residence in another State*") provides in sub-paragraph 1: "*A successor State does not have the obligation to attribute its nationality to persons concerned if they have their habitual residence in another State and also have the nationality of that or any other State*."[224] Thus, under Article 8, *a contrario* a successor State does have the obligation to attribute its nationality to persons concerned (i.e., persons who on the date of the succession of States had the nationality of the predecessor State) who have their habitual residence in another State and do not have the nationality of that State or any other State. At the time of the entry into force of the 1995 Citizenship Law, Mr. Khudyan did not have US nationality. The 1999 ILC Draft Articles are, therefore, perfectly consistent with the position under the 1961 UN Convention on the Reduction of Statelessness in respect of the issue under consideration.

237.  The Tribunal notes that Article 5(3) of the Armenian Constitution provides that:

---

[222]  Mr. Václav Mikulka is a Former Member and the Special Rapporteur on Nationality in relation to the Succession of States International Law Commission and Former Director Codification Division United Nations Office of Legal Affairs.

[223]  V. Mikulka, Introductory Note to the 1999 Articles on Nationality of Natural Persons in Relation to the Succession of States, January 2020 (available at: https://legal.un.org/avl/ha/annprss/annprss.html).

[224]  1999 ILC Draft Articles (Legal Authority CL-0107), Article 8.

> *In case of conflict between norms of international treaties ratified by the Republic of Armenia and those of laws, the norms of the international treaties shall apply.*[225]

238.   Furthermore, Article 2 of the 1995 Citizenship Law reads:

> *The legislation about the citizenship of the Republic of Armenia consists of the Constitution of the Republic of Armenia, the international treaties of the Republic of Armenia, the present law and other legislative acts of the Republic of Armenia.*
>
> *2. If the ratified international treaties of the Republic of Armenia establish norms  others than are foreseen by the present law,  the norms of the international  treaties are put into  effect .*[226]

239.   Accordingly, the Tribunal accepts the Respondent's submission to the effect that, pursuant to Article 5(3) of the Armenian Constitution, as well as Article 2 of the 1995 Citizenship Law, the international law obligations of the Republic of Armenia arising under the 1961 UN Convention on the Reduction of Statelessness would override any conflicting registration requirement that initially formed part of Article 10(3) of the 1995 Citizenship Law (it was later discarded in 2001 in a subsequent revision). Therefore, to the extent there is any conflict with the 1961 UN Convention, the Tribunal is satisfied that no effect is to be given to the registration requirement initially set forth in the second prong of Article 10(3) of the 1995 Citizenship Law. The Tribunal is reinforced in that conclusion by the fact that the registration requirement was removed by the Armenian legislature in 2001 precisely to avoid the problem of statelessness, with specific reference to the 1961 UN Convention on the Reduction of Statelessness.[227] Armenians living abroad would have had a mere 12 days (between the adoption of the 1995 Citizenship Law on November 16, 1995 and its entry into force on November 28, 1995) to register at an Armenian consulate if they had not already done so, while at the same time, no consular recognition procedure existed[228] and the

---

[225]   Constitution of the Republic of Armenia, July 5, 1995 (Exhibit C-0118), Article 5(3).

[226]   1995 Citizenship Law (Exhibits C-0167 / C-0168), Article 2.

[227]   Republic of Armenia, National Assembly, Minutes of Fifth Session of Second Convocation, March 19, 2001 (Exhibit C-0172); Tr., Day 4, 1014:2-6.

[228]   Tr., Day 4, 973:12-16.

Republic of Armenia did not have a consulate in many countries (including in the USA until 1995).[229]

240. The Tribunal also does not accept the Claimants' argument that Mr. Khudyan cannot be deprived of the protection of the ICSID Convention and the BIT on grounds of the alleged incompatibility of Armenia's own laws with the 1961 UN Convention on the Reduction of Statelessness based on general principles of law. This is not a case of a State seeking to excuse its internationally wrongful behaviour by appealing to its domestic law; it is a case in which this Tribunal must determine whether it has jurisdiction over Mr. Khudyan in light of the requirement in the ICSID Convention that a natural person may not have the nationality of the State party to the dispute.

241. Second, the Tribunal is not persuaded that, even if the registration requirement in Article 10(3) were to be given full force and effect, Mr. Khudyan would have thereby been deprived of his Armenian nationality automatically upon the entry into force of the 1995 Citizenship Law. Mr. Arabyan's expert evidence on the 1995 Citizenship Law was very clear in this respect: Armenian nationality can only be terminated in accordance with the special procedure set out in Articles 24 to 26 of the Law.[230] Termination must ultimately be memorialized in a Presidential Decree.[231] If the Claimants' interpretation of Article 10(3) were correct, a large number of Armenian nationals would have been rendered stateless when the 1995 Citizenship Law came into effect without any special procedure having been followed or official act of the State of Armenia being issued. It is much more plausible to interpret Article 10 as applying *ex nunc*; in other words, that the persons falling into the enumerated categories would henceforth be considered to be Armenian nationals automatically but without prejudice to the status of Armenian citizenship that had been acquired prior to the 1995 Citizenship Law coming into force. Indeed, the 1995 Citizenship Law does not appear to alter the status of Armenian citizenship acquired prior to that law.

---

[229]    Tr., Day 4, 973:5-11.
[230]    Tr., Day 4, 968:7-13.
[231]    Tr., Day 4, 968:13-18.

242.    The same observation can be made in relation to the amendment to Article 10(3) in 2001 by which the registration requirement was removed. It seems unlikely that an Armenian national would have been automatically deprived of his or her nationality in 1995 when the earlier version of Article 10(3) came into force by virtue of the registration requirement, and then automatically reinstated with Armenian nationality in 2001 when that requirement was removed by the Armenian legislature. If that were the effect of the 2001 amendment, then one would expect a provision in the amending legislation addressing the reinstatement of citizenship that had been lost automatically by application of the registration requirement in 1995. But there is no such provision.

243.    Finally, it is important to note that, in that relevant period (November 28, 1995 until August 21, 1998), Mr. Khudyan comported himself in a manner that suggests that he considered himself to be a citizen of the Republic of Armenia. Mr. Khudyan attested at the Hearing that until its expiry in 1994, he continued using his USSR passport.[232] Also after the entry into force of the 1995 Citizenship Law, Mr. Khudyan continued identifying as an Armenian citizen, as is borne out by the fact that in April 1997, when he applied for naturalization in the USA, Mr. Khudyan – assisted by an immigration lawyer[233] – declared on the application form his "*Citizenship*" to be "*Armenia/Russia.*"[234] In addition, it is undisputed that stateless persons cannot obtain US nationality through naturalization.[235]

244.    For these reasons, the Tribunal concludes:

(1)    That Mr. Khudyan was a citizen of Armenia prior to the 1995 Citizenship Law coming into force and was recognized as a citizen of the Republic of Armenia on November 28, 1995, when the 1995 Citizenship Law entered into force;

---

[232]    Tr., Day 2, 544:25–545:24.
[233]    Tr., Day 2, 549:23-25.
[234]    Application for Naturalization of Mr. Edmond Khudyan (Exhibit R-0191).
[235]    Respondent's Rejoinder, ¶485.

(2)    That Mr. Khudyan did not lose his Armenian nationality for failure to register in accordance with the registration requirement of the second prong of Article 10(3) of the 1995 Citizenship Law, while in force; and

(3)    That Mr. Khudyan did not become stateless when the 1995 Citizenship entered into force.

   3)  <u>Did Mr. Khudyan lose his Armenian citizenship when he acquired US nationality in 1998?</u>

245.    The starting point for the Tribunal's analysis of the third issue, as to whether Mr. Khudyan lost his Armenian citizenship when he acquired US citizenship, is that:

-    On August 21, 1998, Mr. Khudyan became a citizen of the USA through naturalization;[236] and

-    Mr. Khudyan was recognized as a citizen of the Republic of Armenia before and after the 1995 Citizenship Law came into force.[237]

246.    Although the Tribunal appreciates that the Certificate of Naturalization issued to Mr. Khudyan by the US Commissioner of Immigration and Naturalization states "*Country of <u>former nationality</u>: Armenia*," the Tribunal also notes that upon naturalization the USA does not require a person to renounce any nationality or citizenship that the person held prior to naturalization.[238] In any event, the question as to whether Mr. Khudyan lost his Armenian citizenship as a consequence of the acquisition of US citizenship is governed by Armenian law.

247.    In this respect, the Tribunal notes that in line with prior Soviet policy on the issue[239] Article 1(3) of the 1995 Citizenship Law, when enacted, provided that:

---

[236]    Certificate of Naturalization of Mr. Edmond Khudyan, August 21, 1998 (Exhibit C-0171).

[237]    1995 Citizenship Law (Exhibits C-0167, C-0168 / R-0046), Article 10(3); *see* the Tribunal's findings at 244 above.

[238]    Respondent's Rejoinder, ¶45; Respondent's PHB, ¶6; United States of America, "Dual Nationality" (Exhibit R-0121).

[239]    Arabyan's First Expert Opinion, ¶¶35-42; Tr., Day 4, 961:23–969:7.

*A citizen of the Republic of Armenia may not be concurrently a citizen of another State.*[240]

248.  Hence, when Mr. Khudyan acquired US citizenship in 1998, he did so in violation of Article 1(3) of the 1995 Citizenship Law. Yet, such violation did not cause him to automatically lose his Armenian citizenship because Articles 23 to 25 of the 1995 Citizenship Law, which regulate the termination of citizenship of the Republic of Armenia, require a specific procedure to be followed.

249.  Pursuant to Articles 23 to 28 of the 1995 Citizenship Law, an Armenian citizen can only lose citizenship by way of renunciation or deprivation, both of which are subject to a specific application procedure and require a decree of the President of the Republic of Armenia.[241] There is neither a record of an application procedure, nor a Presidential Decree, aimed at the termination of the Armenian citizenship of Mr. Khudyan.[242]

250.  Should Mr. Khudyan have wished to terminate his Armenian citizenship, he should have filed an application to renounce citizenship of the Republic of Armenia under Article 24 of the 1995 Citizenship Law. The fact that he did not constitutes a ground for deprivation of Armenian citizenship under Article 25 but such deprivation also is not automatic. It too requires the competent bodies under Article 26 to 28 of the 1995 Citizenship Law to administer a specific procedure aimed at depriving Mr. Khudyan of his Armenian citizenship. It is common ground that no such procedure ever took place. Therefore, from the time of his acquisition of US citizenship, Mr. Khudyan had two citizenships.

251.  With the amendment of the 1995 Citizenship Act in 2007, any potential issue arising from Mr. Khudyan's dual citizenship was removed through the introduction of Article 1(6), which provides:

---

[240]    1995 Citizenship Law (Exhibits C-0167, C-0168 / R-0046), Article 1(3).
[241]    1995 Citizenship Law (Exhibits C-0167, C-0168 / R-0046), Article 26.
[242]    Tr., Day 4, 967:23–969:7.

> *Renunciation of the citizenship of the Republic of Armenia or accepting the citizenship of another State shall not per se entail to the loss of citizenship of the Republic of Armenia.*[243]

252.    Based on the foregoing, the Tribunal concludes that the Claimants' claim to the effect that Mr. Khudyan lost his Armenian citizenship when he acquired US citizenship fails for lack of legal foundation.

253.    Accordingly, the Tribunal finds that despite the fact that Mr. Khudyan became a US citizen on August 21, 1998, he continued to hold Armenian citizenship.

> 4)   Is Mr. Khudyan's nationality status affected by the issuance in 2004 of an Armenian passport with special residency status?

254.    The fourth and final issue the Tribunal will address in the context of the analysis of Mr. Khudyan's nationality is whether Armenia's issuance of a passport with special residency status to Mr. Khudyan affected his nationality status under the applicable Armenian law.[244]

255.    On January 22, 2004, upon the application of Mr. Khudyan,[245] the President of the Republic of Armenia granted Mr. Khudyan special residency status on the basis of Articles 21 and 24 of the Law on the Status of Foreign Citizens.[246]

256.    The Tribunal notes that Article 2 of the version of the Law on the Status of Foreign Citizens in the Republic of Armenia in force at the time defines a "*foreign citizen*" as "*any person who is not a citizen of the Republic of Armenia and who is a citizen of another state*".[247]

---

[243]    1995 Citizenship Law (Exhibits C-0167, C-0168 / R-0046 and C-0188).

[244]    1995 Citizenship Law (Exhibits C-0167, C-0168 / R-0046), Article 10(3); *see* the Tribunal's findings at paragraphs 225-232 above.

[245]    Application of Mr. Edmond Khudyan for Special Residency Status, December 18, 2003 (Exhibit R-0007).

[246]    Republic of Armenia, Presidential Decree No. N NK-18-A, January 22, 2004 (Exhibit C-0180); Law on Foreign Citizens (version adopted on June 17, 1994) (Exhibit C-0007), Articles 21, 24.

[247]    Law on Foreign Citizens (version adopted on June 17, 1994) (Exhibit C-0007), Article 2.

257.    In addition, Article 21 of the same Law sets forth the conditions upon which special residency status can be granted by the Republic of Armenia:[248]

> *Special resident status may be granted to foreign citizens of Armenian origin.*
>
> *The special resident status may also be granted to other foreign citizens who carry on economic, cultural activity in the Republic of Armenia.*
>
> *The special resident status shall be granted for a period of ten years. It may be granted more than once.*

258.    While the Tribunal acknowledges that on the basis of the Law on the Status of Foreign Citizens only foreigners are eligible for special residency status, in the particular circumstances of this case, the Tribunal is not convinced that the issuance of a special residency passport to Mr. Khudyan proves that he is a foreigner. This is for three main reasons.

259.    First, at the time Mr. Khudyan took the initiative of seeking special residency status in the Republic of Armenia by filing an application on December 18, 2003,[249] his USSR passport had expired. But, although a passport forms *prima facie* evidence of a person's nationality, it is not a pre-requisite for, or constitutive of, nationality.[250] Nationality or citizenship is established by reference to the applicable law, which at that moment, in his case, was the 1995 Citizenship Law, as amended. When applying for special residency status in Armenia in December 2003, Mr. Khudyan may have been unaware that pursuant to Article 10(3) of the 1995 Citizenship Law he was actually recognized as a citizen of the Republic of Armenia.

---

[248]    Law on Foreign Citizens (version adopted on June 17, 1994) (Exhibit C-0007), Article 21.

[249]    Application of Mr. Edmond Khudyan for Special Residency Status, December 18, 2003 (Exhibit R-0007).

[250]    Schreuer Commentary (Legal Authorities CL-0080 / RL-0030), ¶¶648-649; Z. Douglas, *The International Law of Investment Claims* (Cambridge University Press, 2009) (Legal Authority CL-0074), ¶537; *Soufraki v. UAE* (Legal Authority RL-0068), ¶63; *Siag v. Egypt* (Legal Authorities CL-0142 / RL-0066), ¶151; *Vladislav Kim and others v. Republic of Uzbekistan*, ICSID Case No. ARB/13/6, Decision on Jurisdiction, March 8, 2017 (Legal Authority CL-0158), ¶212; *Mohammad Ammar Al-Bahloul v. Republic of Tajikistan*, SCC Case No. V (064/2008), Partial Award on Jurisdiction and Liability, September 2, 2009, ¶130 (available at: https://www.italaw.com/sites/default/files/case-documents/ita0023_0.pdf).

260.    Second, when Mr. Khudyan applied for special residency status, he stated his full name to be "*Edmond Arshak Khudyan.*"[251] The patronymic and family name used by Mr. Khudyan on his written application are different from those recorded in his USSR passport, where his full name is stated to be "*Edmond Arshaluys Khudaverdyan.*"[252] Mr. Arabyan testified that, given the discrepancy between the personal data provided by Mr. Khudyan for the purposes of his application and the personal data in the records of the former USSR, a search for the person "*Edmond Arshak Khudyan*" would not have led to the identification of "*Edmond Arshaluys Khudaverdyan*."[253]

261.    Third, as Mr. Arabyan credibly attested, in December 2003 and January 2004, the Republic of Armenia was yet to introduce a consolidated population register.[254] In the absence of a population register and functioning software to search the personal data held by the Republic of Armenia, the Tribunal appreciates that, at the time Mr. Khudyan's application was processed, the Head of the Passport and Visas Department of the Police of the Republic of Armenia (to whom Mr. Khudyan's application was addressed) had no means of reliably verifying whether Mr. Khudyan was an Armenian citizen or not.

262.    Moreover, even if the State Population Register that was introduced in 2005 had existed when Mr. Khudyan applied for special residency status, it would not have matched the applicant, who identified himself as "*Edmond Arshak Khudyan*," with the person who had left Armenia in 1989 under the name "*Edmond Arshaluys Khudaverdyan*."[255]

263.    It appears that when applying for and granting special residency status both Mr. Khudyan and the Republic of Armenia erred in respect of the legal reality of Mr. Khudyan's citizenship status. As a mutual mistake is not a ground for the termination of citizenship under the 1995 Citizenship Law, the Tribunal concludes that Mr. Khudyan's Armenian nationality remained legally unaffected by the issuance of a

---

[251]    Letter from Police of the Republic of Armenia, Passport and Visa Department to Mr. Aram Orbelyan, November 22, 2018 (Exhibit R-0008).

[252]    Exit Visa of Mr. Edmond Khudyan (Exhibit C-0165).

[253]    Tr., Day 4, 969:21–971:23.

[254]    Tr., Day 4, 970:3–971:2.

[255]    Tr., Day 4, 971:2-23.

special residency passport to Mr. Khudyan in 2004. As attested by Mr. Arabyan, such mistakes are rather common and are remedied in practice by means of an invalidation of the decision to grant special residency status and a repeal of the relevant Presidential Decree.[256]

264.    Having established that Mr. Khudyan did not lose his Armenian citizenship as a result of (1) the proclamation of independence by the Supreme Council of the ASSR in 1991; (2) the entry into force of the 1995 Citizenship Law; (3) the acquisition of US nationality in 1998; and (4) the issuance of a passport with special residency status in 2004, the Tribunal concludes that Mr. Khudyan is a citizen of the Republic of Armenia.

265.    Accordingly, Mr. Khudyan does not satisfy the nationality requirement of Article 25(2)(a) of the ICSID Convention because he is a person who had the nationality of the Contracting State party to the dispute (i.e., the Republic of Armenia) when the Request for Arbitration was filed on September 18, 2017, as well as on September 27, 2017 when the Request for Arbitration was registered by the ICSID Secretariat.

266.    Therefore, the Tribunal has no jurisdiction *ratione personae* over the first Claimant, Mr. Khudyan.

267.    In light of this conclusion, the Respondent's other arguments in support of its objection to the Tribunal's *ratione personae* jurisdiction in respect of Mr. Khudyan (including those based on (i) an alleged abuse of rights and process; (ii) Mr. Khudyan's dual nationality at the time of the alleged investments; and (iii) other policy arguments said to militate against an exercise of jurisdiction over Mr. Khudyan[257]) are moot and will not be addressed by the Tribunal.

---

[256]    Tr., Day 4, 971:24–972:7.
[257]    Respondent's Counter-Memorial, Section E.VI.4-6.

(ii) *Claimant 2 – Arin Capital & Investment Corp.*

1) Respondent's jurisdictional objection *ratione personae* based on Article 25 of the ICSID Convention

268.    In respect of the Claimant 2, Arin US, the Tribunal notes that the requirements for a legal entity, set forth in the first part of Article 25(2)(b) of the ICSID Convention, are similar to those of the BIT. A legal entity is deemed an investor for the purposes of Article 25(2)(b) if it is validly constituted under the laws of its claimed home State.

269.    As stated at paragraph 200 above, Arin US is incorporated in accordance with the laws of the State of California (USA).

270.    While that fact is uncontested, the Respondent argues that for purposes of the ICSID Convention, Arin US should be characterized as a national of Armenia and is hence outside the scope of Article 25(2)(b) of the ICSID Convention and thereby outside the jurisdiction of this Tribunal. Relying on Prof. Schreuer's Commentary and on ICSID jurisprudence, the Respondent argues that it would be in violation of the object and purpose of the ICSID Convention to qualify Arin US as a "*national of another Contracting State*" for purposes of Article 25(2)(b) of the ICSID Convention in circumstances where that company allegedly is nothing but a shell company, wholly owned and controlled by Mr. Khudyan, an Armenian national. According to the Respondent, allowing Arin US to qualify as a foreign investor on the basis of its State of incorporation alone, without having regard to the Armenian nationality of its "*predominant shareholder and manager*," would be tantamount to allowing a national to bring a claim against its own State.[258] The Respondent concludes on this basis that Arin US does not qualify as an "*investor*" under Article 25(2)(b) of the ICSID Convention and hence falls outside this Tribunal's jurisdiction *ratione personae*.

271.    While the Claimants in their Reply purport to address the Respondent's jurisdictional objections in relation to Arin US, their arguments are largely unresponsive to the particular objection raised by the Respondent. The Claimants did not rebut the legal authorities relied on by the Respondent, nor do they offer any observations on the scope

---

[258]    Respondent's Counter-Memorial, ¶¶191-196, fn 187.

and limits of Article 25(2)(b) of the ICSID Convention or on the suggestion that the Tribunal ought to disregard the State of incorporation of Arin US and determine its nationality according to the nationality of its predominant shareholder and manager.[259]

272.    The only argument that the Tribunal is able to discern in the pleadings of the Claimants in this respect is the general proposition that Mr. Khudyan would be the agent of Arin US under California law and that his control over the alleged investments in Armenia can be imputed to his principal, Arin US. The Tribunal understands the Claimants to allege that not Mr. Khudyan, but Arin US *through* Mr. Khudyan, in his capacity as its CEO, controls the investments that were owned initially by Mr. Khudyan and later by Arin Armenia. For this reason, the Claimants maintain that the Tribunal should reject the Respondent's objection *ratione personae* over Arin US.[260]

273.    The Tribunal is aware of the legal commentary and the body of ICSID jurisprudence supporting the proposition that reliance on the formal place of incorporation of a legal entity, despite the fact that the investment is in reality owned and controlled by nationals of the host State, would allow formalism to prevail over reality and undermine the actual object and purpose of the ICSID Convention.

274.    In *TSA Spectrum v. Argentina*, the tribunal observed:

> *This text* [Article 25(2)(b) of the ICSID Convention] *may be interpreted in a strict constructionist manner to mean that a tribunal has to go always by the formal nationality. On the other hand, such a strict literal interpretation may appear to go against common sense in some circumstances, especially when the formal nationality covers a corporate entity controlled directly or indirectly by persons of the same nationality as the host State.*[261]

275.    Furthermore, in his dissenting in the *Tokios Tokelės v Ukraine* case, Prof. Weil observed that:

> *What is decisive in our case is the simple, straightforward, objective fact that the dispute before this ICSID Tribunal is not between the Ukrainian*

---

[259]    Respondent's Counter-Memorial, ¶195.

[260]    Claimants' Reply, ¶65.

[261]    *TSA Spectrum de Argentina S.A. v. Argentine Republic*, ICSID Case No. ARB/05/5, Award, December 19, 2008 (Legal Authority RL-0059) ("***TSA Spectrum v. Argentina***"), ¶145.

> *State and a foreign investor but between the Ukrainian State and an Ukrainian investor – and to such relationship and to such a dispute the ICSID Convention was not meant to apply and does not apply.*[262] [emphasis in original]

276.    The Respondent also relies on Prof. Schreuer's Commentary on the ICSID Convention, which cites Mr. Broches' statement to the effect that "[i]*n giving effect to such an agreement* [an agreement to submit to ICSID's jurisdiction], *a commission or tribunal should take account not only of formal criteria such as incorporation but also of economic realities such as ownership and control*."[263]

277.    Having considered the Respondent's objection and arguments in this respect, the Tribunal first notes that pursuant to Article 25(1) of the ICSID Convention, the Centre's jurisdiction covers "*any legal dispute arising directly out of an investment, between a Contracting State … and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre*."

278.    Furthermore, Article 25(2)(b) defines a "'*National of another Contracting State*'" as:

> *(b)    any juridical person which had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to … arbitration and any juridical person which had the nationality of the Contracting State party to the dispute on that date and which, because of foreign control, the parties have agreed should be treated as a national of another Contracting State for the purposes of this Convention.*

279.    The ICSID Convention does not itself provide a definition of the concept of "*nationality*" for the purposes of Article 25. Instead, it offers State Parties broad discretion to define nationality and to articulate the criteria by which nationality is to be determined. As regards the nationality of a company, the Armenia–US BIT is clear. It stipulates in Article 1(b) that "company" of a Party means:

> *any kind of corporation, company, association, partnership, or other organization, <u>legally constituted under the laws and regulations of a Party</u> or a political subdivision thereof whether or not organized for pecuniary*

---

[262]    Weil Opinion (Legal Authority RL-0060), ¶21.

[263]    Schreuer Commentary (Legal Authorities CL-0080 / RL-0030), ¶698.

> *gain, or privately or governmentally owned or controlled.*[264] [emphasis added]

280. As indicated above, it is undisputed that Arin US is legally constituted in accordance with the laws of the State of California (USA) and, therefore, Arin US qualifies for purposes of the BIT as a US company, and, by extension, as "*a national of another Contracting State*" for purposes of the Article 25(1) of the ICSID Convention.

281. The Tribunal does not accept to read into the BIT or the ICSID Convention criteria for establishing nationality other than those that are actually stated in those instruments (such as control). As the tribunal in *Rompetrol v. Romania* correctly observed, this would be "*tantamount to setting aside the clear language agreed upon by the treaty Parties*"[265] in violation of the customary principles of treaty interpretation as embodied in the Vienna Convention on the Law of Treaties ("**VCLT**"), and notably Article 31 thereof pursuant to which a treaty is to be interpreted "*in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.*"[266]

282. Had the State Parties to the Armenia–US BIT wanted to elevate the element of "*control*" to a criterion relevant for the determination of a company's nationality, they could have included a provision to that end. Such provisions are by no means uncommon in treaty practice. They did not. Similarly, had the drafters of the ICSID Convention intended to include a requirement that a juridical person or legal entity cannot be controlled by a national of the Contracting State party to the dispute, they could have included specific wording to this effect in the first limb of Article 25(2)(b), just like they specified in the immediately preceding paragraph that a natural person may not have the nationality of the Contracting State party to the dispute. Again, they did not.

---

[264]    BIT (Legal Authorities CL-0081 / RL-0037), Article I(1)(b).

[265]    *The Rompetrol Group N.V. v. Romania*, ICSID Case No. ARB/06/3, Decision on Jurisdiction and Admissibility, April 18, 2008 ("***Rompetrol v. Romania***") (Legal Authority CL-0063), ¶85 (available at: https://www.italaw.com/sites/default/files/case-documents/ita0717.pdf).

[266]    Vienna Convention on the Law of Treaties, May 23, 1969 (Legal Authority CL-0070), Article 31.

283.   While the Tribunal appreciates that in exceptional cases of (suspected) abuse, there may be reasons to analyse the nationality of a corporation beyond the mere incorporation requirement, it notes that the Respondent has not advanced such an argument, nor has it made a *prima facie* showing of abuse of Arin US's corporate form that would warrant investigating such an abuse.

284.   Accordingly, the Tribunal concludes that there are no grounds to, as the Respondent requests, "*pierce the corporate veil*" by disregarding "*Claimant 2's state of incorporation and determine its nationality according to the nationality of its predominant shareholder and manager*."[267]

285.   Instead, the Tribunal finds that Arin US is a US national for purposes of the BIT and "*a national of another Contracting State*" in the sense of Article 25(1)(b) of the ICSID Convention. Therefore, the Tribunal rejects the Respondent's jurisdictional objection *ratione personae* founded on Article 25 of the ICSID Convention in relation to the second Claimant, Arin US.

2)   Respondent's jurisdictional objection based on a purported abuse of right

286.   The Respondent also raised a jurisdictional objection against Arin US on grounds of a purported abuse of right due to its failure to claim for a distinct harm.

287.   Relying on the tribunal's decision in *Orascom v. Algeria*, the Respondent submits that it "*has not consented to being sued by other entities that are controlled by Claimant 1, in relation to the same alleged investment, the same alleged measures and the same alleged harm*" and asserts that Arin US, being controlled by Mr. Khudyan, "*cannot seek protection for the same harm inflicted on Claimant 1's alleged investment*."[268]

---

[267]   Respondent's Counter-Memorial, ¶195.

[268]   Respondent's Counter-Memorial, ¶¶199-201, citing *Orascom v. Algeria* (Legal Authority RL-0061), ¶¶542-543.

288.   It asserts that Arin US's conduct amounts to an abuse of the system of investment protection, which would constitute a further ground for the inadmissibility of Arin US's claim and precludes this Tribunal from exercising jurisdiction over this dispute.[269]

289.   The Claimants reject the Respondent's objection, arguing it lacks any merit as they did not start "*separate arbitration proceedings in connection with the same investment that could create a risk of duplicative liability for Respondent*." According to the Claimants, "*full reparation to either Claimant would compensate both Claimants*,"[270] thereby excluding abuse and the risk of double recovery.

290.   In assessing the Respondent's second jurisdictional objection in relation to Arin US, the Tribunal first notes that in *Orascom v. Algeria*, the single case relied upon by the Respondent, the question of abuse in the sense articulated by Algeria was not so much dealt with as a jurisdictional objection, but more as an issue of standing and admissibility. More importantly, the facts in that case were on a crucial point different from those of the present case. In that case, Algeria had faced claims in relation to the same harm in different proceedings brought under different bilateral investment treaties by different companies placed at various levels of the same vertical corporate chain. It was in view of these circumstances that the *Orascom* tribunal ultimately held that "*this conduct must be viewed as an abuse of the system of investment protection, which constitutes a further ground for the inadmissibility of the Claimant's claims and precludes the Tribunal from exercising its jurisdiction over this dispute*."[271]

291.   In the case at hand, such circumstances have not been argued, let alone demonstrated by the Respondent. Indeed, as the Claimants have correctly pointed out, they did not start separate arbitration proceedings in connection with the same investment but rather brought their claims in one arbitration in which context they have, moreover, represented that "*full reparation to either Claimant would compensate both*

---

[269]   Respondent's Counter-Memorial, ¶202.
[270]   Claimants' Reply, ¶65, fn 92.
[271]   *Orascom v. Algeria* (Legal Authority RL-0061), ¶545.

*Claimants*."[272] Accordingly, in the present case there is no risk of double recovery or duplicative liability for the Respondent that could be labelled as an abuse of right.

292.    Moreover, the Tribunal notes that in the present case, Arin US does not assert claims in relation to the exact same investments as Mr. Khudyan does.[273] Also for this reason, there is – without more – no ground to presume for purposes of jurisdiction that Arin US is claiming for the exact same harm as Mr. Khudyan and that this amounts to an impermissible abuse of rights, warranting a finding of inadmissibility and barring Claimant 2 from the protection of the BIT.

293.    For these reasons, the Tribunal also rejects the Respondent's second jurisdictional objection in relation to Arin US.

294.    The next question is whether the Tribunal also has jurisdiction *ratione materiae* over Arin US's purported investments, which will be addressed in **Section V.B** below.

**B.    JURISDICTION *RATIONE MATERIAE***

**(1)    Do the Claimants have an "Investment" within the Meaning of the BIT and the ICSID Convention?**

295.    The Respondent objects to the Tribunal's jurisdiction *ratione materiae* on grounds that the Claimants do not have a protected investment, and that the purported investments were illegal.

296.    It is the Claimants' case that as of November 16, 2007, they have held the following investments, which they allege are protected investments for the purposes of the BIT and the ICSID Convention:

a.    **Mr. Khudyan** claims to hold the following protected investments:[274]

(1)    the 61.1% shareholding in Arin Armenia;

---

[272]    Claimants' Reply, ¶65, fn 92.

[273]    For instance, Arin US asserts claims arising out of its purported investment consisting of the receivables purportedly owed to it by Arin LLC in connection with the transfer of the USD 3,481,000 for investment in the development of the 33/1 Mashtots Building, while Mr. Khudyan does not.

[274]    Request for Arbitration, ¶60; Claimants' Memorial, ¶¶150-152, Annexes D, E; Claimants' PHB, ¶3.

     (2)     the indirect interest in the 33/1 and 33A Mashtots Buildings via Arin Armenia (which directly owns the immovable property located at 33/1 and 33A Mashtots Avenue in Yerevan); and

     (3)     the contractual rights to receive proceeds from sales of units in the buildings located at 33/1 and 33A Mashtots Avenue, Yerevan.

b.     **Arin US** claims to hold the following protected investments:[275]

     (1)     the indirect control – via the 61.1 % shareholding of its CEO, Mr. Khudyan – over the company Arin Armenia <u>and</u> (via Arin Armenia) over the immovable property located at 33/1 and 33A Mashtots Avenue in Yerevan;[276]

     (2)     the indirect control over the immovable property located at 33/1 and 33A Mashtots Avenue through "*its funding of Mr. Khudyan's purchase*";[277] and

     (3)     an entitlement to receivables owed by Arin Armenia in connection with the amount of USD 3,481,000 provided by Arin US for the development of the immovable property at 33/1 and 33A Mashtots Avenue in Yerevan.[278]

297.    The Claimants contend having made the following contributions:[279]

-     USD 520,000 relating to the initial acquisition of 33/1 Mashtots Property;

-     USD 630,000 relating to the acquisition of 33A Mashtots Property;

-     USD 1,000,000 relating to the reacquisition of 33/1 Mashtots Property; and

---

[275]   Claimants' Memorial, ¶150, fn 208; Claimants' Reply ¶¶61-62 (although presented under the heading of jurisdiction *ratione personae*, the Tribunal will consider these arguments too in the context of jurisdiction *ratione materiae*); Claimants' PHB, ¶3.

[276]   Request for Arbitration, ¶60; Claimants' Memorial, ¶150, fn 208; Claimants' Reply, ¶61.

[277]   Request for Arbitration, ¶60; Claimants' Memorial, ¶150, fn 208.

[278]   Request for Arbitration, ¶60.

[279]   Claimants' Memorial, ¶¶150-151; Claimants' Reply, ¶¶61-62; Claimants' PHB, ¶3.

-    USD 2,500,000 in additional expenses incurred in the construction and development of the immovable property located at 33/1 and 33A Mashtots Avenue in Yerevan.

**(2)    The Parties' Positions**

    **a.    *The Respondent's Position***

298.    The Respondent submits that for the purposes of jurisdiction, the Claimants' purported investments must satisfy the so-called "*double keyhole test*," qualifying as a protected investment under both Article I(1)(a) of the BIT and Article 25(1) of the ICSID Convention.[280] According to the Respondent, the double keyhole test is widely accepted by ICSID tribunals (referring to *AdT v. Bolivia* and *Saba Fakes v. Turkey*) and in legal commentary.[281]

299.    The Respondent criticizes the Claimants for their "*mechanical application*" of the investment examples listed in Article I(1)(a) of the BIT, which in the case of their purported investment leads to "*manifestly absurd and unreasonable result*[s]." The Respondent argues that the Claimants failed to interpret Article I(1)(a) of the BIT in accordance with its ordinary meaning, as required by Article 31(1) of the VCLT.[282] The Respondent submits that the "*ordinary meaning*" of Article I(1)(a) requires the Claimants not only to bring a purported investment within the realm of the investments listed in that provision,[283] but also to prove that the purported investments meet the basic economic features inherent in an investment (regardless of whether an investor resorts to ICSID arbitration or not).[284] In this respect, the Respondent relies on the decision of the UNCITRAL tribunal in *Romak v. Uzbekistan*, holding that for an investment to be a protected investment, it must always include the elements of

---

[280]    Respondent's Counter-Memorial, ¶¶53-54.

[281]    Respondent's Counter-Memorial, ¶¶55-56, citing, *inter alia*, *Aguas del Tunari S.A. v. Bolivia*, ICSID Case No. ARB/02/3, Decision on Jurisdiction, October 21, 2005 (Legal Authority RL-0031) ("***AdT v. Bolivia***"), ¶278; *Saba Fakes v. Republic of Turkey*, ICSID Case No. ARB/07/20, Award, July 14, 2010 ("***Saba Fakes v. Turkey***") (Legal Authority RL-0032), ¶108; Schreuer Commentary (Legal Authority CL-0080 / RL-0030), ¶117. *See also* Respondent's Rejoinder, ¶¶404-405.

[282]    Respondent's Counter-Memorial, ¶¶66-67.

[283]    Respondent's Counter-Memorial, ¶¶67-69; Respondent's Rejoinder, ¶¶386-387.

[284]    Respondent's Counter-Memorial, ¶69.

contribution, risk and a certain duration.[285] It emphasizes that the *Romak* decision is based on the Switzerland–Uzbekistan BIT, which contains a definition of investment that is "*meaningfully similar*" and even "*facially broader*" than the investment definition in the Armenia–US BIT because it includes within its scope "*every kind of assets*." Therefore, the holding of the *Romak* tribunal certainly stands in the context of the more narrowly drawn definition of investment of Article I(1)(a) of the Armenia–US BIT.[286] The Respondent further refers to *Ulysseas v. Ecuador* and *Alps Finance v. Slovakia*,[287] where the tribunals came to a conclusion similar to that of the *Romak* tribunal. Moreover, the *Ulysseas* decision was rendered under another US bilateral investment treaty (the Ecuador–US BIT), which contains a definition of "*investment*" that is nearly identical to the definition in the Armenia–US BIT.[288]

300.    In addition, the Respondent contends that in light of the object and purpose of the BIT, an ordinary commercial transaction does not qualify as an investment within the meaning of Article I(1)(a). By reference to the Preamble of the BIT and the US President's Letter of Submittal, transmitting the BIT to the Senate, the Respondent submits that only investments that contribute to economic cooperation between the contracting States, that are made for a certain duration, that involve a contribution and that are exposed to risk, satisfy this criterion.[289]

301.    Further, with respect to the investment requirement under the ICSID Convention, while the term "*investment*" was left undefined in Article 25(1) by the drafters of the ICSID Convention, the Respondent argues that this does not mean that any transaction falls within the scope of application of Article 25(1). The Respondent criticizes the Claimants' reliance on Prof. Schreuer's Commentary to the effect that "*investment in*

---

[285]    Respondent's Counter-Memorial, ¶¶69-71; Respondent's Rejoinder, ¶¶422-424, citing *Romak S.A. v. Republic of Uzbekistan*, PCA Case No. AA280, Award, November 26, 2009 ("**Romak v. Uzbekistan**") (Legal Authority RL-0034), ¶¶7, 174, 207.

[286]    Respondent's Rejoinder, ¶¶422-424.

[287]    Respondent's Counter-Memorial, ¶¶72-73; Respondent's Rejoinder, ¶¶425-427, citing *Ulysseas, Inc. v. Republic of Ecuador*, UNCITRAL, Final Award, June 12, 2012 ("**Ulysseas v. Ecuador**") (Legal Authority RL-0035), ¶¶5, 251; *Alps Finance v. Slovak Republic, ad hoc*, Award, March 5, 2011 ("**Alps Finance v. Slovakia**") (Legal Authority RL-0036), ¶¶101, 241.

[288]    Respondent's Rejoinder, ¶426, citing *Ulysseas v. Ecuador* (Legal Authority RL-0035), ¶¶5, 251.

[289]    Respondent's Counter-Memorial, ¶¶74-79, referring to, *inter alia*, BIT (Legal Authorities CL-0081 / RL-0037), pp. 2-3.

*the sense of Art. 25 of the Convention may cover almost any area of economic activity
…*" as quoted out of context,[290] because elsewhere Prof. Schreuer identifies on the basis
of ICSID jurisprudence (starting with *Fedax v. Venezuela*) the typical features of an
investment required in order for it to be recognized as such within the ICSID system.[291]

302.   The Respondent argues, by reference to the criteria identified by the tribunal in the
*Salini v. Morocco* case, that in order for the investment to be recognized as such under
the ICSID Convention, an investment must satisfy four criteria: (1) a contribution, (2)
a certain duration of the operation, (3) risk and (4) a contribution to the host State's
development.[292] While the Respondent recognizes that there are certain reservations
about the application of the *Salini* criteria, it insists that the *Salini* criteria have been
cited in many decisions and accepted to varying degrees by tribunals,[293] and should also
be taken into account by the Tribunal in conjunction with one another and not in
isolation.[294]

303.   According to the Respondent, such an approach is consistent with the approach taken
by various ICSID tribunals (citing specifically the decision in *Malaysian Historical
Salvors v. Malaysia*, and decisions criticizing the "*Salini test*," such as *Biwater Gauff
v. Tanzania*).[295] In any event, other tribunals have found a sensible middle ground,

---

[290]   Respondent's Counter-Memorial, ¶¶80-83, citing Claimants' Memorial, ¶161, fn 215 (quoting, in turn, Schreuer Commentary (Legal Authorities CL-0080 / RL-0030), ¶148.

[291]   Respondent's Counter-Memorial, ¶84; Respondent's Rejoinder, ¶406, citing *Fedax N.V. v. Republic of Venezuela*, ICSID Case No. ARB/96/3, Decision on Jurisdiction, July 11, 1997 ("*Fedax v. Venezuela*") (Legal Authority RL-0047), ¶43, fn 63.

[292]   Respondent's Counter-Memorial, ¶¶85-86, citing, *inter alia*, *Salini Construttori S.p.A. and Italstrade S.p.A. v. Kingdom of Morocco*, ICSID Case No. ARB/00/4, Decision on Jurisdiction, July 16, 2001 ("*Salini v. Morocco*") (Legal Authority RL-0038), ¶52.

[293]   Respondent's Counter-Memorial, ¶¶86-87 (*see* fn 46 for the list of cases cited by the Respondent).

[294]   Respondent's Counter-Memorial, ¶88; Respondent's Rejoinder, ¶¶401-409.

[295]   Respondent's Counter-Memorial, ¶¶89-90, citing, *inter alia*, *Malaysian Historical Salvors, Sdn, Bhd v. Government of Malaysia*, ICSID Case No. ARB/05/10, Award on Jurisdiction, May 17, 2007 ("*Malaysian Historical Salvors v. Malaysia*, Award") (Legal Authority RL-0043), ¶¶72, 106, 124, 130; *Biwater Gauff Tanzania Ltd. v. United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award, July 24, 2008 ("*Biwater Gauff v. Tanzania*") (Legal Authority CL-0006), ¶¶312-313, 316; Respondent's Rejoinder, ¶¶410-414.

requiring an investment to satisfy the criteria of a contribution, a certain duration and an element of risk, without explicitly referring to the "*Salini test*."[296]

304.    Finally, although there is some controversy in ICSID jurisprudence over the relevance and applicability over the fourth *Salini* criterion (the contribution to the host State's development), the Respondent submits that this criterion should not be neglected by the Tribunal in its analysis.[297]

305.    Applying the three criteria of (1) contribution, (2) duration of the operation and (3) risk (which are, in the Respondent's submission, generally accepted requirements for an investment to enjoy protection) to the Claimants' purported investment, Armenia concludes that the Claimants did not make an investment that qualifies as such either under the BIT or the ICSID Convention for four main reasons.[298]

306.    First, in respect of contribution towards an investment, the Respondent claims that the Claimants did not make any contribution through their alleged investments. Recognizing that "*contribution*" can comprise a financial contribution or a contribution in kind, the Respondent points out that the Claimants only claim to have made financial contributions for which there is no evidence.[299]

307.    In order to prove the contribution of funds, the Respondent submits that the Claimants have to demonstrate the actual transfer of funds invested in relation to the alleged investments, as well as the purported investor's ownership of the alleged contribution.[300] According to the Respondent, there must be proof of a link between the investment and the person who claims to have made the relevant investment.[301] It is the Respondent's case that the Claimants failed to prove a contribution in respect of any of

---

[296]    Respondent's Rejoinder, ¶¶415-418, citing, *inter alia*, *Saba Fakes v. Turkey* (Legal Authority RL-0032), ¶¶108-110 (stating that such approach "*reflects an objective definition of 'investment'*").

[297]    Respondent's Counter-Memorial, ¶¶92-93; Respondent's Rejoinder, ¶¶417-418.

[298]    Respondent's Counter-Memorial, ¶¶94-97.

[299]    Respondent's Counter-Memorial, ¶100.

[300]    Respondent's Counter-Memorial, ¶¶101-102.

[301]    Respondent's Counter-Memorial, ¶103.

the three transactions alleged by the Claimants to constitute their initial investment in Armenia.

308.    With regard to the original purchase of the 33/1 Mashtots Property, the Respondent argues that the Claimants' own evidence shows that it was not Mr. Khudyan who paid the purchase price but Mr. Armen Mehrabi and that the Claimants have failed to prove that either of the Claimants were at the origin of this transaction. The Respondent insists that the Claimants' mere assertion to the effect that the funds for the purchase were provided by Arin US does not discharge the Claimants' burden of proof.[302] In particular, the Respondent insists that the Claimants failed to adduce any evidence of the alleged relation of Mr. Mehrabi to the Claimants, who was initially described by Mr. Khudyan in his Witness Statement as a friend and then at the Hearing as an employee of Claimant 2, Arin US.[303] Nor did the Claimants adduce any evidence to the effect that Mr. Khudyan would be the beneficial owner of the alleged investment made by Mr. Mehrabi.[304]

309.    Armenia further reiterates that Mr. Khudyan's explanation of this transaction changed continually during his cross-examination. Specifically, the Respondent questions the explanation that Mr. Khudyan came up with for the first time during the Hearing that the purchase price of the 33/1 Mashtots Property was paid by Mr. Mehrabi using cashiers' cheques issued by Arin US, as this is contradicted by the tax returns that are in the record of this arbitration.[305] The Respondent further notes that Mr. Khudyan's testimony at the Hearing contradicts the contemporaneous evidence on record. Mr. Khudyan initially testified that Mr. Mehrabi did not have an account at Wells Fargo (the bank that processed the alleged payment), but later stated that the account number indicated on the relevant payment slip is the Wells Fargo account belonging to Mr. Mehrabi.[306] The Respondent insists that there are multiple outstanding questions in relation to this transaction, including how the money wired by Mr. Mehrabi to

---

[302]    Respondent's Counter-Memorial, ¶¶104-107.

[303]    Respondent's PHB, ¶¶28-30, referring to Tr., Day 2, 311:7-21.

[304]    Respondent's Counter-Memorial, ¶¶104-105; Respondent's Rejoinder, ¶430.

[305]    Respondent's PHB, ¶¶31-34, referring to Tr., Day 2, 351:11-19, 565:21, 341:14-15.

[306]    Respondent's PHB, ¶¶35-36, referring to Tr., Day 2, 347:23–348:9.

Mr. Mangasaryan reached the owner of the 33/1 Mashtots Property, how the land plot was first transferred to Mr. Telpyan and later to Mr. Khudyan and what arrangements they were based on, etc.[307] In this respect, the Respondent points out that during his cross-examination, Mr. Khudyan attested that he knew neither the owner of the 33/1 Mashtots Property, nor how the price that the Claimants allegedly paid for the land plot was fixed.[308]

310.   With regard to the re-purchase of the 33/1 Mashtots Property, the Respondent submits that the lack of the Claimants' contribution towards and ownership of the investment is even more evident, as Mr. Khudyan admits that the USD 1 million allegedly used to fund this acquisition did not come from either of the Claimants, but was provided by his two brothers-in-law (one of whom funded USD 150,000 and the other USD 850,000).[309] However, the Respondent also queries that explanation, as the payment evidence on record is limited to a single wire transfer of USD 1,000,000 from Arin US to Arin Armenia. The Respondent emphasizes the lack of actual contribution by Mr. Khudyan to this transaction as the USD 1,000,000 invested by his brothers-in-law was repaid with the funds of a loan that Arin Armenia took out from HSBC. As the amount was encumbered under the HSBC loan, it does not amount to a contribution by either Mr. Khudyan or Arin US.[310]

311.   With respect to the purchase of the 33A Mashtots Property, the Respondent submits that the Claimants did not provide any contemporaneous evidence concerning the funding of the alleged purchase and points out that the only evidence adduced by the Claimants to support their investment claim is Mr. Khudyan's testimony.[311] In any event, as the amount that Mr. Khudyan claims to have spent on the purchase of the 33A Mashtots Property was lower than the amount for which he sold the 33/1 Mashtots

---

[307]   Respondent's PHB, ¶¶37-42.
[308]   Respondent's PHB, ¶¶41-42. *See also* Tr., Day 2, 356:10-18, 365:11-25.
[309]   Respondent's Counter-Memorial, ¶106.
[310]   Respondent's Rejoinder, ¶432; Respondent's PHB, ¶47.
[311]   Respondent's Counter-Memorial, ¶107; Respondent's Rejoinder, ¶431; Respondent's PHB, ¶44.

Property earlier, the difference cannot be qualified as a (new) contribution on Mr. Khudyan's part but stems from the initial money invested by Mr. Mehrabi.[312]

312. Furthermore, the Respondent claims that the Claimants failed to demonstrate any value creation with their investment. By reference to the decisions in *Poštová banka v. Greece* and *Romak v. Uzbekistan*, the Respondent argues that even if the Claimants were able to prove the existence and their ownership of the alleged funds, the mere fact that the Claimants purchased two land plots does not amount to the requisite contribution because they are not part of a process of value creation, which distinguishes investments from ordinary commercial transactions.[313] Instead of creating value, the Claimants allegedly paid the purchase price of the land plots, which equates a simple exchange of values, not an investment.[314]

313. More specifically, the Respondent submits that on the Claimants' own pleaded case, Mr. Khudyan bought the 33/1 Mashtots Property in December 2003 and made a quick profit when he sold it in 2004, without any construction or development having been undertaken in the meantime.[315] Mr. Khudyan then allegedly purchased the 33A Mashtots Property with an unfinished building on it, with the aim of selling it twelve months later.[316] In this context the Respondent points out that the only reason why Mr. Khudyan repurchased the 33/1 Mashtots Property was that Mr. Mangasaryan had demolished the unfinished building on the 33A Mashtots land plot and had started construction, spanning both the 33/1 and 33A land plots, thereby effectively joining them.[317] The Respondent notes that the Claimants did not make any further financial or other contribution to the construction works. According to the Respondent, it is clear that none of the initial transactions alleged by the Claimants involved or was aimed at any value creation.[318] The construction contracts concluded between Mr. Khudyan and

---

[312]    Respondent's Rejoinder, ¶431; Respondent's PHB, ¶45.

[313]    Respondent's Counter-Memorial, ¶¶108-109, citing *Poštová banka, a.s. and Istrokapital SE v. Hellenic Republic*, ICSID Case No. ARB/13/8, Award, April 9, 2015 ("***Poštová banka v. Greece***") (Legal Authority RL-0054), ¶361; *Romak v. Uzbekistan* (Legal Authority RL-0034), ¶¶215, 222.

[314]    Respondent's Counter-Memorial, ¶¶110-111.

[315]    Respondent's Counter-Memorial, ¶111.

[316]    Respondent's Counter-Memorial, ¶111.

[317]    Respondent's Counter-Memorial, ¶111.

[318]    Respondent's Counter-Memorial, ¶¶112-115.

Mr. Mangasaryan demonstrate that the construction works were financed by the proceeds from the sales of the future apartment units, not by any contribution from either Mr. Khudyan or Arin US.[319]

314.    Finally, the Respondent maintains that even after the alleged restructuring of the purported investment in 2007, involving (1) the creation of Arin Armenia, (2) the transfer of the 33/1 and 33A Mashtots Properties from Mr. Khudyan to the charter capital of Arin Armenia and 3) the Shareholders Agreement between Mr. Khudyan, Mr. Mangasaryan and Mr. Ghevond Ghalumyan, neither Claimant contributed in any way to the alleged investments.[320] It is the Respondent's case that without further funding or any kind of additional contribution, the restructuring did not rise to the level of an investment, warranting protection under the BIT and the ICSID Convention.[321]

315.    Second, in respect of investment risk, Armenia submits that the Claimants did not assume any investment risk in making their purported investment, and to the extent the Tribunal were to find that they did, such risk was purely commercial in nature.[322]

316.    Again by reference to the decision in *Romak v. Uzbekistan*, the Respondent argues that day-to-day business risks must be distinguished from investment risk, which concerns the uncertainty of the investor with respect to the return on its investment.[323]

317.    With the initial purchase of the 33/1 Mashtots Property, the only risk that the Claimants arguably incurred is the risk of fluctuation of the market price of the land, which is a purely commercial risk.[324] It is the Respondent's position that the risks involved in the construction of the apartment building and the sales of the apartments, both of which Mr. Khudyan entrusted to Mr. Mangasaryan, are commercial in nature.[325] While an investor is exposed to risk and uncertainty about the return on his investment,

---

[319]    Respondent's Counter-Memorial, ¶¶115-116.
[320]    Respondent's Counter-Memorial, ¶¶117-118.
[321]    Respondent's Counter-Memorial, ¶119.
[322]    Respondent's Counter-Memorial, ¶120.
[323]    Respondent's Counter-Memorial, ¶¶121-122; Respondent's Rejoinder, ¶¶456-461, citing *Romak v. Uzbekistan* (Legal Authority RL-0034), ¶¶30-35, 37, 53, 56-58, 60, 66, 229-230.
[324]    Respondent's Counter-Memorial, ¶123.
[325]    Respondent's Counter-Memorial, ¶124.

Mr. Khudyan did not run any risk as his agreement with Mr. Mangasaryan guaranteed him that he would receive USD 3,481,000 in cash.[326] In fact, part of his alleged equity investment was repaid to Mr. Khudyan from the mortgage-backed loan that Arin Armenia took out from HSBC.[327] Moreover, the Respondent contends that the Claimants were not exposed to any fluctuation in real estate prices because the apartments were sold to prospective buyers ahead of the construction.[328]

318.    As Mr. Khudyan knew exactly how much he invested and agreed with Mr. Mangasaryan how much his guaranteed return would be, the mere transfer of the Mashtots Properties to the charter capital of Arin Armenia does not involve any exposure of his own funds to investment risk.[329]

319.    In addition, the USD 1 million provided by Mr. Khudyan's brothers-in-law (who are repeatedly referred to by the Claimants as "*investors*" in Arin US) for the re-purchase of the 33/1 Mashtots Property, was according to Mr. Khudyan backed by a repayment guarantee of Ambassador Sargsyan. As a result, Armenia submits, Mr. Khudyan entered into the underlying transactions on the premise that the investment was not exposed to any risk.[330]

320.    The only risk that materialized were the repeated breaches by Mr. Mangasaryan of the contractual obligations he had assumed towards Mr. Khudyan and Arin Armenia. The Respondent is of the view that Mr. Khudyan has only himself to blame for this because he continued working with Mr. Mangasaryan despite his repeated breaches of other contractual obligations in 2003 and 2004.[331] Despite the unsuccessful cooperation and the lack of reliability, Mr. Khudyan continued buying real estate and concluding new agreements with Mr. Mangasaryan. According to the Respondent, Mr. Khudyan was fully aware of the risk of doing business with Mr. Mangasaryan but chose to continue

---

[326]    Respondent's Counter-Memorial, ¶125; Khudyan's First Witness Statement, ¶17.
[327]    Respondent's Rejoinder, ¶440.
[328]    Respondent's Rejoinder, ¶453.
[329]    Respondent's Counter-Memorial, ¶125.
[330]    Respondent's PHB, ¶¶50-54; Tr., Day 2, 372:8-13.
[331]    Respondent's Counter-Memorial, ¶¶126-132.

his dealings only because he wanted to take a chance on the speculatively high returns promised by Mr. Mangasaryan.[332]

321.  Third, in respect of duration of the investment the Respondent argues that the duration of the Claimants' alleged investments was insufficient for it to qualify as an investment. It is the Respondent's case that the relevant time period to be taken into consideration by the Tribunal for the purposes of determining the duration of the alleged investments, is the period during which the Claimants performed their contractual obligations, which allows the Tribunal to distinguish between one-off commercial transactions and proper investment ventures.[333] According to the Respondent, the duration of the performance of the Claimants' contractual obligations in the context of the alleged investments was insufficient to qualify as an investment.[334]

322.  With regard to the Claimants' alleged initial investment in the 33/1 Mashtots Property, the Respondent contends that that alleged investment was limited to a mere purchase without any obligation of construction.[335] Mr. Khudyan agreed with Mr. Mangasaryan that he would construct a 16-storey building at his own expense within one year following the acquisition of the land plot by Mr. Khudyan, who would be paid back the monies allegedly invested with an additional profit from the proceeds of the sales of the apartments.[336] The Respondent posits that similar arrangements were concluded with respect to the 33A Mashtots Property and the repurchase of the 33/1 Mashtots Property in 2005.[337]

323.  As to the alleged restructuring of the Claimants' purported investment, the Respondent argues that the duration of the Claimants' performance was equally punctual. Mr. Khudyan's sole obligation under the contractual arrangement he made with Mr. Mangasaryan and Mr. Ghalumyan was limited to the transfer of the land to the

---

[332]    Respondent's Counter-Memorial, ¶133; Respondent's PHB, ¶¶55-57; Tr., Day 2, 395:6-21.
[333]    Respondent's Counter-Memorial, ¶¶135-136.
[334]    Respondent's Counter-Memorial, ¶137.
[335]    Respondent's Counter-Memorial, ¶138.
[336]    Respondent's Counter-Memorial, ¶139.
[337]    Respondent's Counter-Memorial, ¶139.

charter capital of Arin Armenia and the transfer of a portion of its share capital to Mr. Mangasaryan and Mr. Ghalumyan.[338]

324. The Respondent claims that the short duration of all of the Claimants' alleged investments must be distinguished from cases where investments were found to have been made in relation to construction projects. Notably, the decision in *Toto v. Lebanon*, in which the tribunal exercised jurisdiction, concerned the construction by the investor of a highway over a period of more than five years.[339] By contrast, the Claimants in this case did everything within their power to reduce the duration of the purported investment by seeking to withdraw funds immediately upon becoming available, the most blatant example being the repayment of USD 1.5 million from the HSBC bank loan to Mr. Khudyan as part of the equity he had contributed to Arin Armenia under the Shareholders Agreement.[340]

325. The Respondent further challenges the Claimants' argument that they held on to an interest in the Mashtots development for a period of seven years and thereby would meet the duration requirement for an investment,[341] by insisting that the Tribunal must assess the duration of an investment by reference to the anticipated duration of the venture and not by reference to its actual duration.[342] In this context, the Respondent emphasizes that the construction contract for the Mashtots building was signed on September 9, 2005 and provided for completion of the project barely a year later, by September 15, 2006.[343] As preliminary sale and purchase agreements of apartments had been concluded prior to the start of the construction, the Claimants were not exposed to any risk during the construction period, as a result of which the exposure of the capital committed to any risk was too brief to rise to the levels of an actual investment.[344]

---

[338]    Respondent's Counter-Memorial, ¶140.

[339]    Respondent's Counter-Memorial, ¶141, citing Toto Costruzioni Generali S.p.A. v. Republic of Lebanon, ICSID Case No. ARB/07/12, Decision on Jurisdiction, September 11, 2009 ("***Toto v. Lebanon***") (Legal Authority RL-0052), ¶¶70, 86-87.

[340]    Respondent's Rejoinder, ¶462.

[341]    Respondent's Rejoinder, ¶¶463-467.

[342]    Respondent's Rejoinder, ¶463.

[343]    Respondent's Rejoinder, ¶466.

[344]    Respondent's Rejoinder, ¶¶464-466.

326.    Finally, in respect of the development and/or benefit to the host State, the Respondent submits that the Claimants' transactions in relation to the 33/1 and 33A Mashtots Properties were purely speculative and failed to contribute to Armenia's development. It is the Respondent's case that, as a result, the Claimants' alleged investments do not constitute an investment within the meaning of the ICSID Convention.

327.    The Respondent argues that the construction of a luxury eleven-storey apartment building did not confer any benefit to the Armenian economy or to the Armenian population at large (*cf.* the investment in the case *Jan de Nul v. Egypt*).[345] The Claimants never intended to continue or expand their activity in Armenia (*cf.* the investment in the case *CSOB v. Slovakia*) but instead opted for an exit within the shortest possible timeframe.[346] Unlike investment projects in which the investor engages in significant economic activity, aiming to create or facilitate a flow of private international capital to the host State, the Claimants' goal was exactly the opposite. They sought to take their capital out of the country immediately when (preliminary) purchase agreements had been concluded in respect of apartment units.[347]

328.    In that framework, the Respondent reiterates that the Claimants do not deny that Arin Armenia engaged in tax fraud, large-scale embezzlement, corruption and moreover defrauded Armenian residents by taking their money for apartment units that they would never receive.[348] The Respondent denies the Claimants' assertion that real estate projects such as the Claimants' propelled the Armenian economy and caused an increase in residential construction in the 2000s. Instead, the Respondent argues, the Claimants' venture was premised on channelling the funds committed by buyers under preliminary sale and purchase agreement towards the repayment of Mr. Khudyan's alleged investments before the building was completed and the financing of the

---

[345]    Respondent's Counter-Memorial, ¶¶146-148, citing, *inter alia*, *Jan de Nul N.V. and Dredging International N.V. v. Arab Republic of Egypt*, ICSID Case No. ARB/04/13, Decision on Jurisdiction, June 16, 2006 ("*Jan de Nul v. Egypt*) (Legal Authority RL-0041), ¶92.

[346]    Respondent's Counter-Memorial, ¶¶149-150, citing *Ceskoslovenska Obchodni Banka A.S. v. Slovak Republic*, ICSID Case No. ARB/97/4, Decision on Jurisdiction, May 24, 1999 ("**CSOB v. Slovakia**") (Legal Authority RL-0046), ¶¶2, 80-88.

[347]    Respondent's Counter-Memorial, ¶151.

[348]    Respondent's Rejoinder, ¶¶468-470.

construction. The Respondent concludes that instead of making an investment, Mr. Khudyan opportunistically pursued a quick profit.[349]

329.    Lastly, in respect of control, the Respondent submits that Arin US did not have any control over the alleged investments, either directly or indirectly, as required by the BIT.[350] The Claimants did not adduce any evidence to prove the existence of "control" by Arin US over the alleged investments under any arguably relevant test. To support this argument, the Respondent makes the following points.

-    The Claimants did not prove control of Arin US on the basis of the autonomous test established by the majority of the tribunal in *AdT v. Bolivia*, which is mirrored by the Letter of Submittal of the BIT, defining control as "[o]*wnership of over 50 percent of the voting stock of a company*."[351] The Respondent argues that although this test also acknowledges other forms of control, the Claimants failed to make any showing that Arin US possessed any kind of legal rights over the alleged investments.[352] In particular, the Respondent notes that, in respect of the initial purchase of the 33/1 Mashtots Property, the Claimants failed to prove that the funds for this acquisition were provided by Arin US, and also failed to prove that it acquired any legal rights over the immovable property in consideration of its funding.[353] Arin US's lack of control over the alleged investments became even more apparent after the alleged restructuring of the investment, when the purported investment, then consisting of Mr. Khudyan's 100% shareholding in Arin Armenia, was alienated in part to Mr. Mangasaryan and Mr. Ghalumyan without any involvement of or any shares being provided to Arin US.[354]

---

[349]    Respondent's Rejoinder, ¶¶471-472.

[350]    Respondent's Counter-Memorial, Section E.III.

[351]    Respondent's Counter-Memorial, ¶¶160-162, referring to the BIT (Legal Authorities CL-0081 / RL-0037), p. 3; *AdT v. Bolivia* (Legal Authority RL-0031), ¶264.

[352]    Respondent's Counter-Memorial, ¶¶162-163.

[353]    Respondent's Counter-Memorial, ¶164.

[354]    Respondent's Counter-Memorial, ¶165-166.

- The Claimants' reliance on the decisions in *S.D. Myers v. Canada* and *Standard Chartered v. Tanzania* to argue that the mere funding of an alleged investment is sufficient to constitute "*control*," is misplaced according to the Respondent. In *S.D. Myers* the tribunal did not take the fact that SDMI (the investor company) had provided a loan to Myers Canada (the investment company) into account in its decision.[355] The Respondent further argues that the decision in *Standard Chartered* also must be distinguished from the present dispute because it concerned the equity of the alleged investor in a company, which held security for loans given to a Tanzanian borrower. The tribunal held that such ownership was not sufficient and required "*some activity of investing*" in order to exercise jurisdiction in relation to the alleged investments.[356] The Respondent argues that in the present case, Arin US neither owns any shares of the company that owns the real estate in question, nor has performed any investment activity.[357] In addition, the Respondent argues that the tribunal's decision in *S.D. Myers* was based on pure policy considerations and that it did not consider the evidence before it for the purposes of "*control*." The Respondent insists that such an approach would render the jurisdictional requirements of the ICSID Convention and the BIT meaningless.[358]

- The Claimants also did not prove control of Arin US on the basis of Section 160 of the Corporations Code of the State of California, where Arin US is incorporated, which defines "*control*" as "*possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a corporation.*"[359] Applying this definition to the present case, the Respondent submits that the Claimants would have had to prove that Arin US has the power to direct or cause the direction of the management of the real estate located at

---

[355]    Respondent's Counter-Memorial, ¶¶168-169, citing *S.D. Myers, Inc. v. Canada*, NAFTA, Partial Award, November 13, 2000 ("***SD Myers v. Canada***") (Legal Authority CL-0053), ¶232.

[356]    Respondent's Counter-Memorial, ¶¶170-174, citing Standard Chartered Bank v. United Republic of Tanzania, ICSID Case No. ARB/10/12, Award, November 2, 2012 ("***Standard Chartered v. Tanzania***") (Legal Authority CL-0061), ¶¶196, 198, 200, 230-232.

[357]    Respondent's Counter-Memorial, ¶174.

[358]    Respondent's Counter-Memorial, ¶¶186-188, citing, *inter alia*, *SD Myers v. Canada* (Legal Authority CL-0053), ¶¶229-231.

[359]    Respondent's Counter-Memorial, ¶¶175-178.

the Mashtots Properties (under both the alleged original and restructured investment).[360] The Claimants did not provide any evidence of such power. As Arin US was neither a party to, nor otherwise involved in, the Shareholders Agreement and the transfer of the real estate to the share capital of Arin Armenia,[361] there is no indication of any control in the sense of Section 160 of the Corporations Code of the State of California. The fact that Mr. Khudyan is the majority shareholder of both Arin US and Arin Armenia does not vest Arin US with any legal right to exercise power over Arin Armenia.[362]

330.    Finally, the Respondent submits that the Claimants' characterization of Arin US's alleged control over the investment as "*indirect*" does not help their case, as indirect control simply means that a claimant does not have direct control over the assets comprising the investment, but instead exercises such control indirectly through an entity that does have direct control of the assets, as confirmed in *AdT v. Bolivia*.[363] As there is no intermediary over which Arin US has direct control, and which controls the immovable property located at 33/1 and 33A Mashtots Avenue, no indirect control can be established.[364]

### b.  The Claimants' Position

331.    It is the Claimants' case that both Mr. Khudyan and Arin US have standing to pursue the claims. With respect to Arin US, the Claimants assert on the basis of Article I(1)(a) of the BIT, which defines an investment as "*controlled directly or indirectly by nationals or companies of the other Party*", that Arin US is an American company that indirectly controls, through its officer, Mr. Khudyan, the immovable property at 33/1 and 33A Mashtots Avenue in Yerevan, and Arin Armenia. According to the Claimants, such indirect control is borne out by the following facts:

---

[360]    Respondent's Counter-Memorial, ¶179.
[361]    Respondent's Counter-Memorial, ¶¶179-180.
[362]    Respondent's Counter-Memorial, ¶182.
[363]    Respondent's Counter-Memorial, ¶¶189-190; *AdT v. Bolivia* (Legal Authority RL-0031), ¶236.
[364]    Respondent's Counter-Memorial, ¶190.

- Arin US authorized Mr. Khudyan's investment and granted him all the necessary powers to purchase the properties located at 33/1 and 33A Mashtots Avenue in the period from 2003 to 2005, using funds from Arin US's bank account;

- Arin US incurred risk in relation to the investment, as in 2005 it agreed to receive funds from two investors for the repurchase of the 33/1 Mashtots Property, in relation to which both Claimants assumed liability towards those investors for a fixed return;

- Arin US benefited from the investment, as is proven by the company's tax returns, which record income paid to Mr. Khudyan under preliminary sale-purchase agreements for the apartments in the Mashtots building; and

- Arin US routinely transferred funds to Arin Armenia, either directly or through Mr. Khudyan's accounts, to finance the construction of the building and to pay the company's debts.[365]

332. By reference to the decision in *S.D. Myers v. Canada*, the Claimants submit that it is recognized that a closely-held corporation can indirectly control an investment abroad through its chief officer.[366] In that case, the CEO and majority shareholder of claimant (SDMI), Mr. Dana Myers, owned 25% of Myers Canada. The tribunal decided that in his capacity of CEO of SDMI Mr. Myers made decisions regarding the business of Myers Canada and was its "*authoritative voice*," which was subsequently confirmed by the Canadian courts, which refused to set the award aside.[367] In respect of Prof. Douglas' criticism of the fact-based approach of the Canadian courts in establishing control, the Claimants point out that the *S.D. Myers* tribunal and the Canadian courts implicitly applied the legal test for control of the US principles of

---

[365]   Claimants' Reply, ¶¶60-61.

[366]   Claimants' Reply, ¶¶63-65, citing, *inter alia*, *SD Myers v. Canada* (Legal Authority CL-0053) ¶¶227-228.

[367]   Claimants' Reply, ¶¶63-64, citing *SD Myers v. Canada* (Legal Authority CL-0053), ¶¶227-228; *Attorney General of Canada v. S.D. Myers,* Canadian Federal Court, Reasons for Order, January 13, 2004 (Legal Authority CL-0137), ¶67.

agency law.[368] On that basis, the Claimants submit that the Tribunal should reject the Respondent's jurisdictional objection based on Arin US's alleged lack of control over the investment.

333.    As to the Respondent's objection against the Tribunal's jurisdiction *ratione materiae*, the Claimants submit that their investment qualifies as an investment under both Article I(1)(a) of the BIT and Article 25(1) of the ICSID Convention because Mr. Khudyan indirectly owned immoveable property in the territory of the Respondent and directly owned shares in Arin Armenia.[369]

334.    The Claimants argue that the Respondent improperly attempts to change the definition of "*investment*" under the BIT[370] and reject the Respondent's position that the term "*investment*" used in the BIT implies additional requirements, such as contribution, duration or risk. The Claimants submit that the parties to the BIT adopted a definition of investment that is "*granular, expansive, and* [which] *already contains safeguards to exclude simple commercial transactions*," and that it would be inappropriate to read further restrictions into the definition beyond the ones that the parties explicitly chose.[371]

335.    The Claimants note that many tribunals simply apply the definition of "*investment*" as written in the relevant treaty, without inferring any additional requirements, and point out that several tribunals explicitly rejected attempts of respondent States to introduce additional substantive requirements.[372] The Claimants dismiss the Respondent's reliance on cases where tribunals found that inherent to the term "investment" were additional requirements beyond the wording of the definition as inapposite, because

---

[368]    Claimants' Reply, ¶65, referring to Z. Douglas, *The International Law of Investment Claims* (Cambridge University Press, 2009) (Legal Authority CL-0074), ¶569.

[369]    Claimants' Reply, ¶¶66-68.

[370]    Claimants' Reply, Section I(C)(1).

[371]    Claimants' Reply, ¶71.

[372]    Claimants' Reply, ¶72, citing *Mytilineos Holdings SA v. State Union of Serbia & Montenegro and Republic of Serbia*, UNCITRAL, Partial Award on Jurisdiction, September 8, 2006 (Legal Authority CL-0141), ¶¶129, 131.

they are fact-specific and the investment at issue in those cases did not bear any resemblance to the Claimants' investments in Armenia.[373]

336.   Concerning the requirements of Article 25(1) of the ICSID Convention, the Claimants point out that the definition of "*investment*" does not set forth any of the additional criteria identified by the *Salini v. Morocco* tribunal and the Tribunal should not condition the recognition of a protected investment on requirements beyond those set forth Article 25(1) of the ICSID Convention.[374] The Claimants argue that the only authorities cited by the Respondent for the *Salini* test (Prof. Schreuer's Commentary and the decision in *Malaysian Historical Salvors v. Malaysia*) actually do not support the Respondent's case. According to the Claimants, Prof. Schreuer clearly rejected the notion that the term "*investment*" in Article 25(1) imposes additional jurisdictional requirements, while the award of the tribunal in *Malaysian Historical Salvors* was annulled because of its application of the *Salini* criteria and its refusal to exercise jurisdiction.[375] The Claimants argue that the *Malaysian Historical Salvors ad hoc* committee considered the proper interpretation of Article 25(1) of the ICSID Convention by reference to the *travaux preparatoires*, and concluded that the only limitation imposed by Article 25(1) is the simple cross-border sales of goods, in respect of which ICSID jurisdiction cannot be exercised.[376]

337.   The Claimants state that "[m]*any other tribunals have taken a similar approach, applying only the definition of 'investment' that the host state provided in its instrument of consent to ICSID arbitration.*"[377] The definition of "*investment*" that the contracting parties included in the BIT must be treated with deference, as they knowingly adopted a definition of "*investment*" agreeing to protect certain kinds of economic activity only (thereby excluding others), and agreed to submit to ICSID arbitration any disputes

---

[373]   Claimants' Reply, ¶73.

[374]   Claimants' Reply, ¶75.

[375]   Claimants' Reply, ¶¶76-77, citing Schreuer Commentary (Legal Authorities CL-0080 / RL-030, ¶¶171-172; *Malaysian Historical Salvors, Sdn, Bhd v. Government of Malaysia*, ICSID Case No. ARB/05/10, Decision on Annulment, April 16, 2009 ("***Malaysian Historical Salvors v. Malaysia*, Annulment Decision**") (Legal Authority CL-0144), ¶¶71-73, 80.

[376]   Claimants' Reply, ¶77, citing *Malaysian Historical Salvors v. Malaysia*, Annulment Decision (Legal Authority CL-0144), ¶¶71-73.

[377]   Claimants' Reply, ¶78.

94

arising out of such activities.[378] According to the Claimants, the definition of "*investment*" under the BIT already contains safeguards excluding simple cross-border sale of goods from its ambit, and is thus consistent with Article 25(1) of the ICSID Convention. As a result, the Claimants submit, there is no need for the Tribunal to look beyond the definition of investment contained in the BIT.[379]

338.   In response to the Respondent's assertion that the alleged investment was a purely commercial transaction, the Claimants insist that their venture did not concern a one-off purchase of land, but rather a development project, involving the establishment of a local company and a construction project with the goal of selling apartments for profit,[380] which squarely falls under the ordinary meaning of the term investment in Article I(1)(a) of the BIT and Article 25(1) of the ICSID Convention.[381]

339.   In any event, the Claimants argue that their investment satisfies all of the additional requirements invoked by the Respondent.

340.   First, the Claimants contend that there has been a contribution of money and assets. More specifically, Mr. Khudyan spent substantial sums of money to purchase the land plots at 33/1 and 33A Mashtots Avenue and to contribute towards the construction of the buildings.[382] To substantiate that allegation the Claimants refer to the detailed breakdown of the investment provided by Mr. Khudyan in the context of the Criminal Investigation in Armenia and the Respondent's indictment report,[383] which reveal the following contributions.

-      On December 19, 2003, Mr. Armen Mehrabi transferred USD 400,000 of Arin US's funds to Mr. Mangasaryan in Armenia so that Mr. Khudyan's friend,

---

[378]   Claimants' Reply, ¶¶78-79.

[379]   Claimants' Reply, ¶79.

[380]   Claimants' Reply, ¶69.

[381]   Claimants' Reply, ¶¶69-70.

[382]   Claimants' Reply, ¶81.

[383]   Claimants' Reply, ¶81; Claimants' PHB, ¶¶2-3; City of Yerevan, Decision on Evidence, December 14, 2015 (Exhibit C-0304); 2015 Khudyan Interrogation Report (Exhibit C-0302); Indictment Report (Exhibit C-0121); Wire Transfer Receipt, December 19, 2003 (Exhibits C-0179 / R-0183); Summary of Cash Assets of Mr. Edmond Khudyan, December 11, 2015 (Exhibit C-0303); Arin US Bank Statement, December 22, 2005 (Exhibit C-0184); Motion to Admit Evidence from Mr. Edmond Khudyan, May 8, 2016 (Exhibit C-0119).

Mr. Aram Telpyan, could purchase the vacant land plot located at the 33/1 Mashtots Avenue for Mr. Khudyan (who could not own property in his own name at the time). The Claimants' most recent submission is that Mr. Mehrabi is an employee of Arin US,[384] that Arin US regularly issued cashiers' checks in various denominations to Mr. Mehrabi to enable him to bid on properties at auctions, and that Mr. Mehrabi used such checks to take USD 400,000 to Wells Fargo, which subsequently wired that amount to Armenia.[385] It is the Claimants' case that on April 6, 2004, Mr. Telpyan transferred the 33/1 Mashtots Property to Mr. Khudyan (who by that time has become a special resident of Armenia and therefore was legally allowed to own property in Armenia), which was recorded in the tax returns of Arin US.[386]

- On October 7, 2004, Mr. Khudyan transferred USD 630,000 to Armenia for the purchase of the 33A Mashtots land plot, on which stood a four-storey museum building. The day prior, Mr. Khudyan allegedly sold the 33/1 Mashtots Property for USD 700,000 to Mr. Vikin Barsikhyan (reportedly acting on behalf of his brother Mr. Bariskh Barsikhyan (also spelled as Persan Persigian)).

- On December 2, 2005, Mr. Khudyan concluded an agreement with his brothers-in law, Messrs. Adamyan and Bandaryan, to the effect that they would invest USD 1 million in Arin US for the repurchase of the 33/1 Mashtots Property. On December 13, 2005, Mr. Khudyan transferred USD 1 million to Armenia in order to re-purchase the 33/1 Mashtots Property, which Mr. Mangasaryan had physically joined to the neighbouring 33A Mashtots land plot by constructing the building on the 33/1 land plot also partly on the 33A land plot. The Claimants repaid Messrs. Adamyan and Bandaryan with interest in 2007.

- Over the years, Mr. Khudyan transferred USD 4,205,392 to Armenia for various expenses in connection with the construction of the Mashtots Building.

---

[384]    Tr., Day 2, 311:7-21.
[385]    Tr., Day 2, 335:20-336:23; 342:3-22, 345:5-347:3; 566:19-568:1.
[386]    Claimants' PHB, ¶3.

341. Moreover, the Claimants deny that they would not have created any value. Thanks to the Claimants' investments, there is now a luxury real estate development at a location in downtown Yerevan that was until a few years ago vacant and semi-vacant land.[387]

342. Second, the Claimants submit that their investment entailed risk, as they obtained financing of USD 1 million to repurchase the 33/1 Mashtots Property in 2005, which they needed to repay, if necessary, by selling their assets in the US. The Claimants contend that Arin Armenia, of which Mr. Khudyan was the majority shareholder, took out a USD 2 million mortgage from HSBC to finance the construction project. In addition, Mr. Khudyan spent substantial sums over the following years, when the venture was exposed to a variety of risks, including potential decrease of real estate market prices, and "*special risks involved with operating in Armenia, including being exposed to harmful action and inaction by the Armenian Government.*"[388]

343. The Claimants reject the Respondent's reliance on the *Romak v. Uzbekistan* decision for the proposition that the "*potential default by [a] contractual partner*" constitutes a commercial rather than an investment risk. They argue that the nature of the contract in *Romak* was very different from the Claimants' investments, as it concerned a one-off cross-border sale of wheat, whereas in this case the Claimants were involved in a real estate development with the objective of selling apartments for profit.[389]

344. The fact that their return may have been defined in the Shareholders Agreement, according to the Claimants, does not change the fact that the return was never guaranteed, but rather contingent on the successful completion of the real estate development and the sale of apartments. Moreover, the Claimants note that the BIT specifically includes "*debt*" as a protected investment and argue that, although in a debt instrument the amount to be repaid is always fixed, no one would claim that debt instruments bear no risk.[390]

---

[387]    Claimants' Reply, ¶82.
[388]    Claimants' Reply, ¶83.
[389]    Claimants' Reply, ¶¶84-85.
[390]    Claimants' Reply, ¶86.

345.   The Claimants deny that Mr. Khudyan would have known the exact amount he would end up spending and criticize the Respondent for the analogy it seeks to draw with the *Romak* case, which concerned a single sale of wheat and where the risk was limited to the value of the wheat delivered, while the present case involves a development project, in which the construction costs were uncertain and were to be borne by Arin Armenia, which was in turn supported by its shareholders.[391]

346.   According to the Claimants, their risk was not limited to the contractual defaults of their local partners. In fact, the Claimants suffered from actual criminal acts by their local partner, against which Armenia failed to protect the Claimants, which leads the Claimants to conclude that to the extent that Article 25(1) of the ICSID Convention requires an investment to involve an element of risk, that requirement was evidently satisfied.[392]

347.   Third, with respect to the duration criterion, the Claimants submit that their investments started in 2005 at the latest, when Mr. Khudyan incorporated Arin Armenia, and continued until July 9, 2012, when the last of Arin Armenia's assets were transferred from the company.[393] The Claimants allege that an investment over a seven-year period constitutes a reasonable duration by any standard. The Claimants reject the Respondent's argument that the relevant time period for assessing the duration of the Claimants' investments is the duration of the performance of the Claimants' contractual obligations because that would ignore the difference in nature between the *Salini* investment, which concerned a construction contract under which the investor would construct infrastructure in the host State in exchange for payment, and the present case, where Mr. Khudyan was not the construction contractor, but the indirect owner of the building being constructed.[394] Therefore, the Claimants submit, the relevant duration is the period of time during which Mr. Khudyan owned the immovable property and the shares in Arin Armenia.[395]

---

[391]   Claimants' Reply, ¶87.
[392]   Claimants' Reply, ¶¶88-89.
[393]   Claimants' Reply, ¶90.
[394]   Claimants' Reply, ¶91, citing, *inter alia*, *Salini v. Morocco* (Legal Authority RL-0038), ¶45, 52, 54.
[395]   Claimants' Reply, ¶91.

348.    Finally, with respect to the purported requirement of contribution to the economic development of the host State, the Claimants argue that throughout the 2000s and especially in 2007, Armenia's economy was propelled in important part by a boom in residential construction, driven by investments from members of the Armenian diaspora like Mr. Khudyan. It is the Claimants' case that their investment contributed to this boom.[396] In this context, the Claimants argue that the Respondent's suggestion that only large infrastructure projects qualify for ICSID protection is not serious, and that there is no basis in either the BIT or the ICSID Convention to exclude investments based on their scale or the amounts invested.[397]

349.    The Claimants further deny the Respondent's allegation that they would have withdrawn capital from Armenia by reaping profits from the sale proceeds of apartment units that were yet to be built and insist that it is normal for foreign investors to invest with the expectation of earning a profit, as is borne out by Article IV(1)(a) of the BIT that specifically articulates the investor's right to withdraw returns on an investment from the host State.[398]

350.    On that basis, the Claimants conclude that their investment also satisfies each of the additional *Salini* criteria, invoked by the Respondent.

**(3)    The Tribunal's Analysis**

351.    The Tribunal will ascertain its jurisdiction *ratione materiae* by determining whether each of the Claimants owned or controlled an investment within the meaning of Article 25(1) of the ICSID Convention and Article 1(a) of the BIT that was protected by the BIT. It undertakes this analysis notwithstanding its previous finding that it cannot exercise jurisdiction over Mr. Khudyan because a comprehensive assessment of the alleged investments is necessary in order to determine whether Arin US distinctly made qualifying investments under the BIT and the ICSID Convention.

352.    Article 25(1) of the ICSID Convention provides as follows:

---

[396]    Claimants' Reply, ¶92.
[397]    Claimants' Reply, ¶93.
[398]    Claimants' Reply, ¶¶94-95.

*(1) The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre. When the parties have given their consent, no party may withdraw the consent unilaterally.*

353.    Article I(1)(a) of the BIT provides as follows:

*(a) "investment" means every kind of investment in the territory of one Party owned or controlled directly or indirectly by nationals or companies of the other Party, such as equity, debt, and service and investment contracts; and includes:*

*(i) tangible and intangible property, including movable and immovable property, as well as rights, such as mortgages, liens and pledges;*

*(ii) a company or shares of stock or other interests in a company or interests in the assets thereof*

*(iii) a claim to money or a claim to performance having economic value, and associated with an investment;*

*(iv) intellectual property which includes, inter alia, rights relating to: literary and artistic works, including sound recordings; inventions in all fields of human endeavor; industrial designs; semiconductor mask works; trade secrets, know-how, and confidential business information; and trademarks, service marks, and trade names; and*

*(v) any right conferred by law or contract, and any licenses and permits pursuant to law*[.][399]

354.    As stated above, it is the Claimants' case that Mr. Khudyan's original investment consisted of his ownership of the immovable property located at 33/1 and 33A Mashtots Avenue, which he allegedly purchased with funds of Arin US, and that Arin US, in turn, indirectly controlled that investment through its CEO, Mr. Khudyan. Following the restructuring of the initial investment by way of (i) the transfer of 21.3% and 17.6% of the share capital of Arin Armenia to Mr. Haykaz Sargsyan (holding for Mr. Mangasaryan) and Mr. Ghalumyan respectively; and (ii) the subsequent contribution of the immovable property by Mr. Khudyan to Arin Armenia, Arin US still

---

[399]    BIT (Legal Authorities CL-0081 / RL-0037), Article I(1)(a).

indirectly controlled through its CEO, Mr. Khudyan, the 61.1% stake in Arin Armenia held by Mr. Khudyan.[400]

### a.  Analysis of the alleged investments of Mr. Khudyan and Arin US

355.  The Tribunal will first analyse the "*series of transactions*"[401] through which the Claimants contend to have acquired the alleged investments.

#### (i)  The initial acquisition of 33/1 Mashtots Avenue

356.  The first portion of the Claimants' alleged investments concerns Mr. Khudyan's purported purchase in December 2003 of the 33/1 Mashtots Property with a land plot surface of 956.6 m² [402] in the name of his friend, Mr. Telpyan, using funds from Arin US in the amount of USD 400,000,[403] later amended to an amount of USD 520,000.[404]

357.  The Claimants did not submit a copy of the purchase agreement concerning the alleged initial acquisition of the immovable property located at 33/1 Mashtots Avenue, or of the notarial deed, the title document or the cadastral registration document, proving the seller, the buyer, the particular property sold, and what the purchase price was. Nor is there any document in the record showing the terms of the agreement between Mr. Khudyan and Mr. Telpyan. Further, there are discrepancies between the Claimants' pleaded case and the limited contemporaneous documentation on the record in respect of each of these essential elements.

358.  First, in respect of the property sold, Mr. Khudyan's evidence is that his initial real estate investment on December 5, 2003 concerned the acquisition of the real estate located at **33/1** Mashtots Avenue with a **956.6 m²** surface through his friend

---

[400]    Claimants' Memorial, ¶¶150-151, 161, Annexes D, E; Claimants' Reply, ¶¶61-62, 68, 81.

[401]    Claimants' Memorial, ¶21.

[402]    Khudyan's First Witness statement, ¶9.

[403]    Claimants' Memorial, ¶21; Claimants' Reply, ¶81.1; Claimants' PHB, ¶3; Khudyan's First Witness Statement, ¶9; Wire Transfer Receipt, December 19, 2003 (Exhibits C-0179 / R-0183); Arin Capital & Investment, Income Tax Return, 2003 (Exhibit C-0137); Expenses of Mr. Edmond Khudyan, 2009–2017 (Exhibit C-0144); Indictment Report (Exhibit C-0121), p. 165; 2012 Khudyan Interrogation Report (Exhibits C-0101 / R-0002), p. 37; October 2004 Sale and Purchase Agreement (Exhibit R-0013); Tr., Day 2, 343:1-2.

[404]    Claimants' PHB, ¶3, fn 14.

Mr. Telpyan.[405] As noted, no contemporaneous transaction documents were provided. At a late stage in the arbitration, the Claimants submitted into the record an Expert Opinion rendered by the Armenian National Bureau of Expertise at the request of the Department for Investigation of Particularly Important Cases of the General Investigation Department of the Armenian Police charged with the criminal case against Mr. Mangasaryan ("**Expertise Report**").[406] The Claimants relied for the first time on this report in their post-hearing brief.[407] The Expertise Report, however, states that on December 5, 2003, a land plot at **33A** Mashtots Avenue with a surface of **967 m$^2$** was sold to Mr. Aram Telpyan.[408] There is no reference in the Expertise Report to a property located at 33/1 Mashtots Avenue or a property with a 956.6 m$^2$ surface, nor is there any indication that Mr. Telpyan would have acquired that property for Mr. Khudyan.

359. The Claimants also indicated in their submissions, in a footnote related to a different transaction in relation to the alleged 33/1 Mashtots Property, that this plot was originally denominated 33A Mashtots Avenue and was registered as 33/1 Mashtots on July 21, 2009.[409] Although there are other indications in the record that there may have been a change in the address of one of the plots at issue,[410] this was not clearly pleaded by the Claimants, and the discrepancy in the surface of the land plot remains.

360. Second, in respect of the seller, the Claimants failed to identify in their written submissions the seller from whom the 33/1 Mashtots Property would initially have been bought. The Expertise Report identifies Spitak Tnak LLC as the owner of the property

---

[405]    Khudyan's First Witness Statement, ¶9.

[406]    Expertise Report (Exhibit C-0295).

[407]    Claimants' PHB, ¶3.

[408]    Expertise Report (Exhibit C-0295), p. 121.

[409]    Claimants' PHB, fn 20 ("*the plot was still denominated as 33A Mashtots at the time, and would not be registered as 33/1 Mashtots until 21 July 2009.*"); See also Claimants' Memorial, fn 20 ("*At the time, the plot was denominated as being on 33A Mashtots Avenue. It was given the separate designation 33/1 in 2008*").

[410]    Certificate of Registration for Ownership (Use) of Immovable Property, July 21, 2009 (Exhibit C-0198) issued to Arin US for a "*Multifunctional building*" at 33/1 Mashtots Avenue; Expertise Report (Exhibit C-0295), pp. 128-129 ("*The structure constructed at the address 33/1 (previously 33A) Mashtots Avenue of the city of Yerevan and the structure constructed at the address 33A Mashtots Avenue of the city of Yerevan ...*"); Tr., Day 3, 693:1-7 ("*The building as a whole originally was Mashtots 33A. Subsequently the five-storey, semi finished building remained as Mashtots 33A, but then the 13-storey building as of July 21, 2009 when it acquired state registration, it gained the address 33/1*").

at 33A Mashtots Avenue that sold the property on December 5, 2003 to Mr. Aram Telpyan.[411] That the seller in this transaction was Spitak Tnak LLC was also confirmed by Mr. Khudyan during the Hearing.[412]

361.   However, in spite of the fact that the property acquired in December 2003 was bought from Spitak Tnak LLC, the purchase price was not paid to Spitak Tnak but rather to Mr. Mangasaryan, as discussed in more detail below.[413] There is no document or testimony in the record as to why the purchase price was paid to Mr. Mangasaryan instead of to Spitak Tnak LLC or to Mr. Telpyan so that he could pay it to Spitak Tnak LLC on behalf of Mr. Khudyan.

362.   Third, the Claimants' case on the price paid for the initial acquisition of the 33/1 Mashtots Property evolved. In their Memorial, the Claimants did not mention the purchase price allegedly paid; in the Reply, the Claimants alleged having invested USD 400,000 in the initial acquisition of 33/1 Mashtots Avenue; and in the post-hearing brief they claim that the purchase price was USD 520,000, which is stated to include the earlier claimed USD 400,000 and a further USD 100,000 as repayment of the amount that Mr. Khudyan had loaned to Mr. Mangasaryan earlier in 2003,[414] leaving a further USD 20,000 unaccounted for. While the Claimants alleged at certain times that the loan was repaid with interest, they never indicated the amount of interest that was paid.[415] Mr. Khudyan stated in his first statement that he was given a USD 125,000 discount on the purchase price as repayment of his USD 100,000 loan to Mr. Mangasaryan plus interest.[416] However, this would mean that the investment was for USD 525,000.  During his examination at the hearing, Mr. Khudyan acknowledged

---

[411]   Expertise Report (Exhibit C-0295), pp. 120-121.

[412]   Tr., Day 2, 354:5-10.

[413]   Wire Transfer Receipt, December 19, 2003 (Exhibits C-0179 / R-0183).

[414]   Claimants' PHB, ¶3, fn 14.

[415]   Claimants' Memorial, ¶18; Khudyan's First Witness Statement, ¶7.

[416]   Khudyan's First Witness Statement, ¶9 ("*He proposed that I acquire and build on the land plots located behind 33 Mesrop Mashtots Avenue. Levon also suggested that I hire Mangasaryan as a developer to build the building and sell residential units. Furthermore, Levon had arranged for me to receive a $125,000 discount off the asking price, as repayment for the $100,000 I had loaned to Mangasaryan*").

that the investment must have been for USD 525,000, yet the Claimants maintained in their post-hearing brief that it was for USD 520,000.[417]

363. The only contemporaneous evidence on the record concerning the payment of the purchase price for the alleged initial investment in 33/1 Mashtots Property is an outgoing wire transfer request of Mr. Armen Mehrabi, dated December 19, 2003, ordering Wells Fargo to wire from Account No. 3226284648 an amount of USD 400,000 to the account of Mr. Vladislav Mangasaryan at HSBC Bank in Yerevan, Armenia.[418]

364. During his examination at the Hearing, Mr. Khudyan stated that Wells Fargo Account No. 3226284648 was an account of Mr. Mehrabi but that he had that account as an "*assignee*" of Arin US.[419] When asked about the role of Mr. Mehrabi in the transaction, Mr. Khudyan described Mr. Mehrabi, variably, as an employee, as a project manager and as a contractor of Arin US,[420] who would have provided cashier checks owned by Arin US to Wells Fargo in order to fund the outgoing USD 400,000 wire.[421] The Tribunal notes that the address written by Mr. Mehrabi on the wire transfer request is also the address where Arin US has its registered office.[422]

365. Accordingly, the limited evidence of the alleged payment shows that on December 19, 2003 (i.e., two weeks *after* the sale of the property and four days *after* the transfer of the property by Spitak Tnak to Mr. Telpyan[423]), Mr. Mehrabi ordered Wells Fargo to transfer an amount of USD 400,000 from Account No. 3226284648 – which

---

[417]  Tr., Day 2, 365:11-25.
[418]  Wire Transfer Receipt, December 19, 2003 (Exhibits C-0179 / R-0183).
[419]  Tr., Day 2, 347:12–350:5.
[420]  Tr., Day 2, 311:7-21.
[421]  Claimants' PHB, ¶3.
[422]  Wire Transfer Receipt, December 19, 2003 (Exhibits C-0179 / R-0183); State of California Web Portal, Business Entities, "Arin Capital & Investment Corp." (Exhibit C-0130).
[423]  Expertise Report (Exhibit C-0295), p. 121: "*The indicated property was sold to Aram Telpyan under Real Property Purchase and Sale Agreement of 5 December 2003, based on which Certificate of Registration of the Right of Ownership to Real Property No 1553329 was issued to him on 15 December 2003 (Cadastral Case, part 1, pages 75-78).*"

Mr. Khudyan testified was his account but held by Mr. Armen Mehrabi as an "*assignee*" of Arin US – to Mr. Mangasaryan.

366.    When asked how the USD 400,000 wire can be linked to the purchase price allegedly paid by Mr. Khudyan with funds of Arin US to the seller of the property, no plausible explanation was offered as to how seller Spitak Tnak LLC relates to Mr. Mangasaryan, who received the USD 400,000 from Mr. Mehrabi.[424] Nor has any explanation been provided as to how this alleged payment towards the purchase price on December 19, 2003 relates to the acquisition of a property, which, according to the Expertise Report, had already been registered in Mr. Telpyan's name on December 15, 2003.

367.    In their post-hearing brief, the Claimants also left unexplained how the repayment for the USD 100,000 loan that Mr. Khudyan allegedly provided to Mr. Mangasaryan earlier in 2003 can be linked to the payment of the purchase price due to the seller (i.e., Spitak Tnak LLC) for the initial acquisition of 33/1 Mashtots Property. Further, as stated at paragraph 363 above, the Claimants did not seek to justify the remaining USD 20,000 of the USD 520,000 claimed investment in respect of the initial 33/1 Mashtots Property acquisition.

368.    Fourth, as regards the buyer of the initial 33/1 Mashtots Property acquisition, the Claimants' pleaded case is that the property was acquired in Mr. Telpyan's name because under Armenian law Mr. Khudyan could not own land in his own name until he obtained special residency status in Armenia.[425]

369.    While it appears from the Expertise Report that Mr. Telpyan acquired the 33A Mashtots Avenue property (not the 33/1 Mashtots Avenue Property), there is no evidence on the record (neither documentary, nor witness, evidence[426]) that would serve to establish

---

[424]    Tr., Day 2, 353:2–355:13.

[425]    Claimants' Memorial, ¶¶22-23; Claimants' Reply, ¶81.1; Claimants' PHB, ¶3; Khudyan's First Witness Statement, ¶9.

[426]    Mr. Khudyan stated in his first Witness Statement that "*in December 2003, I purchased in my friend's name the 956.6 square meter empty plot located at 33/1 Mesrop Mashtots Avenue, using funds from Arin Capital & Investment Corp. My friend later transferred the plot to my name in April 2004:*" Khudyan's First Witness Statement, ¶9. Mr. Khudyan did not mention the name of his "*friend.*"

that Mr. Telpyan was merely the owner in title and that the property was beneficially owned by Mr. Khudyan, as the Claimants contend.

370. The fact that Arin US declared USD 595,000 worth of properties in Armenia in its Income Tax Return for 2003[427] does not advance the Claimants' case. It contradicts the Claimants' pleaded case that it was Mr. Khudyan who acquired the 33/1 Mashtots property (through Mr. Telpyan), not Arin US. And, as noted above, the nature of the account from which USD 400,000 of the USD 520,000 purchase price for that property was transferred is unclear.[428]

371. Accordingly, on the limited and contradictory evidence before it, the Tribunal is unable to conclude, as the Claimants ask it to do, that Mr. Khudyan acquired the 33/1 Mashtots Property with a surface of 956.6 m$^2$ [429] in December 2003 and that Arin US funded that acquisition.

> (ii) *The transfer of the 33/1 Mashtots Property from Mr. Telpyan to Mr. Khudyan*

372. The Claimants claim that subsequently on April 6, 2004, Mr. Telpyan transferred legal ownership of the 33/1 Mashtots Property to Mr. Khudyan.

373. For this transaction also, the Claimants did not provide any contemporaneous transaction document or other agreement. In their post-hearing brief, the Claimants cited for the first time the Expertise Report.[430] The Expertise Report does refer to a transaction between Mr. Telpyan as the seller and Mr. Khudyan as the buyer on April 6, 2004, but that reference concerns the **33A** Mashtots Property with a surface of **967 m$^2$**,[431] not the **33/1** Mashtots Property with an alleged surface of **956.6 m$^2$** that

---

[427]    Arin Capital & Investment, Income Tax Return, 2003 (Exhibit C-0137).

[428]    Tr., Day 2, 348:4-9.

[429]    Khudyan's First Witness statement, ¶9.

[430]    Claimants' PHB, ¶3, citing, *inter alia*, Expertise Report (Exhibit C-0295), pp. 120-128.

[431]    Expertise Report (Exhibit C-0295), p. 121 ("*The land parcel* [described earlier in the document as "*the area of the land ... constituted 967m$^2$*"] *was sold to Edmond Khudyan (father's name: Arshak) under the Real Property Purchase and Sale Agreement of 6 April 2004, based on which Certificate of Registration of the Right of Ownership to Real Property No 1440330 was issued to him (Cadastral Case, pages 105-108).*"); *see also* Indictment Report (Exhibit C-0121), p. 136 ("*On 6 April 2004 Edmond Khudyan purchased from Aram Telpyan a land area of 0.0967 hectares, located at 33A Mashtots Avenue*").

Mr. Khudyan claimed to have acquired.[432] Furthermore the Tribunal notes that while the Expertise Report references a "*Real Property Purchase and Sale Agreement of 6 April 2004*" and a "*Certificate of Registration of the Right of Ownership to Real Property No 1440330 (Cadastral Case, pages 105-108,*" neither document was adduced as evidence in this arbitration.

374.    Therefore, the Tribunal considers that the Claimants' case to the effect that the 33/1 Mashtots Property (which had a surface of 956.6 m$^2$ [433]) was transferred by Mr. Telpyan to Mr. Khudyan in April 2004, has not been proven.

375.    On the basis of the evidence before it, the Tribunal cannot establish either whether a purchase price was paid by Mr. Khudyan to Mr. Telpyan, and if so, what that price was.

*(iii) The sale of 33/1 Mashtots Avenue*

376.    According to the Claimants, on October 6, 2004, Mr. Khudyan sold the initially acquired 33/1 Mashtots Property to Mr. Vikin Barsikhyan, who allegedly acquired the property for Mr. Paren Parsegian (also spelled Barsikhyan), a Syrian citizen of Armenian origin and an acquaintance of Ambassador Sargsyan.[434] Mr. Parsegian allegedly paid Mr. Khudyan USD 700,000 for the plot and paid a further USD 300,000 to Mr. Mangasaryan for the construction.[435]

377.    For reasons unknown to the Tribunal, the Claimants did not place the contemporaneous transaction documents for this transaction on the record either. The Respondent submitted the Sale and Purchase Agreement for this transfer as Exhibit R-0013. That agreement concluded between Mr. Khudyan and Mr. Vikin Barsikhyan on October 6, 2004 shows a transfer of the **967 m$^2$ 33A** Mashtots Property for a purchase price of USD 500,000.[436] The Expertise Report also reflects that on October 6, 2004, Mr. Khudyan sold the **967 m$^2$** land plot located at **33A** Mashtots Avenue "*to Vikin*

---

[432]    Khudyan's First Witness Statement, ¶9.

[433]    Khudyan's First Witness statement, ¶9.

[434]    October 2004 Sale and Purchase Agreement (Exhibit R-0013); Khudyan's Second Witness Statement, ¶8.

[435]    Khudyan's Second Witness Statement, ¶9; 2012 Khudyan Interrogation Report (Exhibits C-0101 / R-0002), p. 37.

[436]    October 2004 Sale and Purchase Agreement (Exhibit R-0013).

*Barsikhyan … according to Land parcel Purchase and Sale Agreement drawn up on 6 October 2004.*"[437]

378. The Sale and Purchase Agreement states that Mr. Khudyan's "*ownership right … is evidenced by Certificate No 1440330 issued on 8 April 2004*" and that the "*rights of the citizen Khudyan to the real property have been verified*" by the notary public.[438] However, neither Party submitted a copy of that certificate in this arbitration.

379. The 33A address and 967 m$^2$ surface mentioned in the Sale and Purchase Agreement do not correspond to the 956.6 m$^2$ parcel at 33/1 Mashtots Avenue that Mr. Khudyan would have sold to Mr. Persigian.[439] Rather they correspond to the property that, on the Claimants' case, Mr. Khudyan would only acquire more than a year later, as discussed below in section V.B.(3)(a)(iv).

380. There also is a discrepancy between the purchase price of USD 500,000 recorded in the agreement and the USD 700,000 for which the Claimants claim Mr. Khudyan sold the property to Mr. Barsikhyan.[440] The Tribunal further notes that Mr. Khudyan testified that Mr. Barsikhyan paid Mr. Mangasaryan at the same time USD 300,000 for construction,[441] which raises the question as to whether this sum was in any way related to the sale of the property.

381. The Claimants argue that the overview of the financial flows that Mr. Khudyan provided in the context of the Criminal Investigation proves that the 33/1 Mashtots Property was sold on October 6, 2004, for an amount of USD 700,000.[442] Although the overview does list an entry dated October 6, 2004, in the amount of USD 700,000, the Tribunal is unable to identify from whom the payment originated and what the payment relates to. The Tribunal also notes that the overview is not a contemporaneous

---

[437]    Expertise Report (Exhibit C-0295), p. 121.

[438]    October 2004 Sale and Purchase Agreement (Exhibit R-0013).

[439]    Khudyan's First Witness Statement, ¶9.

[440]    Khudyan's Second Witness Statement, ¶9; Claimants' PHB, ¶3.

[441]    Khudyan's Second Witness Statement, ¶9.

[442]    Documents Produced in Response to Armenia's Document Request Nos. 4 and 5 (Exhibit R-0126), p. EK-000026; *see also* Financial Flows of Mr. Edmond Khudyan, May 2012 (presented during the Criminal Investigation) (Exhibit C-0143); Claimants' PHB, ¶3, fn 16.

document but rather a collation of information provided by Mr. Khudyan to the Armenian officials, who conducted the Criminal Investigation.

382.    As the Claimants' pleaded case is inconsistent with the evidence on the record of this arbitration, the Tribunal is unable to make any conclusive findings about the alleged initial acquisition and the subsequent resale by Mr. Khudyan of **33/1** Mashtots Avenue that is central to the Claimants' pleaded case on the first portion of their alleged investments. As the Claimants have not discharged their burden of proof in this respect, the Tribunal is unable to accept that on October 6, 2004, Mr. Khudyan sold **33/1** Mashtots Property to Mr. Persigian for USD 700,000.

*(iv) The acquisition of 33A Mashtots Avenue*

383.    The Tribunal will now proceed to analyse the second portion of the Claimants' alleged investments, being Mr. Khudyan's acquisition on November 16, 2004, of the **33A** Mashtots Property with an alleged surface of **967 m$^2$** for USD 630,000, financed out of the USD 700,000 sales proceeds of the **33/1** Mashtots Property.[443]

384.    The Real Property Purchase and Sale Agreement for that transaction is in the record and shows that on November 16, 2004, Mr. Khudyan bought from Spitak Tnak LLC a property located at **33A** Mashtots Avenue, comprising a public building of 1,552.8 m$^2$ and a land plot of **956.6 m$^2$**.[444] The agreement states that the notary verified the rights of Spitak Tnak LLC to the real property, which according to Ownership Certificate No. 1461781, had been owned by Spitak Tnak since its privatization in July 26, 2004.[445] The Expertise Report states that on November 16, 2004 Mr. Khudyan became the owner of the **33A** Mashtots Property with a surface of **0.0967 ha**, and on December 17,

---

[443]    Claimants' PHB, ¶3; As indicated in paragraph 88 above, Mr. Khudyan initially attested that the purchase price paid amounted to USD 600,000 (Khudyan's Second Witness Statement, ¶10).

[444]    November 2004 Sale and Purchase Agreement (Exhibit R-0012) ("'*SPITAK TNAK' LLC … 'SELLER', on the one hand and I, USA citizen Edmond Khudyan (father's name: Arshak), with Special residency status, … as 'BUYER', on the other hand, concluded this Agreement … Seller sells the public building located at 33a (thirty-three) Mashtots Ave., … with an area of 1552.8 (one thousand five hundred fifty-two point eight) square meters and a land plot with an area 0.09566 ha /zero point zero nine thousand five hundred sixty-six*").

[445]    November 2004 Sale and Purchase Agreement (Exhibit R-0012), Article 1.2, p. 6; Expertise Report (Exhibit C-0295), p. 121.

2005, Mr. Khudyan became the owner of another parcel located at **33A** Mashtots with a surface of **956.6 m²**.[446]

385.   The surface of the 33A Mashtots Property that Mr. Khudyan acquired in this transaction from Spitak Tnak LLC is identical to the surface of the 33/1 Mashtots Property that – on the Claimants' case – Mr. Khudyan had acquired in December 2003/April 2004 and had resold a month earlier, on October 6, 2004.

386.   The Real Property Purchase and Sale Agreement further records that Mr. Khudyan bought the 33A property from Spitak Tnak LLC for a purchase price of AMD 108,906,000, which at the historical exchange rate amounts to USD 215,668.[447] The Claimants have not offered any plausible explanation[448] for the apparent discrepancy between the purchase price recorded in the agreement (the equivalent of USD 215,668) and the claimed purchase price, which initially was said to amount to USD 600,000[449] and later evolved to USD 630,000.[450]

---

[446]   Expertise Report (Exhibit C-0295), p. 114 ("*On 16 November 2004, … Edmond Khudyan … acquired the incomplete building … located at the address 33A Mashtots Avenue of the city of Yerevan, attached to the History Museum of Yerevan, the land plot with an area of 0,0967 ha occupied thereby, and on 17 December 2005 — the building of the History Museum of Yerevan with an area of 1552,8 sq. m located at the same address, and the land parcel with an area of 0,09566 ha occupied thereby.*") and pp. 121-122 ("*Based on the indicated Decisions and the Property Privatisation Agreement, besides the incomplete structure, Certificate of Registration of the Right of Ownership to Real Property for the main 4-floor building of the Museum No 1461781 was issued to 'Spitak Tnak' LLC on 26 July 2004 (Cadastral Case, part 2, pages 95-100). The indicated building was sold to Edmond Khudyan (father's name: Arshak) according to the Real Property Purchase and Sale Agreement of 16 November 2004, based on which Certificate of Registration of the Right of Ownership to Real Property No 1476577 was issued to him on 18 November 2004 (Cadastral Case, part 2, pages 118-123)*").

[447]   November 2004 Sale and Purchase Agreement (Exhibit R-0012), Article 3.1; *see* https://www.xe.com/fr/currencytables/?from=AMD&date=2004-11-16.

[448]   *See* 2012 Khudyan Interrogation Report (Exhibits C-0101 / R-0002), p. 37. The Tribunal notes that in the context of the Criminal Investigation, Mr. Khudyan explained the differences as follows: "*Let me also add that in reality I purchased the mentioned 4-storey building at USD 600,000 from Spitak Tnak LLC but, for reasons unknown to me, its value was documented as AMD 108,906,000 in the contract and at the time of concluding the contract I did not pay attention to it. I transferred USD 600,000 from my US-based company but I can't remember to whom I transferred it. After that I offered V. Mangasaryan to help me find a buyer for the sale of my area.*"

[449]   Claimants' Reply, ¶81.2 ("*In October 2004,* [Mr. Khudyan] *transferred USD 600,000 to Armenia in order to purchase the plot at 33A Mashtots Avenue, on which stood an unfinished four-story building*"), referring to 2015 Khudyan Interrogation Report (Exhibit C-0302), p. 26; Indictment Report (Exhibit C-0121), p. 136.

[450]   Claimants' PHB, ¶3, referring to, *inter alia*, Documents Produced in Response to Armenia's Document Request Nos. 4 and 5 (Exhibit R-0126), p. EK-00026.

387.    As to the payment of the purchase price, the Claimants rely on the statement of Mr. Khudyan's Armenian bank account to prove that on October 6, 2004, Mr. Khudyan paid USD 630,000 to purchase the 33A Mashtots Property from Spitak Tnak LLC.[451] It is impossible for the Tribunal to read the relevant bank statement (as it is only on the record in Armenian), but the Tribunal does recognize that there is a USD 630,000 debit entry recorded on October 7, 2004.[452] The Tribunal also recognizes that in the overview of financial flows that Mr. Khudyan provided to the Armenian authorities in the context of the Criminal Investigation there is a wire transfer dated October 7, 2004, from Mr. Khudyan to Arin US in the amount of USD 630,000.[453] However, there is no evidence on the record that Arin US subsequently transferred USD 630,000 to Spitak Tnak LLC on account of the purchase price for the 33A Mashtots Property. The Tribunal further notes that there is yet another reference to a purported payment on October 25, 2004, by Mr. Khudyan to an undisclosed recipient in the amount of USD 600,000 for the "*Purchase of 4-story building*."[454]

388.    In view of the limited and largely contradictory evidence on the record, the Tribunal is unable to accept as proven the Claimants' allegation that the outgoing payment of USD 630,000 from Mr. Khudyan's account on October 7, 2004, went to Spitak Tnak LLC and constituted payment of the purchase price for the 33A Mashtots Property that he bought more than a month later on November 16, 2004.

### (v)   The reacquisition of 33/1 Mashtots Avenue

389.    The Tribunal will now address the third portion of the Claimants' alleged investments. On the Claimants' case, on December 17, 2005, Mr. Khudyan repurchased the 33/1

---

[451]    Claimants' PHB, ¶3, referring to, *inter alia*, Documents Produced in Response to Armenia's Document Request Nos. 4 and 5 (Exhibit R-0126), p. EK-00026.

[452]    Documents Produced in Response to Armenia's Document Request Nos. 4 and 5 (Exhibit R-0126), p. EK-00026.

[453]    Financial Flows of Mr. Edmond Khudyan, May 2012 (presented during the Criminal Investigation) (Exhibit C-0143), p. 1.

[454]    Summary of Cash Assets of Mr. Edmond Khudyan, December 11, 2015 (Exhibit C-0303), p. 2; Financial Flows of Mr. Edmond Khudyan, May 2012 (presented during the Criminal Investigation) (Exhibit C-0143), p. 7; 2015 Khudyan Interrogation Report (Exhibit C-0302), p. 26.

Mashtots Property from Mr. Barsikhyan with the USD 1 million that his brothers-in-law, Mr. Adamyan and Mr. Bandaryan, had provided on December 13, 2005.[455]

390.   According to the Land Plot Purchase and Sale Agreement dated December 17, 2005, which the Respondent submitted into the record, Mr. Barsikhyan sold to Mr. Khudyan a "*private land plot, <u>located at 33A (thirty-three A) M. Mashtots Ave., Yerevan</u>, with an* ***area of 0.0967 (zero point zero nine hundred sixty-seven) square meters*** *completely*"[456] [bold emphasis added] for the price of USD 1 million.[457]

391.   The Expertise Report further indicates that on December 30, 2005, Mr. Khudyan received a Certificate of Registration of the Right of Ownership to Real Property No. 2038276,[458] attesting to his ownership of the land parcel described in the December 17, 2005, Land Plot Purchase and Sale Agreement, i.e., the **<u>33A</u>** Mashtots Property with a surface of **<u>967 m$^2$</u>**. The certificate itself, however, is not on the record of this arbitration.

392.   Again, the land plot's address and surface shown in these documents do not correspond to the surface of the land plot that Mr. Khudyan claimed to have (re)acquired.[459]

393.   As to the purchase price, the Claimants initially submitted that on December 13, 2005, Mr. Khudyan transferred USD 1 million in order to repurchase the 33/1 Mashtots Property.[460] It was later clarified that the USD 1 million purchase price for the repurchase of the 33/1 Property from Mr. Barsikhyan was funded by Mr. Khudyan's brothers-in-law.[461]

---

[455]   Claimants' PHB, ¶3; December 2005 Purchase and Sale Agreement (Exhibit R-0014); Agreement between Mr. Edmond Khudyan, Mr. Armen Bandaryan and Mr. Sevak Adamyan, December 2, 2005 (Exhibit C-0183); Arin US Bank Statement, December 22, 2005 (Exhibit C-0184).

[456]   December 2005 Purchase and Sale Agreement (Exhibit R-0014), Article 1 (the English translation refers to 0.0967 m$^2$ but the Armenian original refers to 0.0967 ha).

[457]   December 2005 Purchase and Sale Agreement (Exhibit R-0014), Article 3.

[458]   Expertise Report (Exhibit C-0295), p. 121.

[459]   Khudyan's First Witness Statement, ¶9.

[460]   Claimants' Reply, ¶81.3.

[461]   Tr., Day 2, 525:17–527:2; *see also* Khudyan's First Witness Statement, ¶13; Indictment Report (Exhibit C-0121), pp. 148-149. The Tribunal notes that Mr. Khudyan provided a different explanation to the Armenian authorities in the context of the Criminal Investigation, *see* 2012 Khudyan Interrogation

394.    Pursuant to an agreement allegedly concluded by Mr. Khudyan and his brothers-in-law on December 2, 2005, Mr. Adamyan and Mr. Bandaryan invested as "*investors*,"[462] an amount of USD 1 million, with which Mr. Khudyan would acquire in his own name vacant land at **33A** Mashtots Avenue in Yerevan.[463]

395.    A bank statement of Arin US shows that a single amount of USD 1 million was paid into its account on December 13, 2005, and that that amount was wired the same day to the bank account of Edmond Khudyan at ArmInvest Bank.[464] However, there is no evidence on the record showing the alleged payment of the USD 1 million purchase price by Mr. Khudyan to the seller of the 33/1 Property, Mr. Barsikhyan. The Tribunal notes that the alleged payment of the USD 1 million purchase price by Mr. Khudyan on December 13, 2005 does not match the information that Mr. Khudyan provided to the Armenian authorities about the alleged repurchase of the 33/1 Mashtots Property. In that context, Mr. Khudyan repeatedly listed (without supporting evidence and without indicating the recipient) a payment on November 15, 2005 of an amount of USD 1 million on account of the purchase of "*Mashtotc Payment vacant land [Mashtotc 33a]*,"[465] "*vacant land*"[466] and the "*purchase of Pareni land*."[467]

396.    Therefore, on the basis of the evidence before it, which conflicts with the Claimants' pleaded case, the Tribunal is unable to conclude that Mr. Khudyan paid the purchase price of USD 1 million to the seller of the 33/1 Mashtots Property.

---

Report (Exhibits C-0101 / R-0002), p. 38 ("*On the basis of agreements reached by the mentioned contracts, on 13 December 2005 the contract on purchase and sale of Parin's area was concluded between my representative Armen Ghazaryan and Vickin Barsikhian. Since I did not have that amount at the time, I borrowed an amount of USD 1,000,000 from Sevak Adamyan and Armen Bandaryan with regard to which no written document has been prepared*").

[462]    Tr., Day 2, 525:17-19 ("[**Q**:] *So what were they? Were they investors? Or were they lenders?* **MR. KHUDYAN**: *I take them as investors*").

[463]    Agreement between Mr. Edmond Khudyan, Mr. Armen Bandaryan and Mr. Sevak Adamyan, December 2, 2005 (Exhibit C-0183).

[464]    Arin US Bank Statement, December 22, 2005 (Exhibit C-0184).

[465]    Financial Flows of Mr. Edmond Khudyan, May 2012 (presented during the Criminal Investigation) (Exhibit C-0143), p. 7.

[466]    2015 Khudyan Interrogation Report (Exhibit C-0302), p. 58.

[467]    Summary of Cash Assets of Mr. Edmond Khudyan, December 11, 2015 (Exhibit C-0303), p. 2.

*(vi) The transfer of the 33A and 33/1 Mashtots Properties to Arin Armenia*

397.    While the Tribunal is unable to accept the Claimants' pleaded case as to the transactions just discussed, the Tribunal does accept that as of December 17, 2005, Mr. Khudyan held legal title to two immovable properties located at 33A Mashtots Avenue with a total surface of 1,923.6 m$^2$, composed of:

-    an immovable property located at **33A** Mashtots Avenue with a surface of **956.6 m$^2$** (referred to by the Claimants as the 33/1 Mashtots land plot);[468] and

-    an immovable property located at **33A** Mashtots Avenue with a surface of **967 m$^2$** (referred to by the Claimants as the 33A Mashtots land plot).[469]

398.    The Tribunal further accepts that the address of the immovable property with a surface of **967 m$^2$** was changed to **33/1** Mashtots Avenue on July 21, 2009 after a multifunctional building had been constructed on it.[470]

399.    The Tribunal will now turn to the fourth step in the Claimants' alleged investments, being the alleged transfer of title to the 33A and 33/1 Mashtots Properties to Arin Armenia.[471]

400.    It is the Claimants' case that as of November 16, 2007 (i.e., well before the address change in July 2009), Mr. Khudyan's investment consisted of: (i) his 61.1 % shareholding in Arin Armenia, which as of that date held the title to the 33/1 and 33A Mashtots Properties; (ii) his indirect interests in those immovable properties; and (iii)

---

[468]    November 2004 Sale and Purchase Agreement (Exhibit R-0012).

[469]    December 2005 Purchase and Sale Agreement (Exhibit R-0014).

[470]    Claimants' PHB, ¶3, fn 20 ("*the plot was still denominated as 33A Mashtots at the time, and would not be registered as 33/1 Mashtots until 21 July 2009*"); Certificate of Registration for Ownership (Use) of Immovable Property, July 21, 2009 (Exhibit C-0198) (issued to Arin US for a "*Multifunctional building*" at 33/1 Mashtots Avenue); Expertise Report (Exhibit C-0295), p. 128 ("*The structure constructed at the address 33/1 (previously 33A) Mashtots Avenue of the city of Yerevan and the structure constructed at the address 33A Mashtots Avenue of the city of Yerevan ...*"); Tr., Day 3, 693:1-7 ("*The building as a whole originally was Mashtots 33A. Subsequently the five-storey, semi finished building remained as Mashtots 33A, but then the 13-storey building as of July 21, 2009 when it acquired state registration, it gained the address 33/1*").

[471]    Claimants' Memorial, ¶25.

his contractual rights to proceeds from the sales of units located in the buildings located at 33/1 and 33A Mashtots Avenue.[472]

401.    It is undisputed that on October 1, 2007, Mr. Khudyan entered into the Shareholders Agreement with Mr. Mangasaryan and Mr. Ghalumyan. The Shareholders Agreement provides in relevant part:

> *Considering that:*
>
> *a) The 1st Party* [i.e., Mr. Khudyan] *owns the right of ownership to the building constructed in the address of Mashtots Avenue 33a (hereinafter: the building).*
> *b) The state registration of the unfinished construction in the address of Mashtots Avenue 33a that is owned by the 1st Party has been completed in the Real Estate State Cadaster Center Territorial Department under the No 2235483. Part of the financing was made.*
> *...*
> *(f) The investment of the 1st Party is equal to 3,481,000 USD equivalent in AMD.*
> *…*
> *The Parties agreed to sign the Agreement below:*
> *…*
>
> 1.2    *According to this Agreement and in case of a written consent of the 2nd and 3rd Parties,* **the 1st Party shall undertake to invest the property in Mashtots 33a Avenue**, *owned by him into the Statutory Capital or "Arin Capital" LLC, and immediately after introduction, to realize (sell) respectively the 21,3 and 17,6 percent of the Statutory Capital of "Arin Capital" LLC free of charge to the 2nd* [i.e., Mr. Mangasaryan] *and 3rd* [i.e., Mr. Ghalumyan] *parties.*[473] [emphasis added]

402.    The Tribunal notes that although the Shareholders Agreement does provide for an obligation on the part of Mr. Khudyan to transfer the 33A Mashtots Property to Arin Armenia, there is no reference in it to a 33/1 Mashtots Property. This is because the address change did not occur until July 21, 2009.[474]

---

[472]    Claimants' Memorial, ¶¶151, 264; Claimants' Reply, ¶68.
[473]    Shareholders Agreement (Exhibit C-0025), pp. 12-13.
[474]    Certificate of Registration for Ownership (Use) of Immovable Property, July 21, 2009 (Exhibit C-0198).

403.    Also on October 1, 2007, Arin Armenia took out a USD 2 million loan from HBSC Bank Armenia. The Facility (Loan) Agreement provides in Article 3.1 under the heading "*Loan Terms*:"

> *The loan will be granted upon submission of duly certified consent of the* **co-owner** *of the unfinished multifunctional building and land at the address of No. 33a, Mashtots ave., Kentron Commmunity, Yerevan, RA –* **Silva Adamyan***, and submission of marriage certificate of the latter with duly apostilled and notarized Armenian translation to the Bank, only.*[475]
> [emphasis added]

404.    In the absence of a cadastral ownership certificate attesting to the ownership of the 33A Mashtots Property in October 2007, the Tribunal is unable to establish whether Mr. Khudyan was the sole owner, or whether on October 1, 2007 he co-owned the 33A Mashtots Property with Ms. Silva Adamyan (presumably the wife of Mr. Khudyan and the sister of his brother-in-law Mr. Sevak Adamyan).[476]

405.    On October 5, 2007 (i.e., before the transfer of the Mashtots Properties to Arin Armenia), in accordance with Article 2.1.2 of the Shareholders Agreement, Mr. Khudyan received from Arin Armenia an amount of USD 1.5 million paid out of the HSBC loan.[477]

406.    By Agreement on the Investment (Transfer) of the Real Property of November 16, 2007 made between Mr. Khudyan and Arin Armenia, Mr. Khudyan undertook to transfer

> *to the statutory capital of "ARIN CAPITAL" INVESTMENT LLC the owned multifunctional building situated in 33a (thirty-three a) Mashtots Avenue, Center Community, Yerevan, RA, with the total area of 9167.7 (nine thousand and hundred and sixty-seven and seven-tenth) [illegible] plot: 0.19236 (zero and one, nine, two, three, six) hectares worth of 468,000,000 (four hundred and sixty-eight million) AMD [illegible], hereinafter the "Property."*[478]

---

[475]    HSBC Loan Agreement (Exhibit C-0024), Article 3.1.

[476]    *See* item 7.3 of the Agenda of the Pre-Hearing Organizational Meeting; Agreement between Mr. Edmond Khudyan, Mr. Armen Bandaryan and Mr. Sevak Adamyan, December 2, 2005 (Exhibit C-0183); Tr., Day 2, 368:16–369:5.

[477]    Shareholders Agreement (Exhibit C-0025), Article 2.1.2; Khudyan's First Witness Statement, ¶18; HSBC Loan Agreement (Exhibit C-0024).

[478]    November 2007 Transfer Agreement (Exhibit C-0027). *See also* Khudyan's First Witness Statement, ¶18; Indictment Report (Exhibit C-0121), p. 189.

407.   The Tribunal further notes that this agreement also provides only for the transfer of the 33A Mashtots Property but does not refer anywhere to a 33/1 Mashtots Property. On November 16, 2007, the 33A Mashtots Property measured 0.19236 hectares, which appears to be the total of the 967m$^2$ parcel (referred to by the Claimants as the 33A Mashtots land plot) and the 956.6 m$^2$ parcel (referred to by the Claimants as the 33/1 Mashtots land plot). As noted above, the Tribunal accepts that the two plots carried the same 33A address until the address of the 967m$^2$ parcel was changed to 33/1 on July 21, 2009.

408.   In addition, the Tribunal notes that at the historical exchange rate, the agreed value of the real estate of AMD 468,000,000 amounts to USD 1,439,998,[479] which is just over 41% of the USD 3,481,000 value of the Mashtots Properties that the shareholders had attributed to the Mashtots Properties six weeks prior in their Shareholders Agreement.[480]

409.   On December 13, 2007, Mr. Khudyan transferred 17.6% of the shares in the capital of Arin Armenia to Mr. Ghalumyan and 21.3% to Mr. Sargsyan.[481] Although the Claimants contend, without any substantiation other than Mr. Khudyan's testimony, that Mr. Sargsyan held the shares for Mr. Mangasaryan,[482] it is unclear to the Tribunal what the reason for that arrangement was and whether there is any relation between this Mr. Sargsyan and Ambassador Sargsyan.

410.   On the basis of the evidence on the record,[483] the Tribunal can only establish that on October 5, 2007, Mr. Khudyan received USD 1.5 million in exchange for his transfer of the Mashtots Properties to Arin Armenia, which amount appears to exceed by some USD 60,000, the value of these properties at the date of the transfer of ownership titles

---

[479]   https://www.xe.com/fr/currencytables/?from=AMD&date=2007-11-16.

[480]   Shareholders Agreement (Exhibit C-0025), "*Considering (f),*" Article 2.1.1.

[481]   Republic of Armenia, State Register Agency, Statement of Information for Arin Capital Investments, August 4, 2009 (Exhibit R-0015).

[482]   Khudyan's First Witness Statement, ¶17, fn 11 ("*Vladimir Mangasaryan would declare bankruptcy on 8 January 2009, at which point he was replaced as a shareholder by his son-in-law, Haykaz Sargsyan*").

[483]   HSBC Loan Agreement (Exhibit C-0024); Shareholders Agreement (Exhibit C-0025); November 2007 Transfer Agreement (Exhibit C-0027); Khudyan's First Witness Statement, ¶18; Indictment Report (Exhibit C-0121).

to Arin Armenia (AMD 468,000,000,[484] which is the equivalent of USD 1,439,998). The Tribunal cannot discern any further investment by Mr. Khudyan at this stage.

411.  In closing, the Tribunal notes that the evidence appears to bear out that as of November 16, 2007, Arin Armenia became the owner of the Mashtots Properties.[485]

            (vii)        *The expenses towards construction and development*

412.  Finally, the Tribunal will analyse the last element of the Claimants' alleged contribution, being the amounts purportedly reinvested in Arin Armenia for the construction and development of the Mashtots Properties.[486]

413.  In their Reply, the Claimants submitted that "*over the course of the next several years* [after December 13, 2005]*, Mr. Khudyan transferred USD 4,205,392 to Armenia for various expenses in connection with construction of the Mashtots building.*"[487] In support of that contention, the Claimants relied on the information that Mr. Khudyan had provided to the Armenian authorities in the context of the Criminal Investigation.[488] Although the public prosecution in Armenia accepted Mr. Khudyan's overviews of amounts received and expended as evidence, the Tribunal is unable to form an independent view of such evidence in circumstances where the lists of cash flows and payments allegedly made and received by Mr. Khudyan, for the majority of entries, do not identify the originators or recipients of the amounts listed, and omit for all entries the underlying contemporaneous invoices and/or documentation.[489]

---

[484]  November 2007 Transfer Agreement (Exhibit C-0027); *see also* paragraph 409 above.

[485]  November 2007 Transfer Agreement (Exhibit C-0027); Expertise Report (Exhibit C-0295), p. 125; Certificate of Registration for Ownership (Use) of Immovable Property, July 21, 2009 (cadastral certificate issued to Arin Armenia for the ownership of the multifunctional building at 33/1 Mashtots Avenue based on "*Real Estate Investment Contract No. 889 dated November 16, 2007*").

[486]  Claimants' Reply, ¶81.4; Claimants' PHB, ¶50.

[487]  Claimants' Reply, ¶81.4.

[488]  2015 Khudyan Interrogation Report (Exhibit C-0302); Summary of Cash Assets of Mr. Edmond Khudyan, December 11, 2015 (Exhibit C-0303); City of Yerevan, Decision on Evidence, December 14, 2015 (Exhibit C-0304).

[489]  Motion to Admit Evidence from Mr. Edmond Khudyan, May 8, 2016 (Exhibit C-0119); City of Yerevan, Decision on Not Conducting a Criminal Prosecution, December 21, 2015 (Exhibit C-0164); Summary of Cash Assets of Mr. Edmond Khudyan, December 11, 2015 (Exhibit C-0303).

414.  In their post-hearing brief, the Claimants reduced the allegedly reinvested amount from USD 4,205,392 to USD 2,500,000, apparently giving credit for the amounts Mr. Khudyan had received from the buyers of apartments in the Mashtots Properties.[490] That claim also is merely substantiated by a general reference to the same lists considered by the Tribunal in the previous paragraph.[491]

415.  In the absence of comprehensive and verifiable evidence, the Tribunal is unable to make any conclusive findings in respect of the amounts purportedly reinvested by Mr. Khudyan in Arin Armenia for the construction and development of the Mashtots Properties.

### b.  *Analysis of jurisdiction ratione materiae*

416.  With respect to Mr. Khudyan, the Tribunal has assessed the evidence pertaining to Mr. Khudyan's alleged investments in Armenia in considerable detail and has concluded that, on the basis of the series of transactions described above, Mr. Khudyan acquired a 61.1% shareholding in Arin Armenia, which in turn, held the legal title to the Mashtots Properties. The Tribunal has reached different conclusions with respect to other alleged investments. As per the Tribunal's findings at paragraphs 203 to 266 above, however, it does not have jurisdiction *ratione personae* over Mr. Khudyan. Thus, even if the Claimants had been able to convince the Tribunal that Mr. Khudyan made other investments in **Armenia**, this ultimately would not have assisted the Claimants in view of the Tribunal's conclusion that it has no jurisdiction over Mr. Khudyan.

417.  The Tribunal now turns to the question whether Arin US has any protected investment, as it alleges. The Tribunal noted that Arin US acknowledges that it does not have any

---

[490]    Claimants' PHB, ¶50.

[491]    Motion to Admit Evidence from Mr. Edmond Khudyan, May 8, 2016 (Exhibit C-0119); City of Yerevan, Decision on Not Conducting a Criminal Prosecution, December 21, 2015 (Exhibit C-0164); Summary of Cash Assets of Mr. Edmond Khudyan, December 11, 2015 (Exhibit C-0303).

direct ownership or control over any of the assets acquired and indeed the record provides no indication to that effect. It is the Claimants' case that Arin US has:[492]

(1)    indirect control – via (the 61.1 % shareholding of) its CEO, Mr. Khudyan – over the company Arin Armenia <u>and</u> (via Arin Armenia) the immovable property at 33/1 and 33A Mashtots Avenue in Yerevan;[493]

(2)    indirect control over the immovable property at 33/1 and 33A Mashtots Avenue in Yerevan through "*its funding of Mr. Khudyan's purchase of the property*";[494] and

(3)    an entitlement to receivables owed by Arin Armenia in connection with the amount of USD 3,481,000 provided by Arin US for the development of the immovable property at 33/1 and 33A Mashtots Avenue in Yerevan).[495]

418.    The Tribunal now addresses these points.

419.    First, it is the Claimants' case that although Mr. Khudyan held the 33/1 and 33A Mashtots Properties, as well as the shares in Arin Armenia, in his own name, he did so "*in his capacity as Chief Executive Officer of Arin* [US]."[496] However, the Tribunal notes that there is no contemporaneous evidence on the record to support that contention. There is no evidence on the record establishing that Mr. Khudyan did not acquire the relevant assets on a personal basis, but in his capacity as CEO of Arin US. None of the sale and purchase agreements on record refers to Mr. Khudyan acting in his capacity of CEO of Arin US, or to Arin US in general for that matter. Nor does the contemporaneous documentary record provide any indication that the assets were acquired with funds of Arin US. The evidence only shows that the legal title to the relevant assets remained at all relevant times with Mr. Khudyan, in his own right.

---

[492]    Claimants' Memorial, ¶150, fn 208; Claimants' Reply ¶¶61-62 (although presented under the heading of jurisdiction *ratione personae*, the Tribunal will consider these arguments too in the context of jurisdiction *ratione materiae*); Claimants' PHB, ¶3.

[493]    Request for Arbitration, ¶60; Claimants' Memorial, ¶150, fn 208; Claimants' Reply ¶61.

[494]    Request for Arbitration, ¶60; Claimants' Memorial, ¶150, fn 208.

[495]    Request for Arbitration, ¶60.

[496]    Claimants' Reply, ¶62.

420.  The Tribunal notes again in this respect that the fact that Arin US declared USD 595,000 worth of properties in Armenia in its Income Tax Return for 2003[497] does not advance the Claimants' case. It merely contradicts their pleaded case to the effect that Mr. Khudyan acquired the 33/1 Mashtots Property (through Mr. Telpyan), as well as the evidence that at least USD 400,000 of the USD 520,000 purchase price for that property came from Mr. Mehrabi's account.[498]

421.  Accordingly, the Tribunal finds that the Claimants have failed to discharge their burden of proof in relation to the factual allegation that Mr. Khudyan acquired the assets in his capacity as CEO of Arin US.

422.  Second, the Tribunal also is not persuaded that Arin US indirectly controls Arin Armenia via Arin US's CEO Mr. Khudyan and, as a result, indirectly controlled the immovable property at 33/1 and 33A Mashtots Avenue in Yerevan.

423.  The Tribunal notes that:

-    Mr. Khudyan is the sole shareholder and owner of Arin US;

-    As of November 16, 2007, Mr. Khudyan was the sole owner of the 61.1% shareholding in Arin Armenia; and

-    As of November 16, 2007, until the transfer of its assets pursuant to the liquidation order on July 9, 2012, Arin Armenia alone held the legal title to the 33/1 and 33A Mashtots Properties in respect of which Arin US is seeking legal protection.

424.  The Tribunal notes that the Claimants do not argue that Arin US at any point in time owned any of the real estate or shares in Arin Armenia. Rather, the Claimants contend that Arin US had indirect control over the investment through its "*officer*," Mr. Khudyan, relying on the decision of the tribunal in *S.D. Myers v. Canada* to establish control.

---

[497]    Arin Capital & Investment, Income Tax Return, 2003 (Exhibit C-0137).
[498]    Tr., Day 2, 348:4-9.

425.    The Respondent challenges the authority of the *S.D. Myers* decision because the tribunal in that case failed to perform any real legal analysis to establish control. The Respondent insists that control can only be established if the purported investor has a legal right by means of which it can influence the business decisions regarding the purported investment.

426.    Unlike the tribunal in *S.D. Myers v. Canada*, which found on general policy grounds that SDMI, through its CEO (Mr. Meyers), was the "*authoritative voice*" of Meyers Canada and therefore accepted that SDMI controlled Meyers Canada, this Tribunal is of the view that the question as to whether an investor has direct or indirect control must first and foremost be assessed on the basis of the law governing the corporate entity that is alleged to be controlled, which, in this case, is Armenian law for Arin Armenia.

427.    Although the Claimants allege that Arin US controls the 61.1% shareholding in Arin Armenia (which holds the 33/1 and 33A Mashtots Properties), they did not make any submissions to establish the alleged control over Arin Armenia by reference to the applicable Armenian corporate law.

428.    In addition, the Tribunal considers that there also is no evidence of any legal powers that Arin US would have over Arin Armenia. Arin US holds no legal right or corporate position through which it can exercise control over any of the assets that Mr. Khudyan personally owns directly (i.e., the 61.1% shareholding in Arin Armenia and the contractual entitlement to sales proceeds under the Shareholders Agreement) or indirectly (i.e., the immovable properties located at 33/1 and 33A Mashtots Avenue). It is Mr. Khudyan who controls Arin US, not *vice versa*.

429.    Further, even if control could be exercised in fact without any legal entitlement to direct the company's affairs, which the Claimants have not shown, such control would not be established here as the Claimants have adduced no evidence showing that Arin US in fact exercised control over Arin Armenia. The only person who exercised control was Mr. Khudyan, and the Claimants have not shown that he did so in his capacity as CEO of Arin US.

430.    Third, the Claimants seek to establish indirect control through "*its funding of Mr. Khudyan's purchase of the property*," relying on *Standard Chartered v. Tanzania*.[499] However, that submission does not advance the Claimants' case either because unlike the claimant in the *Standard Chartered* case, Arin US never held any equity in Arin Armenia. As a result, the question as to whether mere ownership is sufficient, does not even arise.

431.    Fourth and finally, Arin US claims to be entitled to receivables owed by Arin Armenia in connection with an amount of USD 3,481,000 allegedly provided by Arin US for the development of the 33/1 and 33A Mashtots Properties. While the Tribunal recognizes that pursuant to Article 2 of the Shareholders Agreement, which Mr. Khudyan in his personal capacity made with Messrs. Mangasaryan and Ghalumyan, he is entitled to "*the value estimated at the time of the share investment from the company and the other Parties - $ 3,481,000*,"[500] the Tribunal finds that there is no evidence that Arin US would have any right of its own to receivables in the amount of USD 3,481,000, allegedly owed by Arin Armenia.[501]

432.    In view of the facts that:

-       Arin US does not own or control any of the shares in Arin Armenia, either directly or indirectly;

-       Arin US does not own or control the 33/1 and 33A Mashtots Properties, either directly or indirectly; and

-       Arin US has not established any entitlement to receivables from Arin Armenia in the amount of USD 3,481,000;

---

[499]    Claimants' Memorial, ¶150, fn 208.

[500]    Shareholders Agreement (Exhibit C-0025), Article 2.

[501]    For the sake of completeness, the Tribunal also notes that of the initial USD 3,481,000 entitlement, Mr. Khudyan already received an amount of USD 1,500,000 from Arin Armenia (paid out of the HSBC loan it obtained in October 2007).

the Tribunal concludes that Arin US did not own or control any asset akin to those listed in Article I(1) of the BIT and therefore did not have a qualifying investment that is protected under Article I(1) of the BIT and Article 25(1) of the ICSID Convention.

433.    In conclusion, for the reasons set out above, Arin US's claims are dismissed for lack of jurisdiction *ratione materiae* because it has failed to establish that it had any direct or indirect ownership of, or control over, any of the assets that are alleged to comprise its investment. Arin US simply holds no rights or entitlements over any assets in Armenia that could qualify as investments under the ICSID Convention and the BIT. Therefore, the Tribunal declines jurisdiction over Arin US's claims.

434.    In view of this finding, and also in view of the Tribunal's lack of jurisdiction *ratione personae* over Mr. Khudyan, the Tribunal can dispense with the examination of the remaining objections *ratione materiae* to the Tribunal's jurisdiction that were raised by Armenia (including the objections to the effect that the Claimants have not made a lawful investment), as a determination thereof would not change the outcome of this arbitration.

## VI.    COSTS

### A.    THE CLAIMANTS' COST SUBMISSIONS

435.    The Claimants request that the Tribunal issue an award "[o]*rdering Respondent to pay Claimants' costs in these arbitration proceedings in an amount to be specified later together with interest thereon, including all attorneys' fees and expenses in connection with this proceeding, and as between the parties, alone to bear responsibility for compensating the Arbitral Tribunal and ICSID Secretariat*."[502]

436.    In their Statement of Costs submitted on July 6, 2021, the Claimants request the Tribunal to award an amount of USD 2,951,643.39, comprising four categories of costs:[503]

---

[502]    Claimants' Reply, ¶613.5. *See also* Request for Arbitration, ¶70; Claimants' Memorial, ¶289.3.
[503]    Claimants' Statement of Costs, ¶¶1-2.

- the professional fees incurred by the law firm Hughes Hubbard & Reed for an amount of USD 2,305,157;

- the expenses incurred in connection with the work performed by Hughes Hubbard & Reed for an amount of USD 121,467.39;

- the professional fees and expenses incurred by the Claimants' counsel and experts based in Armenia for an amount of USD 146,540; and

- the expenses incurred by their counsel, experts and witnesses based in Armenia in relation to the Hearing held in Washington D.C. for an amount of USD 18,479.

437. With respect to the first category, the Claimants state that Hughes Hubbard & Reed's fees are composed of a capped fee of USD 1,735,000, a success fee of USD 530,000, as well as an amount of USD 40,157 for the time spent by their attorneys preparing for and participating in settlement negotiations with the Respondent in Armenia.[504] According to the Claimants, the success fee is only due if the Tribunal's award is in favor of either of the Claimants.[505] The Claimants argue that other tribunals have included success fees when awarding attorneys' fees.[506] The Claimants also state that the actual amount of USD 2,576,323 incurred by Hughes Hubbard & Reed exceeds the capped and success fees.[507]

438. The second category comprises the expenses incurred by Hughes Hubbard & Reed in the amount of USD 121,467.39 on travel expenses and meals (airline travel, cab services and meals), document-related expenses (duplicating services, graphic preparation, analytical proof-reading and shipping), translation services as well as in legal research and database charges.[508]

---

[504] Claimants' Statement of Costs, ¶3.
[505] Claimants' Statement of Costs, ¶3, fn 2.
[506] *See* Claimants' Statement of Costs, ¶3, fn 2 and the cases cited therein.
[507] Claimants' Statement of Costs, ¶4.
[508] Claimants' Statement of Costs, Section II.

439.    Moreover, the Claimants state that the amount of fees and expenses incurred by their Armenian counsel and expert witnesses is USD 146,500, consisting of USD 130,000 for EEL Partnership's legal fees, USD 4,000 for the fees of the expert Ocenka Ltd., and USD 12,500 for Mr. Ghambaryan's fees.[509]

440.    Finally, the fourth category totalling USD 18,479, consists of Hearing expenses, including the travel and accommodation fees of the team members of ELL Partnership, the expert Ocenka Ltd., Mr. Ghambaryan, Mr. Hovhannisyan, and Mr. Baghdasaryan.[510]

## B.    THE RESPONDENT'S COST SUBMISSIONS

441.    The Respondent requests that the Tribunal render an award "[d]*ismissing Claimants' request that Respondent pay Claimants' costs*," and "[o]*rdering Claimants to pay Respondent's costs in these arbitration proceedings in an amount to be specified, including all attorneys' fees and expenses in connection with these proceedings, and all fees and expenses of the Tribunal and the ICSID Secretariat, together with interest thereon*."[511]

442.    From its Statement of Costs submitted on July 6, 2021, it appears that the Respondent incurred fees and expenses in relation to these arbitration proceedings for a total amount of USD 1,650,412:[512]

-    the ICSID payments in the amount of USD 335,000;[513]

-    the lawyers' fees in the amount of USD 1,232,616;[514]

-    the lawyers' costs and expenses in the amount of USD 52,847;[515] and

---

[509]    Claimants' Statement of Costs, Section III.

[510]    Claimants' Statement of Costs, ¶5.

[511]    Respondent's Counter-Memorial, ¶¶1007(c)-(d). *See also* Respondent's Counter-Memorial, ¶44; Respondent's Rejoinder, ¶32, p. 343; Respondent's PHB, ¶122.

[512]    Respondent's Statement of Costs, ¶2.

[513]    Respondent's Statement of Costs, ¶3.

[514]    Respondent's Statement of Costs, ¶4.

[515]    Respondent's Statement of Costs, ¶5.

-       the Respondent's costs and fees in the amount of USD 29,949.[516]

443.    Among the Respondent's lawyers' fees of USD 1,232,616, USD 850,000 were paid to CMS and Concern Dialog, USD 17,616 to Concern Dialog, and USD 365,000 to Steptoe & Johnson, Ms. Elitza Popova-Talty and Prof. Frederic Sourgens.[517]

444.    In addition, the Respondent's lawyers' costs and expenses of USD 52,847 include CMS's costs and expenses of USD 25,000, Concern Dialog's costs and expenses of USD 14,586 and an amount of USD 13,261 charged by Steptoe & Johnson, Ms. Elitza Popova-Talty and Prof. Frederic Sourgens.[518]

445.    The Respondent further states that its costs and fees of USD 29,949 consist of USD 11,449 as part of its expert fees and USD 18,500 for its travel costs and expenses.[519]

## C.    THE TRIBUNAL'S DECISION ON COSTS

446.    Article 61(2) of the ICSID Convention provides:

> *In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.*

447.    This provision gives the Tribunal discretion to allocate all costs of the arbitration, including attorney's fees and other costs, between the Parties as it deems appropriate.

448.    Having failed to establish jurisdiction, the Claimants have lost this arbitration. Accordingly, the Tribunal finds that the Claimants must bear the arbitration costs in full, and make a contribution towards the legal fees and other expenses that the Respondent has incurred to defend itself against their claims in this arbitration.

---

[516]    Respondent's Statement of Costs, ¶6.
[517]    Respondent's Statement of Costs, ¶4.
[518]    Respondent's Statement of Costs, ¶5.
[519]    Respondent's Statement of Costs, ¶6.

Considering the amount of legal fees and other expenses incurred by the Respondent and the fact that the Claimants, who lost the arbitration, spent almost double on legal fees and other expenses compared to the Respondent, the Tribunal accepts that the Respondent's legal fees and other expenses have been reasonably incurred. The Tribunal considers it appropriate to award only a portion of the Respondent's legal fees and other expenses because its decision to change counsel just before the Rejoinder was due inevitably led to a degree of duplication of costs and resulted in a different emphasis in the Respondent's pleaded case. In the circumstances of this case, the Tribunal finds it reasonable that the Claimants contribute USD 400,000 towards the Respondent's legal fees and expenses. The Respondent's claim for interest on legal fees and expenses is unsubstantiated in that it failed to indicate the legal basis for its claim, the applicable interest rate and the period over which interest is claimed. Therefore, the Tribunal does not award the Respondent's claim for interest.

449. The costs of the arbitration, including the fees and expenses of the Tribunal, ICSID's administrative fees and direct expenses, amount to (in USD):

| | |
|---|---|
| Arbitrators' fees and expenses | |
| Melanie Van Leeuwen | 229,925.57 |
| Ank Santens | 85,715.97 |
| Zachary Douglas | 83,640.59 |
| ICSID's administrative fees | 210,000.00 |
| Direct expenses | 65,650.54 |
| **Total** | **674,932.67** |

450. The above costs have been paid out of the advances made by the Parties in equal parts.[520] As a result, each Party's share of the costs of arbitration amounts to USD 337,466.34.

451. Accordingly, the Tribunal orders the Claimants to pay to the Respondent USD 337,466.34 for the expended portion of the Respondent's advances to ICSID and

---

[520] The remaining balance will be reimbursed to the parties in proportion to the payments that they advanced to ICSID.

USD 400,000 to cover a reasonable proportion of the Respondent's legal fees and expenses.

## VII.  DECISION

452.  For the reasons set forth above, the Tribunal:

(1)  FINDS that it lacks jurisdiction *ratione personae* over the first Claimant, Mr. Edmond Khudyan;

(2)  FINDS that it has jurisdiction *ratione personae* over the second Claimant, Arin Capital & Investment Corp;

(3)  FINDS that it lacks jurisdiction *ratione materiae* over the alleged investments of the second Claimant, Arin Capital & Investment Corp;

(4)  DISMISSES the Claimants' claims for lack of jurisdiction; and

(5)  ORDERS the Claimants to pay the Respondent the sum of USD 337,466.34 for the expended portion of the Respondent's advances to ICSID and USD 400,000 towards the Respondent's legal fees and expenses.

(6)  DENIES all other requests for relief.

_____
Ms. Ank Santens
Arbitrator

Date:    December 10, 2021

_____
Prof. Zachary Douglas QC
Arbitrator

Date:    December 10, 2021

_____
Ms. Melanie Van Leeuwen
President of the Tribunal

Date:    December 10, 2021